# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No. 08-242 (PLF)** |
| **v.** | : | |
| | : | |
| **GREGORY JOEL SITZMANN,** | : | |
| **Defendant.** | : | |
| _____ | : | |

## GOVERNMENT'S THIRD AMENDED BILL OF PARTICULARS AS TO (1) THE NAMES OF CO-CONSPIRATORS, (2) THE APPROXIMATE DATES AND LOCATIONS OF MEETINGS OR CONVERSATIONS DEFENDANT PARTICIPATED IN WITH CO-CONSPIRATORS, AND (3) OVERT ACTS IN WHICH DEFENDANT PARTICIPATED IN FURTHERANCE OF THE CONSPIRACY

The United States, by and through its attorney, the United States Attorney for the District of Columbia, as required by the Court, hereby files the following Third Amended Bill of Particulars as to (1) the names of co-conspirators, (2) the approximate dates and locations of meetings or conversations defendant participated in with co-conspirators, and (3) overt acts in which defendant participated in furtherance of the conspiracy. Because defendant's meetings and conversations with co-conspirators are related to and intertwined with overt acts in which defendant participated in furtherance of the conspiracy, they will be provided together in Section II, below.

I.     NAMES OF CO-CONSPIRATORS KNOWN TO THE UNITED STATES:

Names of defendant's co-conspirators can be found in the body of ths document and in the discovery provided by the United States. They include the following:

George Jones

Billy Long

James Fields

Maritza Neila Wills Fontecha

Gary McDaniels

Rebecca Thompson

Ernestine Fields

Alex Mesa

James Nash

Gary Paulson

Andrew Gerst

Roman Torres

Deborah Dreckman

Julian Bermudez Arias

Erling Ingvaldsen

Canadian Hells Angeles

Kevin Rosa

Jeff Rahm

John Dwyer

Robert Streeter

Jerry Harvey

Pappy

Brian Hill

Norm

Jully

Robert Barnaby

Robert Campeau

John Sager


II.  APPROXIMATE DATES AND LOCATIONS OF MEETINGS OR
CONVERSATIONS DEFENDANT PARTICIPATED IN WITH CO-CONSPIRATORS  AND
OVERT ACTS IN WHICH DEFENDANT PARTICIPATED IN FURTHERANCE        OF
THE CONSPIRACY

The approximate dates and locations of meetings or conversations defendant participated

with co-conspirators and the overt acts in which defendant participated in furtherance of the

conspiracy can be found in the discovery provided by the United States and from witnesses

known to the defendant and to be called by the United States.  They include the following:

1.      On numerous occasions beginning no later than 1990 until at least 2004,

defendant met with and talked to co-conspirators, both known and unknown to the United States,

including George Jones, Gary Paulson, James Fields, Billy Long, Maritza Neila Wills Fontecha,

Andrew Gerst, Gary McDaniels, Jerry Harvey, John Sager, Rebecca Thompson, James Nash,

Ernestine Fields, Alex Mesa, Roman Torres, Deborah Dreckman, Erling Ingvaldsen, members of

biker gangs, including the Canadian Hells Angeles, Kevin Rosa, Jeff Rahm, John Dwyer, Robert

Campeau, Brian Hill, Norm, and Julian Bermudez Arias, about smuggling illegal narcotics,

including cocaine and marijuana, and drug proceeds, to, from and within Colombia, Mexico, the

United States, Canada and Europe.

2.      On numerous occasions beginning no later than 1990, defendant met and talked

with Gary Paulson while both were inmates at the Miami Correctional Center, Miami, Florida

and they agreed to traffic in illegal narcotics, including cocaine, after defendant's release.

3.      On numerous occasions beginning no later than 1990, defendant talked with Jerry Harvey about illegal drug trafficking while both were inmates at the Miami Correctional Center, Miami, Florida.

4.      While at the Miami Correctional Center, Miami, Florida, defendant asked Jerry Harvey to look into a King Air airplane that defendant was contemplating using for drug smuggling.  Harvey advised defendant that the plane was an undercover government plane.

5.      On numerous occasions beginning no later than 1990, defendant talked with John Sager about illegal drug trafficking while both were inmates at the Miami Correctional Center, Miami, Florida.  Defendant and Sager discussed what types of airplanes would be best for drug trafficking and they talked about smuggling cocaine into foreign countries, including Canada and countries in Europe, where drug laws were more lenient than in the United States.

6.      On numerous occasions throughout the 1990s, defendant met with Jerry Harvey in Florida and Mexico and discussed the use of airplanes for smuggling narcotics, including marijuana and cocaine, into and through the United States, Nicaragua, Canada and elsewhere.

7.      On numerous occasions throughout the 1990s, defendant met with John Sager in Florida and discussed the use of airplanes for smuggling narcotics, including marijuana and cocaine, into and through the United States, Canada and elsewhere.  Defendant discussed smuggling cocaine through Mexico and into the United States and Canada.  Defendant discussed the use of nurseries and seafood businesses to launder illegal drug proceeds.

8.      In approximately 1990, defendant met with Jerry Harvey in Florida and showed Harvey two bags containing approximately 100 pounds of marijuana in the trunk of defendant's

automobile . Defendant complained to Harvey that the quality of the marijuana was not high and defendant was having difficulty selling the marijuana.

9. Throughout the 1990s, defendant met with Jerry Harvey in Florida to discuss defendant's drug trafficking and money laundering activity.

10. In or about the mid-1990s, defendant met with Jerry Harvey in Florida and told Harvey that defendant was working with Mexican and Colombian drug traffickers, that defendant was moving drug proceeds from cities throughout the United States and Canada and into Mexico and that he was utilizing secret compartments in automobiles.

11. From approximately 1994 and up to approximately 2002, defendant recruited Andrew Gerst in Las Vegas, Nevada and Florida approximately 6-10 times a year to smuggle illegal narcotics, including cocaine and marijuana, and drug proceeds.

12. From approximately 1994 and up to approximately 2002, defendant would call and meet with Andrew Gerst prior to Gerst traveling for defendant to traffic in illegal drugs and defendant would arrange for Gerst to travel to places such as Texas, Florida, Kentucky, Chicago, Mexico and Canada for purposes of Gerst smuggling cocaine, marijuana and large sums of cash and drug proceeds.

13. Defendant supplied Gerst with leather luggage containing secret compartments for purposes of smuggling drugs and drug proceeds and would pick up the drug proceeds from Gerst in Las Vegas after Gerst returned from his trips for defendant.

14. During the mid-1990s, defendant introduced two of his drug smuggling drivers, Jim and Andy, to Jerry Harvey in Florida.

15. During the mid- to late-1990s, defendant laundered drug proceeds through

5

restaurants owned by Andrew Gerst and Rebecca Thompson and real estate owned by defendant in Las Vegas, Nevada.

16.     In or about August 1996, defendant called Andrew Gerst in Las Vegas and asked him to travel to Texas to pick up approximately 250 pounds of marijuana for defendant.

17.     After Andrew Gerst was arrested in Rockwall, Texas on August 23, 1996 carrying approximately 250 pounds of marijuana in his automobile for the defendant, defendant arranged for Gerst's defense attorney in Texas and during the 1990s and early 2000s defendant furnished financial support to Gerst's family in Las Vegas and Florida.

18.     From approximately 1994 and up to approximately May 2002, defendant recruited James Fields in Las Vegas, Nevada approximately 5 times a year to smuggle kilogram quantities of cocaine and drug proceeds.

19.     From the period 1994 and up to approximately May 2002, defendant arranged for and funded Fields's travel from Las Vegas to places such as Florida, Kentucky, Chicago, Mexico, Colombia, Canada and Europe for purposes of Fields smuggling cocaine and bundles of drug proceeds for defendant.

20.     In approximately 1999, defendant supplied Fields with leather luggage containing secret compartments for purposes of smuggling drugs and drug proceeds.

21.     After Fields returned from the trips referred to above that were taken on defendant's behalf, defendant received the drug proceeds from Fields and defendant paid Fields tens of thousands of dollars for each smuggling trip he took for defendant.

22.     On or about June 19, 1994, defendant arrived at LAX International Airport on an international flight.

23.     On or about September 10, 1994, defendant arrived at Miami International Airport on an international flight.

24.     On or about November 22, 1994, defendant arrived at Miami International Airport on an international flight.

25.     In approximately 1994-1995, defendant and Gary Paulson talked on the telephone and defendant told Paulson he wanted to smuggle cocaine into Canada and asked to be introduced to Paulson's connection in Canada who would acquire cocaine on behalf of the Canadian Hells Angels.

26.     In approximately 1994, defendant approached John Sager in Florida and inquired about a Velocity aircraft (U.S. Reg. No. N 130WW) belonging to Sager that had been seized by law enforcement officials in Florida.  Sager and defendant talked about the condition of the airplane and the suitability of the aircraft for drug smuggling, particularly because it was made of a composite material that could not be easily detected by radar.  They discussed that it could carry approximately 150 kilograms of cocaine, as well as the expected flight range of the aircraft, particularly with additional fuel bladders.

27.     In or about April 1995, defendant asked Jerry Harvey to attend a Sheriff's auction with him in Palm Beach County, Florida to inspect the Velocity airplane defendant intended to acquire for drug smuggling purposes.

28.     In or about April 1995, defendant told Jerry Harvey that defendant wanted to acquire the Velocity airplane because it was a composite airplane and less likely to be detected by radar in the United States when loaded with cocaine.

