1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA        :     Criminal No. 08-242
                                :
                                :
v.                              :     February 1, 2012
                                :
                                :
GREGORY JOEL SITZMANN,          :
                                :
            Defendant           :     10:06 a.m.
. . . . . . . . . . . . . . .   :     . . . . . . . . . .


TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE



 APPEARANCES:

 For the United States:       GEORGE P. ELIOPOULOS, AUSA
                              SHARAD KHANDELWAL, AUSA
                              UNITED STATES ATTORNEY'S OFFICE
                              555 Fourth Street, NW
                              Washington, D.C.  20530


 For the Defendant:          THOMAS ABBENANTE
                             THOMAS ABBENANTE, ESQ.
                             1919 Pennsylvania Avenue, NW
                             Suite 800
                             Washington, DC 20006
                             (202) 223-6539


 Court Reporter:             REBECCA STONESTREET, RPR, CRR
                             Official Court Reporter
                             Room 6511, U.S. Courthouse
                             Washington, D.C.  20001
                             (202) 354-3249



Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

2

1              **P R O C E E D I N G S**

2              COURTROOM CLERK:  Criminal 08-242, United States of

3    America versus Gregory Joel Sitzmann.  For the government,

4    Mr. Eliopoulos; for the defendant Mr. Abbenante.

5              THE COURT:  Good morning, everyone.  So I think the

6    purpose of this status -- and I'm sorry I had to change it from

7    yesterday, but I've been in these Hinckley hearings for some

8    time, on and off, and we were trying to finish an expert witness

9    before one of the lawyers had to run to the airport to go

10   someplace at 2:30 or 3:00 o'clock yesterday, so we just skipped

11   lunch and went straight through.

12             So I think we're here -- I wanted to review the sort of

13   status of motions, pending motions, and make sure we're all on

14   the same page as to what's pending and what's been decided.  And

15   then the other thing I wanted to talk about further was the

16   issue of voir dire/jury questionnaire, versus whether we're

17   going to do this in writing, whether we're going to do this

18   orally.

19             So do you want to talk about motions first and then

20   procedures, or the other way around, or do you care?

21             MR. ABBENANTE:  Well, I guess we could first start --

22   if Your Honor wants to start out with the jury situation,

23   because Mr. Eliopoulos and I were talking about that before

24   Your Honor took the bench.

25             THE COURT:  Okay, fine.

1          MR. ABBENANTE:  And I'll just defer to them and their

2     position.

3          THE COURT:  And you both got the three documents from

4     the jury office; the form of subpoena, I guess, or summons, and

5     then they have this prescreening form that relates specifically

6     to the dates of this case, and then they have what I've been

7     referring to as a hardship questionnaire, which is a two-sided

8     document.

9          MR. ELIOPOULOS:  Your Honor, the first thing I would

10    like to address, I checked the calendar, particularly the D.C.

11    school calendar; the week that we are picking a jury is spring

12    break in D.C., and probably in other areas, but obviously we're

13    concerned about D.C.  I think that is going to present us with a

14    little bit of a problem in trying to get a qualified jury.

15         THE COURT:  I think it's already gone out asking them,

16    hasn't it, Michelle?

17         COURTROOM CLERK:  As of January 26th, they had not gone

18    out.

19         THE COURT:  Why don't you check and see.

20         MR. ELIOPOULOS:  I think it's going to be problematic

21    in getting enough jurors, because I think a lot of them are

22    going to have a hardship on that week because they have spring

23    break.  Either they're going to be going away or they'll be

24    taking care of children.

25              So my proposal would be to start jury selection

1    one week later.

2            THE COURT:  Okay.  I hope that's still feasible.  So

3    that's a Wednesday.  Is there any reason, if we can move it,

4    that we shouldn't do it on a Monday?

5            MR. ELIOPOULOS:  Monday is the day after Easter, and

6    the schools in D.C. are still out that Monday.

7            MR. ABBENANTE:  And I think the court usually closes

8    down Easter Monday.

9            THE COURT:  I think that's right.  We actually close

10   down Good Friday.  Is that right?  Is Good Friday the 6th and

11   Easter Monday the 9th?

12           MR. ABBENANTE:  That's right.  I have it in front of

13   me.

14           THE COURT:  Okay.  So April 6th and April 9th.  Okay.

15   So the court is technically closed on the 6th and the 9th.  So

16   the proposal is to move this from April 4th until April 11th.

17           MR. ABBENANTE:  I think we're proposing the 10th,

18   Your Honor.

19           THE COURT:  Okay.  Even better.  That's Tuesday the

20   10th.  Right?

21           MR. ELIOPOULOS:  Tuesday the 10th.

22           THE COURT:  So we would move it from the 4th to the

23   10th.  Okay.

24           Now, that having been said -- so we'll do that.  So

25   Ms. Moon will do a minute order moving it from the 4th to the

1    10th.  So then the question is, what procedures -- and we'll

2    tell the jury office.  So the question is, what procedures do

3    you want to follow?  So what procedures do you think we want to

4    follow?

5            MR. ELIOPOULOS:  Your Honor, I think both the defense

6    and the government do not have a problem with the jury office

7    making the first cut on the hardship issue.  Obviously I think

8    both sides would like to be able to view the questionnaires when

9    they come in, but do not have a problem with the jury office

10   making that first cut.

11           THE COURT:  What do you mean, you want to review them?

12           MR. ELIOPOULOS:  You know, to review the answers given

13   by them.  I think both parties last time talked about looking at

14   the questionnaires.

15           MR. ABBENANTE:  Well, maybe we're on a little bit of a

16   different page.  I don't have any problem with the jury making

17   the first determination.  I don't need to see those

18   questionnaires.  If there are ones that the jury office has

19   declined on hardship, or is leaving them up to the court to make

20   the decision, those are the ones I want to see.

21           THE COURT:  Oh, is that what you mean, too?

22           MR. ELIOPOULOS:  The ones that the jury office feel are

23   on the line, those are the ones we would like to see.

24           THE COURT:  Well, I'm not quite sure how to do this.  I

25   mean, we've had this discussion at least three times now.

1        MR. ELIOPOULOS:  The obvious ones, obviously the jury

2   office can do that.  The government and the defense don't want

3   to get involved in that.  But I think if the jury office feels

4   there are questionable ones or ones that are on the fence which

5   might come before the Court, those are the ones we would like to

6   look at.

7        THE COURT:  I think you ought to make an appointment

8   and talk to them, because I'm just not sure.  This is what my

9   experience has been:  They make hardship determinations, but if

10  they find that they've got more than enough qualified jurors -

11  and this should not be publicly known - they'll take those on

12  the line and say, why bother, let them go too.  If you don't

13  want them to do that, or if you want them to review everything,

14  we can review everything.

15        I think you should call Ms. Larry and make an

16  appointment with her and go talk to her about how they do

17  things, and then tell me what you want to do.

18        MR. ABBENANTE:  I don't have a problem with what you

19  just said.  If that's what they do, that's fine, and then the

20  ones that we get are the ones that...

21        THE COURT:  That we get.

22        MR. ABBENANTE:  That we get.  That's fine with me.

23        MR. ELIOPOULOS:  The concern I had last time,

24  Your Honor, was if there were jurors who might have a problem or

25  their justification for their hardship exception is

1    questionable, again, I don't think those jurors ought to be

2    excluded.  I think jurors have an obligation to appear as jurors

3    in this court or Superior Court, and I don't think a small

4    reason to get out of jury service should accommodate --

5             THE COURT:  That's fine.  The question that we need to

6    get an answer to that I'm not going to be the conduit for is

7    what does the jury office do with those.  Do they put them in

8    the pool or do they just say:  We've got more than enough

9    qualified jurors; these are true hardships, these are maybe yes,

10   maybe no, these are all qualified, nobody is raising a ruckus so

11   we'll just deal with these over here.

