UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------X

UNITED STATES OF AMERICA

           v.                  Criminal Case No. 08-242

GREGORY JOEL SITZMANN,

        Defendant

---------------------------X    Washington, D.C.
                             Thursday, April 19, 2012
                                 1:45 P.M.


Day 6 - P.M. SESSION

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: George Peter Eliopoulos, AUSA
                    Sharad S. Khandelwal, AUSA
                    U.S. ATTORNEY'S OFFICE
                    555 Fourth Street, NW
                    Washington, DC 20530
                    (202) 252-6957


For the Defendant:  Thomas Abbenante, Esq.
                    1919 Pennsylvania Avenue, NW, Suite 800
                    Washington, DC 20006
                    (202) 223-6539


Court Reporter:     Lisa Walker Griffith, RPR
                    U.S. District Courthouse
                    Room 6507
                    Washington, D.C.  20001
                    (202) 354-3247


Proceedings recorded by mechanical stenography, transcript
 produced by computer.

1                        AFTERNOON SESSION

2              THE DEPUTY CLERK:  This is Criminal Case 08-242,

3      United States of America versus Gregory Joel Sitzmann.

4      George Eliopoulos and Sharad Khandelwal for the government.

5      Thomas Abbenante for the defendant.

6              THE COURT:  Okay.  Are we ready for the jury?

7              MR. KHANDELWAL:  Yes, sir.

8              THE COURT:  Okay.

9              MR. KHANDELWAL:  There is one document that the

10     defense is trying to, they want to talk about at cross, but

11     we're going to object on relevance grounds.  I don't think we

12     need to get into it right now.

13             THE COURT:  So, let's finish with the direct and

14     then see where we are.

15             MR. KHANDELWAL:  And, Your Honor, one of the next

16     pieces of evidence that we're going to be introducing and

17     showing to the witness is that big chart that was shown in

18     openings of all the people.

19             THE COURT:  Of all the pictures?

20             MR. KHANDELWAL:  The face chart.  And we've talked

21     to defense about how to do it.  We were just going to show it

22     to the witness.  And I'll move into admission around that

23     same time.

24             THE COURT:  That's fine.

25             MR. KHANDELWAL:  Okay.

```
 1              (Jury Present.)
 2              THE COURT:  Everybody here, everybody ready?  Okay.
 3    Good.
 4              MR. KHANDELWAL:  Thank you, Your Honor.
 5              (Jerry Harvey, witness for the government,
 6    previously sworn.)
 7                    DIRECT EXAMINATION (resumed)
 8    BY MR. KHANDELWAL:
 9    Q   Mr. Harvey, if you can again identify yourself for the
10    record.  Can you please identify yourself again for the
11    record?
12    A   My name is Jerry Harvey.
13    Q   Okay.  All right.  Mr. Harvey, I wanted to talk to you a
14    little bit about some of the defendant's business associates.
15    Did you ever have an occasion to meet anyone that the
16    defendant was working with in terms of smuggling the cocaine
17    that you described earlier in your testimony?
18    A   I met one person.
19    Q   Okay.
20              MR. KHANDELWAL:  At this time, Your Honor, I am
21    going to ask for one of the agents to bring up the exhibit?
22              MR. ABBENANTE:  No objection.
23              MR. KHANDELWAL:  For the record, you are looking at
24    Government's Exhibit Number 20.
25
```

1    BY MR. KHANDELWAL:

2    Q   Mr. Harvey, can you see that exhibit?

3    A   Yes, I can.

4    Q   Okay.  Do you need a moment to just review that?

5    A   I've looked at it.

6    Q   Okay.  Is there anyone on that government's exhibit that

7    you can identify as having been associated with the

8    defendant?

9    A   The guy, Gary Paulson, I know him as Meathead.

10   Q   Okay.  Can you turn that towards the jury?

11   A   (Witness complied.)

12   Q   Thank you.  And just for the record, can you identify

13   where Gary Paulson's picture is for us?

14   A   It's on the second row, the very first one.

15   Q   Okay.  Thank you.

16          MR. KHANDELWAL:  And we'll move into admission

17   Government's Exhibit 20 at this time, Your Honor.

18          MR. ABBENANTE:  No objection.

19          THE COURT:  All right.  He has only identified one

20   person on the -- he personally has only identified one person

21   on that exhibit, but I guess other witnesses have identified

22   some of the others.

23          MR. ABBENANTE:  I think --

24          THE COURT:  If you don't have an objection, I'll

25   admit it.

```
1              MR. ABBENANTE:  No, I don't have an objection.

2              THE COURT:  All right.  It will be admitted.

3              (Government's Exhibit Number 20 was received into

4    evidence.)

5              THE WITNESS:  Your Honor, I saw one other person on

6    there I know other than myself.

7              THE COURT:  You saw one other person on there that

8    you know other than yourself and other than Mr. Sitzmann?

9              THE WITNESS:  Yes.

10             THE COURT:  Okay.

11             THE WITNESS:  I've never seen that, so I didn't --

12             THE COURT:  You want to look at it again?

13             THE WITNESS:  Yes, I know one other person on there.

14   BY MR. KHANDELWAL:

15   Q    Okay.  You've identified Gary Paulson.  You see your

16   photograph on there as well; is that right?

17   A    That's correct.

18   Q    And you also see the defendant's photograph on there?

19   A    Yes, I do.

20   Q    Is there any other photographs that you see on there?

21   A    I see John Sager's photo on there.

22   Q    Okay.  And just for the record, that's the second row,

23   the third photo?

24   A    That's correct.

25   Q    Thank you.  Anything else?
```

1    A    No.

2    Q    Okay.  Thank you.

3         All right.  You talked a little bit about Gary

4    Paulson.  Tell us about how you came into contact with him or

5    the circumstances around you, the defendant talking to you

6    about him.

7    A    The defendant told me he was in business with him in

8    Canada for smuggling the cocaine up and then bringing the

9    money back.  And that it -- yeah, he just told me that they

10   were in, business partners and Gary is the guy who set up the

11   deal in Canada.

12   Q    Now, did you ever personally meet Gary Paulson?

13   A    I saw him two times.

14   Q    Okay.  And you also referred to him by the nickname

15   Meathead; is that right?

16   A    That's correct.

17   Q    Do you know how he got that name?

18   A    That's what Greg called him.

19   Q    Did you actually know that his name was Gary Paulson

20   before you saw that exhibit?

21   A    No, I had heard about it, though.

22   Q    Okay.  Now, you said that, you said you saw him once or

23   twice, right?

24   A    I saw him twice.

25   Q    Twice.  Can you describe the circumstances under which

1    you saw him?

2    A    I was riding with Greg one day and he says, I have to go

3    see a guy.  And the guy was this guy, Meathead.  And they

4    pulled up against each other, you know, one car to the other

5    car.  And he handed him a paper bag.

6    Q    And do you know what was in the paper bag?

7            THE COURT:  Who handed who a paper bag?

8            THE WITNESS:  Greg Sitzmann gave a paper bag to

9    Meathead.

10   BY MR. KHANDELWAL:

11   Q    And do you know what was in that paper bag?

12   A    Greg said it was money.

13   Q    Did you actually see the money yourself?

14   A    No.

15   Q    Did Greg Sitzmann tell you how much money was in there?

16   A    No.

17   Q    Do you know about when that occurred?  Just looking for a

18   ballpark.  If you can't remember, that's fine.

19   A    Somewhere in the '90s.

20   Q    Okay.  Now, you said that you saw him on two occasions;

21   is that right?

22   A    Yes.

23   Q    Was the second occasion like that as well?

24   A    Same thing, car to car, except this time the guy had his

25   wife with him.

1    Q    Okay.  Meathead had his wife with him?

2    A    Yes.

3    Q    And this bag of money, can you describe how big this bag

4    was?

5    A    Twelve inches high, six inches wide.

6    Q    Okay.  Did the bag look to you full or empty or partly,

7    or could you tell?

8    A    I would say half full, three-quarters.

9    Q    I'm going to move on to a slightly different topic.

10         Did the -- during the 1990 period that you knew the

11   defendant, did you, did the defendant ever tell you where he

12   was living?

13   A    Yes.

14   Q    And where did he tell you?

15   A    He told me he was living in Las Vegas, he had a condo

16   there.  And he was living in Mexico.

17   Q    Now, did you ever go to the Las Vegas location?

18   A    No.

19   Q    Did you ever go to the Mexico location?

20   A    No.

21   Q    Did he ever tell you about any other locations that he

22   might live in?

23   A    I can't think of any.  I know he lived in Dania Beach at

24   one time.

25   Q    Okay.  But during the time that you were talking to him

1    in the '90s, is that what he said he lived in?

2    A    No.  He only lived in Las Vegas and Mexico.

3    Q    Did he indicate to you which one he mostly stayed at?

4    A    Mexico.

5    Q    And by mostly, did he give you any indication of which

6    one he considered his primary residence or what?

7    A    I think his primary residence was a beach house in

8    Mexico.

9    Q    Do you know where in Mexico?

10   A    Guadalajara or some place on the west coast.

11   Q    And do you know what that Nevada, Las Vegas, Nevada

12   location, do you know what type of house that was, or you

13   said it was a condo?

14   A    It was a condo.

15   Q    Okay.  All right.  Mr. Harvey, did there come a time that

16   you spoke to the defendant about certain airplanes he was

17   interested in purchasing?

18   A    He came to me and wanted me to look at an airplane for

19   him, do an inspection on it to see the condition.

20   Q    Well, let's talk about that plane.  What type of plane

21   was that?

22   A    That was a Commander 690.

23   Q    Okay.  Did there ever come a time that he talked to you

24   by a Velocity aircraft?

25   A    Yes.

1   Q    Okay.  Let's talk about that for now.  Let's focus on

2   that.  What happened, when did the defendant have

3   conversations with you regarding a Velocity airplane?

4   A    Some time in the late '90s.  After say, 1995, I believe.

5   Q    Okay.  And can you describe, before we get into too many

6   details, can you describe for the jury what a Velocity plane

7   looks like?

8   A    It is a single-engine airplane with the engine on the

9   rear.  It is made out of a composite and very light.

10  Q    Now, you said that it was made out of composite.  Can you

11  explain to the jury what that means?

12  A    It means it cannot be picked up on radar, or at least it

13  would be very difficult to pick it up on radar.  It would

14  show very small.

15  Q    Why?  Why is that?

16  A    Because the radar operates off of metal.  It sends out a

17  beam and hits the metal and then it reflects back.  When it

18  goes out to a airplane made out of composite, it won't

19  reflect off.

20  Q    What is the composite made out of?

21  A    Well, it's a lot of different things.

22  Q    But not metal?

23  A    Oh, no.  No metal.

24  Q    Now, tell us about your interactions with the defendant

25  regarding the Velocity airplane.

```
 1   A    He contacted me one day and said that he was going to go

 2   to an auction and wanted me to go with him.

 3   Q    I'm sorry, to a what?

 4   A    An auction.  It was a sheriff in West Palm Beach, had

 5   this Velocity.  And the put it up -- they had seized it and

 6   they were putting it up for auction.

 7   Q    Okay.  So what happened next?

 8   A    I went to the auction and met him there.

 9   Q    Okay.  And what happened?

10   A    He bought it.

11   Q    Do you remember how much he bought it for?

12   A    Not exactly, but I think it was around 30 or $35,000.

13   Q    Did there come a time that you inspected that plane?

14   A    Yes.

15   Q    Was it done prior to his purchasing it or after?

16   A    No, no, afterwards.

17   Q    Okay.  And when you inspected it, can you tell us what

18   you saw or what you found?

19   A    The airplane had been damaged, the prop had been hit.

20   So, the prop was damaged.

21   Q    And what is the prop, just for us?

22   A    Oh, the propeller that makes the airplane move.  And if

23   the prop has been damaged, possibly the crank would be

24   damaged.

25   Q    What is the crank?
```

1    A    Oh, I'm sorry.  Inside the airplane, you know, the crank

2    that makes everything work.  And I told him he should get it

3    checked.  He has to put a new prop on it.  And I told him, I

4    said, look, I'll show you, I took the engine off for him.  He

5    and -- a friend and I did.  And I told him where to take the

6    engine and get it checked.

7    Q    Now, did there come a time that the defendant told you

8    what he was going to use the plane for?

9    A    I'm not sure if he told me what he was going to use it

10   for.  But, I mean, we had been friends for so long and I knew

11   what business he was in.  He wouldn't buy it to fly around

12   in.

13             MR. ABBENANTE:  Objection.

14             THE COURT:  Sustained.  No speculation.  If he

15   didn't tell you and you don't know, then you don't know.

16   BY MR. KHANDELWAL:

17   Q    What sort of capacity does that plane have?

18   A    I think it would carry probably right around five to 600

19   pounds.

20             MR. ABBENANTE:  Objection.  He thinks, Your Honor.

21             THE COURT:  Sustained.

22   BY MR. KHANDELWAL:

23   Q    Do you actually know?

24   A    Yeah, I know the airplane.

25             THE COURT:  Ask the question again.

BY MR. KHANDELWAL:

Q   How much capacity can that plane hold?

A   You're talking about weight wise?

Q   Yes.

A   Counting the pilot, it would carry maybe 300 pounds.

Q   If it were stored with cocaine, approximately what is the capacity for that plane?  How many kilos of cocaine could it store?

A   150.

Q   Now, at that time that you were talking to him about the Velocity airplane, did you know how much it would cost to buy a kilo of cocaine in Colombia?

A   I had a good idea.

Q   And how did you arrive at that good idea?

A   All that information is usually in the Miami Herald because there are so many drug smuggling things there.  Plus, I still knew a lot of people there.  So, if you were buying it in Colombia, you would have paid about $7,000.

          THE COURT:  Seven thousand dollars for what?

          THE WITNESS:  One kilo.

          THE COURT:  In what time frame are you talking about?

          THE WITNESS:  In the late 1990s.

BY MR. KHANDELWAL:

Q   And about that same time, did you have an idea or an

```
 1   understanding of how much a kilo of cocaine would cost or be

 2   able to be sold at in the United States?

 3   A   Yes.

 4   Q   And how would you arrive at that information?

 5   A   Same thing, from talking to people and seeing what the

 6   people are saying in the papers and all.  It would have been

 7   somewhere around 28 to 30,000.  Maybe 32.

 8           THE COURT:  Does it matter where in the United

 9   States, what part of the country?

10           THE WITNESS:  Yes, it's cheapest in Miami.

11   BY MR. KHANDELWAL:

12   Q   And why is it cheapest in Miami?

13   A   Because it is more cocaine there coming in.  It would

14   have been more expensive in New York, more expensive in

15   Canada, more expensive out west.

16   Q   Why would the price change based on the different

17   locations?

18   A   Because it has to be moved from Miami to other areas.

19   Q   And would it just be the transportation costs that would

20   increase it?

21   A   Well, it would jack it up.  And plus, there's less than

22   New York, so the price would have been higher.

23   Q   Okay.  And you said that the price would be higher in

24   Canada; is that right?

25   A   Oh, yeah.
```

1    Q    Did you get an understanding of how much a kilo of

2    cocaine in that time period would about be?