29.     In or about April 1995, defendant met Jerry Harvey and another individual at the

7

Sheriff's auction in Palm Beach County, Florida and defendant acquired the Velocity airplane (N 130WW) for approximately $30,000 on or about April 29, 1995.

30.     By a Promissory Note and Security Agreement dated May 1, 1995, defendant placed a security interest on the Velocity airplane.

31.     In or about April or May 1995, defendant had the Velocity airplane taken to an airplane overhaul shop in Fort Lauderdale, Florida.

32.     In approximately late 1995, defendant traveled to Montreal, Canada and met with Robert Campeau for purposes of arranging for the distribution of cocaine to the Canadian Hells Angels.

33.     On or about September 23, 1995, defendant preclears U.S. Customs in Montreal, Canada.

34.     On or about October 7, 1995, defendant preclears U.S. Customs in Montreal, Canada.

35.     On or about October 17, 1995, defendant arrives at LAX International Airport in Los Angeles, California from Bogota, Colombia.

36.     By letter dated October 30, 1995, defendant requested that the FAA de-register the Velocity airplane on the grounds that he intended to export the airplane to Mexico.

37.     On or about November 29, 1995, defendant arrived at Newark, New Jersey from Frankfurt, Germany.

38.     On or about December 2, 1995, defendant preclears Customs in Montreal, Canada.

39.     In approximately late 1995, defendant called Robert Campeau in Canada and told

him he was mailing marijuana to Campeau in a hollowed-out book and defendant proceeded to mail Campeau a hollowed-out book.

40.     In approximately late 1995, defendant called Robert Campeau to see if he had received the marijuana.

41.     On or about December 27, 1995, defendant sent a letter to the FAA asking that the Velocity airplane (N 130WW) be re-registered in the United States.

42.     On at least five occasions, from 1995 through approximately 1999, defendant talked to and met with co-conspirators George Jones, James Fields, Robert Campeau and representatives of the Canadian Hells Angeles in Canada and defendant supplied the Canadian Hells Angeles with kilogram quantities of cocaine that defendant and his co-conspirators brought through the United States and into Canada.

43.     On several occasions from 1995 through approximately 1999, defendant paid money to Paulson, or to people on his behalf, as a commission for Paulson's introduction to drug business that defendant was conducting with the Canadian Hells Angeles.

44.     On or about February 4, 1996, defendant arrived in Miami, Florida from Montego Bay, Jamaica.

45.     On or about February 21, 1996, defendant sent the FAA a copy of a Bill of Sale reflecting that the Velocity airplane (N 130WW) was sold to Diana Alejandra Solano Velez, Viaducto #220, Mexico City, Mexico.  Defendant also submitted a letter to the FAA from Diana Alejandra Solano Velez requesting that the FAA de-register N 130WW so she could register the aircraft in Mexico.

46.     Later in the 1990s, defendant told Jerry Harvey in Florida that he housed the

Velocity airplane in Mexico and that it was seized in Colombia during a drug smuggling operation. Defendant told Harvey that defendant had used the plane to smuggle cocaine out of Colombia for Mexican drug traffickers. The Mexicans then offered to buy the plane from the defendant. The Mexicans made two offers to acquire the plane. They would pay $100,000 to the defendant for the plane or they would pay him $75,000 for each of two drug smuggling trips and then own the plane at the completion of the second trip. Defendant told Harvey that he accepted the second offer. The defendant also told Harvey that during the second drug smuggling trip with the Velocity, the pilot got lost trying to find the correct landing strip in Colombia, he ran low on fuel and landed in Cartagena, Colombia without a flight plan. Defendant stated to Harvey that Colombian customs officials seized the plane for illegal entry into Colombia. Defendant went to the Colombian authorities and attempted to get the plane released, claiming that the plane was stolen in Mexico.

47.     On or about February 27, 1996, defendant arrived in Miami, Florida from Montego Bay, Jamaica.

48.     On or about March 6, 1996, defendant arrived at LAX International Airport in Los Angeles, California.

49.     On or about June 15, 1996, defendant traveled from LAX International Airport in Los Angeles, California to Guadalajara, Mexico.

50.     On or about October 14, 1996, defendant arrived at San Diego International Airport on Aeromexico Airlines.

51.     On several occasions in 1997-1998, defendant met with and talked to Gary Paulson in Florida about them smuggling hundreds of kilograms of Colombian cocaine through

10

Mexico and the United States and into Canada to be supplied to the Canadian Hells Angels.

52.     During the period 1997-1998, defendant met with Gary Paulson and others in Florida about flying hundreds of kilograms of cocaine from Colombia into the United States through Louisiana and also airdropping hundreds of kilograms of Colombian cocaine into Nova Scotia to be supplied to the Canadian Hells Angels.

53.     On November 18, 1997, a 1993 Dodge with Nevada Tag 119HDY, registered to the defendant, crossed from Canada to Champlain, New York.

54.     On or about December 3, 1997, defendant arrived at O'Hare International Airport in Chicago, Illinois from Mexico.

55.     On or about December 15, 1997, defendant was searched entering the United States in Laredo, Texas from Mexico driving his 1993 Dodge with Nevada Tag 119HDY that contained at least 2 false compartments in the vehicle and while possessing a birth certificate in the name of Nicolas Sitzman.

56.     On or about February 6, 1998, defendant arrived in Miami International Airport from Barranquilla, Colombia.

57.     On or about February 19, 1998, defendant arrived at San Antonio International Airport on an international flight.

58.     On or about March 27, 1998, defendant arrived at Houston International Airport from Guadalajara, Mexico.

59.     On or about May 19, 1998, defendant arrived at Houston International Airport from Guadalajara, Mexico.

60.     On or about June 11, 1998, defendant applied for and was issued a Mexican non-

immigrant visa book at Puerto Vallarta, Mexico.

61.     In approximately early 1998, defendant met with Gary Paulson in Florida to arrange to supply large quantities of high quality marijuana to potential markets.

62.     In approximately early 1998, defendant supplied a sample of high quality marijuana to Paulson in Florida.

63.     In approximately the summer or fall of 1998, defendant distributed approximately 400 pounds of marijuana to a connection in Indiana.

64.     After the distribution of the marijuana, defendant paid money to Paulson.

65.     In or about the summer of 1998, in Kentucky, defendant asked George Jones to work in defendant's drug trafficking business and to help launder drug proceeds.

66.     In or about the summer of 1998, defendant had Jones drive to Chicago, Illinois where defendant met with Jones and placed luggage containing drug proceeds into the automobile.

67.     In or about the summer of 1998, defendant had Jones drive the automobile containing drug proceeds to Laredo, Texas where defendant met Jones and withdrew the cash from the automobile from which defendant paid Jones for his work on this transaction.

68.     On or about August 12, 1998, defendant traveled from Guadalajara to Mexico City and from Mexico City to Miami.

69.     On or about September 3, 1998, defendant opened a Bank of America account.

70.     On or about September 9, 1998, defendant applied for and received a 1-year non-immigrant visa from Puerto Vallarta, Mexico.

71.     On or about September 9, 1998, defendant arrived at LAX International Airport in

12

Los Angeles, California from Mexico City.

72.     In the summer/fall of 1998, in Florida, defendant met with Paulson and arranged to have Robert Barnaby and Jully make modifications to trucks and Suburban SUVs so that multiple kilograms of cocaine and large quantities of currency could be concealed in the vehicles, including in the fuel tanks and the void under the wiper cowling.

73.     The defendant, for drug trafficking and money laundering purposes, acquired and utilized a silver 1996 Suburban titled in the name of George Jones with VIN 1GKFK16RXTJ719520, and a white 1996 Suburban with VIN 3GKGC26F2TG858037 and Iowa plate number 423FZO, on or about July 1998 in the name of DCI, Inc.

74.     During the mid- and late-1990s, defendant met with Jerry Harvey and told Harvey that he (Sitzmann) was no longer distributing marijuana, that he was distributing cocaine exclusively and that he was collecting drug proceeds in the hundred of thousands of dollars from locations throughout the United States.  Sitzmann told Harvey that Sitzmann and his co-conspirators would amass the drug proceeds in Fort Lauderdale and he and other co-conspirators would periodically take the money into Mexico by secreting the money in secret compartments of automobiles.  Sitzmann met with Harvey and a co-conspirator driver, in Fort Lauderdale, Florida, where they discussed the smuggling of drug proceeds into Mexico from the United States.  Defendant told Harvey that the driver would pick up drug money for Sitzmann and smuggle it by automobile into Mexico.

75.     In 1996-1997, defendant gave Jerry Harvey a leather bag with a secret compartment, one of many defendant told Harvey he had made.  Defendant told Harvey that he would secretly move approximately $15,000 in drug proceeds into Mexico with the use of each

13

bag.

76.     From the mid- to late-1990s, in Florida, on numerous occasions, defendant "deposited" hundreds of thousands of dollars in drug proceeds with Jerry Harvey to hold for safe keeping.  The "deposits" with Harvey were generally $100,000 to $200,000 each; the smallest was $36,000.  During this period, defendant would request "withdrawals" of some portions (generally, $50,000 to $100,000) of the drug proceeds held by Harvey.  Defendant used James Fields and Andy Gerst as money couriers.

77.     In approximately 1997, Sitzmann told Harvey that he had a body shop in Fort Lauderdale, Florida that would alter gas tanks in automobiles, particularly Suburbans, in which the cash proceeds would be placed for smuggling purposes.  Harvey and Sitzmann visited the body shop together to pick up an altered Suburban and they met with the owner of the body shop. Sitzmann described how the fuel tanks were altered.