12            If that's what they do and you don't like that, seems

13   like the alternative is for all three of us to review every

14   single one that comes in.  But why don't you go talk to

15   Ms. Larry and figure out what the options are, and come back and

16   tell me what you want to do.

17            MR. ELIOPOULOS:  All right.

18            MR. ABBENANTE:  That's fine.

19            THE COURT:  Because I know we've had this discussion,

20   and I'm not sure that we're all on the same page and I'm not

21   sure I'm accurately describing the alternatives available to us.

22   One is we review all of them, and what I would do, if that's

23   what you prefer, is to review them -- and she gives me a cover

24   sheet.  You know, I get 50 at a time or something.  She gives me

25   a cover sheet, and I'll go through them and I'll say, excused,

1    not excused, which is a presumptive determination.  And then you

2    can come in and look at them and say, we think you've been too

3    lenient, or, we think you may as well throw these other three or

4    four people in the pile too because it's going to be more

5    trouble than it's worth.  So that's one way to do it.

6           The other is to allow her to do the entirety of it, and

7    then the question is whether she just dumps everybody into the

8    excused pot that raises anything, or whether she and her staff

9    are more discerning and send us stuff.  And that's what you need

10   to sort out.  Because in view of Mr. Eliopoulos' philosophical

11   point - which I agree with, people shouldn't get out because

12   they have a nose bleed or something - but in terms of

13   logistically how they handle that category, if they don't handle

14   it to your satisfaction and the only other alternative is for us

15   to do it, I'm willing to do it.

16          MR. ELIOPOULOS:  That's fine, Your Honor.  I think both

17   sides agree, the ones that the jury office would clearly think

18   there would be a hardship, neither one of us need to look at

19   those questionnaires.  But all we need is some kind of

20   understanding from the jury office as to kind of the ones that

21   are on the fence, what happens to then.

22          THE COURT:  Right.  And whether they are able or

23   willing to do what you're proposing, or whether they're going to

24   send me everything.  My experience in the past is either, Judge,

25   you do it or we'll do it.  And it seems to me, unless I

1    misunderstand the procedure, you may be asking for some sort of

2    a hybrid.  So if you can go talk to her together, and call her

3    first and tell her you would like to make an appointment and

4    talk to her, and Ms. Moon will tell her that you're going to

5    call her.

6         All right.  So that's not decided.  The next question

7    we were talking about is whether or not you wanted to do this

8    orally or you wanted to do this with a questionnaire.

9         MR. ABBENANTE:  I don't have a problem with it.  I know

10   Mr. Eliopoulos suggested, I believe, last time that he wanted to

11   do it orally.  That's fine.

12        MR. ELIOPOULOS:  That's what I think, Your Honor.  Have

13   them come in, the Court can read the questions.  I'm not sure if

14   the Court uses an index card or --

15        THE COURT:  Yes.

16        MR. ELIOPOULOS:  And then they can fill out which ones

17   they have an issue with.

18        MR. ABBENANTE:  That's fine.

19        THE COURT:  Okay.  The next question, I guess, is:

20   Have you agreed upon an appropriate number we ought to bring in,

21   and that, in turn, turns in part on how many alternates we're

22   going to have and how many people are going to want out of this

23   either because of the length of it - even if they're not

24   technically hardship - or for other reasons.

25        It seems the last time I said, this is not a situation

1    like a child porn case, or like, I don't know, pick another

2    category of case.  I had a case involving a police officer who

3    was a tax evader.  Well, a lot of people have strong views about

4    taxes; there are also a lot of people who have strong views,

5    either pro or con, about police.  So you may need a larger

6    group.

7          Here, despite the complexity of it, it's a drug

8    conspiracy case.  And the question is -- maybe there are some

9    people that are for legalizing drugs, maybe there are some

10   people that hate all alleged drug dealers, but that's not

11   atypical.  So maybe we don't need that many people.

12         In a normal one week, two-week trial, we would get how

13   many, Ms. Moon?

14         COURTROOM CLERK:  You would get 50.

15         THE COURT:  We would get 50.

16         MR. ELIOPOULOS:  Your Honor, I was thinking double

17   that, 80 to 100, because I'm sure there's going to be issues on

18   hardship, despite whatever they write in their questionnaires,

19   assuming they respond.

20         THE COURT:  I would be more inclined to go with about

21   80, and bring in 40 on day one and 40 on a subsequent day,

22   rather than bring in all 80.

23         MR. ELIOPOULOS:  I think that's fine.

24         THE COURT:  Now, we may not get through 40 in a day.

25   Or we could do 30, 30, and 20; or 30, 30, and 30, and then the

1    jury office could presumably -- if we didn't really need

2    everybody, we could call the last group up and tell them not to

3    show up.

4            MR. ABBENANTE:  I think I would ask for 10 extra.  I

5    think we should do 90, just to be safe, because we can always

6    release them.  And I think Your Honor said the last time -- I

7    can't remember, did you say four or six alternates?

8            THE COURT:  What do you think, if the trial is going to

9    last six to eight weeks?

10           MR. ABBENANTE:  I know I was just up with Judge Leon in

11   that case that he had.

12           THE COURT:  Which was 15 weeks.

13           MR. ABBENANTE:  Yeah, and I'm trying to remember how

14   many he had sitting in the front.  I think he had two or three

15   in the front, so he had at least 16; he may have had 17.  I

16   don't know.  But I would think we should err there on the side

17   of caution, too.

18           MR. ELIOPOULOS:  Absolutely, Your Honor:

19           MR. ABBENANTE:  So I would say five or six.

20           THE COURT:  Is there a difference between five and six?

21           MR. ABBENANTE:  No.

22           MR. ELIOPOULOS:  So is the Court saying six?  Because

23   that's fine with the government, too.

24           THE COURT:  All right.  So we'll do 12 and six

25   alternates.  And then that means you've got 10 peremptories for

1    the defense and six for the government first go-round, and then

2    I guess you each get three.  Right?  You get one for every two

3    alternates?

4         MR. ABBENANTE:  Right.

5         THE COURT:  And we'll devise a system to keep them

6    anonymous.

7         So that means we've got 22 peremptories.  10 and 6 is

8    16; plus 6 is 22; plus 18, that's 40.  So if we have 90 people,

9    there's a potential 50 for cause, including hardship, which may

10   be more than we need.

11        But I will talk to the jury office about how we do

12   this, if we do it in three groups rather than -- I mean, and

13   then we don't need the ceremonial courtroom, by the way,

14   Ms. Moon, if we do it in groups.  Because the original idea was

15   to get 100 people in here, or 90 people in here, and have them

16   fill out their questionnaire together, and then send two-thirds

17   of them home, or three-quarters of them home, while you

18   reviewed -- send them all home while you reviewed the

19   questionnaires, and then have them come back in smaller groups.

20   And that was going to take days and days.

21        If we do it orally, we can just bring them in in three

22   groups and ask the general questions, and we should be able to

23   get through 30 in a day; you know, 15 in the morning or 15 in

24   the afternoon, something like that.  They may be long days, but

25   we should be able to do it.

1          Okay.  Anything else on the jury situation?

2          MR. ELIOPOULOS:  Your Honor, if we're potentially doing

3     three days for jury selection - and I think that's going to be

4     enough - the government would request to start with the openings

5     on that following business -- whatever that Monday is after

6     that.

7          THE COURT:  That's fine.

8          MR. ELIOPOULOS:  Just so we don't break up the case.

9          THE COURT:  I think that's fine, and I think it also

10    gives us a little flexibility in that week.  So we'll start on

11    the Tuesday, and presumably if all goes smoothly, we'll have our

12    jury by the end of Thursday and we'll take Friday off.