3    A    I heard it was about 40,000.

4    Q    So, from $7,000, you purchasing it, it could be sold for

5    around 40,000?

6    A    That's correct.

7    Q    Now, did the defendant ever talk to you about what

8    happened to that Velocity airplane that you inspected?

9    A    The next time I heard about this Velocity, he came and

10   told me somebody had stolen it out of Mexico.

11   Q    And what did he tell you about it?

12   A    He said it was in Cartagena, Colombia and somebody had

13   stolen it.

14   Q    Did he ever tell you -- did there ever come a time that

15   he told you a different story about what happened to that

16   Velocity airplane?

17   A    Yes.  Originally, he, I believe, maybe it had been

18   stolen.  And he asked me to contact somebody in Colombia and

19   get the airplane back for him.  So I said yeah, I know some

20   people that could get it back for you if it was stolen.

21   Q    And did you do that?

22   A    Yes, I put him in touch with somebody there that would

23   get it for him.

24   Q    After that happened, did there come a time that you had a

25   different understanding from the defendant about what had

1    actually happened to that plane?

2    A   Yes, I found out it wasn't really stolen.

3    Q   And was that something -- information from the defendant?

4    A   Well, he finally admitted it when I confronted him.

5    Q   Okay.  And tell us about that.

6    A   He -- some smugglers in Mexico wanted to use the

7    airplane, so they said we'll buy it from you.  He wanted, I

8    think, $100,000 for it.  And he finally worked out a deal and

9    he let them use it for $75,000, provided they would give him

10   another $75,000 on the second load.  And then they owned the

11   airplane.

12   Q   When he told you about this, did you understand that he

13   was essentially leasing the plane for smuggling?

14   A   Yes, that's what it would have been.

15   Q   Now, moving away from the Velocity aircraft that he

16   talked to you about, did there come a time that he talked to

17   you about a Stallion airplane?

18   A   Yes.

19   Q   Okay.  And before we get into what you and the defendant

20   talked about regarding that Stallion aircraft, can you

21   explain to the jury what a Stallion aircraft is?

22   A   A Stallion looks similar to a Cessna 210, except it's

23   bigger, stronger and better.

24   Q   How does it differ from a Velocity?

25   A   It's similar to a Velocity, except it has a different

1   airframe inside, but it is still wrapped with fiberglass to

2   prevent the radar from picking it up.

3   Q   Now, does it have a, the same load as the Velocity, a

4   smaller load or a bigger load?

5   A   Oh, no, it can carry a thousand pounds.

6   Q   And how much did you say the Velocity carried?

7   A   Easily a thousand pounds.

8   Q   No, for the -- how much did you say the Velocity carried?

9   A   One hundred and fifty because you've got to have a pilot

10  in it.

11  Q   So from 150 to a thousand, that's the difference?

12  A   Yes.

13  Q   When you buy a Stallion aircraft, does that come already

14  assembled from the manufacture?

15  A   No, it is a kit.  You have to put it together.

16  Q   Is that fairly common in the plane industry, to have kit

17  airplanes?

18  A   I don't know if it is common, but there is a lot of them

19  out there.

20  Q   Okay.  Have you ever purchased a Stallion?

21  A   Yes, I purchased one jointly with Greg.

22          THE COURT:  When was that?

23          THE WITNESS:  That would have been probably around

24  1995 or '96.

25

1   BY MR. KHANDELWAL:

2   Q   And again, that's just an estimate of the date?

3   A   Huh?

4   Q   That's just a rough estimate?

5   A   Yeah, it could have been '97.  I'm not sure.

6   Q   Okay.  Can you tell us the circumstances around, under

7   which you and the defendant first began discussing the

8   Stallion aircraft that you wanted to purchase?

9   A   I didn't know what the Stallion was.  He came to me and

10  said I have a chance to pick up a Stallion real cheap, the

11  kit, and I already know somebody that would put it together.

12  He says, I need you to go buy it for me.  So I said okay, I

13  will.  And we were supposed to be 50-50 partners on it.  And

14  he said he had somebody in Colombia that would pay 400 for it

15  when we finished.

16  Q   How much were you buying it for?

17  A   We were buying it, what I did is I think I paid 22,000

18  for everything except the wings, the engine, prop, avionics,

19  stuff like that.  And I figured we would have probably 150 to

20  175 in it when we finished.  So we would have made 200 on it.

21  Q   So just to go over that again, you would have probably

22  invested into the plane to build it from a kit about another

23  125,000?

24  A   Well, we had to buy the wing also.  I figured when we

25  finished, we would have about 175 in it.

1   Q   Okay.  So, you said that he asked you to go and look at

2   it and buy it for him.  And you actually did that; is that

3   right?

4   A   Yes, I did.

5   Q   When you first looked at it and purchased it, what sort

6   of condition was it in?  Was it already assembled or not

7   assembled?

8   A   Oh, no, it was just a kit.  All the parts were there

9   except for a wing.

10  Q   And where did the plane go from there?

11  A   He told me to take it to a guy named Jeff Rahm in New

12  Smyrna Beach, Florida.  And I did.

13  Q   Okay.  Did the defendant tell you why he was interested

14  in this particular plane as opposed to other planes?

15  A   Well, because they were in demand in Colombia and

16  somebody down there wanted to buy it from him.

17  Q   Okay.  Did he tell you why they were in demand in

18  Colombia?

19  A   Yeah, because they couldn't be picked up on radar.

20  Q   And why was that important for him?

21  A   Well.

22  Q   What business would it be that you would need that for?

23  A   Well, if you are going to smuggle drugs, you don't want

24  the feds or anybody picking you up on radar.

25  Q   How many Stallions -- well, let me ask you this:  Was the

1   Stallion kit that you purchased for around 20, 22,000, was

2   that the only Stallion kit that he purchased that you are

3   aware of?

4   A   No, he went and purchased another one for himself.

5   Q   And do you know where he got that from?

6   A   He would have got it from the guy in California, from the

7   factory.

8   Q   Okay.  And do you know how much he paid for it?

9   A   No.  I know they were about 100 grand, though.

10  Q   So they were being sold for 100 grand, but you don't know

11  how much he specifically paid for it?

12  A   No, I don't know what he paid.

13  Q   Okay.  Do you have any idea why the one that you paid for

14  was only 20,000?

15  A   Well, because I didn't get the wing and the wing was very

16  expensive and I got it for about half price.  A guy had

17  bought it, but he didn't know how to put it together.  So, I

18  think he said he paid 40 some and I gave him, I believe, 22.

19  Q   Did he tell you how much the second Stallion aircraft,

20  how much it was going to be sold for?

21  A   Five hundred.

22  Q   And did he tell you that he had buyers?

23  A   Yes.

24  Q   And where were those buyers?

25  A   Colombia.

```
 1    Q    Now, the first Stallion, you said that you put up $20,000

 2    of your own money?

 3    A    Twenty or 22.  I could have put up 25, I don't know.

 4    Q    Okay.  And did he put up any money?

 5    A    I don't think he did.

 6    Q    Okay.  Did you expect and hope to make a profit off of

 7    this purchase?

 8    A    Sure, that's the reason I bought it.

 9    Q    What happened after you sent the kit to Jeff Rahm?

10    A    He started putting it together.

11    Q    Did there come a time that you walked away from the deal?

12    A    Yes.

13    Q    And can you explain that to the jury?

14    A    Well, it was getting out of hand.  It was too much of a

15    real smuggling deal then because he and Jeff Rahm and some

16    others were designing another airplane strictly for smuggling

17    and all.  The only thing I wanted to do is buy into this one,

18    turn around and sell it and that was it.  So I just got out

19    of it.

20         THE COURT:  What was the name of the other person

21    that you just mentioned that he was -- Jeff who?

22         THE WITNESS:  Rahm, R.A.H.M.

23         THE COURT:  Okay.

24    BY MR. KHANDELWAL:

25    Q    Now, did you end up making any money off of the initial
```

1    investment of 20,000?

2    A    No, I lost everything.

3    Q    And did you ever find out what happened to the plane

4    after you walked away from the deal?

5    A    No.

6            MR. KHANDELWAL:  I'm going show to the defense

7    what's been marked as 400-J -- well, let me start from the

8    beginning.  Four hundred-A., 400-B, 400-N, 400-X, 400-Z,

9    400-HH and 400-JJ.  The numbering system that went out of

10   control.

11           THE COURT:  Yes.

12   BY MR. KHANDELWAL:

13   Q    I am going to show to you all those same exhibits.

14           I'm showing you a series of exhibits previously

15   identified in the record under the 400 series.  Can you just

16   flip through those very quickly and tell us, have you ever

17   seen those photos before and what they are basically?

18   A    This is Super Stallion being put together.

19   Q    Okay.  And are those fair and accurate pictures of the

20   Stallion being put together?

21   A    Yes, yes.

22           MR. KHANDELWAL:  Your Honor, at this time, we would

23   move into evidence all of those photos.

24           MR. ABBENANTE:  No objection, Your Honor.

25           THE COURT:  Okay.  There is no objection, but why

1    don't you give us the numbers again so that we think we have

2    them correctly.

3              MR. KHANDELWAL:  And just again for the record, it's

4    400-A, 400-B, 400-N, 400-X, 400-Z, 400-HH and 400-JJ.

5              (Government's Exhibit Numbers 400-A, 400-B, 400-N,

6    400-X, 400-Z, 400-HH and 400-JJ were received into evidence.)

7              MR. KHANDELWAL:  I'm going to publish to the jury,

8    Your Honor.  We'll start with 400-A.

9              THE COURT:  Yes.

10   BY MR. KHANDELWAL:

11   Q    Can you just tell us what we're looking at?

12   A    You are looking at the front of the Super Stallion with

13   the pilot's door down.

14   Q    You before had referenced a, I think a fiberglass

15   exterior of the plane?

16   A    Yes.

17   Q    Can we see that in this photo?

18   A    Yes.

19   Q    And can you just tell us what we're looking at exactly

20   and how that relates?

21   A    Well, you can see the metal frame inside there, but you

22   can see the whole body is out of a fiberglass.

23   Q    So, all the yellowish sort of substance on the outside,

24   is all of that fiberglass material?

25   A    That's correct.

1   Q    And that's what makes it unable to be picked up on radar?

2   A    It makes it very difficult.

3   Q    The white frame, I guess, what's --

4   A    That's a chromoly frame inside.

5   Q    Okay.  Now, the door that we're looking at, which door is

6   that?

7   A    That's the pilot's side, the left side.

8   Q    Okay.  All right.  Let's move to 400-B.  What are we

9   looking at there?

10  A    You're looking at the wings.

11  Q    Okay.  Is that picture actually, needs to be turned

12  around?

13  A    No, it's okay.

14  Q    It's fine?

15  A    It should turn around because -- well, if you turn it

16  around, you'll see they're sitting on the ground.

17  Q    All right.  So, just at the top of where the picture is

18  now, those are actually the wings?

19  A    Those are the two wings.

20  Q    Are those also encased in that same fiberglass material?

21  A    Oh, yes.

22  Q    And is the entire plane wrapped in that fiberglass?

23  A    Yes.

24  Q    And how are those wings then connected to the plane?

25  A    It is a high-wing airplane, so they'll be going through

1    the top of the fuselage or the cockpit.  One from one side,

2    one the other.  If you will see, the wings are offset a

3    little, that goes through there.

4    Q   Let's look at 400-N.  Can you tell us what we're looking

5    at there?

6    A   You are looking at the copilot's seat inside the cockpit,

7    the right side.  In other words, you see the right seat.

8    Q   Okay.  But the pilot would actually be sitting on the

9    left side?

10   A   The left side, yes.

11   Q   Okay.  Can we move to 400-X?

12        Can you tell us what we're looking at in 400-X?

13   A   You are looking at the right-hand side of the Super

14   Stallion.  And this door is a very big door.

15   Q   Why is that important that the door is so wide?

16   A   Because you can raise this door up, it goes upward.  And

17   you've got a space from here all the way over to there, to

18   where you could load the airplane and unload it real quick

19   (indicating).  Or put, or you could put very big packages in

20   there.

21   Q   Okay.  And just for the record, you've indicated the

22   space that the witness is sitting in all the way up to the

23   closest juror rail?

24   A   I would say eight and a half feet, something like that.

25   Q   Could you then, let's go to 400-Z.

1          What are we looking at there?

2    A    You are looking at the right-hand side again, but the

3    door hasn't been mounted yet.  And you're looking at the rear

4    of the airplane.  And you're also looking at the top of the

5    airplane where the wings would have gone through on each

6    side.

7    Q    So, just to orient us, we're from the rear of the

8    airplane; is that correct?

9    A    That's correct.  You're on the right rear.

10   Q    So the pilot would sit on the left side?

11   A    Yes.

12   Q    So we're looking at essentially the front passenger side

13   door; is that right?

14   A    That's correct.

15   Q    Okay.  And actually, 400-HH, tell us what we're looking

16   at there.

17   A    Okay.  You are at the very rear of the airplane now.

18   They've already put the tail on it.  It's getting ready to

19   have the wings put on it because almost everything is

20   completed here except maybe the rotor back here.  And no

21   engine yet.

22   Q    Okay.

23   A    But you can see it is wrapped all the way around, even

24   the tail.  Everything is in fiberglass now.

25   Q    Now, you said that the wings that we see on the plane

1    now, those aren't the only wings that would be on the plane?

2    A    Oh, no, no.  You see the tail wing part.  No, the big

3    main wing hasn't been installed yet.

4    Q    And that would be installed where on the plane?

5    A    On the tip top.

6    Q    On the very top of the roof that is kind of slanted?

7    A    Yes, where the cockpit is.

8    Q    And very briefly, 400-JJ.  And that's just another

9    picture of the --

10   A    The door.

11   Q    That would be the -- now, if a person were making

12   airdrops of cocaine from that plane, which door would they be

13   using to do that from, the pilot door or this door in the --

14   A    Well, it would be this door (indicating).

15   Q    And why is that?

16   A    Well, the door on the other side was only for, to allow

17   the pilot to get in.  This is a nice big cargo door on this

18   side.

19          THE COURT:  The Stallion planes, you buy them, you

20   buy the parts and put them together?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  And did you do that yourself?

23          THE WITNESS:  No, he had a guy named Jeff Rahm up

24   there.

25          THE COURT:  So that's what Jeff Rahm did?

1        THE WITNESS:  Yes.

2        THE COURT:  Did he have experience doing that sort

3    of thing?

4        THE WITNESS:  He said he did.  I didn't have much

5    confidence in him, that's the reason I got out of it.

6        THE COURT:  Well, you know, are these things easy to

7    put together?