78.     In approximately 1997, defendant told Harvey that he was using some stolen automobiles to transport the cocaine and drug proceeds.  Defendant told Harvey that one stolen Suburban was in an accident in Texas with one of his drivers and that defendant had to go to Texas to retrieve the automobile before the police discovered it was stolen and that it had drug money in the fuel tank.

79.     In the late 1990s, defendant, accompanied by Jerry Harvey, took possession of a Suburban with secret compartments from Gary Paulson in Davies, Florida.  Defendant told Harvey that Paulson was helping him in arranging for the installation of the secret compartments.

80.     In the late 1990s, approximately 1998, defendant, accompanied by Jerry Harvey, gave a bag full of cash to Gary Paulson in Ft. Lauderdale, Florida.  Defendant told Harvey that

14

Paulson was the man that set up the Canadian cocaine deals for defendant.  Defendant told

Harvey that defendant and Paulson were supplying cocaine to a motorcycle gang in Canada and

they were picking up the money and moving it back to the States.  Defendant told Harvey that the

cocaine was driven from the United States to Canada and the money was driven from Canada

back into the United States.  Defendant told Harvey that both defendant and Paulson used

fictitious identification cards when traveling to Canada.  Defendant also told Harvey that

defendant took issue with the motorcycle gang's attempt to pay for the cocaine in Canadian

dollars.

81.     On several occasions in the late 1990s, approximately 1998-1999, defendant met

with John Sager in Jupiter, Florida and asked if he wanted to get involved in the illegal drug

smuggling business with defendant.  They discussed acquiring a Piper Navajo Panther, that

would be piloted by Sager, to smuggle large quantities of cocaine through the United States and

into Canada to be distributed to a motorcycle gang.  They discussed how they would share in the

profits.  Defendant offered to give Sager $100,000-200,000 per load, but Sager stated he wanted

a fixed percentage for each load, which would consist of approximately 250 kilograms of

cocaine.

82.     After his meeting with Sager in Jupiter, Florida in 1998-1999, defendant told

Sager that he believed he was being followed and that Sager might be a government informant.

83.     The defendant, for drug trafficking and money laundering purposes, acquired and

utilized a utility truck in which the defendant installed a secret compartment under the truck bed

for purposes of smuggling large quantities of cocaine and drug proceeds.

84.     On or about September 21, 1998, defendant arrived at JFK International Airport in

New York from Mexico City.

85.     In or about September-October 1998, defendant met with and talked to Gary Paulson in New York City and gave Paulson approximately $15,000 in cash and a leather bag with a secret compartment in which to smuggle the cash into Canada.

86.     In or about the fall of 1998, defendant arranged to rent approximately 3 homes in the St. Sauveur area of Canada and at least 2 self-storage facilities in the Montreal and St. Sauveur areas for purposes of facilitating the smuggling of cocaine through the United States and into Canada for redistribution.

87.     In or about the fall of 1998 in Florida, defendant recruited Robert Campeau to work in his drug trafficking enterprise by watching over the homes in the St. Sauveur area.

88.     In or about the summer/fall of 1998 in Florida, defendant recruited George Jones to smuggle kilogram quantities of cocaine from the United States into Canada to supply biker gangs in Canada.

89.     On or about September 28, 1998, defendant traveled from Mexico City to Guadalajara.

90.     On or about September 29, 1998, defendant arrived at O'Hare International Airport in Chicago, Illinois from Mexico and purchased a ticket for October 28, 1998 from Chicago to Guadalajara.

91.     In or about September-October 1998, defendant requested that George Jones drive through the United States and into Canada in an SUV with a secret compartment in the gas tank containing approximately 20-30 kilograms of cocaine.

92.     In or about September-October 1998, defendant met George Jones in Canada and

16

removed the cocaine from the SUV and supplied a Canadian motorcycle gang.

93.     In or about September-October 1998, defendant had Jones smuggle drug proceeds from Canada into the United States that was concealed in the gas tank of the SUV.

94.     On or about October 6, 1998, defendant arrived at Houston International Airport from Guadalajara, Mexico.

95.     In or about September-October 1998, defendant arranged to have approximately 90 kilograms of Colombian cocaine brought through Mexico and the United States and into Canada, ostensibly through Detroit and into Windsor, Canada.

96.     In or about October 1998, defendant met with George Jones, James Fields, Robert Campeau and Gary Paulson in Canada where defendant had George Jones and James Fields take the approximately 90 kilograms of cocaine secreted in at least two Suburban SUVs, including in their altered fuel tanks, to St. Sauveur, Canada.

97.     In or about October 1998, defendant met with George Jones, James Fields, Gary Paulson and Robert Campeau in St. Sauveur, Canada where defendant stored the cocaine and attempted, along with Campeau and Paulson, to dry and clean kilograms of cocaine contaminated with gas or diesel.

98.     In or about October 1998, defendant distributed approximately 90 kilograms of cocaine to the Canadian Hells Angels in a series of transactions.

99.     In or about October 1998, defendant arranged to have this and other cash proceeds in the amount of approximately $3 million smuggled into the United States, through Detroit Michigan, in the Suburban SUVs and in the secret compartments of leather bags supplied by him.

100.    In or about October 1998, defendant paid a portion of the proceeds to defendant's

Colombian source of drug supply, who defendant referred to as "Pappy."

101.    During the late-1990s, defendant told John Sager that he was residing in Mexico.

102.    On several occasions in the late 1990s to early 2000s in Florida, and in approximately 1998 in Mexico City, Mexico, defendant told Jerry Harvey that defendant was residing in Mexico and had an apartment or condominium in Bogota, Colombia.

103.    In the mid to late 1990s, defendant requested that Jerry Harvey look at airplanes on defendant's behalf to determine how much cocaine the airplanes could carry and what distances they could travel.

104.    In the late 1990s, defendant told Jerry Harvey that defendant, by automobile, was moving large quantities of cocaine into Canada from the United States and removing large sums of drug proceeds out of Canada and into the United States and Mexico.

105.    In the late 1990s, defendant asked Jerry Harvey for advice on how to create off-shore bank accounts to hide his drug proceeds and to launder his drug proceeds.  Defendant also asked Harvey for advice on how to purchase airplanes with use of cash proceeds.

106.    In or about October 1998, defendant provided drug proceeds to Jerry Harvey to launder in Panama.

107.    On or about October 21, 1998, defendant had George Jones transfer title to the 1996 Suburban with VIN 1GKFK16RXTJ719520 to D.C.I. Inc., a purported company of which defendant was president.

108.    On or about October 23, 1998, defendant, as the purported president of D.C.I. Inc., wrote and sent a letter from St. Sauveur, Canada giving permission for his sister Julie Curry to sign the Application for Title for the State of Iowa for the 1996 Suburban with VIN

18

1GKFK16RXTJ719520.

109.    On or about October 28, 1998, defendant travels from Chicago to Guadalajara.

110.    On or about November 10, 1998, defendant purchased a vehicle from Paul Young Auto Mall, Laredo Texas for $18,000, acting as president of D.C.I. Inc.

111.    On or about November 18, 1998, defendant arrived at JFK International Airport from Mexico City.

112.    On or about November 19, 1998, defendant purchased an American Airlines ticket in the name of Gary Giester to fly from JFK to Montreal.

113.    On or about November 22, 1998, in Fort Lauderdale, Florida, defendant purchased tickets to fly on Continental Airlines.

114.    On or about November 27, 1998, defendant purchased an American Airlines ticket in the name of Gary Giester to fly from Dallas to Chicago and to fly on December 1, 1998, from Montreal to Chicago and then from Chicago to Dallas.

115.    In or about November 1998, defendant met with Gary Paulson in Florida and discussed a cocaine deal in which 120 kilograms of Colombian cocaine would be smuggled through Mexico and the United States and into Canada.

116.    In or about November-December 1998, defendant had the cocaine secreted in at least the two Suburban SUVs, including in their altered fuel tanks, and had George Jones and James Fields bring the cocaine to Montreal, Canada.

117.    In or about November-December 1998, defendant instructed Robert Campeau to purchase a large freezer with funds supplied by defendant. The freezer was placed in a self-storage facility in Montreal and used to store cocaine.

118.     In or about November-December 1998, defendant had the cocaine moved to a second self-storage facility in St. Sauveur, Canada.

119.     On or about December 2, 1998, defendant purchased an airline ticket and traveled from Chicago to Las Vegas on American West Airlines.

120.     On or about December 3, 1998, defendant traveled from Las Vegas to Mexico City and from Mexico City to Puerto Vallarta on American West Airlines.

121.     On or about December 8, 1998, defendant traveled from Puerto Vallarta, Mexico to Phoenix, Arizona and then on to Chicago.

122.     On or about December 10, 1998, defendant traveled from Laredo, Texas to Dallas, Texas on American Airlines.

123.     During a series of transactions in December 1998-January 1999, defendant and his co-conspirators distributed the 120 kilograms of cocaine to the Canadian Hells Angels.

124.     In or about December 1998-January 1999, defendant secreted approximately $3 million in cash proceeds of the cocaine in the Suburban SUVs and in the secret compartments of leather bags supplied by him and had the proceeds smuggled into the United States.  Defendant also smuggled other drug money into the United States from Canada that belonged to defendant's source of supply and delivered to the source of supply, "Pappy,"  in return for a commission. Defendant paid some of the proceeds to defendant's Colombian source of supply.  Defendant provided drug proceeds to Jerry Harvey to launder the money in Panama.