13          What I will do, though, is I won't swear the jury that

14    week, just in case somebody gets deathly ill over the weekend or

15    something.  And the other thing I've done on occasion is have

16    the 18 come back, but also have another three or four people

17    come back just in case something comes up with one of the 18,

18    and we know we have a small group that we can go to, maybe do a

19    little additional voir dire and then plug them in somewhere.

20          MR. ABBENANTE:  That's fine.

21          MR. ELIOPOULOS:  That's fine, Your Honor.

22          THE COURT:  All right.  So that's jury selection.  And

23    you'll talk to her and I'll talk to her.

24          Okay.  What else do we want to talk about

25    preliminarily, other than motions?

1           MR. ELIOPOULOS:  Your Honor, I know the defense -- the

2    defendant filed a pro se motion with respect to the

3    ineffectiveness of Mr. Abbenante.  We opposed that motion, and I

4    think that's something we ought to address.

5           MR. ABBENANTE:  I need to also address the Court on

6    that issue, because I didn't file anything in writing

7    purposefully because I made the decision I would rather do it

8    orally.

9           THE COURT:  If we want to move to motions, we probably

10   should deal with that one first, in any event.  So if you want

11   to have a seat, Mr. Eliopoulos, and I'll listen to

12   Mr. Abbenante.

13          MR. ABBENANTE:  Your Honor, I think the government

14   addressed the one part of the motion that dealt with the

15   situation involving my failure to object to the questions that

16   were asked.  I think the government's response sets forth what

17   the facts were at that time, and I don't have anything else to

18   say on that issue.

19          With regard to the issue involving the Hylton case

20   which Mr. Sitzmann mentioned in his motion, this was brought up,

21   I don't remember exactly when, but a couple of months ago -

22   maybe even longer than that - when I met with Mr. Sitzmann at

23   the jail.  He had raised it with me; obviously he had done some

24   research and tried to, I guess, check my background in some way.

25   Since it was a *Kastigar* issue, it may have been related to the

1    pending motion that was filed by Mr. Klugh at that time.

2           And in that particular case, as he referenced it in his

3    motion, the Court of Appeals reversed Mr. Hylton's conviction,

4    and in that written opinion said that the basis upon which they

5    were reversing his conviction was because I failed to raise the

6    *Kastigar* issue during the second trial, and therefore I was

7    ineffective.  And when they reversed that conviction, they

8    issued that written opinion and Mr. Sitzmann became aware of it

9    and read it.

10          When he raised that issue with me, I told him then

11   that -- I explained to him that, yes, the conviction was

12   reversed.  When Mr. Hylton came back down before the

13   District Court, he entered a plea of guilty in the case and then

14   did not pursue any *Kastigar* hearing at that point, because,

15   quite frankly, there was no issue.

16          As these cases are handled, as Your Honor probably is

17   aware, whenever this happens, the case -- I am referred to the

18   bar for an investigation by bar counsel.  And that investigation

19   took place in July of 2003.  They issued an opinion in writing,

20   and just the pertinent parts --

21          THE COURT:  Bar counsel issued the opinion?

22          MR. ABBENANTE:  Yeah, bar counsel issued an opinion,

23   which is confidential, and I guess I'm the only person who is in

24   a position to release it.  I'm not going to file it as part of

25   the case.  I'm going to let Your Honor look at it.  I've

1    explained this to Mr. Sitzmann at the jail over a couple of

2    months ago.  I thought it was a dead issue; for whatever reason,

3    he decided to raise it.

4          When this letter was issued to me, the pertinent part

5    was that the bar gave me a chance to explain what the situation

6    was; they also brought in the prosecutor who was also involved

7    in this, and they did a complete investigation.  And the

8    findings were:  "We find that your explanation for not

9    requesting a *Kastigar* hearing credible.  We do not find that you

10   violated your ethical obligations by failing to request such a

11   hearing.  We note that our finding is based upon information

12   available to this office and may not be available to the court.

13   Based on the foregoing, we do not find clear and convincing

14   evidence of any ethical violation on your part.  We trust that

15   this letter adequately advises you of the basis of our decision

16   to terminate our investigation."

17         I provided this letter -- and I'll just pass it up to

18   the Court, and I let Mr. Eliopoulos look at it this morning.  I

19   provided that letter to Chief Judge Hogan at the time.

20         THE COURT:  Was the Hylton case Judge Hogan's case?

21         MR. ABBENANTE:  No, it was Judge Penn's case.  It was

22   Judge Urbina's first -- during the first trial -- and the irony

23   of this whole thing is, during the first trial there was a

24   *Kastigar* issue, I litigated it, and Judge Urbina excluded all of

25   the testimony, et cetera, that resulted from the defendant's

1    failure to be properly advised.  He was acquitted of all but one

2    of the charges at that trial, and then he was retried on this

3    one other charge, and this issue was raised after he was

4    convicted on that charge.

5            THE COURT:  So the second trial was before Judge Penn?

6            MR. ABBENANTE:  Yes.  And I assume -- I don't know what

7    the procedure is internally within the court, but obviously when

8    someone is referred to the bar or there's a question of an

9    attorney's competence, I brought that to the attention of Chief

10   Judge Hogan.  And I don't know if it was circulated among the

11   judges at that time, or the disciplinary part of the court here,

12   but no action was taken based on that letter.

13           To this day, obviously it's something that I've let

14   pass, but the bottom line is that I maintained then - and I

15   think it's been borne out by this investigation - that I did

16   nothing wrong, and that's the way I explained it to

17   Mr. Sitzmann.  Why he brought it up in this pro se motion, I

18   don't know.

19           But I talked with the bar, I'm not trying to be adverse

20   to Mr. Sitzmann in any way by representing this to the Court,

21   but since he raised it and I'm the only one who can address it,

22   it has nothing to do with the representation in this case, I'm

23   bringing that forward to the Court.

24           THE COURT:  Mr. Sitzmann, is there anything you would

25   like to say in response, or to supplement what you said in

1    writing?

2              THE DEFENDANT:  No.  No, Your Honor, that's fine.

3              THE COURT:  Okay.  Thank you.  Mr. Eliopoulos, is there

4    anything you want to add?

5              MR. KHANDELWAL:  I'm happy to address any points that

6    the Court wishes me to make, but we believe our filing was

7    sufficient on this issue.

8              THE COURT:  Okay.  Thank you.  Let me just read the

9    letter.

10             I don't know whether Judge Hogan would have brought it

11   to the attention of our grievance committee, but typically in a

12   case like this -- because I've been on the grievance committee

13   when I was in practice, and I've been liaison to the grievance

14   committee.  Typically in a case like this, the grievance

15   committee might say, we're not going to do anything until we see

16   whether bar counsel does anything, because they have more

17   resources and so forth.  If bar counsel had taken some action,

18   then there might have been reciprocal discipline.  But once they

19   didn't, typically the grievance committee here wouldn't do

20   anything.

21             Yes, Mr. Sitzmann?

22             THE DEFENDANT:  I have no idea what the government

23   filed.  When you asked me to respond, I don't know what it is.

24             MR. ABBENANTE:  I thought that when I sent my

25   investigator and my paralegal down to see Mr. Sitzmann the other

1    day at the jail, I thought they gave him a copy of it.  I don't

2    have an extra copy with me.  If I can just see if Mr. Eliopoulos

3    has a copy, I can borrow it.

4           THE COURT:  If not, I'll make a copy, if Mr. Sitzmann

5    wants time to read it.  I don't have to resolve this today.

6    Mr. Sitzmann, you can read it now if you would like, or if you

7    would rather take it back with you.