8        THE WITNESS:  No.

9        THE COURT:  So you would want to have confidence in

10   someone if you are going to fly in one of those things?

11       THE WITNESS:  Absolutely, yes.

12   BY MR. KHANDELWAL:

13   Q    Would you have flown in that?

14   A    I would have never flown in it, no.

15       THE COURT:  It is not exactly Boeing.

16       THE WITNESS:  No, definitely not.

17   BY MR. KHANDELWAL:

18   Q    All right.  I want to move to a different topic.  Sir,

19   did there come a time that the defendant asked you for advice

20   on how to launder money?  Did you hear me?

21   A    Yeah, I heard you, but I don't remember him asking me how

22   to launder money.

23   Q    Did he ever ask you about transporting money?

24   A    No, he knew how to transport money.

25   Q    Okay.  Did you two ever talk about it?

1    A    He asked me for money one time in a bank account.

2    Q    All right.  Well, let's back up a little bit.  Can you

3    explain what the purpose of money laundering would be and why

4    you would move money from bank account to bank account?

5    A    Oh, to clean it up so you could use it.

6    Q    Now, explain it for us who don't really understand that

7    concept.  What do you mean by clean it up?

8    A    To make it look legal.  In other words, you, say for

9    instance you have some drug money and you want to get it to

10   where you can use it, you have to find a bank offshore or

11   some place to where you can put that money in there and then

12   wire it to another bank or wire it to a different company.

13   You've got to make it look like -- say, for instance, you are

14   going to buy something, and they may check it in the U.S.,

15   you want to show that it came from a bank.

16   Q    Why can't you just put it in your own bank account?

17   A    Well, because the feds now have a deal where you can't

18   put more than $10,000 in there.  So, if you had a lot of

19   money, it would take you forever to put it in there.

20   Q    Because you would try to do it underneath the $10,000

21   limit?

22   A    You could, I guess, but it would take you forever.

23   Q    Right.  So, and that's one of the reasons why you would

24   try to put it in an offshore bank?

25   A    Yes.

1    Q    Okay.  Now, you said that the purpose was to clean it.

2    Would you then move the money from one bank to another?

3    A    Yes.

4    Q    And can you explain that to the jury?

5    A    Well, once you get it in one bank, it is pretty good.

6    But then what you want to do is you want to move it to a

7    different country in another bank.  And then you let it sit

8    there for a while.  And then you can use it wherever you want

9    to send it then.

10   Q    Would you want to put all of these bank accounts in your

11   name?

12   A    No, I wouldn't.

13   Q    Why wouldn't you?

14   A    I went through the experience before, I had one in my

15   name.  And the feds took it.

16   Q    Now, did there come a time that the defendant asked you

17   about moving money this way and about the use of offshore

18   accounts?

19   A    He may have asked me.  I'm not sure what I would have

20   told him.  I just remember he had an account down in Panama.

21   Q    And did you give him advice about that account?

22   A    I think I did, but he didn't listen.

23            MR. ABBENANTE:  Objection.

24            THE COURT:  I think, I really think that we have to

25   come to the bench and have a discussion about this whole line

1    of questioning.

2              (Bench conference.)

3              THE COURT:  His testimony is he didn't ask me for

4    advice, I didn't give him advice, we didn't talk about it

5    because we didn't have to because he knew how to do it.  And

6    then you are trying to ask him, but he has already said

7    nothing happened.

8              MR. KHANDELWAL:  What I will do is I'll try to get

9    the testimony because he has already testified about a

10   particular time that he assisted the defendant basically with

11   money laundering.

12             THE COURT:  Well, it may be that he doesn't -- I

13   mean he has described it and he knows what he is talking

14   about, but the direct question, did he ever ask you for

15   advice about money laundering, and he said no.  So I don't

16   think you should try -- if you are trying to get a different

17   answer, I think you shouldn't try.  If you are trying to use

18   this as sort of a foundation or a predicate to get into a

19   specific answer, then I think you are better just going into

20   the specific incident.

21             MR. KHANDELWAL:  I think what I am going to do is

22   just make sure that the question is appropriate, did there

23   come a time that you and he discussed the large purchase of

24   an airplane.  And that's going to get us into that specific

25   transaction because that's the money laundering transaction.

1          THE COURT:  And he may or may not be willing to

2     characterize it as such.

3          MR. KHANDELWAL:  That's, I think, the issue.

4          MR. ELIOPOULOS:  I think they were talking past each

5     other.

6          THE COURT:  Yes.  I think that's fine.

7          (Open Court.)

8     BY MR. KHANDELWAL:

9     Q   All right.  Mr. Harvey, did there come a time that you

10    and the defendant discussed how to purchase a large item,

11    like an airplane?

12    A   Yes.

13    Q   Okay.  Can you tell us what you and he spoke about?

14    A   He wanted to buy an airplane in the U.S.

15         MR. ABBENANTE:  Excuse me, Your Honor.  Can we have

16    a time frame on this?

17         THE COURT:  Okay.  When was this approximately?

18         THE WITNESS:  I would say this was around 1998 or

19    '99.

20    BY MR. KHANDELWAL:

21    Q   And again, that's just an approximate date?

22    A   Yes.  I would say I'm pretty close there though, '98,

23    '99.

24    Q   Okay.  And continue.

25    A   He was wanting to buy an airplane to use, and he wanted

1    to buy it -- first, he was going to buy one in Mexico and I

2    told him that airplane was no good.  He then picked one

3    himself without me inspecting it or anything.  And it was in,

4    I think Clearwater, Florida.  Anyway, it was on the west

5    coast around Tampa.  And it was a Piper Navajo Panther.

6    Q    Have you ever flown that plane before?

7    A    I've flown that airplane, but not his.

8    Q    But you've flown on Piper Navajo?

9    A    Oh, yeah.  Piper Navajo Panther.  It's a different

10   airplane.  It has big engines on it, four-bladed props.

11   Q    Can you compare that to the Stallion and the Velocity as

12   you described earlier?

13   A    Much better.

14   Q    Better how?

15   A    Faster, carry more weight, stronger.  But it picks up on

16   radar, is the problem with it.

17   Q    All right.  You said that you and he were discussing how

18   to purchase that; is that right?

19   A    Well, he needed money to purchase it, which was clean

20   money, you know, money out of a bank.

21   Q    Why did he need clean money to purchase it?

22   A    In Florida, you can't sell an a airplane for cash

23   anymore.  So, no matter how much you offer them, they're not

24   allowed to sell it to you.

25   Q    So you have to go through a bank?

1   A   Well, you have to show where the funds came from, either

2   with a wire transfer or a check.

3   Q   Okay.

4   A   No cash.

5   Q   And did there come a time that you assisted him in

6   acquiring that airplane?

7   A   Yes.

8   Q   And can you explain to the jury what happened?

9   A   I had my attorney to wire $500,000 to a bank account that

10  he had in Panama.

11  Q   Now, before we get into that, did he provide you with any

12  funds?

13  A   Well, he gave me the 500 in cash.  And then I had to wire

14  transfer to him.

15  Q   Five hundred U.S. dollars?

16  A   Yes.

17  Q   Or is it 500,000 or 500 U.S. dollars?

18  A   Five hundred thousand.

19  Q   Okay.  And can you explain what the purpose of that plane

20  that he was trying to acquire, what was the purpose he told

21  you?

22  A   He told me he was going to use it out of Colombia into

23  Nicaragua, from Nicaragua back to Colombia.

24  Q   And for -- what was going to be the load on that plane?

25  A   He was bringing cocaine in from Colombia to Nicaragua and

1   money from Nicaragua back to Colombia.

2   Q   Okay.  And now, you said he brought you some money; is

3   that right?

4   A   Yes.

5   Q   Did he bring it to you in a check or in cash?

6   A   Cash.

7   Q   And did he bring it to you in one lump sum or in broken

8   up amounts?

9   A   No, it took about three different trips, he gave me

10  money.

11  Q   When you -- at that point, you said that you instructed

12  your attorney to wire some money?

13  A   Yes.

14  Q   Now, which account did you use?

15  A   I thought we had used the account in Panama, but then I

16  was told it came out of Europe.  So, he would have got it out

17  of Europe.  And it would have gone to the Panama bank.

18  Q   Now, let me just ask you this:  Were you shown some

19  documents about that sale, about that transaction?

20  A   No.

21          THE COURT:  So, Mr. Sitzmann gave you money?

22          THE WITNESS:  Yes.

23          THE COURT:  And you put it in a bank?

24          THE WITNESS:  No, I had it in my house.

25          THE COURT:  Well, how was it -- where was it wired

1    from?

2              THE WITNESS:  No, no, no.  He gave me cash.

3              THE COURT:  Right.

4              THE WITNESS:  And then I contacted my attorney and

5    the attorney wired his bank.

6              THE COURT:  Oh, I see.  It's not the same.  You kept

7    the cash in your house?

8              THE WITNESS:  I kept the cash.

9              THE COURT:  And so, the question was, the money that

10   was wired was from an account of yours to Mr. Sitzmann's

11   bank?

12             THE WITNESS:  Yes, it was one that my attorney had

13   control on.

14             THE COURT:  Okay.  So, do you know where that

15   account was from which the money was wired?

16             THE WITNESS:  No, I don't.

17             THE COURT:  But it is an account that you, through

18   your attorney, had control over?

19             THE WITNESS:  Yes.

20             THE COURT:  Okay.

21   BY MR. KHANDELWAL:

22   Q    Now, you kept the cash, right?

23   A    Yes.

24   Q    And essentially used your funds that were in a bank

25   account?

1    A    Yes.

2    Q    And you just kept the cash to live on?

3    A    Yes.

4    Q    And then used the account money to purchase, to complete

5    the purchase?

6    A    Yes.

7    Q    Okay.  Now, did he tell you where he got the $500,000 he

8    gave you?

9    A    No.

10   Q    Do you know where that money was wired to?

11   A    It wasn't to the National Bank of Panama.  It was some

12   other small bank there in Panama.

13   Q    All right.

14         MR. KHANDELWAL:  I'm showing to the defense what

15   they have already previously seen as Government's Exhibit

16   Number 759.

17   BY MR. KHANDELWAL:

18   Q    I'm showing to you what's been marked as 759.  Would you

19   take a moment to review that document?

20   A    (Perusing the document.)

21   Q    Did you have a chance to review that?

22   A    Yes.

23   Q    Does that document look familiar to you?

24   A    Yes, I evidently I must have written it some time ago.

25   Q    Do you remember writing it?

```
 1    A    No.

 2    Q    Have you ever seen that document since the time you wrote

 3    it?

 4    A    Not that I recall.

 5    Q    Okay.  Do you know who you sent that document to?

 6    A    I would have faxed it down to Greg.

 7    Q    And that's the defendant, Greg Sitzmann?

 8    A    Yes.

 9    Q    Okay.  Do you see your name on that document?

10    A    My name?

11    Q    Yes.

12    A    Yes.

13    Q    And what page is that, your name on?

14    A    The last page, second page.

15    Q    In fact, at the very end it says, I think your name,

16    Jerry?

17    A    Yes.

18    Q    Okay.  Does this document have anything to do with that

19    money transfer we were just talking about?

20    A    Yes.

21         MR. KHANDELWAL:  Your Honor, at this time we would

22    move into evidence Government's Exhibit Number 759.

23         MR. ABBENANTE:  No objection.

24         THE COURT:  759 will be admitted.

25         (Government's Exhibit Number 759 was received into
```

 1   evidence.)

 2   BY MR. KHANDELWAL:

 3   Q   Now, just for record, you didn't provide this document to

 4   us?

 5   A   No.

 6   Q   Okay.  You don't know where we got the document from?  We

 7   never told you and you've never seen it?

 8   A   I've never seen it.

 9   Q   The first time you are seeing it is right here?

10   A   Yes.

11   Q   That document, however, does -- that document you said

12   discusses this very wire transfer of money?

13   A   Yes, yes.

14   Q   And what does it say?

15   A   I says, "I spoke to M.M. this morning and she confirmed

16   she had began instructions to have the money wired from

17   Europe, yeah, to the BAC bank in Panama."

18   Q   So that's from your European, your Swiss bank account; is

19   that right?

20   A   Yes.

21   Q   And to the BAC, that's a bank in Panama?

22   A   That's correct.

23   Q   Okay.  I want to refer to the second page of that

24   document.  Hold on, let me just get that from you.

25           I want to direct your attention to this last

1  paragraph right here (indicating).  Can you read that for us?

2  A   "Greg, I cannot tell you how these guys in Colombia ended

3  up with the plane or anything about it now.  But you must be

4  careful and make sure you get the log books, records are

5  real.  And the records are real."

6  Q   All right.  Besides this $500,000 that the defendant gave

7  to you in exchange for you then wiring the same amount of

8  money from your bank account, did there ever come a time that

9  the defendant ever asked you to hold onto some other money?

10 A   Well, he did before, you know.

11 Q   When was that?

12 A   It would have been '96, '97, '98, somewhere through

13 there.  He would drop off and ask me to hold some money for

14 him.

15 Q   And how much money were we talking about?

16 A   Sometimes as little as 30,000, sometimes as much as 100,

17 150,000.  Different amounts.

18 Q   And how many times about did he ask you to do this?

19 A   Ten.

20 Q   I'm sorry?

21 A   Ten.

22 Q   Did he ask you to give that money to somebody?

23 A   Yes.  Sometimes he would ask me to meet him at the hotel

24 and bring so much back to him or give it to one of his

25 drivers.

1    Q    So he would give it to his drivers?

2    A    No, he would ask me sometimes to give it to his drivers.

3              MR. KHANDELWAL:  Court's indulgence.

4              (There was a pause in the proceedings.)

5              MR. KHANDELWAL:  I am going to show to the defense

6    what's been marked as Government's Exhibit 135, what's

7    already been previously admitted.

8    BY MR. KHANDELWAL:

9    Q    All right.  I'm going to show you what has already been

10   admitted as Government's Exhibit 135.  Just for the record,

11   this is the item, 135 is something that we seized from the

12   defendant in France.  Let's not focus on the chart here.

13   Let's focus -- do you see what I'm looking at right there?

14   A    Yes.

15   Q    And just for the record, I'm describing a small --

16   A    Yes.

17   Q    -- a small piece of paper with some boxes and lines

18   around it.  Do you see that?