125.     In or about late November-December 1998, defendant asked George Jones to travel to Chicago, Illinois to pick up 20 kilograms of cocaine in Chicago on defendant's behalf and George Jones and defendant traveled to Chicago in November-December 1998 with several

hundred thousand dollars secreted in the SUV with which to purchase the cocaine.

126.     On or about December 13, 1998, defendant arrived in a taxi at the Detroit

Ambassador Bridge from Canada carrying 2 airline tickets in his possession in the name "Gary

Giester" that were purchased in cash on the same day of travel, one showed travel from New

York to Montreal on November 19, 1998, and the other showed travel from Dallas to Chicago to

Montreal on November 27, 1998, and a return to Dallas, through Chicago, on December 1, 1998.

127.     On or about December 13, 1998, at the Ambassador Bridge, defendant stated to

Customs inspectors that he was in Cleveland for 4 days and visited the Windsor Casino for a

couple of hours.  Defendant also had the birth certificate of his dead brother Nicholas Sitzman,

approximately $3,000 in cash and two ticket stubs in defendant's name, one ticket was purchased

in cash on the same day of travel, December 9, 1998, originating in Puerto Vallarta, Mexico to

Guadalajara, Mexico and returning to Puerto Vallarta on December 10, 1998, and the second

ticket was purchased in cash on the same day of travel, December 10, 1998, originating in

Laredo, Texas to Dallas and on to Detroit, with a return to Laredo on December 15, 1998.  When

defendant was confronted with the discrepancy between his statement about being in Cleveland

and his ticket stubs, defendant complained that the Custom inspectors were not picking up what

defendant was saying.

128.     On or about December 14, 1998, defendant, as president of D.C.I. Inc., had the

title to the 1996 Suburban with VIN 1GKFK16RXTJ719520 returned to the name of George

Jones.

129.     On or about December 15, 1998, defendant traveled from Detroit to Dallas and

then to Laredo on American Airlines.

130.    On or about December 18, 1998, defendant entered Puerto Vallarta, Mexico.

131.    In or about 1998-1999, in Florida the defendant secreted a large quantity of drug proceeds (approximately $1.5 million) in the utility truck with the secret compartment and had an individual drive the truck to Laredo, Texas to be picked up and driven into Mexico by others.

132.    During 1999-2000, defendant attempted to acquire and build airplanes to be used in his drug trafficking enterprise and to be sold to other drug traffickers in Colombia.  He met with and talked to Gary Paulson and Jerry Harvey about helping him in this endeavor.  Defendant used proceeds of his drug trafficking enterprise and funds from Jerry Harvey to acquire two Stallion kit planes.

133.    On or about January 19, 1999, defendant incorporated International Aircraft Fabricators in Florida to purchase the Stallions.  Defendant listed Jerry Harvey as an officer.

134.    In or about 1999, defendant requested that Robert Streeter carry a briefcase full of money, which defendant provided, to Panama and give it to another individual at a predetermined hotel.

135.    On or about January 25, 1999, defendant arrived at LAX from Puerto Vallarta, Mexico.

136.    Within days or weeks of completing the approximately 120-kilogram cocaine deal, defendant talked to Paulson in Florida about another approximately 120-kilogram cocaine deal that would be conducted like the previous deal.  In or about January-February 1999, defendant secreted the cocaine in at least two Suburban SUVs, including in their altered fuel tanks, and had the cocaine brought through the United States and into Montreal, Canada. Defendant distributed the 120 kilograms of cocaine to the Canadian Hells Angels.  Defendant

secreted approximately $3 million in cash proceeds from the cocaine transaction in the Suburban SUVs and in the secret compartment of leather bags supplied by him and had the proceeds smuggled into the United States.  Defendant paid some of the drug proceeds to defendant's Colombian source of supply who defendant referred to as "Pappy."   Defendant also smuggled other drug money into the United States from Canada that belonged to defendant's source of supply and delivered to the source of supply in return for a commission. Defendant provided drug proceeds to Jerry Harvey to launder the money in Panama.

137.    On or about February 3, 1999, defendant traveled from Mexico City, Mexico to Miami International Airport.

138.    On or about February 6, 1999, defendant traveled from Mexico City to Miami International Airport.

139.    On or about February 24, 1999, defendant entered Mexico.

140.    On or about March 6, 1999, defendant entered Mexico.

141.    On or about March 10, 1999, defendant traveled from Mexico City to Miami International Airport.

142.    On or about March 11, 1999, defendant entered Mexico.

143.    On or about March 23, 1999, defendant traveled from Mexico City to JFK International Airport.

144.    On or about April 2, 1999, defendant arrived at Miami International Airport.

145.    On or about April 20, 1999, defendant traveled from Cartagena, Colombia to Miami International Airport.

146.    On or about April 26, 1999, defendant filed a Currency Monetary Instrument

Report ("CMIR") for $29,000.

147.    On or about April 27, 1999, defendant titled the white Suburban with VIN 3GKGC26F2TG858037 and Iowa plate number 423FZO in the names of DCI Inc., and Gregory Sitzman.

148.    On or about May 9, 1999, defendant filed a CMIR for $22,000 while traveling from Bucerias, Mexico to Miami.

149.    On or about May 17, 1999, defendant filed a CMIR for $22,000 while traveling from Puerto Vallarta, Mexico to San Diego, California.

150.    On or about May 22, 1999, defendant filed a CMIR for $12,500 while traveling from Bucerias, Mexico to Houston, Texas.

151.    On or about June 10, 1999, defendant filed a CMIR for $14,000 while traveling from Nogales, Mexico to Nogales, Arizona.

152.    In or about June 1999, defendant had James Fields travel to Montreal, Canada for purposes of smuggling cocaine and laundering cash proceeds.

153.    On or about June 7, 1999, James Fields traveled from Mexico to LAX on behalf of defendant.

154.    On or about June 14, 1999, defendant acquired a Stallion airplane.

155.    In approximately June 1999, defendant asked Jerry Harvey in Fort Lauderdale, Florida to travel to Mexico City, Mexico to inspect an airplane in contemplation of defendant acquiring the airplane for purposes of smuggling 500-kilogram loads of cocaine from Colombia to Nicaragua and drug proceeds back to Colombia.

156.    In approximately June 1999, defendant told Jerry Harvey in Fort Lauderdale,

24

Florida that defendant had made the needed arrangements for the smuggling operation into/through Nicaragua, including with the Nicaraguan Air Force, air traffic controllers, and customs.

157.    On or about June 18, 1999, defendant and Jerry Harvey inspected a 690 Commander airplane in Mexico City, Mexico to determine whether the airplane was appropriate for defendant to use in an operation to smuggle hundreds of kilograms of cocaine from Colombia to Nicaragua.  Defendant and Harvey viewed the airplane, which was in disrepair, and they discussed the preferability of using a Piper Navajo Panther for smuggling large quantities of cocaine.  Defendant requested that Harvey be part of the drug smuggling operation.

158.    On or about June 19, 1999, defendant traveled from Mexico City to Miami.

159.    In or about June 1999, defendant met with Jerry Harvey at Fort Lauderdale Executive Airport and requested that Harvey take $500,000 in cash drug proceeds from defendant and launder the money so defendant could use it to purchase a Piper Navajo Panther (N97CK) for use in defendant's cocaine smuggling enterprise.

160.    In or about June 1999, defendant provided Jerry Harvey in Fort Lauderdale, Florida with drug proceeds of approximately $500,000 in U.S. Currency (in 2-3 payments) that defendant wanted to launder and deposit into a bank so defendant could buy the Piper Navajo Panther (N97CK) for use in his cocaine smuggling enterprise.

161.    On or about July 4, 1999, defendant filed a CMIR for $21,200 inbound at Miami International Airport from Mexico City.

162.    On or about July 7, 1999, defendant had Jerry Harvey wire approximately $500,000 from a European bank to BAC International Bank-Florida and then to an account in the

name of Bangal (Panama) S.A. at BAC International Bank-Panama.

163.     On or about July 8, 1999, defendant ordered a title search on Piper Navajo Panther

(N97CK) from AIC Title and purchased Nations Bank Personal Money Order, Number 0216465,

in the amount of $500.

164.     On or about July 19, 1999, defendant had approximately $205,000 wired from

Bangal's account in BAC International Bank-Panama to AIC Title Service for the purchase of the

Piper Navajo Panther (N97CK) and instructed that upon defendant's verbal direction, AIC Title

Service would dispense $187,000 to the seller of the Navajo N97CK and the balance of the

$205,000 to defendant and that defendant would direct in what name to register the aircraft.

165.     On or about July 20, 1999, James Fields traveled internationally into Phoenix on

behalf of defendant.

166.     On or about July 23, 1999, defendant received a check in the amount of $18,000

from AIC Title's Nations Bank account.

167.     On or about August 4, 1999, defendant entered Mexico.

168.     On or about August 12, 1999, defendant filed an FAA Bill of Sale showing

defendant purchased the Piper Navajo Panther (N97CK) from Clearwater Aircraft.

169.     On or about August 21, 1999, defendant applied for a Bank of America credit card

and listed James Fields as an authorized user of the card.

170.     On or about September 8, 1999, defendant applied for and was issued a 1-year

non-immigrant visa out of Puerto Vallarta, Mexico.