8           THE DEFENDANT:  If I may.

9           THE COURT:  Yeah.

10          MR. ABBENANTE:  I'll get him a copy, Your Honor.

11          THE COURT:  So if Mr. Sitzmann wants to respond or say

12   anything in response to the government, I suggest you do it

13   reasonably soon so I can decide the question reasonably soon.

14   Let me read the letter.

15          Okay.  I'll give this back to Mr. Abbenante.

16          MR. ELIOPOULOS:  Your Honor, I understand that the

17   defendant wants to read the government's opposition; however,

18   with this issue still hanging over the proceeding, obviously I

19   would like to resolve it as quick as possible.  If the defendant

20   can read the government's opposition, which is not that long,

21   and make a decision at that point about whether he needs more

22   time to digest it, I just don't want to get too far afield with

23   this issue still hanging out there.

24          THE COURT:  I agree with that.  So if Mr. Sitzmann

25   wants to do it this way, I'll take a 10 or 15-minute break and

1    he can read it and we can continue this discussion.  But if he

2    really wants to take it back with him and read it at the jail,

3    I'll let him do that, and we'll just have to set a deadline by

4    which he's going to file something further or say something

5    further, if that's his desire.

6            MR. ABBENANTE:  And maybe in the interim, if Your Honor

7    is going to take a little bit of recess, Mr. Eliopoulos and I

8    can talk to the jury administrator.

9            THE COURT:  If she's available now.

10           So why don't we do this:  If you can go talk to her, if

11   that works now, I'll take 15 minutes.  Mr. Sitzmann can read

12   this, he can then come back and tell us whether he wants to say

13   anything now or whether he wants more time.  Let him read it

14   first before he decides.

15           Okay.  Then we'll discuss the other things on my list.

16           MR. ABBENANTE:  Thank you, Your Honor.

17           (Recess taken at 10:38 a.m.)

18           THE COURT:  My law clerk has some extra copies of the

19   filing.

20           MR. ABBENANTE:  Your Honor, I spoke with Mr. Sitzmann.

21   He wants an opportunity to respond in writing.

22           THE COURT:  Okay.  How much time would you like to do

23   that, Mr. Sitzmann?

24           THE DEFENDANT:  May I show this to Your Honor?

25           THE COURT:  This has to do with the use of the law

1    library.

2          THE DEFENDANT:  Yes.  Since Thanksgiving we've been

3    there twice.

4          THE COURT:  Yeah, well...

5          THE DEFENDANT:  So when you ask me how long I need to

6    do it, that's why I showed it to you.  As soon as I can get

7    there, I will answer.

8          THE COURT:  That document suggests, Mr. Abbenante, that

9    you should call Maria Amato and ask her.  She's pretty good at

10   solving problems.

11         All right.  So Mr. Sitzmann is going to respond to

12   this.  I looked at the Hylton opinion.  With all due respect,

13   Judge Silberman and Judge Sentelle wrote the opinion in *North*,

14   which is their view of *Kastigar*, which is the law of this

15   circuit, which is the law of no other circuit, which is my bias

16   since I worked on the *North* case as a prosecutor.  I think

17   they've got a skewed view of *Kastigar*, but it is the law of this

18   circuit.  So anyway, that's what it says.

19         Well, I'm ready to talk about other motions, unless --

20         MR. ABBENANTE:  I don't want to interrupt Your Honor.

21   Just to trying to resolve the issues.  We talked to the jury

22   commissioner, and the way it was explained to us, which is

23   agreeable, is she's going to make the initial cut of everyone

24   that she believes are hardship, and there may be a few that fall

25   into the category where she would in fact not grant their

1    request for hardship but they would be on the border, and she

2    says she'll separate those and send them to the Court for us to

3    review.  And that's agreeable to us.

4            MR. ELIOPOULOS:  That was acceptable, Your Honor.  She

5    agreed that she'll make the cut on those people that are

6    clearly -- there is a hardship; anybody on the fence, she'll

7    present it to the Court.

8            MR. ABBENANTE:  She also said that she thought 90 was

9    more than enough to handle our situation based upon the number

10   of alternates, et cetera.

11           THE COURT:  Well, she'll probably try to talk me into

12   80 or something.

13           MR. ELIOPOULOS:  Well, actually, we asked her is it too

14   many or is it enough, and she said it's enough.

15           THE COURT:  And I'll talk with her - and maybe you

16   have - but I'll talk with her again about, it might be helpful

17   from her perspective - and I'm sure we can work this out - not

18   to bring them all in in one group, but to bring them in in three

19   separate groups.

20           MR. ELIOPOULOS:  That's fine, Your Honor.

21           MR. ABBENANTE:  However you think is the best way to do

22   it is fine with me, in terms of bringing people in.

23           THE COURT:  If we find out the second day that we may

24   not need the entire third group, she may be able to bring in a

25   partial third group.

1          I've looked at pending motions, and I have some views

2     which I can share and see whether it solves things.  Let me

3     start with the *Kastigar* thing.  I said, I believe -- when we met

4     on December 13th and it was explained that if we had a *Kastigar*

5     hearing, that there would be two or three witnesses, we actually

6     set aside two days next week, or portions of two days, to do

7     that.  I said that -- the government argues as to why -- it

8     argued on the 13th as to why they didn't think a hearing was

9     necessary, and Mr. Abbenante responded.

10         I said that having read the motion for a *Kastigar*

11    hearing filed back in April of 2010 by Mr. Klugh, and his

12    Appendix A to that motion, and the government's opposition filed

13    in the summer -- June of 2010; and Mr. Sitzmann's reply, which

14    was also filed by Mr. Klugh; and amended reply, also filed on

15    Mr. Sitzmann's behalf by Mr. Klugh, I said that having read all

16    of that, that I agreed with the government that we didn't need a

17    hearing.  And I gave Mr. Abbenante until, I can't remember what

18    date - January 20th or something - to file something further, if

19    he wanted to, in response to my preliminary conclusion that we

20    didn't need a hearing, and nothing was filed.

21         So is there anything more to be said on whether you

22    think -- to be said with respect to whether a hearing is

23    required?

24         MR. ABBENANTE:  Your Honor, all I can say to that is

25    that I've investigated the matter, and I am not in a position to

1    file any affidavits in support of the motion.

2            THE COURT:  In that case, what I want to say is the

3    motion is captioned a motion for *Kastigar* hearing, but it's

4    really a motion for a hearing, and then raises certain issues.

5    So I'm prepared to say that I'm not going to have a hearing on

6    *Kastigar*.  So I guess I don't want to deny the motion in its

7    entirety and take it off the docket, because I think I need to

8    say some things about the issues that are raised that are not --

9    that can be resolved in my mind without a hearing.

10           So you'll hear further from me on the substance of the

11   arguments, but I don't think we need a hearing to decide them.

12   If that's clear, I'll leave it at that for now.  I don't know

13   how Ms. Moon is going to deal with the docket in view of what I

14   just said.  If it had been captioned "Motion For a *Kastigar*

15   Hearing and to Exclude Evidence on the Basis of *Kastigar*," then

16   the computer probably would have listed it as two separate items

17   and we could deny one and keep the other one open.  But I guess

18   we have to keep it open for now.

19           The next thing that I looked at, because there was some

20   question about it last time, is what was captioned "Defendant's

21   Motion For Transcription, In-Camera Review, and Disclosure of

22   Transcripts of the Grand Jury Proceedings."  And that was docket

23   number 66.  So I've been back through all of these motions,

24   because there was some confusion about what exactly was being

25   asked for in the motions.  And what's important in talking about

1    these is that this was all fully briefed -- it's docket 66.