19   A    Yes, I do.

20   Q    Okay.  Now, have you ever seen this document before?

21   A    You showed it to me the other day.

22   Q    And that was how many days ago?

23   A    Two.

24   Q    Okay.  That was the first time you ever saw it?

25   A    First time I ever saw it.

```
1    Q    Can you explain to us what we are looking at here?

2    A    My interpretation is, somebody is moving money from one

3    place to another.

4              MR. ABBENANTE:  Objection.

5              THE COURT:  Sustained.  Disregard.

6    BY MR. KHANDELWAL:

7    Q    Okay.  When you were talking about moving money before,

8    you talked about offshore accounts; is that right?

9    A    Yes.

10   Q    What type of banks would you use?  What type?  What

11   name -- what banks would you use?

12   A    Well, I would use them through the Caribbean.  Anything

13   that is a tax haven you could get money into them.  So then,

14   you would try -- like the British Virgin Islands, the Cayman

15   Islands in the old days.  The British, even the Bahamas was

16   very good in the old days.

17   Q    And when you would deposit this money, would you just go

18   up to the bank and just deposit money in cash?

19   A    It's changed now.

20   Q    But I'm talking about back then, the '90s?

21   A    Yeah, back then, if you had a very good banker, you could

22   go in and give them cash.  And they would take, say from

23   three percent to five percent, maybe seven percent of it.

24   And they would put it into their bank.

25   Q    And then what would you do with the money from there?
```

1    A    Move it to a different bank.

2    Q    You would by wire?

3    A    Yes.

4    Q    And then how much would a wire take off of that?

5    A    The banks charge different prices.

6    Q    Just about?

7    A    One percent.  And then they would -- that would be their

8    fee.  Maybe one, maybe two percent.

9    Q    So you would keep moving it from one account to another?

10   A    Yes.

11   Q    And the entire purpose of this is to hide the origin of

12   the money?

13   A    Yes.

14   Q    So it can't be traced?

15   A    Yes.

16   Q    Okay.  You talked about the British Virgin Islands.  Is

17   the Dutch Antilles another place that people would deliver?

18   A    Yes, it was good in the old days.

19   Q    Okay.

20        MR. KHANDELWAL:  Your Honor, may we approach?

21        THE COURT:  Yes.

22        (Bench conference.)

23        THE COURT:  I guess people sort of long for the good

24   ole days.

25        MR. KHANDELWAL:  I'd like to show this to the

```
1    witness to explain what is going on with this document.  The
2    witness has essentially testified about how money laundering
3    works.  The defense has said in its opening basically, Jerry
4    Harvey is an expert in money laundering.  I think that it
5    would be appropriate for the witness to show what this
6    document is.
7         THE COURT:  Do you have any idea who wrote this
8    document?
9         MR. KHANDELWAL:  It was in the defendant's
10   possession along with the Barcelona amount when he was
11   apprehended in France in 2004.
12        MR. ABBENANTE:  But I'm trying to remember the exact
13   words, but he said -- he didn't say he knew what that
14   document was.
15        THE COURT:  He said he has never seen the document
16   until two days ago.  And he said something like, well, I
17   assume what it shows is --
18        MR. ABBENANTE:  Right.
19        MR. KHANDELWAL:  The defense has said in their
20   opening statement that he is an expert money launder.  I'm
21   hoping this one question can --
22        THE COURT:  He can explain money laundering.  He
23   refused to do so before.  He refused to embrace the term
24   money laundering.  And he has never seen this document
25   before.
```

```
 1            And, you know, if you want to make an argument in

 2    closing argument, maybe I'll let you make an argument in

 3    closing argument.  I'm not sure.  But, or bring in an expert

 4    in money laundering.  I mean, he can assume that BVI means

 5    British Virgin Islands.  He can assume, well, there is a

 6    word, Dutch Antilles, there.  But I just don't think, I don't

 7    think this is -- I just don't think this is fair.  It's

 8    speculation.

 9            So how much longer do you think you will be with

10    him?

11            MR. KHANDELWAL:  I just have one more topic.

12            THE COURT:  Okay.  And then you want to take a

13    little break?

14            MR. ABBENANTE:  Please.

15            (Open Court.)

16            THE COURT:  I am going to sustain the defendant's

17    objection to the government's questioning about Exhibit 135,

18    and tell the jury to disregard what Mr. Harvey has just begun

19    to say about that.  And then we will move on.

20    BY MR. KHANDELWAL:

21    Q   Now, Mr. Harvey, did there come a time that the defendant

22    showed you some bags that he had?

23    A   Yes.

24    Q   Can you tell us about that?

25    A   I met him one morning at the motel on State Road 84.  And
```

1    he had about four or five, maybe six luggage bags there.  And

2    he showed them to me and I didn't think anything of them.

3    And then he says, ph, they're special, they have a false

4    bottom.  He showed me how they worked.

5    Q    What happened next?

6    A    I asked him for the black one.  But he said no, he was

7    keeping that one.  He gave me one of the tan ones.

8    Q    What did you do with the tan one?

9    A    I gave it to Jared.

10   Q    Okay.  Did you ever use it yourself?

11   A    No.

12   Q    Where did you keep it?

13   A    Just sitting in the house.

14   Q    Okay.  And at some point, there came a time that the

15   agent, after you spoke to him, asked you for that bag?

16   A    Yes.

17        THE COURT:  About when did you have this

18   conversation with Mr. Sitzmann and when he showed you the

19   bags?

20        THE WITNESS:  I would say it was probably right

21   around 1998.

22   BY MR. KHANDELWAL:

23   Q    And again, that's an approximate date?

24   A    Yes.  It could have been '99.

25        THE COURT:  And you met him in a motel, was this in

1    Florida, did you say?

2            THE WITNESS:  Yes, sir.  It was in Fort Lauderdale,

3    on State Road 84.

4            MR. KHANDELWAL:  Showing to the defense what has

5    already been marked as 260.

6    BY MR. KHANDELWAL:

7    Q    I am going to show to you what has been marked as 260.

8    Do you recognize that?

9    A    Yes.

10   Q    Is this bag that you were just talking about?

11   A    Yes.

12   Q    And the bag you provided to Agent Rine?

13   A    Yes.

14           MR. KHANDELWAL:  Your Honor, at this time we would

15   move into evidence Government's Exhibit Number 260.

16           MR. ABBENANTE:  No objection.

17           THE COURT:  It will be admitted.

18           (Government's Exhibit Number 260 was received into

19   evidence.)

20   BY MR. KHANDELWAL:

21   Q    If we asked you, would you be able to show us that fake

22   compartment?  Do you think you could do it or do you think

23   you would have some difficulty?

24   A    I don't know.  I could try.

25   Q    Do you want to try?

```
1    A    Yes.

2    Q    All right.

3            MR. KHANDELWAL:  With the Court's permission?

4            THE COURT:  Yes.

5            THE WITNESS:  (Witness complied.)

6    BY MR. KHANDELWAL:

7    Q    Were you able to find it?

8    A    Yes.

9            MR. KHANDELWAL:  With the Court's permission, if the

10   witness could step down and show it to the jury?

11           THE COURT:  Could you -- sure.  But before you do

12   that, could you just describe, we all heard some sounds while

13   you were doing what you were doing.  Could you describe what

14   you did and how you found it?

15           THE WITNESS:  You have to go through this side

16   (indicating).

17           MR. KHANDELWAL:  And just for the record, you are

18   indicating the side that has got the big 260 on it.

19           THE COURT:  The side with the buckle on it.

20           THE WITNESS:  Yes, sir.

21           THE COURT:  Yeah.

22           THE WITNESS:  And in there you've got a piece of

23   velcro and you've got to pull this velcro up.  And there is a

24   zipper in there, you have to unzip it, and then you can go

25   into the bottom of the big bag.
```

1    BY MR. KHANDELWAL:

2    Q    If you can turn it around and show it to the jury?

3            THE COURT:  Sure.  If you want to step down and

4    show --

5            THE WITNESS:  Yeah.

6    BY MR. KHANDELWAL:

7    Q    You are opening it?

8    A    There is a zipper here and then the velcro.  Then it has

9    a zipper here to unzip it.  Then you go into the bottom.  Is

10   that good enough?

11   Q    I think that's good.

12           MR. KHANDELWAL:  I have no further questions for

13   this witness.

14           THE COURT:  All right.  Let's take a little break

15   and then Mr. Abbenante will have some questions.  So why

16   don't we let the jury go out and take a little rest.  And

17   we'll come back in 10 or 12 minutes.

18           (Jury Out.)

19           MR. ABBENANTE:  There is a preliminary matter.

20           THE COURT:  All right.  Mr. Harvey may step down.

21   And perhaps he should go to the witness room if we're going

22   to talk about an exhibit.

23           (Witness exits courtroom.)

24           MR. ABBENANTE:  Your Honor, in addition to these two

25   notes that I think you've already seen, you've seen the one

1    where, I'm not sure they have admitted them yet, but the one

2    where he meets and negotiates a tax settlement.  And then the

3    other note that Mr. Harvey gave to Agent Rine.

4           There is another, I believe it is a letter, that was

5    addressed to Agent Rine with the caption being corruption.

6    And in there he makes a number of statements about how, for

7    instance, like there is no place in the justice system for

8    corruption.  He just goes on and on about his rights as a

9    citizen and things of this nature.

10          He also goes into allegations against the U.S.

11   Attorney in Miami, DEA agents in Alabama, the people that

12   were involved in this case, calling them corrupt.  He also

13   talks about, I believe, who the U.S. Attorney in that case in

14   Mobile, and also another two individuals, and calls them the

15   biggest piece of shit on earth.  And about the other

16   prosecutors in his tax case and how crooked and corrupt they

17   are.

18          And I just think this is a fair area to cross this

19   witness on.  I mean, he is coming up here and he is basically

20   saying, oh, I decided to, I'm helping you in this

21   investigation.  I've done my part.  That's going to come out,

22   I'm being truthful with you guys, I'm being honest.  Blah,

23   blah, blah.

24          And I think that anything that, especially if he has

25   written it to the agent in this case, while this case has

1  been pending, this is dated May 26, 2010.  Even though it

2  doesn't specifically, or it may not specifically relate to

3  certain things that he has testified about with regard to

4  this case, he is basically, you know, engaging in a dialogue

5  with the investigating agent in this case.  And he is going

6  on and on about corrupt prosecutors and everything else.

7         And I just think it's fair game, especially,

8  especially in light of the fact that -- I mean, the

9  government is saying, I'm bringing out with this witness, you

10  know, that we haven't made any deals with you and we've told

11  you we could prosecute you, but yet, the last letter, I think

12  the last note says, you know, you said that you weren't

13  interested in me.  I think that's one of his words.  I mean,

14  there is the thread throughout this, these communications

15  with the agent and e-mails that he has written, that I

16  believe are subject to fair cross examination.

17         MR. KHANDELWAL:  Your Honor, he can get to that

18  thread through the documents that we've already referred to.

19  This letter, however, actually literally begins, "This letter

20  has absolutely nothing to do with or regarding the case I

21  visited with you recently in Washington.  However, it is far

22  more important to all citizens of the United States."

23         And it's a discussion of his views on the criminal

24  justice system and corruption in the justice system.  And he

25  is not trying to say anything about corruption for the

1    prosecution team in this case.  He believes that the people

2    in his cases back in the 1980s and '90s, early '90s, because

3    the last case ended, I think, in 1990, that's what he is

4    talking about.  That's 20 years ago.

5         THE COURT:  But we have been spending half this

6    trial talking about what happened 20 years ago.

7         MR. KHANDELWAL:  Well, that's certainly true, but

8    this has nothing to do with the prosecution in this case.

9    And this letter says that.  Has absolutely nothing to do

10   with, regarding the case I visited with you recently in

11   Washington.

12        THE COURT:  Well, let me look at the letter during

13   the break.  I think that anything that goes to undermine his

14   credibility or show his bias or his unreliability or his

15   changing attitude toward friends and enemies alike probably

16   goes to his credibility.  So, I'm probably going to let him

17   do it, but let me read it.  And then you've got redirect.

18   That's why we have examination and cross examination.

19        Juror number 14 wants to see the bag as it would

20   normally look, as opposed to how, the demonstration that was

21   just done.  And my view of it is, you know, they get to see

22   the evidence when deliberations begin, unless you want to,

23   now that I've -- since the juror raised the question with the

24   courtroom deputy, I'm reporting it to counsel.  And you've

25   got this witness still on the stand and you are going to have

1    other witnesses on the stand.  And if you choose to, in

2    effect, to respond to her question through testimony or

3    further demonstration, that's your choice.  But obviously, we

4    can't send an exhibit back to the jury room at this point in

5    time.

6           MR. KHANDELWAL:  I'm happy to publish it to the jury

7    and have them pass it around.

8           THE COURT:  If you want to do that.  Did I

9    accurately describe?

10          THE DEPUTY CLERK:  Yes.

11          THE COURT:  Okay.  So we'll take a little break.

12   I'll look at this document and then we'll see where we are.

13          (A brief recess was taken.)

14          THE COURT:  Okay.  Over the break, I've had the

15   opportunity -- the jury is not here yet.  Mr. Sitzmann just

16   arrived.

17          Over the break, I've had an opportunity to read this

18   May 26th typed letter from Mr. Harvey to Agent Rine, entitled

19   Corruption.  And for the reasons I said before the break,

20   that I do think that it is relevant to showing bias and

21   undermining his credibility and so forth, I think it is

22   appropriate.

23          In addition to that, he actually talks in this

24   letter about a lot of the things that Mr. Khandelwal brought

25   out on direct examination.  It talks about his work for the

1    DEA, his work for the FBI, his work for the U.S. Attorney's

2    Office, over those same four years that he was asked about in

3    direct examination.  It appears that in May 2010, he had a

4    slightly different view of the relationships that he had with

5    all of those people for whom he worked, than the view he may

6    have had during that period or perhaps the view he has today.

7    I don't know.

8         But he makes a lot of allegations about stuff that

9    may be totally unsupported by facts, but it has to do with

10   his views.  And to the extent that it has to do with those

11   years of working with the DEA and the FBI and the U.S.

12   Attorney's Office in Miami and in Mobile, and his attempts to

13   deal with his IRS problems, I think it is relevant for that

14   reason as well as to the extent it can be used to undermine

15   his credibility and to show whatever bias he has, or to show

16   that he, you know, as we used to, McCormick or Wigmore used

17   to say about impeachment, to show that he blows hot and cold

18   depending on what day you talk to him.

19        I'm not saying I would admit this document in

20   evidence.  I don't know whether Mr. Abbenante has any thought

21   of introducing it, but I think it can be marked for

22   identification.  It can be shown to him and he can be asked

23   about it.

24        So, I overrule the government's objection on that.

25   And I'll asks Ms. Gumiel to give you back the document.

1          So, is there anything else before we get the jury

2     and Mr. Harvey back in?  So, you're ready?  Are we ready for

3     the jury?

4               MR. ABBENANTE:  Yes.

5               MR. KHANDELWAL:  I'd ask to publish the exhibit to

6     the jury.

7               THE COURT:  Before he begins?

8               MR. KHANDELWAL:  Yes, if that is appropriate.

9               THE COURT:  That's fine.

10              (Jury Present.)

11              THE COURT:  Mr. Khandelwal, everybody is here.

12              MR. KHANDELWAL:  I would like to publish

13    Government's Exhibit Number 260 to the jury.

14              THE COURT:  You can examine the bag, which is

15    Exhibit 200, pass it down the row and then down to the other

16    rows.  So just take a few minutes and do that before we get

17    started again.