171.     On or about September 22, 1999, defendant traveled from Bogota to Miami

International Airport.

172.    On or about October 4, 1999, defendant had Robert Streeter incorporate Aero-Tec Sales of Florida and defendant is later listed as president.

173.    On or about October 8, 1999, defendant traveled from Mexico City to Miami International Airport.

174.    On or about November 23, 1999, defendant transferred title to the white Suburban with VIN 3GKGC26F2TG858037 and Iowa plate number 423FZO to the name Gregory J. Sitzman.

175.    On or about December 9, 1999, defendant, through Aero-Tec Sales of Florida, purchased a DC-3 aircraft (N34AH) from Full Air Aircraft Services.

176.    On or about December 10, 1999, defendant called Gary Paulson from Georgia.

177.    On or about December 10, 1999, defendant enters into a contract with Aerolease of America to purchase/lease/repurchase the Piper Navajo Panther (N97CK).

178.    On or about December 16, 1999, defendant filed a CMIR for $41,000 outbound from Miami to Bogota.

179.    On or about December 16, 1999, defendant takes out an insurance policy from Wenk Aviation Insurance on the Piper Navajo Panther (N97CK) covering the United States, Canada and Mexico.

180.    On or about December 20, 1999, defendant charged a plane ticket on Aviateca, Guatemala on his PNG VISA.

181.    On or about December 20, 1999, defendant traveled to Miami International Airport on TA # 370.

182.    On or about December 26, 1999, defendant paid for a room at the Sea Horse

Hotel, New Smyrna Beach, Florida with his PNG VISA.

183.    On or about January 7, 2000, defendant used his PNG VISA card in Puerto Vallarta, Mexico.

184    On or about January 12, 2000, defendant paid $39,144 for computers from Today's Computers in Ft. Lauderdale.

185.    On or about January 12, 2000, defendant had issued check # 1006 in the amount of $2,056.40 to Vintage Props & Jets with the notation "Navajo 97CK" from Aero-Tec Sales Bank of America account.

186.    On or about January 12, 2000, defendant bought a condominium at 4300 N. Lamont St., #226, Las Vegas, NV 89115.

187.    On or about January 13, 2000, defendant deposited $6,000 into his Bank of America account using check # 1015 from AERO-TEC'S Bank of America acct. 0030-6167-5756 and made payable to Gregory J. Sitzman.

188.    On or about February 3, 2000, defendant withdraws $40,000 in cash from Bank of America account # 003061675756 in Ft. Lauderdale.

189.    On or about February 8, 2000, defendant traveled through Alabama and Louisiana and made telephone calls from those locations.

190.    On or about February 9, 2000, defendant filed a CMIR outbound from Laredo, Texas to Nuevo Laredo, Mexico for $41,000.

191.    On or about February 10, 2000, defendant entered Laredo Texas from Nuevo Laredo, Mexico at 12:27 a.m. with no CMIR filed.

192.    On or about February 10, 2000, defendant filed a CMIR outbound from Laredo,

Texas to Nuevo Laredo, Mexico for $41,000.

193.    On or about February 10, 2000, defendant entered Laredo Texas from Nuevo Laredo, Mexico at 10:56 a.m. with no CMIR filed.

194.    On or about February 10, 2000, defendant filed a CMIR outbound from Laredo, Texas to Nuevo Laredo, Mexico for $41,000.

195.    On or about February 10, 2000, defendant's white Suburban with VIN 3GKGC26F2TG858037 and Iowa plate number 423FZO crossed the Mexican border and entered the United States at Laredo, Texas on two separate occasions.

196.    On or about February 17-28, 2000, defendant applied for and was granted a loan from the First Federal Bank of La Mars and a lien was recorded on the title of his white Suburban with VIN 3GKGC26F2TG858037 and Iowa plate number 423FZO.

197.    On or about February 19, 2000, defendant filed a CMIR for $40,000 inbound at Miami International Airport from Mexico City.

198.    During on or about February 19, 2000, to on or about February 29, 2000, defendant traveled in south Florida.

199.    On or about March 1, 2000, defendant filed a CMIR for $35,000 outbound from Miami International Airport to Bogota.

200.    On or about March 4, 2000, defendant traveled from Bogota to Miami.

201.    On or about March 17, 2000, defendant rented a car from Florida Auto Rental, Miami, Florida on his PNG VISA.

202.    On or about March 22, 2000, defendant rented a car from Florida Auto Rental, Miami, FL on his PNG VISA.

203.    On or about March 28, 2000, defendant charged a room at the Hotel Dann Carlton, Bogota on his PNG VISA.

204.    On or about March 31, 2000, defendant traveled from Cartagena to Miami International Airport.

205.    On or about April 4, 2000, defendant rented a car from Florida Auto Rental, Fort Lauderdale, FL on his PNG VISA.

206.    On or about April 27, 2000, defendant made a charge on his PNG VISA from "The Place" in Bogota.

207.    On or about April 28, 2000, defendant rented a room at the Melbourne Harbor Suites on his PNG VISA.

208.    On or about May 23, 2000, defendant rented a room at the Flying Cloud Motel, Fort Lauderdale, FL.

209.    On or about May 31, 2000, defendant rented a room at the Days Inn, Fort Lauderdale, FL.

210.    On or about June 28, 2000, defendant traveled from Bogota to Miami International Airport.

211.    On July 11, 2000, defendant made a charge on his PNG VISA from Panama.

212.    On or about July 13, 2000, defendant traveled from San Jose, Costa Rica to Miami International Airport.

213.    On or about August 10, 2000, defendant provided Check # 327 for $1,500 to Andrew Gerst from defendant's Bank of America acct. 0036-2635-1962.

214.    On or about August 11, 2000, defendant deposited $37,000 into Bank of America

account.

215.    On or about September 1, 2000, defendant traveled from Bogota, Colombia to Miami International Airport.

216.    On or about September 2, 2000, defendant made a charge on his PNG VISA from Riviera Beach, FL.

217.    On or about September 7, 2000, defendant was issued a non-immigrant visa for 1 year out of Puerto Vallarta, Mexico.

218.    On or about September 8, 2000, defendant asked Wenk Aviation Insurance for a copy of his policy on an airplane with tail number "N97CK".

219.    On or about September 12, 2000, defendant issues checks # 1008 and 1009 for $2,000 and $4,000, respectively to Count Von Schlieffen from defendant's Bank of America acct 0036-2635-1962.

220.    On or about September 13, 2000, defendant traveled from the Dominican Republic to Miami.

221.    On or about September 15, 2000, defendant took out an additional Mexican Insurance Policy on "N97CK" for three days (policy was good until 9/18/00).

222.     On or about September 15, 2000, defendant wire transfers $6,000.00 to Internationale Bert, Luxembourg from defendant's Bank of America acct. 0036-2635-1962.

223.    On or about September 18, 2000, defendant made a $552.16 purchase  purchase from Mexicana Air on his debit card attached to his Bank of America acct. 0036-2635-1962.

224.    On or about September 21, 2000, "N97CK" is checked from the outside by a U.S. Customs Air/Marine dog at West Palm Beach/Lantana Airport and a positive "hit" was made for

narcotics.

225.    In September-October 2000, defendant had modifications made to N 97CK to make it more difficult for law enforcement to detect the airplane in flight.

226.    In September-October 2000, after a test flight of N97CK to evaluate the modifications, law enforcement searched the airplane at Lantana Airport in Florida.

227.    On or about September 23, 2000, defendant traveled from Cancun, Mexico to Miami International Airport.

228.    On or about September 27, 2000, defendant wire transferred $8,000.00 to Internationale Bert, Luxembourg from defendant's Bank of America acct. 0036-2635-1962.

229.    On or about October 11, 2000, defendant traveled from Mexico City to Miami International Airport.

230.    On or about October 16, 2000, defendant wire transferred $10,000.00 to Internationale Berat, Luxembourg from defendant's Bank of America acct. 0036-2635-1962.

231.    On or about October 19, 2000, defendant traveled from Miami to Medellin, Colombia.

232.    On or about October 20, 2000, defendant traveled from Medellin to Bogota, Colombia.

233.    On or about October 21, 2000, defendant traveled from Bogota to Miami International Airport.

234.    On or about October 27, 2000, defendant prepared to sell the Piper Navajo Panther (N97CK) through Boca National Aircraft.

235.    On or about October 31, 2000, defendant rented a room at the Comfort Inn,

Lantana, Florida using his PNG VISA.

236.    On or about October 31, 2000, defendant issued check #1031 for $1,000 to Chris Pennington from defendant's Bank of America account 0036-2635-1962.

237.    On or about October 31, 2000, defendant wired $5,000 to Banque International, Luxembourg from Aero-Tec Sales Bank of America account 0030-6167-5756.

238.    On or about November 5, 2000, defendant rented a room at the Fairfield Inn, Fort Lauderdale, Florida using his PNG VISA.

239.    On or about November 6, 2000, defendant bought a ticket on American Airlines for a November 8, 2000 departure from Miami to Bogota to Miami on his PNG VISA.

240.    On or about November 6, 2000, defendant rented a room at the Western Inn, Lantana, Florida on his PNG VISA.

241.    On or about November 6, 2000, defendant sold N97CK for $190,000 through broker Boca National Aircraft and AIC Title Company.

242.    On or about November 6, 2000, defendant issued check # 1033 in the amount of $1,000 to Chris Pennington from Aero-Tec's Bank of America account 003063675756.