2    This was all fully briefed before I decided five defense

3    motions, including four motions to dismiss the indictment.

4            And the argument for the transcription, in-camera

5    review, and disclosure of grand jury proceedings is -- there are

6    a number of grounds.  One was that the government violated the

7    statute of limitations or constructively amended the indictment

8    through the Bill of Particulars.  But I ruled back in September

9    that the government did not violate the statute of limitations

10   and did not constructively amend the defendant's indictment; I

11   rejected the argument that the Bill of Particulars are binding

12   admissions of the content and scope of the indictment; and I

13   rejected the argument that for that reason, they were

14   constructive amendments.  The Bill of Particulars does not

15   impermissibly add additional charges, I said.

16           With regard to the statute of limitations issues, I

17   ruled that for the charges to fall within the five-year statute

18   of limitations, the government had to show only that the

19   conspiracy continued into the period.  And because the last act

20   in furtherance of the conspiracy occurred within the five-year

21   limitations period, the fact that the conspiracy began 14 years

22   earlier I said was not important.

23           The government -- I'm sorry, the defendant also raised

24   in this motion for transcription the question of the

25   extraterritorial application of 841 and 846 of Title 21.  And I

1    also dealt with those substantive questions in the hearing on

2    September 8th and in my subsequent order, and I said that those

3    statutes may apply extraterritorially so long as there's been

4    actual possession in a United States territory, or a conspiracy

5    that involved the drugs entering or being transported through

6    United States, even if not intended to be distributed in the

7    United States.

8           So that undermines the argument, or makes moot the

9    argument that the transcripts of the grand jury proceedings are

10   important because the government misled the grand jury as to

11   permissible bases for the indictment.  Because that argument was

12   premised on the notion, as set forth in this motion we're

13   talking about now, that the prosecutor led the grand jury to

14   believe that a conspiracy by a U.S. citizen to transport cocaine

15   from South America to other countries, not the United States,

16   can satisfy the elements.  Well, in view of my ruling about the

17   elements and the conspiracy and the extraterritorial reach, I

18   don't think there's anything to that.

19          The next point has to do with the argument that

20   George Jones and Terrence Colligan are now deceased, and the

21   defendant argued that there was prejudice to him.  I found at

22   the hearing on September 10th that everything that the defense

23   said about Colligan and Jones was pure speculation, without any

24   concrete evidence that the defense has been harmed; and further,

25   that based on all of the representations to me, that the deaths

1    of those two individuals didn't hurt the defense, it hurt the

2    United States.  So I gave oral rulings on all of these

3    underlying questions on September 8th, and there's a transcript

4    of that.

5            And then by order, which I signed on September 10th and

6    was filed on September 15th, I denied all of the motions to

7    dismiss for the reasons stated at the hearing on September 8th:

8    The motion to dismiss based on preindictment delay; the motion

9    to dismiss the indictment or to strike the Bill of Particulars

10   based on violations of the statute of limitations and based on

11   constructive amendment; I denied the motion to dismiss based on

12   due process violations relating from the nature of the

13   indictment, the jurisdictional issues, and interference with the

14   defendant's ability to timely respond; I denied the motion to

15   transfer venue to the Southern District of Florida; and dealt

16   with the motion to dismiss for lack of venue and due process

17   violations, or to change venue.

18           So it seems to me that everything from the motion for

19   transcription, in-camera review, and transcripts of grand jury

20   proceedings is -- all of those arguments fall by the wayside in

21   view of my rulings.  The only issue that maybe I didn't address

22   has to do with the question of whether Gary Paulson's grand jury

23   testimony revealed immunized information given to the government

24   by Mr. Sitzmann.  And so it seems to me that that question is --

25   and it's argued that his grand jury testimony included

1   information that was covered under the scope of immunity that

2   the government allegedly granted to Mr. Sitzmann.  I think

3   that's the argument.

4          And I guess the question is whether anybody thinks,

5   when I go back to look at the *Kastigar* motion, that I need to

6   see Paulson's grand jury testimony in camera or not, or -- I'm

7   not quite sure how it relates to the argument that Mr. Sitzmann

8   was given immunity, and what Mr. Paulson would say about it, but

9   that's the -- I think that's the only open question in the

10  motion under document 66.

11         MR. ABBENANTE:  Well, I as I understood the motions,

12  that was the harm that Mr. Klugh was trying to allege in those

13  motions, that Mr. Paulson's testimony was tainted or should be

14  excluded on the basis of the fact that he was provided

15  information that Mr. Sitzmann had given during previous alleged

16  debriefings where he was supposedly granted immunity.

17         So I just think in an abundance of caution, so that

18  Your Honor can have a complete picture of what went on, and what

19  if anything went on in the grand jury, what if anything was said

20  by Mr. Paulson, that I would ask the Court to ask the government

21  to let you review it before you decide the motion.

22         THE COURT:  The *Kastigar* motion and the remainder of

23  this motion?

24         MR. ABBENANTE:  Yes.

25         MR. ELIOPOULOS:  Your Honor, it's the government's

1    position that the defendant was not given immunity.  There

2    hasn't been any facts presented by the defense by affidavit or

3    otherwise.  The defense's argument that Mr. Paulson may have

4    been fed information from whatever the defendant had provided to

5    the government, and that information may then have been fed by

6    Mr. Paulson to the grand jury, again, it's pure speculation, and

7    I think we all know the requirements for the government to

8    produce grand jury material is very, very high.

9            But I can make one representation, Your Honor, but I

10   would like to approach the bench - it's 6(e) material -

11   regarding that issue.

12           THE COURT:  Well, do you object to Mr. Abbenante being

13   at the bench when you tell me about the 6(e) material?

14           MR. ELIOPOULOS:  I do, Your Honor.  Then we can talk

15   about whether it would be disclosed.  But I don't think he would

16   be entitled to that information, since he still wouldn't be

17   entitled to the information with respect to Mr. Paulson, because

18   even he is requesting an in-camera review.

19           THE COURT:  Oh, I see.  So what you're going to tell

20   me -- since the alternative -- the request, at least the initial

21   request in Mr. Klugh's motion, is for in-camera review of the

22   Paulson material, so Mr. Sitzmann and Mr. Abbenante would not

23   see it unless and until I decided it was relevant to the

24   *Kastigar*.

25           MR. ELIOPOULOS:  Correct.  Because I think what the

1    defense is arguing is that we indicted the defendant based on

2    the information that he provided to the government in France,

3    that we fed that information or those statements by the

4    defendant to Mr. Paulson, and then we went into the grand jury

5    with Mr. Paulson and got out his statements.

6         MR. ABBENANTE:  The only thing I want to say -- again,

7    I don't have the pleadings in front of me, but I think part of

8    the argument that Mr. Klugh was making was information that

9    Mr. Sitzmann allegedly provided to the prosecutors in Florida,

10   based upon the letter that he attached to the motion for

11   Mr. Howell indicating that he wanted -- the conditions were full

12   immunity.  So I think that's part of the argument.

13        But again, the one thing I haven't heard yet is, what

14   is the problem -- I understand the whole 6(e) issues, but what's

15   the problem with the government providing the transcript to the

16   Court?

17        THE COURT:  Right.  So before I hear what

18   Mr. Eliopoulos wants to say about 6(e) at the bench ex parte,

19   for the moment I just want to make one other observation.  In

20   one of the supplemental filings with respect to this motion for

21   transcription, Mr. Klugh and Mr. Sitzmann argue that regardless

22   of the ultimate determination of the immunity issue, that

23   Mr. Paulson's grand jury testimony of information provided by

24   the government is *Brady* material.  Again, I don't know that he

25   would know that without seeing it, but that's, of course, always

1    the conundrum in *Brady*.