18              (There was a pause in the proceedings.)

19              THE COURT:  The jury has examined it, so whenever

20    you are ready, Mr. Abbenante, we'll get Mr. Harvey back.

21              MR. ABBENANTE:  I'm ready, Your Honor.  I was just

22    waiting for them to get Mr. Harvey.

23                         CROSS EXAMINATION

24    BY MR. ABBENANTE:

25    Q    Good afternoon, Mr. Harvey.

1   A    Hello.

2   Q    Mr. Harvey, you've heard the term like honesty is always

3   the best policy, right?

4   A    That's correct.

5   Q    Okay.  And it would be fair to say that you've never

6   lived according to that creed, have you?

7   A    I think I have.

8   Q    You have?

9   A    Yes.  My word is very good.

10  Q    Your word is good?

11  A    Yes.

12  Q    Okay.  And so, drug dealing and breaking the law,

13  smuggling, laundering money, hiding your money from the

14  government, that's a good thing?

15  A    No, I said my word is good.  I already admitted I'm not

16  the best citizen that's ever been here.

17  Q    Well words are one thing, but actions always speak louder

18  than words; isn't that right?

19  A    Possibly.

20  Q    Possibly?  Well in your case, let's say.

21  A    I don't know.

22  Q    You don't know?

23  A    No.

24  Q    Well, again, when I ask you questions, okay, I'm not

25  trying to put any words in your mouth.  I'm just asking

1    questions.  So, if you don't understand something, if you

2    think that I'm asking you something you don't know the answer

3    to then tell me, okay?

4    A    Sure.

5    Q    All right.  Now, you've been down this road before

6    according to what I understand from the government's direct

7    examination, you've been an informant before, a cooperator,

8    right?

9    A    Yes, I worked for the U.S. Attorney's Office.

10   Q    Right.  And when was that again?

11   A    That would have been 1980 through 1984.

12   Q    Okay.  And after that?  When was the next time you acted

13   as an informant or provided information to the government?

14   A    Only on this case.

15   Q    Only on this case, okay.

16        Now, it's fair to say, as I understand your

17   testimony, that you had no more contact with Mr. Sitzmann

18   after 1999; is that right, approximately?

19   A    Approximately that date, yes.

20   Q    Well, when you say approximately, it could have been

21   1998, 1999, 2000, but not after at least '99, 2000?

22   A    I don't recall ever talking to him or having

23   communications with him after that.

24   Q    So you have no idea what he was doing from 2000 up to

25   this point?  Personal knowledge, I mean, discussions with

1    him, things of that nature?

2    A    Not with him, no.

3    Q    Okay.  Now, you come, as I understand it, you come or you

4    contact -- how did you get involved in this particular case?

5    A    I was stalked at the airport coming through Immigration

6    in New Jersey and taken to a room there.  And a guy said

7    somebody from Homeland Security wishes to talk to you.  So I

8    said okay.

9    Q    And who was that person?

10   A    Jared Rine.

11   Q    Okay.  And when approximately was that?

12   A    I'd say it was approximately two years ago.

13   Q    Okay.  And then at that point, what did you indicate to

14   him then, that you're willing to cooperate?

15   A    No, he only asked me if I knew Greg Sitzmann and I said

16   yes, I know him.

17   Q    Okay.  And that's all he asked you then?

18   A    Well, he asked me if he could come visit me in Florida

19   and talk to me and I said sure.  And then he asked me if I

20   would come to Washington and give a statement and I said

21   sure.

22   Q    Okay.  And when approximately was that?

23   A    I would say when I first was stopped at the New Jersey

24   airport, let's say two years.

25   Q    No, when did you come to Washington?

1    A    I would say a year or so ago.  Maybe a year and a half

2    ago.

3    Q    Okay.  And was that around July of 2011 or before then?

4    A    I don't know.  It could have been July --

5    Q    Okay.

6    A    -- of 2011.

7    Q    Well, I'm going to ask you again to take a look at what's

8    been -- I believe it has been admitted into evidence, but if

9    not, it's Government's Exhibit Number 281.

10   A    (Witness complied.)  Okay.

11   Q    Okay.  You know that that's something that you created,

12   right?

13   A    Yes, it is.

14   Q    Okay.  And you called it a means to negotiate a tax

15   settlement?

16   A    Yes.

17   Q    All right.  And did you bring that with you to Washington

18   on your first meeting in person?

19   A    No.

20   Q    When did you bring that?

21   A    I'm not sure if I brought it or if I sent it.  I'm not

22   sure.  If I brought it, it would have been the second time I

23   would have come up to see him.

24   Q    Okay.  But it wasn't, in other words, you didn't generate

25   it until after you had your first meeting?

1  A   That's correct.

2  Q   Okay.  And let me ask you, what was the purpose of this

3  document?  Why did you bring it and why did you give it to

4  either Agent Rine or Mr. Eliopoulos?

5  A   That's when my cancer had returned and I felt like, okay,

6  I'll settle up anything with the government now.  And I

7  figured, okay, I'll go ahead and pay my taxes and interest on

8  the money and that was my only intention.  If I had -- my

9  cancer hadn't of returned, I'm sure I wouldn't have done it.

10  Q   Okay.  In other words, you would have still been not

11  paying your taxes on this money, right?

12  A   That's correct.

13  Q   Okay.  And have you paid your taxes on this money as we

14  sit here today?

15  A   No, but it was very close.  We're just now getting the

16  records together.

17  Q   The records from where?

18  A   From in Switzerland.

19  Q   And so, is it your testimony -- I mean, well, the,

20  bottom -- you know, I'm a bottom line kind of person.

21  A   Sure.

22  Q   The bottom line on this Government's Exhibit Number 281,

23  the means and negotiated tax settlement, I'm just going to

24  read parts of it to you.  But the bottom line is, is that if

25  the government would have agreed to this, right, you would

1   have been able to keep the principle of your money in your

2   foreign accounts?

3         MR. KHANDELWAL:  Objection, calls for speculation.

4         THE COURT:  Well, it's his proposal.  He's asking --

5

6         -- you're asking about his proposal?

7         MR. ABBENANTE:  Right.

8         THE WITNESS:  My intentions were to pay my taxes and

9   pay the interest that I would owe.  Whatever the IRS said I

10  owed, I asked the attorney in Switzerland to pay them.

11  Anything left over, I've already signed over to a charity

12  organization in Switzerland.  If the government doesn't

13  settle and doesn't want me to pay the tax, then I've asked

14  the Swiss lawyer to give everything to the charity.

15  BY MR. ABBENANTE:

16  Q   Did you bring those papers?

17  A   No, I signed them in Zurich last time I went there.

18  Q   And all this -- and have you ever provided them to

19  Mr. Eliopoulos?

20  A   No, because they weren't interested in making a deal.  So

21  I retained an attorney in Fort Lauderdale, Florida to talk to

22  the IRS.  If they want to settle we'll pay them.  If they

23  don't then we'll give everything to a charity.

24  Q   Okay.  But we don't have, I mean, this is what your

25  testimony is.  Do you have any documents in your possession?

1    A    No, but I don't need to lie about that, either.

2              MR. KHANDELWAL:  Objection.

3              THE COURT:  Overruled.  Go ahead.

4    BY MR. ABBENANTE:

5    Q    Do you have any documents in your possession to basically

6    confirm what you're saying about that?

7    A    I have no documents.

8    Q    Okay.  So we have to rely on your word on that?

9    A    My word is good on this.

10   Q    Okay.  Now, did you -- when you came forward, again,

11   correct me if I'm wrong.  You're saying your word is good.

12   You're coming forward and you want to cooperate with the

13   United States Attorney in regard to Mr. Sitzmann, right?

14   A    I have to cooperate.  If they ask me a question and I lie

15   about it, then I get charged with perjury.  So I have to tell

16   the truth in this case.  And it's the same thing, if they

17   ask -- brought me to Washington, subpoenaed me, if I don't

18   answer the question, they'll lock me up until, you know, this

19   case is over.  So, I don't really have a choice.  I had to

20   tell the truth.

21   Q    Well, you didn't have to tell the truth unless they gave

22   you the immunity agreement.  In other words, you weren't

23   willing to just come in here and get up on the witness stand

24   and testify without some protection, right?

25   A    My attorney asked for some protection, but no, I would

 1    have still come and testified.

 2    Q    The truth of the matter is, is that you, first, according

 3    to what I understand, and correct me if I'm wrong, you first

 4    came in without a lawyer and you came in and you sat down and

 5    you talked with the government, right?

 6    A    That's correct.  They asked me questions and I answered

 7    them.

 8    Q    Okay.  And then there came a point in time --

 9              MR. ABBENANTE:  May I approach the witness, Your

10    Honor?

11              THE COURT:  Go ahead.

12    BY MR. ABBENANTE:

13    Q    -- where again, in July of 2011, you signed what is

14    Defendant's Exhibit Number Four.  Do you know what that is?

15              MR. KHANDELWAL:  Objection, Your Honor, can I see

16    the document?

17              MR. ABBENANTE:  I thought I just showed it to you.

18              (There was a pause in the proceedings.)

19              MR. ABBENANTE:  I'll withdraw that, Your Honor.

20    BY MR. ABBENANTE:

21    Q    Okay.  When did you sign Government's Exhibit Number 280?

22              THE COURT:  That's the immunity agreement?

23              MR. ABBENANTE:  Yes.

24    BY MR. ABBENANTE:

25    Q    When was the letter dated?

```
 1    A    April the 4th, 2012.

 2    Q    Okay.  And --

 3              THE COURT:  So a couple of weeks ago?

 4              MR. ABBENANTE:  A couple of weeks ago.

 5              THE WITNESS:  Yes, sir.

 6    BY MR. ABBENANTE:

 7    Q    And you signed it on April 6th of 2012, right?

 8    A    That's correct.

 9    Q    And your attorney signed it on April 9th, 2012?

10    A    That's correct.

11    Q    Now, were you always represented by an attorney during

12    this period or do you always consulting with an attorney

13    while you were talking with the government here?

14              MR. KHANDELWAL:  Objection, vague.

15    BY MR. ABBENANTE:

16    Q    During this period of time when you first came up here to

17    Washington to meet with the U.S. Attorney, okay, according to

18    you, you didn't have a lawyer, you just met with them and

19    answered questions, right?

20    A    That's correct.

21    Q    At that time, were you consulting with some lawyer in

22    Florida?

23    A    Not on that first time, no.

24    Q    Okay.  When was the first time that after that first

25    meeting that you consulted with an attorney?
```

```
1              THE COURT:  About this case?

2              MR. ABBENANTE:  About this case?

3              THE WITNESS:  It would have been some time last year

4    probably in the summer, August or September.

5    BY MR. ABBENANTE:

6    Q   Okay.  And at that point, was a discussion with your

7    attorney about the possibility of obtaining immunity?

8              MR. KHANDELWAL:  Objection, Your Honor.

9              THE COURT:  Well, we don't want to go into.

10             MR. ABBENANTE:  I don't want to go into.

11   BY MR. ABBENANTE:

12   Q   When did you first decide that it was in your interest to

13   get a letter from the United States Attorney granting you

14   immunity concerning your in court testimony here?

15   A   I never asked for it.  The attorney, Bruce Zimet, my

16   attorney down there, is the one who had asked for it.

17   Q   Okay.  So, in other words, what you're saying you would

18   have been willing to come in here without a grant of immunity

19   and testify about everything that you've done, as you have on

20   direct examination without any protection?

21   A   Yes.

22   Q   And why is that?

23   A   Well, I agreed to come and testify a long time ago, two

24   years ago, and tell the truth and I was.

25   Q   Isn't it true, Mr. Harvey, that when we talk about the
```

1    first document that you gave to the United States Attorney,

2    Government's Exhibit Number 281, about your means to

3    negotiate a tax settlement, okay.  Were you trying, I mean,

4    wasn't the purpose of that attempt to negotiate with the

5    government ultimately an attempt by you to keep your money?

6    A    No, I don't really care about that money.  That money is,

7    as far as I'm concerned, I've already signed it off.  I don't

8    care at all about that money.

9    Q    Uh-huh.  Then why -- did you keep on asking the

10   government about your proposal throughout this period of time

11   up until the time you testified here?

12   A    I don't think so.

13   Q    You don't think so?

14   A    Not, about that money over there because I had spoken to

15   George and George said he couldn't do anything.  So that's

16   when I went to Bruce Zimet and I told him what I had done in

17   Zurich and asked him to contact the IRS and see if they

18   wanted to settle.

19   Q    Did you identify in any of your discussions with

20   Mr. Eliopoulos or Agent Rine, did you tell them what bank

21   your money was in in Switzerland?

22   A    I don't know the name of the bank.  I never wanted to

23   know the bank.  The only bank I knew about was the Panama

24   National Bank in Panama.  And then I had the attorney to wire

25   it.  And I think it has been in a number of different banks,

1    I'm not sure, I can't even answer that, but I don't know.

2    Q    Have you had access to that money over the years?

3    A    I've never gone to the bank, any bank over there.  I've

4    never gotten any money out of there either.

5    Q    I thought you said you had an attorney who was very

6    cooperative with you.

7    A    Yes, the attorney is very good to me.  If I ask him, I

8    need something, sure, he'll help me.

9    Q    So you had access to the money, he gets the money or

10   wires it somewhere?

11   A    Yes.

12   Q    Okay.  So you've had access to that money?

13   A    Yes.

14   Q    All right.  Is it fair to say that that's all illegal

15   drug money?

16   A    No, it's not a dollar of it's drug money.  It's all legal

17   money.

18   Q    It's all legal money?

19   A    Yes, it is.

20   Q    Then why would you put it in a foreign account?

21   A    Because I prefer it to be in Switzerland.

22   Q    Why would you not, if it's all legal money, why would you

23   not want to know the amount of it or where it is or none of

24   the particular details, what bank it's in?  If it's all

25   legal, what's the problem?

1   A    I don't care about that money.

2   Q    You don't care about the money?

3          THE COURT:  Back originally when you setup the

4   foreign bank accounts before your cancer had returned and

5   before you decided to give it to charity.

6          THE WITNESS:  Yes.

7          THE COURT:  At that point you cared about it, didn't

8   you?

9          THE WITNESS:  Not a great deal.  You know, I guess I

10  wanted to keep some of it and I would try to help people with

11  it, but it wasn't my top priority.