243.    On or about November 11, 2000, defendant traveled from Bogota to Miami International Airport.

244.    From on or about November 14, 2000, until at least November 19, 2000, defendant traveled in south Florida.

245.    On or about November 28, 2000, defendant rented a room at the Hotel Dann Carlton, Bogota on his PNG VISA.

246.    On or about December 1, 2000, defendant purchased an airline ticket from

Southwest Airlines for travel from San Antonio to Fort Lauderdale.

247.    On or about December 11, 2000, defendant traveled between Medellin and Cali, Colombia and rented a room at the Hotel Dann Carlton, Bogota on his PNG VISA.

248.    On or about December 13, 2000, defendant traveled from Cali to Bogota, Colombia.

249.    On or about December 14, 2000, defendant rented a room at the Hotel Dann Carlton, Medellin on his PNG VISA.

250.    On or about December 17, 2000, defendant traveled from Bogota to Miami.

251.    On or about January 19, 2001, defendant rented a room at the Red Roof Inn, Lansing, Illinois on his PNG VISA.

252.    On or about January 26, 2001, defendant bought a ticket on American Airlines departing Miami on January 26, 2001, to Bogota to Miami on his PNG VISA.

253.    On or about January 28, 2001, defendant made a charge at TGI Fridays, Bogota on his PNG VISA.

254.    On or about January 28, 2001, defendant had a $50 charge on his PNG VISA from the Miami Princess Hotel.

255.    On or about January 31, 2001, defendant traveled from Bogota to Miami.

256.    On or about January 31, 2001, defendant had a charge on his PNG VISA from the Hotel Dann Carlton, Bogota.

257.    On or about May 9, 2001, defendant traveled from Cancun to Miami.

258.    On or about May 16, 2001, defendant had a charge on his PNG VISA from the Hotel Dann Carlton, Bogota.

259.     On or about May 17, 2001, defendant had a charge on his PNG VISA from the Hotel De La Ville, Bogota.

260.     On or about May 19, 2001, defendant had a charge on his PNG VISA from the Hotel Saint Simon, Bogota.

261.     On or about May 20, 2001, defendant traveled from Bogota to Miami International Airport and then to Cancun, Mexico.

262.     On or about May 23, 2001, defendant traveled from Cancun, Mexico to Miami International Airport.

263.     In or about June 2001, defendant traveled in Madrid, Spain where he would smuggle cocaine into Europe until February 2004.

264.     On or about June 19, 2001, defendant reported that his passport was stolen in Madrid.

265.     On or about July 12, 2001, defendant traveled from Amsterdam to Miami.

266.     On or about July 12, 2001, defendant filed a CMIR inbound at Miami for $14,700 and reported that the point of departure was Madrid.

267.     On or about July 19, 2001, defendant entered Mexico.

268.     On or about July 20, 2001, defendant had a charge for Aeromexico on his PNG VISA.

269.     On or about July 21, 2001, defendant exits Mexico.

270.     In or about the summer of 2001, including July 17, 2001, August 20, 2001 and August 21, 2001, defendant called Billy Long in Beaumont, Texas and asked him if he would like to earn $30,000 a month conducting illegal activity for defendant and told Long he would

wire money to him and instructed Long to get a passport for purposes of traveling to Bogota, Colombia.

271.    On or about August 3, 2001, defendant traveled from Cancun, Mexico to Miami International Airport.

272.    On or about August 9, 2001, defendant exited from Mexico.

273.    On or about August 19, 2001, defendant traveled from Amsterdam to Miami.

274.    In the summer of 2001, including August 21, 2001, and August 22, 2001, defendant called James Fields and requested that he travel to Bogota for drug smuggling purposes.

275.    On or about August 27, 2001, defendant had a charge on his PNG VISA from Bogota.

276.    On or about September 5, 2001, defendant traveled from Madrid to Miami International Airport.

277.    On or about September 6, 2001, defendant entered Mexico.

278.    On or about September 6, 2001, defendant was issued a non-immigrant visa for 1 year out of Puerto Vallarta, Mexico.

279.    On or about September 10, 2001, defendant wired approximately $500 from Citibank Mexico to Billy Long in Beaumont, Texas.

280.    On or about September 11, 2001, defendant entered and exited Mexico.

281.    On or about September 13, 2001, defendant traveled from Puerto Plata, Dominican Republic to Miami International Airport.

282.    On or about September 16, 2001, defendant had James Fields travel from Bogota

to Miami.

283.     In or about September, 2001, defendant traveled to, and smuggled cocaine into, Spain.

284.     On or about September 30, 2001, defendant traveled from Madrid to Miami International Airport.

285.     In or about October 2001, defendant traveled to Madrid, Spain.

286.     On or about October 10, 2001, defendant reported his passport stolen at a Western Union in Madrid.

287.     On or about October 30, 2001, defendant arrived in Mexico.

288.     On or about October 31, 2001, defendant traveled from Cancun to Miami International Airport and filed a CMIR for $16,000 in foreign currency.

289.     In or about the fall of 2001, including November 5, 2001, defendant called Billy Long in Beaumont, Texas and requested that he travel to Bogota, Colombia in December 2001.

290.     On or about November 5, 2001, defendant entered Bogota, Colombia.

291.     On or about November 16, 2001, defendant traveled from Bogota to Miami International Airport.

292.     On or about November 20, 2001, defendant requested and received a 6-month Colombian visa from the Colombian consulate in Miami, Florida.

293.     On or about November 21, 2001, defendant ordered and received a 16" sealer and bags from All Packaging Supplies.

294.     On or about, November 25, 2001, defendant met with Terrence Colligan in South Florida, and asked Colligan to "shine up" at least 3 kilograms of cocaine that was in a house in

the keys of Florida.  Defendant and Colligan "shined up" the cocaine in the home of George

Jones in Florida to make the cocaine appear to be of high-quality.  Defendant acquired material

to make a press, and also acquired acetone and inositol crystals for this purpose from GNC in

Sunrise, Florida.  Defendant utilized a triple beam scale to weigh the cocaine.

295.    On or about December 3, 2001, defendant entered Mexico and traveled to Spain.

296.    On December 5, 2001, defendant traveled from Madrid, Spain to Miami, Florida.

and then to Mexico.

297.    On or about December 6, 2001, defendant traveled to Medellin, Colombia.

298.    On or about December 6, 2001, defendant filed a CMIR outbound from Miami to

Medellin, Colombia for $24,000.

299.    During the period from December 13, 2001, to December 17, 2001, defendant met

with Billy Long in Bogota, Colombia and told Long that Long would fly to Barcelona, Spain to

transport cocaine.

300.    During the period from December 13, 2001, to December 17, 2001, defendant met

with Billy Long and gave him approximately 2 kilograms of cocaine in Bogota, Colombia to

transport to Spain.

301.    In mid-December 2001, defendant made flight arrangements, and paid for Billy

Long to travel from Bogota, Colombia to Barcelona, Spain.

302.    On or about December 14, 2001, defendant made a $1,985 purchase from Cia

National Air with credit card 4635760002261737 associated with AERO-TEC SALES Bank of

America acct. 0030-6167-5756.

303.    On or about December 18, 2001, defendant made a $220.01 purchase from the

Morrison Hotel with credit card 4635760002261737 associated with AERO-TEC SALES Bank of America acct. 0030-6167-5756.

304.    On or about December 18, 2001, defendant traveled from Bogota, Colombia.

305.    During the period from on or about December 17, 2001, to December 23, 2001, defendant called Billy Long in Barcelona, Spain.

306.    During the period from on or about December 17, 2001, to December 23, 2001, defendant made arrangements to have the cocaine that Long transported to Barcelona, Spain picked up by other co-conspirators.

307.    During the period from on or about December 17, 2001, to December 23, 2001, defendant called Billy Long in Barcelona, Spain and instructed him to travel to Madrid, Spain and meet with James Fields, who also smuggled cocaine into Spain for defendant during this period, to receive approximately $1,800 for purposes of making travel arrangement to return to the United States.

308.    On or about December 20, 2001, defendant made a $723.06 purchase from United Airlines with credit card 4635760002261737 associated with AERO-TEC SALES Bank of America acct. 0030-6167-5756.

309.    On or about December 21, 2001, defendant traveled to Costa Rica and then to Bogota, Colombia.

310.    On or about December 23, 2001, defendant left Bogota, Colombia and entered Mexico.

311.    On or about December 23, 2001, Billy Long and James Fields, on behalf of the defendant, traveled from Madrid, Spain to Atlanta, Georgia.

312.    On or about December 24, 2001, defendant arrived at Miami International Airport from Mexico City.

313.    On or about December 24, 2001, defendant called Billy Long and James Fields.

314.    In or about late December 2001, to January 2002, defendant paid Billy Long approximately $6,000 (including the approximately $1,800 paid in Spain) for smuggling the cocaine to Spain in December 2001 and defendant advised Long that he would be paid $10,000 for transporting 4 kilograms of cocaine and he was paid approximately $6,000 (minus expenses) for the approximately 2 kilograms of cocaine Long transported in December 2001.

315.    On or about December 29, 2001, defendant entered Mexico.

316.    In or about 2001, in Las Vegas, Nevada, defendant and James Fields packed drug proceeds in coffee grounds to avoid detection while smuggling the drug proceeds.