2         And so the question is, irrespective of the immunity

3    question, whether there is anything in Mr. Paulson's testimony

4    that is favorable or exculpatory and therefore *Brady*.  I don't

5    know if you're ready to answer that, if you've read the Paulson

6    transcript recently.

7         MR. ELIOPOULOS:  Your Honor, I have not read it

8    recently, but I can tell the Court that the government has made

9    *Brady* disclosures, continues to make *Brady* disclosures to the

10   defense, including disclosures regarding Mr. Paulson have

11   already been provided to the defense.  But aside from that, as

12   far as I can tell, standing here with some time having elapsed

13   since I last reviewed his transcript, I do not recall any *Brady*

14   that was in that transcript that has not already been disclosed

15   to the defense.

16        THE COURT:  Okay.  Why don't you come to the bench and

17   tell me what you want to say under seal because it's 6(e)

18   material.

19             (BENCH CONFERENCE ON THE RECORD.)

20        MR. ELIOPOULOS:  Again, it's been awhile since I looked

21   at Paulson's transcript, but, Your Honor, we indicted the case

22   in August of '08.  The grand jury remained open for some months

23   because we were considering superseding and possibly bringing in

24   other defendants.  I believe Mr. Paulson testified after the

25   indictment in the grand jury, so the grand jury could not have

1    indicted the defendant based on anything Mr. Paulson had said.

2            I can follow up on that with a letter to the Court or

3    an e-mail just to confirm that.

4            THE COURT:  So he only testified once?

5            MR. ELIOPOULOS:  That's what I recall.  I recall it was

6    only once.

7            THE COURT:  Why don't you let me see it?

8            MR. ELIOPOULOS:  I can do that, Your Honor.  We can do

9    that.

10           And with respect to *Brady*, Your Honor, Mr. Paulson does

11   have illnesses.  I've provided that to the defense.  Other than

12   that, I don't know of any -- clearly he has said things

13   incriminating to this defendant.

14           THE COURT:  I assume it's not that long of a

15   transcript.

16           MR. ELIOPOULOS:  It's been awhile since I read it.  I

17   don't think it's long.  I try to keep them short, for obvious

18   reasons.

19           THE COURT:  I'm going to say on the record that

20   Mr. Eliopoulos decided that whether there's a particularized

21   need, you're going to show it to me.

22           MR. ELIOPOULOS:  Okay.

23           (END BENCH CONFERENCE.)

24           THE COURT:  Okay.  I think what I'm going to do is,

25   without regard to whether a particularized need has been shown,

1 and fully accepting Mr. Eliopoulos' representations about *Brady*,

2 I'm going to ask Mr. Eliopoulos to show me the Paulson

3 transcript in camera.  I'll read it --

4    MR. ELIOPOULOS:  Actually, Your Honor, Mr. Sharad has a

5 copy of it.  I can do it now, if you want to check what I said

6 at the bench.

7    THE COURT:  Let me just take it for a day or so and

8 read the whole thing, and I'll get it back to you.  I'll call

9 your office and send it back.

10    All right.  So that's where we are on this question.

11 So for all of these reasons, I think that the motion for

12 transcription should be denied in all respects, except with

13 respect to Paulson, and I'll decide that in the next couple of

14 days.  So we don't have to do anything yet until I've read

15 Paulson.

16    Now, the next one is called a motion to -- let me get

17 the title correct.  Motion for production of *Brady* and *Giglio*

18 material, and for access to original tape recordings for

19 forensic examination.  I believe that I've been told - but

20 Mr. Abbenante can tell me if I'm wrong - that at least for now I

21 don't need to decide any motions on *Brady* material because the

22 government seems to be providing what it needs to provide.  Tell

23 me if I'm wrong about that.  If I'm wrong about that, the only

24 thing we have to talk about is this access to original tape

25 recording for forensic exam.

1          MR. ABBENANTE:  Your Honor, I trust that Mr. Eliopoulos

2    is continuing to provide the information that he considers to be

3    *Brady*.  I think we still have an issue as to when he's going to

4    make the *Giglio* disclosures, and how soon in advance of trial.

5    That is something I don't think we've been able to agree on.

6          THE COURT:  Well, I would like for you-all to try to

7    reach an agreement on *Giglio* and on *Jencks*, because this is

8    going to be a long trial; I think the law is pretty clear,

9    Mr. Eliopoulos, that *Brady* requires -- I think it requires

10   disclosure as soon as it's apparent that it's exculpatory and

11   favorable, and that includes law enforcement officers' files as

12   well as prosecutors' files.

13         And there is some dispute in the law about whether

14   *Giglio* is required as early as *Brady*, the theory being that

15   since you don't get witness statements and even witness names as

16   a matter of course, that by providing *Giglio*, you're in effect

17   providing witness names and witness statements.  Clearly we know

18   what the Jencks Act and Rule 26.2 requires.  On the other hand,

19   with a lengthy trial and a lot of witnesses to prepare for,

20   its's been my experience - and I'm sure it's been your

21   experience - that the lawyers ought to agree on a timetable for

22   disclosure of *Giglio* and for disclosure of *Jencks* and for

23   disclosure of witness lists and for disclosure of -- well, and

24   that's it for the moment.

25         So what I'm saying is, I think the *Brady* obligation -

1   and Mr. Eliopoulos seems to acknowledge this - has kicked in.

2   It's an ongoing obligation.  And so the issue is *Giglio* and

3   *Jencks*.

4          So I think you-all ought to talk to each other further.

5   We now know when the trial is going to begin, when opening

6   statements are going to take place, and I don't want delays in

7   the trial while Mr. Abbenante is reading *Jencks* material.  And I

8   don't want an argument to be made that, oh, if I had had this

9   impeaching material earlier, I would have done some

10  investigation.  I mean, it's one thing for a good lawyer, as

11  Mr. Abbenante is, to look at the stuff a couple of days before

12  and prepare his cross-examination, but there are some witnesses

13  that you learn information about, and to impeach them, you need

14  to do an investigation of some sort.  You need to explore

15  things.  And it's not just using your decades of experience to

16  know how to cross-examine somebody based on what you've already

17  gotten, it may require some investigation.

18         So you need to talk to each other about *Giglio* and

19  *Jencks* and the timetable.  Okay?

20         MR. ELIOPOULOS:  Mr. Abbenante and I will talk,

21  Your Honor, but the government does have concerns in this case.

22  We all know the defendant, at least based on the government's

23  allegations, has been a large scale international

24  drug-trafficker, where his sources of supply were coming from

25  Columbia and/or Mexico involving the cartels and paramilitary

1    organizations.  The defendant in this case has already

2    threatened a witness in this case, threatened to kill him and

3    his family.  That was part of one of the first Bill of

4    Particulars that the government had filed in this case.  He

5    threatened to kill the witness' family in front of him, then he

6    would kill his dogs, and then he would kill the witness.

7          So the government, in order to protect its witnesses,

8    does not want to disclose the identity of witnesses to the

9    extent the defense doesn't already know about them.  But we

10   don't want to be party to any type of intimidation, threats, or

11   violent acts against our witnesses that are going to be

12   testifying against him.  We already know through jail calls,

13   Your Honor, that this defendant has had a co-conspirator looking

14   for witnesses.

15         So again, we have concerns in this case.  This is not

16   the run-of-the-mill type of case.  This case involves large

17   scale drug trafficking, where the stakes are very high.  So we

18   do have our concerns, and that's why I'm very hesitant to

19   provide very early *Jencks* and *Giglio* information.

20         I had proposed the last time we were here that the

21   government would disclose its *Jencks* and its *Giglio* the Friday

22   before the week the witnesses would be testifying.  And that's

23   what we've done in previous cases, in large cases.  I have been

24   involved in long trials, and that has worked.