12  BY MR. ABBENANTE:

13  Q    Well how are you supporting yourself now?

14  A    I'm all right.

15  Q    What do you mean you're all right?

16  A    Well, I don't spend much money.

17  Q    How many homes do you own?

18  A    None.

19  Q    None?

20  A    None.

21  Q    Well, you put them in corporation's names in the past, am

22  I right?

23  A    Yes.

24  Q    Okay.  Do you have any homes that you're now living in or

25  that are in the names of corporations?

```
1    A    No.

2    Q    No.  And did you, you say -- and I'm not asking you for

3    any specific address or anything, but you say you're living

4    now in area Pompano Beach, right?

5    A    I'm living in South Florida.

6    Q    South Florida.  Okay.  What kind of a house are you

7    living in?

8              MR. KHANDELWAL:  Objection, goes to safety.

9              MR. ABBENANTE:  I'm not asking the address, Your

10   Honor, or anything.

11             THE COURT:  I think we need to know something

12   about -- come to the bench.

13             (Bench conference.)

14             MR. KHANDELWAL:  I'm concerned that this is going to

15   go to the safety of the witness, Your Honor.  The witness has

16   already expressed in a written document about his concern

17   about his safety in this particular case, and specifically

18   that he did not want his address because he feared for a

19   specific danger from the defendant.  I'm not trying to limit

20   the cross.

21             THE COURT:  Yes.

22             MR. KHANDELWAL:  But he has gotten his point across,

23   I think.  And I think there's other ways to do it besides

24   asking, you know -- which I think was dangerous, frankly.

25   But I think we're just going too far here.  We have to be
```

1    concerned about the witness' safety at some point.

2            THE COURT:  All right.

3            MR. ABBENANTE:  Your Honor, he's saying he's doing

4    all right.  And he's, you know, he doesn't need that money.

5    And all I want to do is I want to know what kind of house he

6    lives in because our information is he's living in an area

7    called Naked Lakes Estates.

8            THE COURT:  I don't want you to discuss this.

9            MR. ABBENANTE:  I got that information from my

10   client, Your Honor.

11           MR. KHANDELWAL:  Just exactly why I'm worried.

12           THE COURT:  Well, I'm not going to let you ask where

13   he's living or what part of the state he's living in beyond

14   what he has already said.  And, I mean, if you want to ask

15   about, is the house under a corporation that he set up or

16   that he's a part of, you can ask that.  If you want to ask

17   how many homes he has an interest in through corporations,

18   you can ask that.  If you want to ask what is the

19   legitimate -- I mean, I thought we heard either him hearing

20   outside the presence of the jury, or in the presence of the

21   jury, that he has never had any legitimate business.  So, I

22   guess buying and selling airplanes, maybe that's legitimate.

23   You know, where did all this money come from that's suddenly

24   legitimate.

25           I think you can ask all sorts of questions.  If you

1   want to ask the value of the house if he knows it or if it is

2   a house, what it's assessed as.  If you're trying to show

3   opulence, I think you can do it through that.  Or if you want

4   to show that he owns indirectly more than one house, you can.

5   Maybe he has houses in other countries, I don't know.  But I

6   don't want to get into anything that's going to help identify

7   where it is or anything specific about it.

8           MR. ABBENANTE:  No.  I -- well, I understand what

9   the government's concern is.  And I don't know whether or not

10  there's any basis upon which Mr. Harvey, to make the

11  assertion that he has made in the letter.  There has been a

12  long history between these two.  However, my client has

13  investigated this case even before I came into it.  And my

14  understanding is, is that he has always known where

15  Mr. Harvey has been living.  And my understanding is is that

16  he's living it up.  He has a beautiful home, some acreage.

17          THE COURT:  Well why don't you ask him does he have

18  a beautiful home, how many square feet is it, things like

19  that.  How many acres is it on.  That doesn't identify the

20  address or the area.  And how many homes and does he live

21  elsewhere at different times of the year, other countries,

22  other states.

23          MR. ABBENANTE:  Okay.

24          THE COURT:  Okay.  Let's see what we can accomplish.

25          MR. ABBENANTE:  Thank you, Your Honor.

1              (Open Court.)

2    BY MR. ABBENANTE:

3    Q    Now, Mr. Harvey, are you living in a house now?

4    A    Yes.

5    Q    Okay.  How big is that house?

6    A    I don't know.  I really don't know.

7    Q    You don't know how many square feet it is?

8    A    No.  It's an old wooden frame house.

9    Q    Is it got a swimming pool?

10   A    Yes.

11   Q    Okay.  Is it owned in the name of some corporation?

12   A    Yes.

13   Q    Okay.  And are there other times during the year where

14   you reside in other houses or other places?

15   A    Yes.

16   Q    All right.

17   A    With friends.

18   Q    With friends?

19   A    Yes.

20   Q    Okay.  And what kind of houses are those?

21   A    Well, sometimes I stay with a friend in Leesburg and it's

22   a fairly nice house.

23   Q    Leesburg --

24   A    Florida.

25   Q    Okay.

1  A   And I've stayed with friends in Pompano and it's okay.

2  Q   All right.  Do you have any homes or properties located

3  anywhere else?

4  A   No.

5  Q   All right.  Do you have any companies right now that you

6  have any interest in or control over?

7  A   I don't think so.  I don't know of any.

8  Q   You don't know of any?

9  A   Oh, I may have one.  It's a Delaware corporation that

10  owns an airplane.  That's the only one I can think of.

11  Q   Uh-huh.  Have you disclosed all of, I mean, did you ever

12  disclose that to the government?

13  A   They never asked me.

14  Q   Okay.  Now this attorney that has been so helpful to you.

15  A   Yes.

16  Q   What's his name?

17  A   I'd rather not say.

18          THE COURT:  Is he in Switzerland?

19          THE WITNESS:  Yes, he is.  He's in Zurich.

20          THE COURT:  I don't think we need to know his name.

21          MR. ABBENANTE:  Okay.

22  BY MR. ABBENANTE:

23  Q   Does this attorney -- now you say that all this money

24  that you got in Switzerland is not drug money?

25  A   No, not a dollar.

1  Q   Not a dollar.  Okay.  Well, correct me if I'm wrong.  We

2  heard on direct examination that you made millions of dollars

3  in drug smuggling and selling airplanes to Colombian drug

4  dealers and the whole bit, right?

5  A   That's correct.

6  Q   Okay.  And that there was money was deposited in a

7  Panamanian bank account, right?

8  A   That's correct.

9  Q   And those were illegal funds, right?

10 A   Yes, they were.

11 Q   Okay.  And as I understand it, those monies were

12 improperly disposed of by the bank or stolen from you, right?

13 A   I don't know if you would say stolen, the IRS served a

14 levy on them and they gave them the money.

15 Q   Okay.  But you evidentially --

16         THE COURT:  The same money that you then went to

17 court and got some of it back?

18         THE WITNESS:  Well, I -- no, I couldn't get that

19 money back because that had been turned over to the IRS.  So

20 I sued them on misconduct.  In other words, they broke the

21 Panamanian law by giving away the information on that bank

22 account.

23         THE COURT:  So you sued the Panamanian bank on

24 misconduct?

25         THE WITNESS:  Yes, sir.

 1              THE COURT:  And you settled that case?

 2              THE WITNESS:  Yes, sir.

 3              THE COURT:  For how many money?

 4              THE WITNESS:  It was, it was just over $7 million, I

 5      believe.

 6              THE COURT:  So the Panamanian bank was forced to pay

 7      you $7 million for its misconduct?

 8              THE WITNESS:  Yes.

 9      BY MR. ABBENANTE:

10      Q    So in other words, you got -- you actually -- that's like

11      laundering money, isn't it?  You sued the Panamanian bank and

12      got a legitimate, I guess, court judgment.  But really what

13      happened there is that you got substitute assets that were

14      seized by the U.S. government?

15      A    That's not true.

16      Q    What is it?  Explain how I'm wrong.

17      A    Because I ended up with onlay about $4 million.  They

18      took about 5.7 or 5.9.  And this was totally different money

19      because before I could open a bank account in Switzerland I

20      had to send a complete, the file where we had gone to court.

21      And the government there said yes, this is legal money.  And

22      so, that's the only way I was able to open a bank account

23      there.

24      Q    But what I'm saying, and again, Mr. Harvey, correct me if

25      I'm wrong.  The money that the U.S. government seized from

1    Panama, by your own admission, was drug money, dirty money?

2    A    It wasn't all drug money.  Some of it was, no, some was,

3    some wasn't.  It was a mixture of both, but it doesn't really

4    matter, you're still wrong.  The money that I got from the

5    bank when I sued them is totally different money.

6    Q    But you got that money from the bank because, according

7    to your lawsuit and according to whatever the judgment was in

8    Panama, the Panamanian bank had no right giving -- they broke

9    their own laws by giving the United States your drug money?

10   A    They broke the law by breaking the law in Panama by

11   disclosing that I even had an account there.

12   Q    Right.  But the bottom line is, your dirty money got back

13   to the United States?

14   A    I don't see it the same as you.

15   Q    Okay.  Well, I'm not going to argue with you.

16           Now, in your means to negotiate a tax settlement, do

17   you have it in front of you?

18           THE COURT:  It's Exhibit 281?

19           MR. ABBENANTE:  Exhibit 281.  Do you have it?

20           THE WITNESS:  Yes, I have it.

21   BY MR. ABBENANTE:

22   Q    Okay.  Paragraph five.  Okay.  This was your suggestion.

23   A    Yes.

24   Q    "The taxpayer's settlement agreement must be authorized

25   by the attorney general.  He must give his full endorsement

1    and authorization in writing to the assistant U.S. Attorney

2    to make this settlement.  Once settlement is completed,

3    payment for all owing taxes will be paid provided the

4    attorney signs off on the settlement."  Right?

5    A    That's correct.

6    Q    Okay.  So, until the government does what you want or

7    what your attorney wants, you're not going to pay those

8    taxes?

9    A    That's the way -- no, they have to tell me how much I

10   owe.  And if they're not willing to settle, no, I'm not

11   willing to pay.  I think that's what it is.  And you have to

12   get the attorney general or somebody to sign off on it.  You

13   can't go to an agent and say oh, I want to work a deal with

14   you.  I tried that once before.

15   Q    And that didn't work out, did it?

16   A    No, I sat down with the U.S. Attorney's Office in Miami

17   and when I gave up everything, they still went ahead and took

18   the money.

19   Q    And that left a bad taste in your mouth, right?

20   A    A real bad taste.  Uh-huh.

21   Q    And in that regard, I'm going to show you what has been

22   marked as Defendant's Exhibit Number Five.  Can you tell us

23   what that is?

24   A    It looks like a letter, maybe I sent to Jared.

25   Q    Maybe you sent to Jared?

 1    A    No, I haven't read it yet.  (Reading the document.)  Yes,

 2    I remember writing this letter.

 3            THE COURT:  What's the date of it?

 4            THE WITNESS:  26 of May, 2010.

 5    BY MR. ABBENANTE:

 6    Q    Okay.  And you wrote this letter in May of 2010.  Was

 7    that before you came and met with Mr. Eliopoulos?

 8    A    When?

 9    Q    May of 2010.  Was that before you came to meet with

10    Mr. Eliopoulos the first time or was it after you met him?

11    A    Oh, no, it would have been after.  I didn't even know him

12    then.

13    Q    Okay.  This is a letter to Agent Rine.  You met Agent

14    Rine before you met Mr. Eliopoulos, right?

15    A    I would talk to him first.  I'm not sure.  I think he

16    came to visit.  I'm not sure.  I can't answer it.  I think he

17    did come to Fort Lauderdale though.

18            THE COURT:  You think who came to Fort Lauderdale?

19            THE WITNESS:  Agent Rine.

20            THE COURT:  Okay.  You first met him in an airport,

21    right, when you were stopped?

22            THE WITNESS:  I talked to him on the phone then.

23            THE COURT:  Oh, I see.

24            THE WITNESS:  He was in Washington, and I was in

25    Newark, New Jersey.

1          THE COURT:  I see.

2    BY MR. ABBENANTE:

3    Q   Okay.  And in this letter you expressed, you know, your

4    displeasure with what happened to you and the way the office

5    of the U.S. Attorney in Miami dealt with you and some of the

6    agents and all that; isn't that true?

7    A   I pointed out that there were a lot of crocked agents in

8    Miami.

9    Q   All right.  And that basically, in your view, in your

10   view, they went back on their word with you, right?

11   A   They did.

12   Q   They did.  Okay.  And you want to make sure at least that

13   that doesn't happen here, right?

14   A   I want to make sure we don't deal with any crocked agents

15   or any crooked people in the Justice Department.

16   Q   Okay.  But they didn't keep their word back then.  And

17   right now, it's of concern to you whether or not the

18   government keeps their word now, right?

19   A   It's always a concern.

20   Q   It's always a concern.  Okay.

21         And let me show you, again, what's been marked, and

22   I don't think this has been admitted, and Government's

23   Exhibit Number 282.  And when did you give that to Agent

24   Rine?

25   A   When I came up this time last week.

1    Q    Last week?

2    A    Yes.

3    Q    And the first line says, "Let's make sure we all keep our

4    word.  I told you I would help you with Greg and I will.  You

5    both told me I had nothing to worry about as you have no

6    interest in me.  Let's keep it that way."  That's what you

7    said, right?

8    A    That's correct.

9    Q    Now, I thought when Mr. Khandelwal asked you questions on

10   direct examination, he asked you whether or not any deals had

11   been made with you, right?

12   A    Yes.

13   Q    And you said oh, wait a minute.  They can still prosecute

14   me if they find other evidence other than what I say here and

15   they can still go against me, right?

16   A    Yes, that's the way it was explained to me.

17   Q    But then why did you write this letter to them up to two

18   weeks ago saying that they told you, they told you, that they

19   have no interest in you?

20   A    That's what they told me when I first met them.  And I

21   believed them.  And I went right along with it.  And I just

22   want to make sure I'm telling the truth and I'm doing exactly

23   everything I said I would.

24   Q    So, as far as you're concerned, what you said on direct

25   examination, when you said on direction examination, oh,

1    yeah, I don't have any agreement with the government.  All I

2    have to do is tell the truth here and they can still

3    prosecute me if they've got other evidence, right?

4    A    That's correct.

5    Q    But you're saying in this letter up until two weeks ago,

6    that they told you that they have no interest in you.  So if

7    they have no interest in you, why would there be any concern

8    on your part about them prosecuting you based on some other

9    evidence?

10   A    I'm not sure if I have that great concern.  In other

11   words, I took them at their word that they have no interest

12   in me, they want me to testify here.  And that's exactly

13   what's been going on.

14   Q    But you wrote this letter, right?

15   A    Yeah.

16   Q    Okay.  Then, "I told you I would get the bank records and

17   figure taxes due on any accounts in which I may have an

18   interest.  And I would pay the taxes and also the late

19   interest which may be due.  I am keeping my word."  Right?

20   A    Yes.

21   Q    That's what you said.  You haven't given them any bank

22   records, have you?

23   A    I don't even have them yet.

24   Q    Well, I mean, I thought this attorney that you have, you

25   know, he's a real good attorney, okay, and he's good to you.

1    A    Sure.

2    Q    You can't pick up the phone and say hey, send me the

3    records?