317.    On or about January 5, 2002, defendant entered Madrid, Spain.

318.    On or about January 24, 2002, defendant departed Madrid, Spain and arrived in Bogota, Colombia.

319.    On or about January 26, 2002, defendant arrived at Miami International Airport from Bogota, Colombia.

320.    On or about January 30, 2002, defendant enters Mexico.

321.    On or about January 31, 2002, defendant exited Mexico.

322.    On or about January 31, 2002, defendant entered Bogota, Colombia.

323.    On or about January 31, 2002, defendant had James Fields travel from San Jose, Costa Rica to Miami.

324.    On or about February 3-5, 2002, defendant was in Las Vegas.

40

325      On or about February 12-26, 2002, defendant was in Colombia.

326.     On or about February 26, 2002, defendant departed Bogota, Colombia.

327.     On or about February 27, 2002, defendant arrived in Madrid, Spain.

328.     On or about March 1, 2002, defendant arrived in Mexico.

329.     On or about March 3, 2002, defendant arrived in Miami, Florida from Mexico

City.

330.     On or about March 3, 2002, defendant submitted a CMIR for $ 14,000 in Spanish

Currency (Pesetas).

331.     In or about early 2002, including March 4, 2002, defendant called Billy Long in

Beaumont, Texas and requested that he make another trip to Bogota, Colombia to smuggle

cocaine into Spain.

332.     On or about March 5, 2002, defendant arrived in Medellin, Colombia.

333.     In early 2002, including March 5, 2002, defendant called James Fields in Las

Vegas, Nevada and requested that he make another trip to Colombia and Spain for purposes of

smuggling cocaine into Spain.

334.     From on or about March 13, 2002, until March 23, 2002, defendant met with Billy

Long and Maritza Neila Wills Fontecha in Bogota, Colombia.

335.     From on or about March 13, 2002, until March 23, 2002, defendant paid for Billy

Long's expenses while in Bogota, Colombia.

336.     On or about March 22, 2002, in Bogota, Colombia, defendant received at least 4

kilograms of cocaine from co-conspirators.

337.     On or about March 22, 2002, in Bogota, Colombia, defendant met with Billy Long

41

and Maritza Neila Wills Fontecha, and defendant cleaned, re-wrapped in heat-sealed plastic packages 4 kilograms of cocaine and concealed them in the secret compartment of a leather bag.

338.    On or about March 22, 2002, in Bogota, Colombia, defendant gave Billy Long the 4 kilograms of cocaine to smuggle into Madrid, Spain.

339.    On or about March 23, 2002, defendant left Bogota, Colombia and on March 24, 2002, entered Madrid, Spain and met with Billy Long in Madrid, Spain regarding the 4 kilograms of cocaine.

340.    From on or about March 24, 2002, to March 27, 2002, defendant arranged for Julian Bermudez Arias and another co-conspirator to pick up the 4 kilograms of cocaine from Billy Long in Madrid, Spain.

341.    While in Madrid, Spain between March 24, 2002, to March 27, 2002, defendant told Billy Long that he would pay Long when Julian Bermudez Arias paid defendant.  On or about March 27, 2002, defendant paid Billy Long $10,000 in Euros in Madrid, Spain.

342.    On or about March 30, 2002, defendant made a charge to his Bank of America Visa acct. 4319-0400-0410-3341 at the Apart Hotel Noella, Europe.

343.    On or about April 10, 2002, defendant made a charge to his Bank of America Visa acct. 4319-0400-0410-3341 at the Hotel Villa De Barajas, Madrid.

344.    On or about April 12, 2002, defendant made a charge on his Bank of America Visa acct. 4319-0400-0410-3341 at the Persal Hostal, Madrid.

345.    On or about April 13, 2002, defendant made a charge to his Bank of America Visa acct. 4319-0400-0410-3341 at the Persal Hostal, Madrid.

346.    On or about April 14, 2002, defendant made a charge to his Bank of America Visa

acct. 4319-0400-0410-3341 at the Hostal Bari, Madrid.

347.    On or about April 24, 2002, defendant arrived at Miami International Airport from Madrid, Spain and then traveled to Bogota, Colombia.

348.    On or about May 3, 2002, defendant arrived at Miami International Airport from Bogota, Colombia.

349.    In or about the Spring of 2002, including May 5 and 7, 2002, defendant called Billy Long in Beaumont, Texas and requested that Long make another trip to Bogota, Colombia to smuggle cocaine into Spain.  Defendant called James Fields and told him to meet Billy Long in Mexico City, Mexico and fly together to Bogota, Colombia for purposes of smuggling cocaine into Spain.

350.    In or about the Spring of 2002, including May 4, 5, and 7, 2002, defendant called James Fields in Las Vegas, Nevada and requested that Fields make another trip to Bogota, Colombia to smuggle cocaine into Spain.   Defendant called Billy Long and told him to meet James Fields in Mexico City, Mexico and fly together to Bogota, Colombia for purposes of smuggling cocaine into Spain.

351.    In or about the Spring of 2002, including May 3, 4, 5, 7, defendant called George Jones in Florida, and requested that Jones make a trip to Bogota, Colombia to smuggle cocaine into Spain.

352.    On or about May 8, 2002, defendant entered Bogota, Colombia.

353.    In or about May 2002, defendant made travel arrangements for Billy Long and James Fields to travel to Bogota, Colombia on May 13, 2002.

354.    Between May 14, 2002, and May 17, 2002, defendant called and met on several

43

occasions with Billy Long and James Fields in Bogota, Colombia about smuggling cocaine from Bogota, Colombia to Spain.

355.    Between May 14, 2002, and May 17, 2002, defendant met together with Billy Long, James Fields and George Jones in Bogota, Colombia about smuggling cocaine from Bogota, Colombia to Spain.

356.    Between May 14, 2002, and May 17, 2002, in Bogota Colombia, defendant met with and spoke to George Jones about carrying kilograms of cocaine from Bogota, Colombia to Spain.  George Jones advised defendant that he would not smuggle kilograms of cocaine out of the Bogota airport for defendant.  Defendant said that he already paid for the airline tickets. Defendant allowed Jones to withdraw from that smuggling trip to Spain.

357.    On or about May 16, 2002, in Bogota, Colombia, defendant brought Billy Long and James Fields each 2 leather suitcases with secret compartments.  Each of the 2 suitcases contained 2 kilograms of cocaine.   Defendant told Long and Fields to put one suitcase in the other and put clothing, particularly dirty underwear, on top to avoid detection of the cocaine. Defendant advised Long and Fields to dress well and look like clean-cut businessmen. Defendant advised Long and Fields that they were old Americans and were not likely to be suspected of drug smuggling.

358.    On or about May 17, 2002, defendant and Maritza Neila Wills Fontecha  went to the airport in Bogota, Colombia.

359.    On or about May 17, 2002, defendant had made arrangement to travel from Bogota, Colombia to Madrid, Spain.

360.    On or about May 17, 2002, defendant met with Maritza Neila Wills Fontecha in

44

the airport in Bogota, Colombia, and she warned defendant that Billy Long and James Fields had

been arrested attempting to smuggle cocaine out of the airport in Bogota, Colombia, and advised

him not to attempt to go through airport security.

361.    After Billy Long and James Fields were arrested on May 17, 2002, in Bogota,

Colombia, defendant made arrangements, including sending payments, to have individuals travel

to Colombia in an attempt to get Long and Fields released from prison.

362.    On various dates from May 17, 2002, to approximately February 24, 2004,

defendant and Maritza Neila Wills Fontecha met with Billy Long and James Fields while Long

and Fields were incarcerated in Colombia.

363.    On various dates in the Spring and Summer of 2002, while Long and Fields were

incarcerated in Colombia, defendant told Long and Fields not to talk about their arrest to U.S.

Embassy and law enforcement officers for fear that defendant's and Fontecha's involvement in

the cocaine smuggling would be uncovered.  During these meeting, defendant was also

attempting to determine whether Long and Fields were arrested because someone had tipped off

law enforcement officers or new X-ray machines had been installed at the Bogota airport

364.    From or about May 17, 2002, until approximately February 24, 2004, while Billy

Long and James Field were in prison in Colombia, defendant provided benefits to Long, Fields,

and their families in the United States, including regular payments of money and legal assistance.

365.    On or about June 4, 2002, defendant executed a power of attorney in Colombia on

behalf of Terrence Colligan with respect to defendant's 1996 Suburban.

366.    Between May 8, 2002 and June 30, 2002, defendant made purchases in Colombia.

367.    On or about June 30, 2002, defendant traveled from Bogota, Colombia to Mexico

45

and then on to Miami International Airport.

368.    On or about July 11, 2002, defendant requested and received a one-year visa from the Colombian consulate in Miami, Florida.

369.    On or about August 2, 2002, defendant entered Bogota, Colombia.

370.    On or about August 7, 2002, defendant arrived at Miami International Airport from Bogota, Colombia.

371.    On or about August 17, 2002, defendant arrived in Bogota, Colombia.

372.    On or about September 20, 2002, defendant arrived in Bogota, Colombia.

373.    On or about November 20, 2002, defendant arrived at Miami International Airport from Bogota, Colombia.

374.    On or about November 21, 2002, defendant made charges in Ft. Lauderdale, Florida on his Bank of America Visa acct. 4319-0400-0410-3341.

375.    On or about December 1, 2002, defendant made charges in Key Largo, Florida from his Bank of America acct. 0036-2635-1962.