25         In this particular case, Your Honor, with the concerns

1    of the government, I do not think early disclosure, well before

2    the jury is even selected, for us to be making any type of

3    disclosures like that.

4         MR. ABBENANTE:  I think this is the impasse that we

5    have with Mr. Eliopoulos and myself.  Again, as I indicated, I

6    think, at a previous hearing, I'm willing to get this

7    information pursuant to a protective order and not disclose it

8    to Mr. Sitzmann until whatever Mr. Eliopoulos and I agree upon,

9    like on the eve of testimony or a week before, the way he wanted

10   to disclose it.

11        But I just feel -- again, I've been doing this a long

12   time, and I'm one person here.  I don't have two lawyers

13   working -- another lawyer working with me.  It's very difficult

14   to get in the middle of trial, when I'm trying to prepare to

15   cross-examine witnesses, to start looking at *Jencks* material

16   that's coming out for the next week.  I mean, it gets very

17   difficult.

18        And as Your Honor indicated, many times, once you

19   review this, I have to send my investigator out to try to follow

20   up on some of this stuff.  And I understand the concerns that

21   Mr. Eliopoulos may have with regard to my client and some of the

22   allegations that he's raised and has proffered today; however, I

23   think those can be alleviated, those concerns, if I agree to a

24   protective order.  And I'm willing to do it and I've done it

25   before, and there's not been any problem.

1          But to dump -- I'm saying dump.  But there's two months

2    worth of witnesses.  A number of witnesses are going to be from

3    out of the country.  There's no way that I can -- even though

4    they're probably mostly law enforcement, there's no real way

5    that I can properly investigate any of this stuff if I've only

6    got their information three or four days before their testimony.

7          And I know we're at an impasse, and I'm willing to keep

8    on talking to Mr. Eliopoulos, but I don't think that it's going

9    to work itself out.  I don't know whether -- I'm not trying to

10   get the Court involved unless we have to, but at a bare minimum

11   I think that the Court could require that once a jury is sworn,

12   that all the *Jencks* material be turned over - everything - once

13   the jury is sworn.  But in lieu of that, in lieu of that, I

14   would be willing to work out a protective order agreement, and

15   I'm willing to talk with Mr. Eliopoulos about it.

16          THE COURT:  Well, you can talk and see what happens.

17          Do you want to say anything else?

18          MR. ELIOPOULOS:  Your Honor, I understand Mr. Abbenante

19   would like a protective order and be able to still get the

20   information.  Mr. Abbenante in many respects, including during

21   the last hearing, raised Judge Leon's case, that there was a

22   protective order in that case.  And I talked to the prosecutors

23   in that case, and one of the defense attorneys produced

24   documents covered by the protective order to the defendants, or

25   at least one of the defendants, in that case.  I don't think it

1    was done on purpose, but things are done inadvertent, by

2    accident, and covered documents still ended up in the hands of

3    the defendant or defendants in that case.  So that is definitely

4    not foolproof.  The government will talk with the defense to see

5    if we can come up with something.

6            I also want to represent to the Court that a lot of the

7    witnesses, including the out-of-country witnesses, are law

8    enforcement.  The government has -- when the government gets

9    documents from France, Your Honor, I've turned that over to the

10   defense.  And that would include any reports, police reports,

11   statements.  They've already gotten that information,

12   Your Honor.  I've received some documents out of Columbia;

13   again, I've produced the reports to the defense that I received

14   that came from the Columbians.

15           So for the defense to say that we're going to be

16   dumping all of this information, that's not true, because I've

17   gone well beyond what I think I'm obligated to do in producing

18   documentation by French law enforcement, Columbian law

19   enforcement, other law enforcements.  I think I produced

20   documents to the defense regarding an arrest of the defendant

21   back in the 1990s, where there might be a witness that is going

22   to testify with respect to that.  So still those reports have

23   been given to the defense.

24           So I don't think it's fair for the defense to be saying

25   I'm going to be dumping *Jencks*.  A lot of that *Jencks* has been

1    produced.

2         MR. ABBENANTE:  I didn't mean to imply the government

3    was going to dump all of this.  They've been giving information.

4    There's thousands of pages of documents and reports and

5    everything else that they've provided.  I'm talking about

6    getting a bunch of grand jury transcripts, a bunch of *Giglio*

7    material, statements that have been given to agents, all of this

8    stuff being given at that particular point in time, when I'm in

9    the midst of the trial, when I'm trying to prepare in a very

10   difficult case with an admittedly, the record reflects, a very

11   difficult situation that I'm involved in at this point.

12        So that's what my position is.  Again, Mr. Eliopoulos

13   and I have known each other for a long time, we get along, I can

14   try to work it out.  I just think we're at an impasse.

15        And with respect to the protective order with

16   Judge Leon, it wasn't me that violated that protective order, it

17   was another lawyer.  And my handling of the information and the

18   way we did it with my investigator was actually the standard

19   upon which the court was making comparisons, and I'll do the

20   same thing in this case.  Mr. Sitzmann will not get any

21   documents that he's not supposed to get, and will not see

22   documents that he's not supposed to see until the witness

23   actually testifies in court.  But at least I'll have the

24   opportunity to do what I need to do so that I'm not going to be

25   accused of being ineffective, I'm not going to be accused of not

 1    asking all the proper questions, there won't be follow-up

 2    written motions by Mr. Sitzmann that I should have asked this or

 3    I should have asked that or I didn't cover that.  That's what

 4    I'm trying to prevent here.

 5            THE COURT:  I'll think about it and you'll see what you

 6    can do.

 7            The other piece of this motion was a request for the

 8    original recording of undercover recorded telephone

 9    conversations in an attempt to detect alterations and

10    manipulations of the content.  The government argues that it has

11    already provided copies of the recordings - copies of the

12    recordings - along with transcripts, and has also represented

13    that the recordings are authentic, accurate, and complete.

14            The defense says, well, there's no basis to withhold

15    this stuff, but Rule 16 -- there are a number of cases that

16    suggest that under Rule 16, the government doesn't have to

17    produce original recorded statements so long as it provides

18    copies.  And the question really is whether or not providing

19    copies is a sufficient compliance with Rule 16 without some

20    prima facie showing of alteration or misidentification between

21    the original and the copy.

22            So I'm not quite sure what is to be -- I guess on the

23    one hand I'm not quite sure why the defense thinks they need the

24    original; on the other hand, I'm not quite sure why the

25    government isn't willing to let the defense hear the original,

1    although they may not want to let it out of their hands.  And at

2    the same time I'm not sure that Rule 16 requires the government

3    to do anything more than it's already done.

4            MR. ABBENANTE:  Well, as I understand it - and I

5    haven't listened to it recently - the only real piece of

6    evidence that we're talking about here is a tape that was

7    allegedly made by Mr. Paulson himself, that wasn't sponsored in

8    any way by the government, of conversations that he had with

9    Mr. Sitzmann.  A copy of that was in fact provided to Mr. Klugh.

10           My understanding is that it was Mr. Sitzmann's

11   position, after listening to it with Mr. Klugh, that there were

12   portions that either were inaudible or chopped up, and it was

13   their position that it was either -- or their allegation is that

14   Mr. Paulson may have altered the tape in some way before he

15   provided it to the government.  And therefore they made this

16   request to have an opportunity -- I don't know whether or not it

17   was to turn over the original tape.  I forgot what the motion

18   said, but --

19           THE COURT:  For forensic testing.

20           MR. ABBENANTE:  For forensic testing.  But that's what

21   the issue is.  I think it's only that one piece of evidence.

22   Mr. Eliopoulos can correct me if I'm wrong, but that's what my

23   understanding is.