4    A    Let me tell you exactly how tough it is to get records in

5    Switzerland now.

6    Q    But can you --

7    A    No, no, let me tell you.  The government here has sued

8    the banks over there.  In order to get those records now, you

9    have a hard time getting them.  And then what you have to do

10   is the bank has to certify those records.  They then send

11   them to the government and they have to be certified there

12   because the U.S. government has a deal, if the bank makes a

13   mistake, they're liable.  If the government makes a mistake,

14   they're liable.  So, it's not as easy as in the old days.

15   Q    Mr. Harvey, your first means to negotiate a tax

16   settlement, you make a proposal and part of this proposal is

17   oh, I'm going to come forward, I'm going to give you my

18   records, right?  You're trying to negotiate with them, right?

19   You're a drug dealer, you know how to negotiate, don't you?

20              MR. KHANDELWAL:  Objection, Your Honor.

21              THE COURT:  Ask one question at a time.

22              THE WITNESS:  What's your question this time?

23   BY MR. ABBENANTE:

24   Q    My question this time is, you've already admitted that

25   you are or have been a drug dealer?

1    A    I was a drug dealer, yes, sir.

2    Q    Okay.  Now, when you deal with drugs, I mean, you're

3    dealing with the Colombian cartel, right?

4    A    Yes.

5    Q    Okay.  You're dealing with people that are working for

6    you, transporting drugs, right?

7    A    Yes.

8    Q    Right.  And you know how to work a deal, negotiate,

9    right?

10   A    I knew how to negotiate for pot out of Columbia.

11   Q    You, according to your testimony, you're down there in

12   the farmer's fields, right?

13   A    Yes.

14   Q    You're looking at their product?

15   A    Yes.

16   Q    And you're talking with the people that are growing it?

17   A    Yes.

18   Q    And you're negotiating with them, right?

19   A    That's exactly what I said.  I know how to negotiate the

20   pot.

21   Q    Exactly.  So, and that's the same thing you're trying to

22   do here.  You're trying to negotiate, you're trying to use

23   the skills that you learned from being a drug dealer and a

24   smuggler.  And you're trying to use those same skills to

25   negotiate with the U.S. Attorney's Office?

1    A    I'm willing to pay my taxes and the interest if the IRS

2    wants me to pay.

3    Q    You had a year since you first entered the scene here to

4    do that and you haven't done it.  And you're saying now that

5    you can't pick up the phone and forget about getting

6    certified records, let's just say getting from your attorney,

7    who's so helpful, you can't even pick up the phone and get

8    your attorney to send you any documents.  That's what you're

9    saying?

10   A    If you had money there, you couldn't do it either.  None

11   of us can.

12   Q    The truth is, okay, the truth, Mr. Harvey, is that you

13   don't want to give the government the records so that they'll

14   know what bank your money is in or what account your money is

15   in or who this attorney is that has been so helpful to you in

16   this regard.  That's the truth of the matter, isn't it?

17   A    No, it's not.

18   Q    Okay.

19   A    I'd like to settle with them.

20   Q    What?

21   A    I said I would be happy to settle with them.

22   Q    And you're in a position, financially, according, and

23   correct me if I'm wrong.  You're in a position financially

24   where you're able -- as you said, correct me if I'm wrong,

25   where you said earlier, you know, I'm doing all right, I'm

1    doing all right now.  You don't have any, you're not working

2    now, right?

3    A    No, I'm retired.

4    Q    Okay.  You're retired, you're a retired, what, drug

5    dealer?

6    A    I'm just retired.

7              MR. KHANDELWAL:  Objection, Your Honor.

8              THE WITNESS:  I was a drug dealer more than 30 years

9    ago.  I've never been in it since.

10   BY MR. ABBENANTE:

11   Q    What legitimate, tell me what legitimate businesses or

12   what legitimate sources of income you've had over the past 30

13   years?

14   A    Buying, selling in airplanes.

15   Q    To who?

16   A    To anybody who wants to buy them.

17   Q    Including the drug dealers in Colombia?

18   A    I did in the old days.  Now you don't sell them to them,

19   but I did.

20   Q    And who is the last legitimate person that you sold an

21   airplane to and when?

22   A    I would say a couple of years ago.

23   Q    Who?

24   A    A company down in Venezuela.

25   Q    A company in Venezuela?

1    A    Yeah.

2    Q    Okay.  And do you have a company here where you sold that

3    company to a company in Venezuela?

4    A    No.

5    Q    Okay.  And how did that sale, how did you arrange that

6    sale?

7    A    Advertising the airplanes.

8    Q    Pardon?

9    A    Advertising the airplanes.

10   Q    Okay.  And tell me how -- what, did you build the plane,

11   you have somebody build it here in the states?

12   A    No, just a regular airplane.

13   Q    So, it was a new airplane or a used airplane?

14   A    Used airplane.  I don't have any new airplanes.  I don't

15   deal in them.

16   Q    Okay.  And where was the airplane, or where was the

17   airplane located when you sold it?  How did it get to

18   Venezuela?

19   A    Panama.

20   Q    Pardon?

21   A    The airplane was in Panama.

22   Q    Okay.  And was that an airplane that you once owned?

23   A    No, I brokered that airplane.

24   Q    Just the two years ago?

25   A    Yes.  I don't buy any airplanes anymore, I broker them.

```
 1              THE COURT:  What does that mean?

 2              THE WITNESS:  Oh, it means I'll put the buyer and

 3     the seller together and I'll take a commission out of it.

 4   BY MR. ABBENANTE:

 5     Q    And who was the person in Panama?

 6     A    Who was the person in Panama?  Mike Dubinsky.

 7     Q    Okay.  And is he -- and how do you know him?

 8     A    I've known him for a long time.

 9     Q    And in what capacity do you know him?  I mean, he's in

10     Panama, right?

11     A    Yes.

12     Q    Okay.  And is he a person from your past?

13     A    Well, if you're trying to find out if he was a drug

14     dealer, he wasn't.  He's just a regular guy.

15     Q    But is it somebody that you dealt with in your past while

16     you were a drug dealer?

17     A    No.

18     Q    Did he know about you being a drug dealer?

19     A    Yes.

20     Q    Okay.  When did he -- he's known that all the years that

21     he's been -- well, when did he first find out about that?

22     A    I don't know, I may have told him 10 years ago or 20

23     years ago.  I'm not sure.

24     Q    Okay.  So this is a man who knows that you were once a

25     drug dealer.  You're retired now.  But you brokered the plane
```

1    with him.  And then it ends up to a company in Venezuela and

2    this is all legit, that's your testimony?

3    A   Yes.

4    Q   Do you have records of that?

5    A   No.

6    Q   Do you have a bill of sale?

7    A   No.  It didn't come from the states.

8    Q   So they don't use bills of sales in Panama?

9    A   Well, they can switch that airplane down there.  If you

10   have to sell one from up here, yeah, you have to go through

11   the FAA out in Oklahoma City.  But as long as you're down

12   there selling them from different places, I mean, I've

13   brokered a lot of airplanes through Europe and all around.

14   Q   Okay.  And how much money did you make off of that?

15   A   I think I made about $15,000.

16   Q   Okay.  And did you claim that as income?

17   A   I'm not sure.

18   Q   Okay.  What about all these -- and this is back in 2010,

19   according to you, a couple of years ago?

20   A   Maybe 2009, '10.

21   Q   All right.  Now, these other planes that you brokered,

22   you know, a sale for, where did these planes end up,

23   Venezuela?

24   A   No.

25   Q   Where?

1    A    They would go to different places.

2    Q    Like where?

3    A    I don't ask them where they're taking their airplane.  If

4    I broker one, the guy comes and buys it, he can take it

5    wherever he wishes.

6    Q    But where would the people coming from that were buying

7    the planes?

8    A    Some would be in the states, some would be in Panama,

9    some in Costa Rico, all around.  Wherever, I have calls from

10   every place.

11   Q    Uh-huh.  And all of these sales that you've been involved

12   in or broker, how much did you make on these?

13   A    I don't remember.

14   Q    You don't remember.  And did you pay any tax on any of

15   that money?

16   A    I don't remember.

17   Q    Now --

18            MR. ABBENANTE:  I apologize, Your Honor.  Can I

19   approach the witness?

20            THE COURT:  Yes.

21   BY MR. ABBENANTE:

22   Q    I'm going to show you what's been marked as Defendant's

23   Exhibit Number Six.  Do you remember this?

24   A    Yes.

25            THE COURT:  What is it, Mr. Harvey?

1          MR. ABBENANTE:  What is this?

2          THE WITNESS:  It's a note to Jared Rine.

3    BY MR. ABBENANTE:

4    Q    About the John Sager, right?

5    A    Yes.

6    Q    Okay.  And when did you give him this?

7    A    Possibly two years ago.

8    Q    Two years ago?

9    A    Possibly.  Yeah, I believe I gave it to him when he and

10   the guy, Tim, came down to visit in Fort Lauderdale.

11   Q    Okay.

12   A    I believe.  I could be wrong, maybe I mailed it to him, I

13   don't know.

14   Q    Okay.  Now, was this letter sent to Agent Rine while John

15   Sager had a case pending in Florida?

16   A    Yes.

17   Q    And was it sent to Agent Rine when John Sager was on the

18   run?

19   A    I don't know if he was on the run or he had been

20   arrested.  I don't recall.

21   Q    Okay.  But it was before his case had been resolved,

22   before he went to trial?

23   A    Yes.

24   Q    Okay.  And basically, without going into the specifics of

25   the letter, essentially, you were making an offer of sorts to

1    assist Agent Rine in the government -- not Agent Rine's

2    personal investigation or Mr. Eliopoulos' investigation of

3    Mr. Sager, but to help with the government's investigation of

4    Mr. Sager, right?

5    A    That's correct.

6    Q    Okay.  And in here, in here, you say that you don't want

7    Agent Rine to get in trouble with anybody, but, you know, if

8    he would grant you permission to be involved in, you know,

9    giving information about John Sager, you're willing to help,

10   right?

11   A    I was willing to help him, yes.

12   Q    And the one -- but the condition, the condition of it was

13   that you wouldn't, you didn't want to speak to anybody but

14   Agent Rine, right?

15   A    Yes, I didn't want to speak to anybody in Gainesville.

16   Q    Right.  And you didn't want him to authorize to disclose

17   your name in any manner regarding the John Sager case and you

18   said you won't testify either?

19   A    That's correct.

20   Q    I mean, the bottom line is, okay, that you didn't want,

21   you didn't want to let John Sager know that you would be

22   giving any information against him, right?

23   A    I didn't want him to know that I had disclosed to Jared

24   Rine where his two airplanes were sitting.

25   Q    Okay.  But that would be information --

1    A   Yes.

2    Q   -- that could be used to either convict or hurt

3    Mr. Sager, right?

4    A   I don't think it would hurt him being convicted.  It

5    would hurt him financially losing the two airplanes to the

6    government.

7    Q   Right.  And the last person you wanted to know about that

8    is John Sager, right?

9    A   That's correct.

10   Q   Okay.  Now, you know for a fact that John Sager has been

11   convicted in that case in Florida, right?

12   A   I heard he had.

13   Q   Okay.  In fact, you even accompanied his wife, his wife

14   to the office where she hired an attorney, right?  She asked

15   you to bring her?

16   A   No, she took me.  She asked me to ride with her to see

17   him.

18   Q   Right.  Well, to ride with her?

19   A   Yes.

20   Q   Okay.  I mean, so his wife at least, and you correct me

21   if I'm wrong.  At the time I assume Mr. Sager himself knew

22   that you were going with his wife to go to the attorney.  Am

23   I right?

24   A   I don't know.  She just asked me to ride with her to see

25   an attorney.

1    Q    Okay.  And you did?

2    A    Yes, I did.

3    Q    And according to you, you didn't pay for any of it,

4    right?

5    A    Not one dollar.

6    Q    Not one dime.  Okay.  Did you tell his wife that you had

7    offered to cooperate against her husband and give information

8    against her husband?

9    A    I didn't offer to give information against her husband.

10   I offered to disclose where the two airplanes were sitting.

11   Q    Which he owned?

12   A    Yes.

13   Q    Okay.  Which the government would have eventually

14   forfeited?

15   A    Yes.

16   Q    Okay.  And you don't call that giving information against

17   Mr. Sager?

18   A    No, not really.

19   Q    Well then why did you want to make sure that Agent Rine

20   didn't tell him about it?

21   A    I don't want somebody coming to my house shooting me.

22   Q    But you know what, let me ask you this:  Have you ever

23   heard of the term playing the 50?

24   A    No.

25   Q    Okay.  Well, did you ever hear, you know, like people

1    that like to work both sides of the fence?

2    A    I've heard something like that.

3    Q    Something like that.  Now, here you are, on the one hand

4    in the background, you know, trying to help the government

5    against somebody that supposedly is a friend of yours,

6    Mr. Sager, right?

7    A    I thought he was a friend at one time, but I found out he

8    wasn't.

9    Q    He was a friend enough of yours -- well, let me ask you

10   this:  Okay.  At the time he wasn't, but you're giving

11   information to the government about Mr. Sager.  And then

12   you're going with his wife to the lawyer where she's going to

13   hire to represent her husband, right?

14   A    No, you're wrong.

15   Q    What am I --

16   A    I gave that information to Jared after I had gone with

17   her to pay the attorney.

18   Q    Isn't that worse?

19   A    Why?

20          MR. KHANDELWAL:  Objection, Your Honor.

21   Argumentive.

22          THE COURT:  I'll permit it.

23   BY MR. ABBENANTE:

24   Q    So you go with the man's wife to get an attorney for her

25   husband, acting like a friend, I would assume.  I mean, let

me ask you this:  I mean, you know, a woman's husband is in

trouble, right?

A    Yes.

Q    Big trouble.  Right?

A    Yes.

Q    Right.  And that woman reaches out to someone that she

believes, I would assume believes that she has enough trust

to have come with her to hire a lawyer to represent her

husband, you, right?

A    She only -- she did not want to drive all the way to

Gainesville and back by herself.  And she asked me to ride

with her.

Q    I assume she could have asked anybody, but she asked you.

A    Yeah.

Q    Okay.  And you went?

A    Yes.

Q    And then the first chance you got, you were ready to give

information that could potentially hurt her husband's

financial interest, right, that's what you did?

A    Not the first, no.

Q    What?

A    When I found out that he really wasn't a friend is when I

went and I told Jared I would locate the two airplanes for

him.

Q    And was this before or after you went with the wife?

1    A    Afterwards.

2    Q    Afterwards.   When was that again?

3    A    When did I go with her?

4    Q    When was that?

5    A    Well that had to be two or three years ago, maybe four

6    years ago.  I don't know.

7    Q    And let me ask you something.  Mr. Sager, you know, when

8    you say he was your friend at some point, he was a fellow

9    drug dealer, right?