376.    In later 2002, defendant met with Gary Paulson in Ft. Lauderdale, Florida.  When Paulson demanded money still owed to him by defendant for the Canadian cocaine smuggling transactions, defendant threatened to tell Paulson's parole officer that Paulson used a fake name and that he left the United States and entered Canada.

377.    On or about January 16, 2003, defendant arrived in Bogota, Colombia.

378.    On or about January 21, 2003, defendant arrived in Bogota, Colombia.

379.    On or about February 1, 2003, defendant sent $300 to George Jones by Western Union from Bogota, Colombia.

380.     On or about February 3, 2003, defendant sent $720 to George Jones by Western Union from Bogota, Colombia.

381.     On or about March 18, 2003, defendant sent $700 to George Jones by Western Union from Bogota, Colombia.

382.     From on or about March 26, 2003, through March 29, 2003, defendant met with George Jones in Bogota, Colombia.

383.     On or about June 16, 2003, defendant requested and received a 3-year visa in Bogota, Colombia.

384.     On or about June 17, 2003, defendant left Bogota, Colombia and entered Madrid, Spain on June 18, 2003.

385.     On or about June 21, 2003, defendant wired $850 from Alcantarilla, to Maritza Wills.

386.     On or about June 25, 2003, defendant sent Terrence Colligan $900 by Western Union from La Manga.

387.     On or about June 27, 2003, defendant charged on his Bank of America Visa acct. 4319-0400-0410-3341 in Madrid, Spain.

388.     On or about July 13, 2003, defendant charged on his Bank of America Visa acct. 4319-0400-0410-3341 in Rome, Italy.

389.     On or about July 18, 2003, defendant wired $400 from Western Union in Rome, Italy, to Chase Manhattan Bank.

390.     On or about July 21, 2003, defendant wired $950 from Western Union in Rome, Italy to Maritza Neila Wills Fontecha.

391.    On or about July 24, 2003, defendant wired $950 from Western Union in Rome, Italy.

392.    On or about July 30-31, 2003, defendant charged on his Bank of America Visa acct. 4319-0400-0410-3341 in Rome, Italy.

393.    On or about August 1, 2003, defendant charged $298.61 to his Bank of America Visa acct. 4319-0400-0410-3341 by Iberia, Madrid.

394.    On or about August 1, 2003, defendant arrived in Bogota, Colombia.

395.    On or about September 17, 2003, wired $300 by Western Union in Bogota, Colombia to his Bank of America Visa acct. 4319-0400-0410-3341.

396.    On or about October 10, 2003, defendant arrived at Miami International Airport from Bogota, Colombia.

397.    On or about October 13, 2003, defendant charged on his Bank of America Visa acct. 4319-0400-0410-3341 in Tavernier, FL.

398.    On or about October 13, 2003, defendant departed JFK in New York and arrived in Rome, Italy.

399.    On or about October 14, 2003, defendant arrived at JFK in New York from Rome, Italy.

400.    On or about October 14, 2003, defendant charged on his Bank of America Visa acct. 4319-0400-0410-3341 at Alamo Rent a Car, Tampa, FL.

401.    On or about October 16, 2003, defendant charged on his Bank of America Visa acct. 4319-0400-0410-3341 at Alamo Rent a Car, Tampa, FL.

402.    On or about October 23, 2003, defendant charged on his Bank of America Visa

48

acct. 4319-0400-0410-3341 at American Air, Miami, FL.

403.     On or about October 23, 2003, defendant departed Miami International Airport for Bogota, Colombia.

404.     From on or about November 17, 2003, to November 27, 2003, defendant wired money from Western Union in Bogota, Colombia.

405.     On or about December 9, 2003, defendant departed from Bogota, Colombia.

406.     On or about December 12, 2003, defendant wired $950 from Western Union in Madrid, Spain to Daniel Garzon Wills.

407.     On or about December 12, 2003, defendant charged $167.32 on his Bank of America Visa acct. 4319-0400-0410-3341 at Hotel Paris, Madrid, Spain.

408.     On or bout December 13, 2003, defendant wired $500 from Western Union in Madrid, Spain to Maritza Niela Wills Fontecha in Bogota, Colombia.

409.     On or about December 14, 2003, defendant wired $500 from Western Union in Madrid, Spain to George Jones, Tavernier, Florida.

410.     On or about December 16, 2003, defendant wired $800 and $700 by Western Union in Madrid, Spain to Chase Manhattan Bank and Bank of America, respectively.

411.     On or about December 17, 2003, defendant wired $900 by Western Union in Madrid, Spain to Daniel Garzon Wills, Bogota.

412.     On or about December 19, 2003, defendant wired money by Western Union in Madrid, Spain.

413.     On or about December 24, 2003, defendant wired approximately $900 by Western Union in Madrid, Spain to George Jones, Tavernier, Florida.

49

414.    On or about December 26, 2003, defendant wired $900 by Western Union in Madrid, Spain to Gary Paulson, Fort Lauderdale, Florida.

415.    On or about December 31, 2003, defendant charged $2.58 on his Chase Credit Card acct. 5431-4301-1461-0279 at Hotel El Prado, Madrid, Spain.  The charge is reversed.

416.    On January 1, 2004, defendant entered Bogota, Colombia.

417.    After James Fields died in prison in Colombia in December 2003, defendant arranged for Fields's funeral in Colombia and the shipment of Fields' remains to the United States.

418.    On January 22, 2004, defendant departed Bogota, Colombia and entered Miami, Florida through Pereire/Matecana, Colombia.

419.    From on or about January 22, 2004, until on or about February 5, 3004, defendant charged on his Chase and Bank of America cards in south Florida.

420.    In late 2003-early 2004, defendant asked Gary Paulson to store a Stallion kit plane while defendant tried to sell it.  The plane was acquired by defendant with drug proceeds and was intended by him to be used in defendant's drug trafficking enterprise.

421.    In January-February 2004, defendant talked to Gary Paulson in Florida and asked Paulson if was willing to do another large cocaine deal in which kilograms of cocaine would be carried through the United States and into Canada to be delivered to the Canadian Hells Angels.

422.    In January-February 2004, defendant talked to Gary Paulson in Florida about the rewards and risks of defendant smuggling cocaine into Spain.

423.    In or about February 2004, defendant met with George Jones in Florida where they talked about smuggling cocaine and Sitzman asked if Jones would travel to Bogota,

Colombia for purposes of smuggling cocaine from Colombia to Spain.

424.    In or about February 2004, in Florida, defendant spoke with George Jones and/or Terrence Colligan about furnishing cocaine to co-conspirators.

425.    In or about February 2004, in Florida, defendant spoke with Terrence Colligan about transporting cocaine from Colombia to Europe.

426.    In or about February 2004, in Florida, defendant spoke with George Jones and negotiated Jones's acquisition of cocaine from defendant for $18,000 per kilogram.

427.    Sometime around February 2004, in Florida, defendant spoke with Terrence Colligan and told Colligan that defendant was going to supply cocaine to George Jones for $18,000 per kilogram.

428.    On or about February 12, 2004, defendant departed Miami, Florida and entered Pereire/Matecana, Colombia and then arrived at Bogota, Colombia.

429.    On or about February 19, 2004, defendant departed Bogota, Colombia and arrived at Madrid, Spain on or about February 20, 2004.

430.    On or about February 23-24, 2004, defendant drove a Spanish rental car that he had rented in Madrid, Spain into southern France.  Defendant was driving through southern France and intended to travel into Italy.  Defendant, dressed in a suit and tie, was carrying approximately 8 kilograms of cocaine in secret compartments of 2 identical black leather bags.  The 2 leather bags were placed in one larger bag that also contained some clothing.  Defendant was stopped by French police near the Italian border outside Nice, France.  Defendant stated to French police that he was traveling to Italy and that he thought he was smuggling 1 million Euros in the bags.  Defendant also stated that he thought he was smuggling 7 kilograms of cocaine.

51

431.     Sometime during February and March 2004, defendant instructed James Nash to pay $1,000 to George Jones and $500 to Terrence Colligan.

432.     From at least 2000 and continuing until at least March 26, 2004, defendant maintained drug trafficking paraphernalia at 469 Beach Road, Tavernier, Florida.   These items included a 1996 Suburban containing hidden compartments, including in the gas tank; dial-o-gram balance scale, with cocaine residue; Braun grinder; Mettler Toledo Scale; at least 7 leather bags with hidden compartments; cellular telephone; and drug trafficking related documentation. Additionally, in February 2006, found in the Beach Road home were cans of Acetone, wrapping paper in coffee cans, wrapping paper, plastic wrap, vacuum sealers and plastic bags and an automobile gas tank.

433.     After his arrest in France in February 2004, defendant sent letters to George Jones, Gary McDaniels and Maritza Neila Wills Fontecha seeking their assistance in selling proceeds and instrumentalities of drug trafficking located in the United States and elsewhere.   Sitzmann sought to have airplanes and parts sold and to have proceeds sent to him in France where he could use it to buy time off his sentence.   Sitzmann had McDaniels, Gary Paulson, Kevin Rosa and Jeff Rahm sell the items.   Defendant had the proceeds funneled through McDaniels' business

and personal bank accounts.   Additionally, defendant had John Dwyer take part of the proceeds,

$15,000 in cash, to Colombia and gave it to Fontecha.

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY

*George Eliopoulos*

_____
GEORGE ELIOPOULOS
Assistant United States Attorney
D.C. Bar No.390601
555 4th Street, N.W.
Washington, DC 20530
(202) 252-6957