24           MR. ELIOPOULOS:  Your Honor, we have tapes that look

25   like the minicassettes that people used years ago.  I have no

1    problem with Mr. Abbenante coming to my office - although I

2    don't know if I have one of those tape recorders - and listening

3    to it and making a determination whether he wants to go further

4    with that.  I don't even know if that's the original that I have

5    in my possession or whether what I was given was a copy.

6           THE COURT:  I guess the concern would be this, assuming

7    there's some basis to all of this.  And I don't know enough

8    about Mr. Paulson's role in all of this and so forth.  But if

9    you're dealing with a law enforcement officer who has recorded

10   something, there's a presumption -- I don't know if the law says

11   this, but there's a presumption of regularity.  They're a

12   government official, they have professional responsibilities,

13   and if you had a law enforcement officer who you caught who had

14   altered a tape before he gave it to you, there would be severe

15   consequences.  So we start with a presumption that the tape that

16   the prosecutor gets from the Metropolitan Police Department or

17   the FBI or whomever has not been messed around with, and that

18   any copy that you or your people make from it hasn't been messed

19   around with.

20          The assertion here, or allegation here, is that

21   Paulson - not as reliable as an FBI agent - may have altered the

22   tape, the original, before he gave it to you, and you in good

23   faith are relying on it.  So it may be a little different.

24          So I guess what we ought to do is, step one -- and I

25   don't know whether -- I mean, is this tape going to be evidence?

1          MR. ELIOPOULOS:  It may be, Your Honor.  As I said, I

2    have no problem with Mr. Abbenante at least at first blush

3    listening to it, at least the one that would be an original for

4    me.  I don't know if it's the actual original, but it's the one

5    that the government has.  And then make a determination whether

6    we need to step back even further.

7          THE COURT:  I mean, presumably when Paulson testifies,

8    either side -- or in your witness preparation you can explore

9    this further - but that may come too late for Mr. Abbenante if

10   he needs a forensic analysis, and certainly a cross-examination

11   comes too late - can explore with this witness, then they can --

12          MR. ELIOPOULOS:  Again, I have no problem.

13          THE COURT:  So the suggestion, Mr. Abbenante, is,

14   step one, you'll go to Mr. Eliopoulos' office and listen to what

15   he's got, and then we'll talk further about what we need to do.

16          MR. ABBENANTE:  Fine.

17          THE COURT:  All right.  The next item on my list is

18   404(b).  And I'm not ready to do anything about 404(b), I just

19   want to make sure that I've got everything that relates to

20   404(b).  There is a government amended motion in limine on

21   404(b) which is document 60; there is a defendant memorandum in

22   opposition to that which I think is document 82, but I'm not

23   sure because of the way it printed out, and it was filed by

24   Mr. Beshouri way back when.

25          So I guess question one is whether the government needs

1    to modify or amend or supplement the 404(b) notice; and question

2    two is whether Mr. Abbenante wants to modify or amend the

3    opposition.

4          MR. ELIOPOULOS:  Your Honor, I probably would like the

5    opportunity to file a second amended or supplemental, because

6    there have been some issues that have developed that I would

7    like to address in another document.

8          THE COURT:  Okay.  And do you take the same position on

9    609?

10          MR. ELIOPOULOS:  609, the government is going to add

11    another felony conviction in 609, which is actually part of our

12    overt acts, and that was a conviction in Florida - I believe it

13    was 1994 - where the defendant was convicted of attempting to

14    fraudulently obtain a driver's license in the name of somebody

15    else.  For 609 purposes, we would like to include that, and it's

16    also, we believe, an overt act in the conspiracy itself.

17          THE COURT:  So put that in writing too, even though it

18    may be short.

19          MR. ELIOPOULOS:  We'll do.

20          THE COURT:  So when do you want to file supplemental

21    404(b) and 609?

22          MR. ELIOPOULOS:  I think we can get everything filed,

23    and the things that I'm looking at right now could be resolved

24    within 10 days.

25          THE COURT:  So you'll file something within 10 days?

```
 1              MR. ELIOPOULOS:  Yes.

 2              THE COURT:  Which gets us to February 12th, which is a

 3    Sunday.  So you want to file on the 13th?

 4              MR. ELIOPOULOS:  Is that the Monday?

 5              THE COURT:  Yeah.

 6              MR. ELIOPOULOS:  That's good.

 7              THE COURT:  And if he files the supplemental 404(b) and

 8    609 on the 13th, when do you want to file oppositions?  Because

 9    the first 609 hasn't been answered, in any event, so you'll have

10    to go back and look at that.  But you're free to add to anything

11    that Mr. Klugh or Mr. Beshouri already said on the 404(b) or the

12    609.

13              MR. ABBENANTE:  Your Honor, can I have 10 days, until

14    the 23rd?

15              THE COURT:  Sure.  And while you're up, Mr. Eliopoulos,

16    when do you want to respond to the recently filed motion to

17    compel which was filed on the 31st, document 143?

18              MR. ELIOPOULOS:  Same time, Your Honor, same day?

19              THE COURT:  Okay.  And Mr. Abbenante, if you want to

20    reply to that, you can do it on the same time schedule too.

21              So on February 13th the government will file

22    supplemental 404(b), supplemental 609, and the response to the

23    motion to compel; on February 23rd Mr. Abbenante will file

24    oppositions to the 404(b) and 609, and any reply to the

25    opposition to the motion to compel.  And that covers everything
```

1    I have on my list, I think.

2          Now, if we're not going to have a *Kastigar* hearing, we

3    don't need to be here the 7th and the 8th.  We can cancel the

4    7th and the 8th.  But I do think we should have another status

5    hearing, just because there are always things to discuss, it

6    seems, in this case.  And I could do that on the 24th of

7    February, since there will be filings made on the 23rd, or

8    March 1st and beyond.

9          MR. ELIOPOULOS:  I would rather do it in February,

10   Your Honor.

11         THE COURT:  Does February 24th work for you,

12   Mr. Abbenante?

13         MR. ABBENANTE:  What time, Your Honor?

14         THE COURT:  You tell me.  At the moment I don't have

15   anything on my calendar.

16         MR. ABBENANTE:  10:00?

17         THE COURT:  Is that all right?

18         MR. ELIOPOULOS:  That's good.

19         THE COURT:  Okay.  Is there anything else we can

20   fruitfully do today?

21         MR. ABBENANTE:  I think we're okay, Your Honor.

22         THE COURT:  All right.  Mr. Sitzmann, Mr. Abbenante

23   will call Ms. Amato, who is the general counsel of the

24   Department of Corrections, and see what he can do about the

25   library.  Because it would be -- if we're getting back together

1    again on the 24th, and today is only the 1st, try to get

2    something filed in the next couple of weeks on that, if you can.

3    I know it's not totally in your control, but try to get

4    something filed so I can deal with that either before we come

5    back here on the 24th, and hear you further on that day and try

6    to resolve it.

7            Anybody else want to say something?

8            MR. ELIOPOULOS:  I can't think of anything.

9            THE COURT:  If you have a copy of that transcript, why

10   don't you give it to my law clerk.

11           MR. ELIOPOULOS:  I have the condensed version.

12           THE COURT:  Have it delivered in the next couple of

13   days and I'll look at it right away and get back to you.  Okay?

14   Thank you.

15           (Proceedings adjourned at 11:50 a.m.)

16

17

18

19

20

21

22

23

24

25

1              **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3         I, Rebecca Stonestreet, certify that the foregoing is a

4  correct transcript from the record of proceedings in the

5  above-entitled matter.

6

7

8

9  _____        _____

10 **SIGNATURE OF COURT REPORTER**                      **DATE**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25