10   A    I think he was a drug dealer, yes.

11   Q    You think he was a drug dealer?

12   A    He said he was.

13   Q    You didn't know for a fact he was?

14   A    I never saw him with drugs.

15         MR. KHANDELWAL:  Objection, Your Honor.

16         MR. ABBENANTE:  I'm sorry.  I didn't mean --

17   BY MR. ABBENANTE:

18   Q    You didn't know he was a drug dealer.  That's your

19   testimony?

20   A    I said I understood he was because he told me he was.  I

21   said I have never seen John Sager with drugs before in my

22   whole life.

23   Q    Have you ever heard this term, you know, there's no honor

24   among drug dealers?

25   A    No, I haven't heard that.

1    Q    You haven't heard it.  Okay.  In your -- again, this is

2    not the first time you've testified in court, right?

3    A    That's correct.

4    Q    Under oath, right?

5    A    Yes, that's correct.

6    Q    Okay.  And there was a time when, you know, there was a

7    case that you were involved in?

8              MR. ABBENANTE:  In fact, Your Honor, can we approach

9    the bench just -- we can resolve this?

10             (Bench conference.)

11             MR. ABBENANTE:  I apologize, Your Honor.

12             THE COURT:  Okay.

13             MR. ABBENANTE:  There's this case that was provided

14   to me, just after the original Giglio disclosure,

15   Mr. Khandelwal provided me with several cases.  I think there

16   are four of them.  One of them is Jerry V. Harvey as the

17   plaintiff against the United States.  And it was in the

18   United States District Court of Florida.  And I'm not -- I

19   talked this over with Mr. Khandelwal.  I'm not sure he's

20   right about this, but at this point I'm not in a position to

21   argue otherwise.  I think in some of these cases basically

22   the Court found Mr. Harvey's testimony not credible.

23             And at the moment, I'm not sure whether I can get

24   that in.  But, there are certain instances, for instance,

25   where they -- things that he did.  For instance, while the

1   proceedings were pending in this case, that he became aware

2   of the IRS's levy against certain property.  And he, through

3   an agent, gave power of attorney over that bank account and

4   attempted to withdraw the funds while the action was pending.

5   So, in other words, he was trying to get out from under the

6   radar of the IRS.

7           He also talks about houses that were in the name of

8   companies where he was living, where he was deducting

9   interest payments on the mortgage.  And also he talks about,

10  he had testified that money that was in accounts going to

11  third parties.  And he testified.

12          THE COURT:  That were in his accounts?

13          MR. ABBENANTE:  No, there was funds in the accounts

14  which belonged to third parties.  So, I assume they were in

15  his named accounts, but he's, he went into Court and said

16  that they belonged to third parties.  And --

17          THE COURT:  Well, look.  I think it seems to me that

18  all of this gives you a factual basis to ask the question,

19  except for one.  This opinion that you're summarizing gives

20  you the factual basis to ask the question.  The only question

21  then is whether you're bound by the answer that he gives you

22  under Rule 608, I believe it is, or whether you're entitled

23  to say that --

24          MR. ABBENANTE:  Right.

25          THE COURT:  So, otherwise.  And I think that -- and

1    the question about, there's some other judge who said that he

2    wasn't credible, unless you show me a case to the contrary, I

3    would say that's out of bounds because I don't care what

4    anybody else thinks about his credibility.  The only question

5    is what this jury thinks about his credibility.  So, I think

6    you can ask those questions.  And the question is whether or

7    not you can use this opinion.

8                MR. ABBENANTE:  Well, I wasn't going to mark the

9    opinion or anything like that.  I want to just ask him if he

10   is familiar with the case.  In fact, he filed against the

11   United States in the Southern District of Florida in 1988

12   because that --

13               THE COURT:  In 1988?

14               MR. ABBENANTE:  Well, the case that he --

15               THE COURT:  Because, you know, part of the problem

16   is that, the questions about whether he was living in houses

17   that corporations owned or he has an interest in or whatever,

18   I believe you asked all those questions in the present tense.

19   And, you know, so that doesn't directly contradict him if

20   that was the state of affairs in 1988.

21               MR. KHANDELWAL:  That case is talking about facts,

22   events that occurred in '83.

23               THE COURT:  In '83.

24               MR. KHANDELWAL:  That's even past the remoteness

25   inquiry this Court made on other issues.  We're getting far

1    afield, Your Honor.

2            THE COURT:  Yeah.  So, I mean, I think that -- and

3    if you want to say you've testified, and such and such and

4    such and such, but isn't it true that you have in the past

5    lived in houses that were owned by corporations or

6    controlled, and then you're stuck with his answer.  I mean, I

7    don't know how far it gets you necessarily, but I don't think

8    that opinion necessarily, if it's that old, it doesn't seem

9    to me, based on the recollection of what he said a little

10   while ago, I don't think it contradicts.  But there's

11   certainly a factual basis, even though it's remote, if you

12   think it helps you with your credibility attack, to ask some

13   of those questions.

14           MR. ABBENANTE:  I'm trying to finish up.

15           MR. KHANDELWAL:  And I'd like to keep -- we stay

16   until we're finished.  I think we're very close and this

17   witness has --

18           THE COURT:  Well, let's just keep going as quickly

19   as we can.

20           (Open Court.)

21   BY MR. ABBENANTE:

22   Q   Okay.  As I asked you the questions on cross examination

23   this afternoon about you living in houses, about whether or

24   not you're living in any house or houses that are owned by

25   companies that you control and your answer is no.

1   A   That's correct.

2   Q   Okay.  But in the past you've done that, right?

3   A   Yes, I did.

4   Q   Okay.  And have you ever put money -- do you have any

5   money now out there in banks either in this country or in

6   other countries that are in the names of other people that

7   you really -- that's really your money?

8   A   No.

9   Q   But you've done that in the past too, haven't you?

10  A   Yes, I have.

11  Q   Okay.

12          THE COURT:  Was the Swiss bank accounts, or Swiss

13  bank accounts, is your Swiss bank account, without getting

14  into detail, in your name or is it in the name of the lawyer

15  as nominee or someone else as nominee or is it in a numbered

16  account that you control through a lawyer?

17          THE WITNESS:  Your Honor, I don't know what name

18  it's in or anything.  I just know that I contact the Swiss

19  lawyer if I want something.

20          THE COURT:  Okay.

21  BY MR. ABBENANTE:

22  Q   Now, you know, according to what I can see from your

23  means to negotiate a tax settlement and your testimony that

24  you know that if you've got money in foreign bank accounts,

25  that they're subject to tax here in this country, right?

1  A    I understand if I have full control or it's in my name or

2  I have associated with it, yes, I would be.

3  Q    But in the past you've testified that the laws were so

4  complex that you didn't file taxes on your money in other

5  countries or in other accounts because you didn't think you

6  had to, right?

7         MR. KHANDELWAL:  Objection, asked and answered.

8         THE COURT:  No, I don't think this question has been

9  asked and answered.

10         THE WITNESS:  A long time ago I didn't believe you

11  did until around 1993, when I went to court I was realized

12  you still have to even, if it's there and you're not taking

13  it out, it's the way it was explained to me then.

14  Previously, I didn't believe you had to.  That was prior to

15  1993.

16  BY MR. ABBENANTE:

17  Q    But that was after, I mean, you had been involved in

18  drugs since 1977, right?

19  A    '76.

20  Q    '76?

21  A    Right.

22  Q    And you had been putting money in foreign accounts from

23  that date up until the '90s, right?

24  A    No.  I put money in there from say '77 and '78.

25  Q    Up until the '90s?

1   A   No, I didn't put any money in there up til the '90s.

2   Q   But monies were in accounts up til that point, no?

3   A   The money was, yeah, the money was offshore I think until

4   1988 or '89.

5   Q   Okay.  And you were using that money, right?

6   A   No.  It was just sitting there.

7   Q   Just sitting there.

8   A   Yes.

9   Q   Well how did you support yourself?

10  A   I was making money.

11  Q   Doing what?

12  A   By selling airplanes.  Yes.

13  Q   And none of which you reported?

14  A   Huh?

15  Q   You didn't report it though, none of it?

16  A   The money outside the country?

17  Q   No, the money you were making selling airplanes?

18  A   Yes, I reported it.

19  Q   Now, in this latest letter that you wrote, which was

20  Defendant's Exhibit Number Five, okay?

21          THE COURT:  That's the one from May 26, 2010?

22          MR. ABBENANTE:  Right, Judge.  That's right.

23  BY MR. ABBENANTE:

24  Q   You talk about how the U.S. Attorney and the agents in

25  Florida, I guess from your point of view, they basically

1    double crossed you, right?

2    A    Yes.

3    Q    Okay.  And they were, I guess, dishonest with you, right?

4    A    The one in Mobile, Alabama was dishonest.

5    Q    Right.  And the DEA agent, Robert Lassiter from Mobile,

6    that's the one you're referring to, right?

7    A    That's the one I'm referring to.  He was crooked and

8    corrupt.

9    Q    And in that letter you go on to say that Agent Lassiter

10   was the biggest piece of shit on earth?

11   A    I still agree, he's the biggest piece of shit on earth.

12   Q    Okay.  Well let me ask you that, define for me, if you

13   would, what your definition of a person who is a piece of

14   shit.

15   A    Robert Lassiter.

16   Q    Well, what characteristics about him?

17   A    He was the agent who arrested everybody in Mobile,

18   Alabama.  Okay.  When I made my deal with Pat Sullivan, with

19   the U.S. Attorney's Office in Miami, he coordinated with the

20   U.S. Attorney's Office, also in Mobile, Alabama.  I had to be

21   fully debriefed by Lassiter.  He screamed and hollered, so I

22   was fully debriefed.  He took that same information and he's

23   the one who started the IRS case with the money in the Cayman

24   Islands.

25   Q    Okay.  And were you -- is that the one that you were

1    convicted of?

2    A    Yes.

3    Q    Okay.  But maybe I didn't make it clear.  I want you to

4    tell me, in your own words, your definition of a person who

5    is a piece of shit.

6              MR. KHANDELWAL:  Objection.

7              THE COURT:  Go ahead, I mean --

8              THE WITNESS:  I can try, Your Honor.

9              THE COURT:  He can try.

10             THE WITNESS:  Somebody who lies, steals, cheats, is

11   completely 100 percent dishonest and a no good son of a

12   bitch.

13             MR. ABBENANTE:  No other questions, Your Honor.

14                     REDIRECT EXAMINATION

15   BY MR. KHANDELWAL:

16   Q    Mr. Harvey, Mr. Abbenante asked you a lot of questions up

17   here, didn't he?

18   A    Yes.

19   Q    He didn't ask you any questions about his client, did he?

20   A    No, not a one.

21             MR. KHANDELWAL:  Thank you.  No further questions.

22             THE COURT:  All right.  May we excuse Mr. Harvey?

23             MR. KHANDELWAL:  Yes, sir.

24             MR. ABBENANTE:  Yes, Your Honor.

25             THE COURT:  All right.  You're excused.  Thank you

1   very much.

2              THE WITNESS:  Thank you.

3              (Witness excused.)

4              THE COURT:  So, we ready to adjourn until Monday

5   morning, unless you want to stay a little bit longer?

6              MR. KHANDELWAL:  Yes, Your Honor.

7              THE COURT:  Okay.  So, if you'll leave your

8   notebooks on your chairs, they'll be locked up over the

9   weekend.  Wait, don't leave yet, I got to tell you something

10  else.  If you insist on leaving now, I'll make you stay for

11  20 more minutes of testimony.  No.  It's three days, right?

12             So, let's try again for 9:15, I think we'll be okay

13  if we try for 9:15 on Monday morning.  And please, please,

14  please, let me remind you again, don't talk to anybody about

15  the case.  If you go back to work tomorrow, over the weekend,

16  your friends, your family, don't discuss it with anybody.

17  It's really important.  And I'm sure you understood the first

18  time I said it, but now that you've actually gotten into the

19  testimony and everything, you understand that to be fair to

20  both the government and the defendant, you need to keep an

21  open mind throughout the trial until you've heard all of the

22  evidence and all of the witnesses.  And then reach your

23  conclusion after all the evidence is closed and after I tell

24  you what the law is.

25             Again, if you overhear a conversation with anybody

1  involved in the case, any of the witnesses, any of the

2  lawyers, any of the agents, walk away, tell the courtroom

3  deputy what you've heard.  If anybody tries to discuss the

4  case with you, same thing.  If you do see anything in the

5  newspaper, radio or television, don't read it, don't watch

6  it, don't listen to it.  Don't do any independent research.

7  Don't go on the Internet.  Don't engage in any blogging or

8  e-mailing or texting.  Don't do any independent research.

9         And again, the reason is to limit yourself to the

10  evidence presented and the witnesses who were sworn to tell

11  the truth rather than something you might read about on a

12  blog or any place else.

13         So with that, we'll try for 9:15 Monday morning.

14  Leave your notebooks, they'll be locked up overnight.  And

15  thank you again for your attention and we'll see you then.

16         (Jury Out.)

17         THE COURT:  I know you wanted to get one or both of

18  these short witnesses in, but I thought that we had ended on

19  such an uplifting note with the last question or two from

20  Mr. Abbenante.  And it was a pretty good definition,

21  actually, I thought.

22         No, I just thought the jury was ready to go.  So,

23  I'm sorry.

24         MR. ABBENANTE:  I didn't really think it was going

25  to take me that long because I told, you know,

1    Mr. Khandelwal, you know, told me about his concern with the

2    witnesses.  And, you know, I'm sorry.

3         THE COURT:  It happened.  No, no, I mean, don't say

4    you're sorry.  I mean, it's very important.  And this was an

5    important witness to take whatever time you need.

6         So, as I said, the people for the end of the Court

7    are going to be here tonight.  And then I've got a sentencing

8    tomorrow, so I guess the government is going to take all of

9    its exhibits away.  And if you want to lock them up, you can

10   do that.

11        Be here a little before 9:15 on Monday morning.

12   Give Mr. Abbenante your revised order of witnesses for next

13   week and e-mail one to me and Brian, or me or Brian and

14   Marissa.  And if anything does come up during the day

15   tomorrow that you think we need to talk about so that we

16   don't have to do it Monday morning, you know, we can get on a

17   conference call or something.

18        MR. ELIOPOULOS:  Will do.

19        (The proceedings adjourned at 5:07 P.M.)

20

21

22

23

24

25

C O N T E N T S

| **WITNESS** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|
| (Government) | | | | |
| JERRY HARVEY | | | | |
| By Mr. Khandelwal | 3 | | | |
| By Mr. Abbenante | | 55 | | |

ooOoo

EXHIBITS

PAGE:

Government's

| 20 | 5 |
|---|---|
| 400-A, 400-B, 400-N, 400-X, 400-Z, 400-HH and 400-JJ | 23 |
| 759 | 38 |
| 260 | 47 |

CERTIFICATE OF REPORTER


        I, Lisa Walker Griffith, certify that the foregoing

is a correct transcript from the record of proceedings in the

above-entitled matter.




_____          _____
Lisa Walker Griffith                            Date