# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.                                                    Crim. No. 08-242 (PLF)

GREGORY J. SITZMANN,

　　　　　　Defendant.

## DEFENDANT'S MOTION FOR JUDGMENT OF
## ACQUITTAL, OR IN THE ALTERNATIVE, FOR A NEW TRIAL

Defendant Gregory J. Sitzmann, through undersigned counsel, respectfully moves the

Court for an order entering an acquittal on Count One of the Indictment under Rule 29, Fed. R.

Crim. P., due to insufficiency of the evidence on the issue of venue and the existence of the

conspiracy charged in Count One.  Should the Court not enter an acquittal on Count One,

Defendant Sitzmann moves the Court for an order granting a new trial in the interests of justice.

In support thereof, defendant submits the attached Memorandum of Points and Authorities:

WHEREFORE, for the foregoing reasons, it is respectfully requested that an acquittal be

entered, or in the alternative, a new trial be ordered.


Dated:  January 22, 2013                    Respectfully submitted,


                                            /s/Paul L. Knight
                                            Paul L. Knight (D.C. Bar No. 911594)
                                            Nossaman LLP
                                            1666 K Street, N.W., Suite 500
                                            Washington, DC  20006
                                            Telephone:  (202) 887-1400
                                            Facsimile:  (202) 466-3215

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.                                                      Crim. No. 08-242 (PLF)

GREGORY J. SITZMANN,

                    Defendant.

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR JUDGMENT OF ACQUITTAL,**
**OR IN THE ALTERNATIVE, FOR A NEW TRIAL**

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................. iii

I.   CASE OVERVIEW ............................................................................................................1

    A.   The Indictment ...........................................................................................................4

II.  DUE TO THE FAILURE OF THE GOVERNMENT'S PROOF ON THE
    ISSUES OF VENUE, STATUTE OF LIMITATIONS, AND MULTIPLE
    CONSPIRACIES, DEFENDANT SITZMANN IS ENTITLED TO AN
    ACQUITTAL UNDER RULE 29 .......................................................................................17

    A.   The Rule 29 Standard..............................................................................................17

    B.   The Defendant is Entitled to Acquittal under Rule 29  Because the
        Government Has Failed to Prove Venue ...............................................................17

    C.   The Government Cannot Establish Venue in the District of Columbia
        Through Actions that Violate a Defendant's Constitutional Rights .....................20

    D.   In Deciding This Rule 29 Motion, the Court Should not Consider the
        Testimonies of Gary Paulson, Brian Hill, Bill Long, and Michael Fields as
        Evidence Because Their Testimony was Secured by Prosecutorial
        Misconduct and Grand Jury Abuse .......................................................................23

    E.   The Defendant is Entitled to Acquittal Because the  Government Failed to
        Present Any Evidence that the Charged  Conspiracy in Count One
        Continued Into the Limitations Period...................................................................24

    F.   Because the Evidence at Trial Established Multiple Conspiracies,
        Acquittal is Required Where No Conspiracy Occurred in the District of
        Columbia.................................................................................................................25

III. ALTERNATIVELY, IF THE COURT DOES NOT DIRECT AN ACQUITTAL,
    THE DEFENDANT IS ENTITLED TO A NEW TRIAL UNDER RULE 33.................25

    A.   The Rule 33 Standard..............................................................................................25

    B.   The Defendant Was Improperly Denied the Right to Have Venue Decided
        By the Jury ..............................................................................................................27

    C.   Sitzmann was Unfairly Prejudicial Not Only by Massive Amounts of
        Irrelevant Evidence, but also by Highly Prejudicial Other Crimes Evidence........29

1.    The Government Introduced Extrinsic Evidence of Other Crimes
Without Providing Prior Notice ................................................................. 32

2.    The Court Erroneously Admitted 404(b) Evidence Based on
Government Misrepresentations About Its Evidence ................................ 33

IV.    THROUGHOUT THE TRIAL, THE GOVERNMENT IMPROPERLY
ENGAGED IN VOUCHING FOR THEIR WITNESSES CREDIBILITY AND
IMPROPERLY ATTEMPTING TO BOLSTER SUCH TESTIMONY .......................... 40

V.    THE GOVERNMENT IMPROPERLY TRIED TO USE GEORGE JONES'
GUILTY PLEA AS SUBSTANTIVE EVIDENCE OF SITZMANN'S GUILT ............. 49

VI.    THE GOVERNMENT VIOLATED DEFENDANT SITZMANN'S RIGHT TO
AN INDICTMENT BY A GRAND JURY, ENGAGED IN GRAND JURY
ABUSE, AND CONSTRUCTIVELY AMENDED THE INDICTMENT ...................... 50

VII.    THE GOVERNMENT'S RELIANCE ON JONES'S AND COLLIGAN'S TAPE
RECORDED STATEMENTS FOR THE TRUTH OF THE MATTERS
ASSERTED VIOLATED SITZMANN'S CONFRONTATION RIGHTS UNDER
THE SIXTH AMENDMENT ............................................................................ 52

VIII.    THE CUMULATIVE EFFECT OF ALL THESE ERRORS HAVE DEPRIVED
MR. SITZMANN OF A FAIR TRIAL ............................................................... 54

IX.    CONCLUSION ............................................................................................. 55

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Braverman v. United States,*
   317 U.S. 49 (1942)...............................................................................1, 3

*Costello v. United States,*
   350 U.S. 359 (1956)............................................................................23, 50

*Crawford v. Washington,*
   541 U.S. 36 (2004)...................................................................................53

*Harris v. United States,*
   402 F.2d 656 (D.C. Cir. 1968) ................................................................40

*Ianelli v. United States,*
   420 U.S. 770 (1975)...................................................................................1

*In re Grand Jury Proceeding (Fernandez Diamante),*
   814 F.2d 61 (1st Cir. 1987).......................................................................23

*Jackson v. Virginia,*
   443 U.S. 307 (1979)..................................................................................17

*Old Chief v. United States,*
   519 U.S. 172 (1997)..................................................................................32

*Russell v. United States,*
   369 U.S. 749 (1962)............................................................................17, 50

*Salinas v. United States,*
   522 U.S. 52 (1997)......................................................................................2

*Small v. United States,* 544 U.S. 385 (2005) ................................................5

*States v. Mejia,*
   448 F.3d 436 (D.C. Cir. 2006)....................................................................5

*Stirone v. United States,*
   361 U.S. 212 (1960)..................................................................................51

*United State v. Baker,*
   61 F.3d 317 (5th Cir. 1995) ........................................................................3

*United States v. (Xavier) Brown,*
   508 F.3d 1066 (D.C. Cir. 2007).................................................40, 41, 49, 55

*United States v. Anchondo-Sandoval,*
   919 F.2d 1234 (5th Cir. 1990) ....................................................................................41

*United States v. Baker,*
   609 F.2d 134 (5th Cir. 1980) .......................................................................................5

*United States v. Barboa,*
   777 F.2d 1420 (10th Cir. 1985) ..................................................................................19

*United States v. Battle,*
   613 F.3d 258 (D.C. Cir. 2010) ....................................................................................17

*United States v. Benbow,*
   539 F.3d 1327 (11th Cir. 2008) ....................................................................................5

*United States v. Bowie,*
   232 F.3d 923 (D.C. Cir. 2000) ....................................................................................38

*United States v. Brothers Const. Co. of Ohio,*
   219 F.3d 300 (4th Cir. 2000) ......................................................................................23

*United States v. Butler,*
   792 F.2d 1528 (11th Cir. 1986), *cert. denied*, 479 U.S. 933 (1986).........................24

*United States v. Cabrera,*
   734 F.Supp.2d 66 (D.D.C. 2010) (Hogan, J.) ...........................................................26

*United States v. Cormier,*
   468 F.3d 63 (1st Cir. 2006).........................................................................................41

*United States v. Cornett,*
   195 F.3d 776 (5th Cir. 1999) ......................................................................................53

*United States v. Cornett,*
   232 F.3d 570 (7th Cir. 2000) ......................................................................................41

*United States v. Delgado-Garcia,*
   347 F.3d 1337 (D.C. Cir. 2004) ..................................................................................24

*United States v. Fielding,*
   630 F.2d 1357 (9th Cir. 1980) ......................................................................................4

*United States v. Gaudin,*
   515 U.S. 506 (1995).....................................................................................................28

*United States v. Giunta,*
   925 F.2d 758 (4th Cir. 1991) ........................................................................................3

*United States v. Haire*,
    371 F.3d 833 (D.C. Cir. 2004) .........................................................................17, 21, 27

*United States v. Iennaco*,
    893 F.2d 394 (D.C. Cir. 1990) ................................................................................ passim

*United States v. Kellington*
    217 F.3d 1084 (9th Cir. 2000) .........................................................................................25

*United States v. Kuzniar*,
    881 F.2d 466 (7th Cir. 1989) ...........................................................................................26

*United States v. Lam Kwong-Wah*,
    924 F.2d 298 (D.C. Cir. 1991) .................................................................................17, 27

*United States v. Linares*,
    367 F.3d 941 (D.C. Cir. 2004) .......................................................................................31

*United States v. London*,
    714 F.2d 1558 (11th Cir. 1983) ......................................................................................27

*United States v. Lopez-Vanegas*,
    439 F.3d 1305 (11th Cir. 2007) ...................................................................................5, 24

*United States v. Luton*,
    486 F.2d 1021 (5th Cir. 1973), *cert. denied*, 417 U.S. 920 (1974).................................27

*United States v. Manfre*,
    368 F.3d 832 (8th Cir. 2004) .......................................................................................4, 53

*United States v. Medina*,
    761 F.2d 12 (1st Cir. 1985).................................................................................................3

*United States v. Miller*,
    111 F.3d 747 (10th Cir. 1997) ........................................................................................21

*United States v. Moccia*,
    681 F.2d 61 (1st Cir. 1982)..............................................................................................32

*United States v. Moran*,
    493 F.3d 1002 (9th Cir. 2007) .....................................................................................3, 53

*United States v. Nazemian*,
    948 F.2d 522 (9th Cir. 1991), *cert. denied*, 113 S. Ct. 107 (1992)..................................3

*United States v. Nwoye*,
    663 F.3d 460 (D.C. Cir. 2011) .................................................................................17, 28

*United States v. Pace*, 314 F.3d 344 (9th Cir. 2002) ....................................................................27

*United States v. Pascarella*,
    84 F.3d 61 (2d Cir. 1996)..........................................................................................................39

*United States v. Perez*,
    989 F.2d 1574 (10th Cir 1993)(*en banc*) ................................................................................3

*United States v. Reed*,
    522 F.3d 354 (D.C. Cir. 2008) ...............................................................................................41

*United States v. Roberts*,
    618 F.2d 530 (9th Cir. 1980) ..................................................................................................41

*United States v. Rosenblatt*,
    554 F.2d 36 (2d Cir. 1977)........................................................................................................3

*United States v. Santana*,
    342 F.3d 60 (1st Cir. 2003) .....................................................................................................39

*United States v. Sears*,
    343 F.2d 139 (5th Cir. 1965) ............................................................................................16, 20

*United States v. Shabani,*
    513 U.S. 10 (1994)....................................................................................................................1

*United States v. Spriggs*,
    102 F.3d 1245 (D.C. Cir. 1997) .............................................................................................21

*United States v. Star*,
    470 F.2d 1214 (4th Cir. 1972) ...........................................................................................23, 50

*United States v. Tarantino,*
    846 F.2d 1384 (D.C. Cir. 1988)........................................................................................49, 53

*United States v. Thomas*,
    8 F.3d 1552 (11th Cir. 1993) ..................................................................................................22

*United States v. Treadwell*,
    760 F.2d 327 (D.C. Cir. 1985), *cert. denied*, 474 U.S. 1064 (1986) ........................................2

*United States v. Urbanik*,
    801 F.2d 692 (4th Cir 1986) ....................................................................................................4

*United States v. Vega*,
    285 F.3d 256 (3rd Cir. 2002) ..................................................................................................39

*United States v. Wilson*,
    605 F.3d 985 (D.C. Cir. 2010) ..................................................................................40, 41

*United States v. Winship*,
    724 F.2d 1116 (5th Cir. 1984) .................................................................................21

*United States v. Woods*,
    544 F.2d 242 (6th Cir. 1976), *cert. denied sub nom., Hurt v. United States*, 429 U.S.
    1062 (1977) ...........................................................................................................23

*United States v. Young*,
    470 U.S. 1 (1985) ...............................................................................................41, 49

## FEDERAL STATUTES

8 U.S.C. § 1324(a) ........................................................................................................24

18 U.S.C. § 1956(h) ......................................................................................................19

18 U.S.C. § 3237 .....................................................................................................17, 27

18 U.S.C. § 3238 .......................................................................................................5, 52

21 U.S.C. § 841 ................................................................................................... passim

21 U.S.C. § 846 ................................................................................................... passim

21 U.S.C. §959 ..............................................................................................................5

21 U.S.C. § 960 ..............................................................................................................5

21 U.S.C. § 963 ..............................................................................................................5

## RULES

Fed. R. Crim. P., Rule 18........................................................................................17, 27

Fed. R. Crim. P., Rule 29.................................................................................... passim

Fed. R. Crim. P., Rule 33........................................................................................25, 26

Fed. R. Evid., Rule 401................................................................................................29

Fed. R. Evid., Rule 403...........................................................................................29, 33

Fed. R. Evid., Rule 404(b) .................................................................................. passim

Fed. R. Evid., Rule 801................................................................................3, 52, 53, 54

**CONSTITUTIONAL PROVISIONS**

United States Constitution ...................................................................................................... passim

I.       **CASE OVERVIEW**

It is difficult to provide a case overview in this matter because of the vagueness and lack of specificity in the indictment.  There are wide disparities between what is been alleged in the indictment, what was alleged in the government's bill of particulars, what was represented by the government to the court in pre-trial motions, and the evidence ultimately presented in the trial. The case overview is also difficult because there is a glaring lack of coherence in what was presented.

The evidentiary lack of coherence is compounded by the fact that the government uses conspiracy terminology very loosely.  For example, the government either did not know or else chose not to adhere to the basic fundamentals of conspiracy law.  The fundamental feature of a conspiracy is that it involves <u>an agreement</u> to commit some offense.  *United States v. Shabani,* 513 U.S. 10, 16 (1994); *Ianelli v. United States*, 420 U.S. 770, 777 (1975); *Braverman v. United States*, 317 U.S. 49, 53 (1942).  As Judge Ginsburg, now Justice Ginsburg, made clear, exploratory and inconclusive or preliminary discussions or equivocal statements or discussions how to violate the law are not sufficient to establish an agreement.  *United States v. Iennaco*, 893 F.2d 394, 397-398 (D.C. Cir. 1990).  It is basic, fundamental conspiracy law that there is no agreement or conspiracy where individuals merely talk about criminal activity or how criminal acts might be accomplished.  *Id.*  Yet, the government, throughout this entire case, has repeatedly called mere conversations without any agreement to be evidence of a conspiracy.  It misled the Court prior to trial and the jury during trial as to when and where there could possibly be a conspiracy.

It is axiomatic that before the government can start calling individuals "co-conspirators," it must first identify the specific agreement that these individuals entered into, including the

unlawful object of that agreement.  It is also essential that the government be able to determine what each co-conspirator agreed to do or not do.  *United States v. Treadwell*, 760 F.2d 327, 336 (D.C. Cir. 1985), *cert. denied*, 474 U.S. 1064 (1986).  The partners in the criminal plan must agree to pursue the same criminal objective.  *Salinas v. United States*, 522 U.S. 52, 64 (1997).  The government repeatedly failed to do this.

As described below, the government has never identified any <u>agreement</u> to violate 21 U.S.C. §846 that was entered into while the defendant, Sager, Harvey, or Paulson were incarcerated in MCC.  At the very most, the evidence showed that some of the four talked about their prior drug smuggling days and drug smuggling airplanes, but, of course, that conduct does not even come close to being an agreement.  Our Court of Appeals made this clear over 20 years ago.  *See, e.g., United States v. Iennaco, supra.*

The government, however, did not let the law or its obvious lack of relevant evidence slow down its claim that individuals were co-conspirators "from at least the 1990s."  (Dkt. No. 2, Indictment)  It stated in its opening:  "We're going to present evidence that starting at least by 1990 ..., this conspiracy was ongoing."  (Opening, 4/17/12 a.m. at 27).[1]  "...this conspiracy started while these four individuals, Mr. Sitzmann, Mr. Paulson, Mr. Harvey and Mr. Sager were all housed in jail together."  (Opening, 4/17/12 a.m. at 32).  The fact that it never presented any evidence of a conspiracy in MCC in the early 1990s did not stop the government even in its closing (Closing, 5/16/12 p.m. at 39).  These arguments were made notwithstanding the fact the evidence at trial proved there was no agreement in the early 1990s.

Likewise, the government liberally used the word "conspiracy" throughout these proceedings, but never focused on the object of that "conspiracy" or whether there was

---

[1] References to the trial transcripts will show the witness's last name, the transcript date, whether it was an "a.m." or "p.m." session, and the relevant page number(s).

agreement among the various participants to commit the same offense.  Using the word "conspiracy" without identifying the object of that conspiracy can be very misleading.  *See, e.g., United States v. Rosenblatt*, 554 F.2d 36, 40-41 (2d Cir. 1977) (conspiracy conviction overturned because neither conspirator intended as agreed to commit the same offense); *United State v. Baker*, 61 F.3d 317, 325 (5th Cir. 1995) (if the object of the conspiracy is not unlawful, then there is no basis for a conspiracy conviction); *United States v. Giunta*, 925 F.2d 758 (4th Cir. 1991) (where conspirators' goals were different and not the same, no agreement occurred).  The object of the conspiracy charged in Count One must be a violation of a United States statute, namely 21 U.S.C. §841(a).  The government treated this case as a conspiracy to distribute drugs but entirely ignored the fact that the conspiracy charged had to be a violation of U.S. law.

The prosecutors likewise did not appear to know what constitutes an overt act.  An overt act is any statement or act that is knowingly said or done by one or more of the conspirators in an effort to accomplish the purpose of the conspiracy.  *Braverman,* 317 U.S. at 53.  An overt act is to show the conspiracy in operation; the statement or action must somehow further the charged object of the conspiracy.  *United States v. Medina*, 761 F.2d 12, 15 (1st Cir. 1985).

The government also lacked an understanding of the foundational requirements of Fed. R. Evid. 801(d)(2)(E) evidence regarding co-conspirator declarations.  First, there must be evidence that the defendant was a participant in the conspiracy, and second, the statement must be in furtherance of the charged conspiracy.  *See, e.g., United States v. Perez*, 989 F.2d 1574, 1578 (10th Cir 1993)(*en banc*); *United States v. Nazemian*, 948 F.2d 522, 529 (9th Cir. 1991), *cert. denied*, 113 S. Ct. 107 (1992).  Statements by co-conspirators that are mere idle conversations that touch on, but do not further the conspiracy, or narrative declarations about past events are not admissible under Rule 801(d)(2)(E).  *United States v. Moran*, 493 F.3d 1002, 1010 (9th Cir.

2007); *United States v. Manfre*, 368 F.3d 832, 838 (8th Cir. 2004); *United States v. Urbanik*, 801

F.2d 692 (4th Cir 1986); *United States v. Fielding*, 630 F.2d 1357, 1365 (9th Cir. 1980).  It does

not include statements made by government cooperators and undercover agents who by law are

not conspirators.

### A.    The Indictment

Four and one-half years after Gregory Sitzmann was arrested and incarcerated in France,

the government hastily returned the indictment on August 7, 2008 in anticipation of Sitzmann's

arrival from France on August 8, 2008.  Immigration and Customs Enforcement ("ICE") Special

Agent Jared Rine made a brief appearance on August 5, 2008, and another brief appearance on

August 7, 2008.  On August 5, Agent Rine read an abbreviated chronology of events – mostly

dates of when Sitzmann entered and exited the United States.  There was no explanation how

most of these dates related to the alleged narcotics conspiracy that was subsequently indicted.  In

his August 7 appearance, Agent Rine described the May, 2002 arrests of Billy Long and James

Fields in Bogota, Colombia, the March 26, 2004 search of George Jones's residence in Florida

and the seizure of certain property, and May, 2004 sale of a partially assembled Stallion airplane

from which $15,000 was taken to Colombia for Maritza Fonseca Wills on June 7, 2004.  No

evidence of venue in the District of Columbia was presented to the Grand Jury by Agent Rine.

The Grand Jury, which was sworn in on November 15, 2007, returned a single count

conspiracy under 21 U.S.C. §846.  Count One reads:

> From at least the 1990s, through at least 2004, the exact dates
> being unknown to the Grand Jury, within the united States,
> Mexico, Canada, Columbia (sic), the Bahamas, Spain, France, Italy
> and elsewhere, GREGORY JOEL SITZMANN, did knowingly
> and willfully combine, conspire, confederate and agree together
> and with other persons both known and unknown to the Grand
> Jury, to unlawfully, knowingly and intentionally distribute and
> possess with intent to distribute a mixture and substance containing

> a detectable amount of cocaine, a Schedule Ii narcotic drug
> controlled substance and the said mixture was 5 kilograms or more
> in violation of Title 21, United States Code, Sections 841(a)(1) and
> 841(b)(1)(A)(ii).

As charged under §846, Count One, at most, prohibited an agreement by the co-conspirators violate 21 U.S.C. §841(a), namely to distribute cocaine in the United States or to possess cocaine in the United States with the intent to distribute it.[2]  Section 841(a) as well as §846 requires some nexus between the controlled substance and the United States.  *United States v. Benbow*, 539 F.3d 1327, 1333 (11th Cir. 2008); *United States v. Lopez-Vanegas*, 439 F.3d 1305, 1313 (11th Cir. 2007); *see also United States v. Baker*, 609 F.2d 134, 139 (5th Cir. 1980).  Stated differently, possession of cocaine in the Republic of Colombia ("Colombia") or Europe, where the only intent is to distribute it in Europe (with no intent to ever involve the United States), does not fall within any U.S. legal prohibition.  *United States v. Lopez-Vanegas, supra.*  The object of a Section 846 conspiracy is a violation of 21 U.S.C. §841 – namely, an agreement to distribute or possess with the intent to distribute the controlled substance in connection with the United States.  A conspiracy to import cocaine from Colombia directly to Europe is necessarily a separate conspiracy from a Section 846 conspiracy – and not a crime in the United

---

[2] 21 U.S.C. §§841 and 846 contain no mention whether they can be applied extraterritorially.  A silent statute is presumed to apply only domestically.  *See Lopez-Vanegas, supra*, at 1311, *citing Small v. United States*, 544 U.S. 385, 388 (2005); *compare* 21 U.S.C. §§959, 960 which specifically permits the extraterritorial application of §§959-963 where the controlled substance is possessed with the knowledge and intent that such controlled substance would be unlawfully imported into the United States.  Specifically, 21 U.S.C. §959(c) provides:

> This section is intended to reach acts of manufacture or distribution committed outside the
> territorial jurisdiction of the United States.  Any person who violates this section shall be tried in
> the United States district court at the point of entry where such person enters the United States, or
> in the United States District Court for the District of Columbia.

*See, e.g., United States v. Mejia*, 448 F.3d 436, 439 (D.C. Cir. 2006).  Section 959(c) generally tracks, but not exactly, 18 U.S.C. §3238.  Section 959 obviously controls Title 21 offenses.
Conspiracies to import have extensive extraterritorial reach while conspiracies to possess with the intent to distribute under §§841(a) and 846 require a clear nexus to United States territories.

States.  Federal courts in the United States are not international drug courts – contrary to the government's contention in this matter.

Having established the limits of the §846 narcotic conspiracy charged in Count One, we turn to the government's evidence at trial.  The government emphatically claimed that the conspiracy charged in Count One began in the late 1980s and at least by the 1990s, when Greg Sitzmann, Gary Paulson, John Sager, and Jerry Harvey were all incarcerated at the Metropolitan Correctional Complex (MCC) in Miami, Florida (Govt's Opening Statement, 4/17/12 at 30-32).  Early in the trial, the government introduced Federal Bureau of Prisons records showing certain overlapping dates when Sitzmann, Sager, Harvey, and Paulson were all incarcerated at the MCC in Miami between 1987 and 1990 (Rine, 4/19/12 a.m. at 30-33).

While the government's theory of when the alleged conspiracy commenced appeared possibly based on the Bureau of Prison's records, the evidence presented at trial showed it was complete fiction.  No agreement to distribute cocaine or possess cocaine with the intent to distribute was ever entered into in the late 1980s or early 1990s between Sitzmann and/or Sager, Paulson or Harvey while they were incarcerated at the MCC in Miami.

The government knew their claim about when the conspiracy started in the early 1990s was false when the government filed its motion to admit Rule 404(b) evidence and when it described this "evidence" in its opening statement.  As will be described in more detail below discussing grand jury abuse, it presented Gary Paulson to a grand jury nearly nine months after the indictment was returned.  *See* Attachment No. 1.  In that grand jury testimony, Paulson never described any agreement to distribute drugs having been formed in the 1990s.  Paulson did not know why Sitzmann was in MCC other than it involved a smuggling venture where the pilot miscalculated his fuel and crashed his plane.  His testimony in the grand jury was consistent with

6

his testimony at trial – that his involvement with Sitzmann "first" began in 1997 or 1998 with a 300-400 pound marijuana deal.  Paulson told the grand jury he was impressed with Sitzmann in 1997 or 1998 as they result of selling that marijuana – "he proved that he could do something" – "I thought the guy was a real roller when I saw that"…"without touching anything or even being there, I made $10,000."  *Id.* at 21.

The evidence likewise never substantiated the government's assertion that John Sager became a co-conspirator of Greg Sitzmann while they were together in MCC in 1990.  In fact, the evidence is absolutely clear that Sager and Sitzmann were never co-conspirators.  They never entered into any agreement to violate 21 U.S.C. §841(a).  Sager has not had any contact with Greg Sitzmann since 1998 – at least eight (8) years prior to the indictment in this case.

The evidence presented through Sager shows that Sitzmann and Sager had conversations about the capabilities of different airplanes in the 1989-1990 timeframe when they were both incarcerated in MCC Miami (Sager, 4/23/12 p.m. at 42-44, 51-52).  But no agreements to smuggle drugs were entered into between Sitzmann and Sager while they were at MCC Miami or, for that matter, ever (Sager, 4/24/12 a.m. at 20, 38).  Sager testified that he saw Gary Paulson at MCC, but did not know him very well (*Id.* at 46).  Thus, there was never any conspiracy between Paulson and Sager in the 1990s or before.  Sager testified that he met Harvey at MCC in 1990, but noted that even then, Harvey had retired from drug smuggling (*Id.* at 40-41).  There was never any conspiracy to violate §841(a) between Sager and Harvey in the early 1990s or before.

Sager, when he was interviewed under oath on October 21, 2011, never described any conspiracy that was formed in the 1990s while he was at MCC Miami.  Sager didn't even know

the circumstances why Sitzmann was at MCC other than "some kind of drug charge.  I wasn't sure exactly what."  *See* Attachment 2.

The evidence at trial showed at most that there was "talk" about prior smuggling ventures and airplane capabilities among some of these defendants while they were incarcerated.  But "talk" is clearly insufficient to form the "agreement" necessary to become a criminal conspiracy. *Iennaco*, 893 F.2d 394 at 398.

The government claimed that Jerry Harvey was a co-conspirator, but the evidence at trial showed that Jerry Harvey never agreed or conspired with Greg Sitzmann to violate any drug laws.  He was never involved in Sitzmann's drug smuggling (Harvey, 4/19/12 a.m. at 115). Harvey, who had known Sitzmann for more than ten years prior to when they were both at MCC in the first half of 1990, simply testified that he "had seen" Sitzmann at the MCC (Harvey, 4/19/12 a.m. at 115).

It is very significant that at the time that prosecutors hurriedly rushed the Sitzmann indictment through the Grand Jury on August 7, 2008, which was the day before France delivered Sitzmann to U.S. agents at Dulles Airport, the government had not even taken statements from Paulson, Sager, or Harvey.[3]

Gary Paulson described meeting Sitzmann at MCC Miami in 1989 and 1990.  Paulson testified the first time they entered into a §841(a) conspiracy was in 1997 or 1998 (Paulson, 4/24/12 p.m. at 29-31).  He did not believe he met either John Sager or Jerry Harvey at MCC Miami.  He believed he met Sager at another federal prison in the mid-1990s and that he met Harvey "on the streets" after MCC (Paulson, 4/24/12 p.m. at 17-21).  Sager testified he got to

---

[3] As will be discussed in more detail below, the government repeatedly engaged in prosecutorial misconduct and grand jury abuse by calling witnesses to try to develop evidence for trial – well after the Indictment was returned on August 7, 2008.  These witnesses who were subpoenaed to various grand juries post indictment included Gary Paulson, Brian Hill, Michael Fields, and Rhonda Fields, before the grand jury.

know Paulson better in 1994 when they were incarcerated together in another prison (Sager,

4/23/12 at 46, 48, 50).  The facts showed that Paulson was incarcerated for at least another six

years after he last saw Sitzmann in 1990 (Paulson, 4/24/12 p.m. at 26).  Sitzmann was

incarcerated, separate, and apart from Sager and Paulson in the Bahamas.

The government called two witnesses from the Florida Department of Motor Vehicles –

Wonders Aldridge and Victor Barrios-Lopez – and introduced a certified copy of Sitzmann's

State of Florida conviction showing that in late January, 1994, just after Sitzmann's release from

prison in the Bahamas, he attempted to fraudulently obtain a Florida driver's license (Aldridge,

4/23/12 a.m. at 8-15; Barrios-Lopez, 4/23/12 a.m. at 16-25).  When it introduced this evidence

from January, 1994, the government knew that the charged conspiracy had not yet been formed

because none of their witnesses – Paulson, Harvey, or Sager – had ever testified that a

conspiratorial agreement had been formed.  Both Paulson and Sager were still in federal prison

and Harvey was entirely out of drug smuggling.  Moreover, the government did not present a

shred of evidence that this attempt to obtain this fraudulent Florida driver's license was in any

fashion connected to any narcotics conspiracy.[4]  This "other crimes evidence" was introduced

without prior approval from the court.  *See* Opinion and Order, Dkt. No. 169.  The only purpose

that it served in the trial was to unfairly prejudice Sitzmann by further showing his bad character

---

[4] Notwithstanding the complete lack of evidence tying the incident with any drug conspiracy, the government, in its opening statement, told the jury: "... in 1994 the defendant needed a very important tool for drug smuggling.  He needed false identification..." (Opening, 4/17/12 a.m. at 32).  The government persisted in this argument in its closing (Closing, 5/16/12 p.m. at 45).

> and then in January of 1994 the defendant starts with the conspiracy and putting things together.  He is acquiring the tools of the trade the same month he is released from prison from the Bahamas for drug smuggling.
>
> And you're going to hear, ladies and gentlemen, that in 1994 the defendant needed to get a very important tool for illegal drug smuggling.  He needed a false-identification.  So what does he do?  He goes into the Department of Motor Vehicles in Florida and he walks in with a fake birth certificate a fake Social Security card in an attempt to get a fraudulent identification card.  He is arrested and convicted of attempting to do that.

Opening, 4/17/12 a.m. at 32.

and criminal predisposition – that Sitzmann could not stay out of trouble for even two weeks from his release from prison.

In late 1994 or early 1995, Gary Paulson asked his then-brother-in-law Robert Campeau to show Greg Sitzmann around the Montreal area.  Sitzmann visited for two days and they tried ice fishing and went to some bars.  Sitzmann visited again a few months later but, again, nothing more sinister than visiting bars occurred (Campeau, 4/25/12 p.m. at 13-15).  Campeau next saw Sitzmann in the summer or fall of 1998 in the Montreal area when they again went out to bars (*Id.* at 16).

In April, 1995, Greg Sitzmann bought, under his own name, a significantly damaged Velocity airplane at an auction conducted by the Palm Beach Sheriff's Department.  The plane had been ordered forfeited by a Florida judge (Rine, 4/27/12 a.m. at 24-27).  The plane had been crash-landed in 1993 by a drug smuggler who was working with John Sager in a smuggling operation – that was not connected in any fashion with Sitzmann.[5]  Prior to purchasing the plane, Sitzmann consulted with Sager as to whether the plane had been constructed in a sturdy fashion as well as the plane's capabilities[6] (Sager, 4/23/12 p.m. at 54-58).  Jerry Harry accompanied Sitzmann to the Palm Beach Sheriff's auction.  Sager learned, after the fact, that Sitzmann had purchased the plane at the Sheriff's auction (*Id.* at 59).  Absolutely no evidence was presented at trial that Sitzmann ever used this plane in connection with the conspiracy charged in Count One of the Indictment.

---

[5] Further evidence that Sager was not a co-conspirator with Sitzmann is that following his release from the MCC where he met Sitzmann, Sager embarked on a drug importation conspiracy with an individual not known to Sitzmann.  Sager did not divulge his participation in this conspiracy to Sitzmann (*Id.* at 55).

[6] Presumably, when the airplane was sold by the Palm Beach Sheriff's Department, it did not contain any illegal modifications such as fuel bladders.  There was no evidence that this plane was illegally outfitted with any devices that would make this plane capable of smuggling.

In 1997 or 1998, Sitzmann advised Paulson that he (Sitzmann) had 300 to 400 pounds of marijuana and that he was looking for someone to sell it to.  Paulson described this marijuana deal as his "first opportunity" to enter into an agreement with Sitzmann (Paulson, 4/24/12 p.m. at 29-31).

Paulson testified that his "second opportunity" to work with Sitzmann also occurred in 1997 or 1998 involving a plan to sell cocaine in Canada to Hell's Angels.  Sitzmann had a source of cocaine that transported the cocaine in semi-tractor trailers from Mexico to Toronto.  Paulson agreed to speak with his contact in Canada (Hells Angel Normand Theoret) to see what his group would pay for it.  Sitzmann wanted Suburbans with modified fuel tanks to assist in the smuggling of the cocaine.  Paulson introduced Sitzmann to Robert Barnaby in Florida. Employees in Barnaby's machine shop modified the gas tanks on one or two Suburbans to Sitzmann's specifications.[7]  Paulson believed the gas tank on a third Suburban was modified, but he never saw this third Suburban.

Paulson testified that after the semi-truck delivered the cocaine in Windsor, Ontario, it was concealed in the Suburbans' gas tanks and driven to Montreal and Sherbrooke in Quebec, Canada.  Paulson testified the first load was 90+ kilos, that the shipment was divided into 50 and 40 kilo lots.  Paulson recalled that gas from the car gas tanks penetrated some of the bags of cocaine in that first load (Paulson, 4/24/12 p.m. at 42-47).

Robert Campeau recalled that he was asked to stay at three chalets rented by Sitzmann near St. Sauveur, Quebec.  There was no cocaine kept at this first chalet (Campeau, 4/25/12 a.m. at 17-21).  Campeau rented a second chalet in the same area and recalled that while staying there,

---

[7] The two employees who modified the gas tanks were no longer alive at the time of the trial.  Barnaby saw the first gas tank being modified and believed a second one was modified while he was away from Florida.  Barnaby had no knowledge about any additional Suburbans being modified (Barnaby, 4/23/02 a.m. at 81-82, 91, 103-104).

Gary Paulson showed up with about 15 kilos of cocaine that were soaked in fuel. Paulson showed Campeau how to dry them out. Campeau testified that they salvaged about three kilos from the approximately 15 kilos that were soaked in fuel. Campeau burned the packaging and the rest of the damaged cocaine in the fireplace of the second chalet (*Id.* at 25-31).

Paulson participated in two shipments to Canada. Paulson related that James Fields and George Jones were present whenever a load of cocaine came in.[8] Campeau delivered a freezer to a storage unit in Montreal. He saw Sitzmann and Paulson at the storage unit as well as four to five boxes of cocaine in the freezer (Campeau, 4/25/12 p.m. at 42-49). Paulson heard that there was a third shipment, but he did not participate because he was not getting his money. Also, Norman Theoret and Paulson had an argument causing Paulson to leave (Paulson, 4/24/12 p.m. at 66-68). Robert Campeau never saw Greg Sitzmann again in Canada after April, 1999 (Campeau, 4/25/12 a.m. at 54-55).

In July, 1999, Greg Sitzmann bought a 27-year old Piper Navaho Panther and registered it in his own name. The cost was $187,000. In November, 2000, some 16 months later, Sitzmann sold the plane to NSJS, LLC (Sanders, 4/27.12 a.m. at 6-7, 11; Rine, 4/27/12 a.m. at 31-43). There was no evidence presented by the government at trial that this plane was ever used by Sitzmann or any co-conspirator for drug smuggling or any other illegal purpose.[9]

---

[8] On October 18, 1998, George Jones entered the U.S. driving a GMC Suburban. He was stopped by Customs and issued a citation for possession of a small amount of marijuana (Rine, 4/27/12 a.m. at 56). Robert Campeau recalled Jones in Canada driving a Suburban loaded with what appeared to be Christmas presents. Jones was sick when he arrived and immediately went to a hospital (Campeau, 4/25/12 p.m. at 38-41). Jones suffered a series of major heart attacks in the late 1990s and never drove again for Sitzmann.

[9] There was evidence presented that after Sitzmann sold the plane to NSJS, LLC, the company had the interior of the plane refurbished. When the floor boards were removed, copper tubing was discovered, which could have been used in conjunction with a fuel bladder. There was no evidence presented as to when this copper tubing was installed or by whom. There was no evidence that Sitzmann was even aware of this copper tubing under the floor board and carpeting of the airplane.

There was also evidence that in late September, 2000, a U.S. Customs drug canine "alerted" on this plane where it was kept at the Lantana Airport. A search was conducted and no contraband was found. There was no evidence presented that Sitzmann was even aware of this dog "alert."

In October, 2001, Greg Sitzmann obtained a new passport in Madrid, Spain, as his passport was stolen on October 7, 2001.  On November 21, 2001, business records showed that Greg Sitzmann purchased a heat sealer and plastic bags (Oren, 4/30/12 p.m. at 125-135).

In December, 2001 and March, 2002, Billy Long was contacted in the U.S. by Sitzmann and recruited to transport cocaine from Bogota, Colombia, to Spain.  Long carried the cocaine from Bogota directly to Barcelona, Spain, in December, 2001.  He was met there by James Fields, whom Long met for the first time.  Fields provided Long with money to purchase a plane ticket from Madrid to Alabama where Long resided.  In March, 2002, Long carried four kilos of cocaine from Bogota directly to Madrid, Spain, where he delivered the cocaine to two men.  Long was paid $10,000 by Sitzmann (Long, 5/1/12 a.m. at 24-45).  At no time on either trip was there any discussion or intent to bring cocaine to the United States.  The cocaine was to travel from Bogota directly to Spain without any contact whatsoever with the United States (Long, 4/1/12 a.m. at 94).

In May, 2002, James Fields and Billy Long were recruited to each transport two kilos of cocaine from Bogota to Madrid, via Mexico City and Paris.  There was no intention to ever bring the cocaine to or through the United States.  Fields and Long were arrested in the Bogota airport before they could leave on the airplane.  Both were convicted and sentenced to prison (Long, 5/1/12 a.m. at 53-72, 94; Stipulation, 4/27/12 p.m. at 4).

During the May, 2002 smuggling venture, Long met George Jones for about one hour.  Long did not know why Jones was in Bogota, but saw that George was every ill (*Id.* at 64-66).  There was anecdotal evidence from Jones when he was tape recorded by the government in 2004 that he too was to smuggle cocaine from Bogota to Spain, but that he decided not to get involved and flew home to the U.S.

After Long and Fields were arrested, a plan was made between Fields, Long, Maritza Fonseca Wills and Sitzmann to have Fields take the blame for all of the cocaine, including the cocaine in Long's bag.  Long was nevertheless convicted.  Sitzmann and Maritza Fonseca Wills sent money every week to Fields and Long until 2004 (Long, 5/1/12 a.m. at 73-89).  In December, 2003, Jimmy Fields died in the Colombian prison.  Greg Sitzmann arranged for Field's cremation and funeral in Colombia and the return of Field's personal effects to his family (R. Fields, 4/27/12 p.m. at 30-35).

Gary Paulson, who became a government informant in 2000, testified that in 2003 or 2004, right before Sitzmann went back to Spain and right after the terrorists had blown up a train in Spain, Sitzmann asked him "in passing" if he wanted to "go back to Canada?" and if he wanted to "start up with the Hell's Angels again?" (Paulson, 4/25/12 a.m. at 23, 51).  Paulson testified that he told Sitzmann "No," that he did not want to get involved.  Paulson made clear that he and Sitzmann "never agreed to do anything in 2004 and again that there was no agreement."  The described discussion was very brief as Paulson declined to get involved as the whole thing was "ridiculous."  Because Paulson was never interested in getting involved, there was no discussion whether this potential venture involved cocaine going directly from Colombia to Canada (Paulson, 4/25/12 a.m. at 23-24, 50-51).

Sitzmann told Paulson that he was working in Europe, in Spain, that Europe had open borders, was easy, and that he (Sitzmann) was doing all right (Paulson, 4/24/12 p.m. at 22-23, 100).  According to Paulson, the last shipments of cocaine to Canada occurred in 1999. (Paulson, 4/24/12 p.m. at 22-23).  Paulson's testimony confirmed that the initial agreement to smuggle cocaine to Canada ended in 1999, and that five years later, when there was a suggestion made in passing to enter into a new venture, Paulson flatly rejected the opportunity.  Thus, there

was no agreement in 2004.  *See United States v. Iennaco*, 893 F.2d at 397.  Moreover, Paulson

worked as a confidential informant for DEA and ICE beginning in 2001 until sometime in 2004.

On February 12, 2004, Greg Sitzmann flew from Miami to Bogota, Colombia.  On

February 19, 2004, he flew from Bogota, Colombia, to Madrid, Spain.

On February 23, 2004, Sitzmann was arrested in France with seven kilos of cocaine.  He

was driving a car rented in Spain and was about to enter Italy (Rine, 4/18/12 p.m. at 117-125;

Correges, 4/17/12 p.m. at 7-47; 4/18/12 a.m. at 19-32; Giraudo, 4/18/12 at 35-46; Dorcet,

4/18/12 at 47-76).  There was no evidence presented that this possession of seven kilograms was

part of any conspiracy involving the United States.

In March, 2004, George Jones, who was a sickly old man after suffering multiple heart

attacks, wanted kilos of cocaine to sell.  In a recorded conversation, Jones related that Sitzmann

would not do anything for Jones.  Sitzmann had left the United States on February 12, 2008, and

did not return prior to his incarceration in France on February 23, 2008.

Jones's only role in any alleged conspiracy was to be a driver or courier.  Jones was a

driver to and from Canada in the late 1990s until he had his heart attacks and then ceased doing

any work for Sitzmann (Armbruster, 5/10/12 p.m. at 32-34).  There was no evidence presented at

trial that Jones was ever supplied with cocaine by Sitzmann so he (Jones) could sell to

customers.

ICE agents, including William Buss, using government informant Terrence Colligan,

conducted a "sting" or reverse" on George Jones in which the government became the supplier

of the cocaine to George Jones.  The government's plan, executed by informant Colligan, was to

15

hand Jones 16 kilos of "sham cocaine,"[10] without any requirement of up-front money, in order to arrest Jones and pressure Jones to be a witness against Sitzmann (Buss, 4/30/12 a.m. at 9).

Because prosecutors in Florida advised ICE and the U.S. Attorney's Office in the District of Columbia that they would not prosecute such a case,[11] the ICE agents directed Colligan to have George Jones wire approximately $1,000 to a Western Union office in the District of Columbia. Western Union records showed that on March 19, 2004, a wire transfer of $980 was made by an Alex Mesa, a friend of George Jones, to Terrence Colligan at a Western Union office on K Street, N.W. in the District of Columbia[12] (Buss, 4/30/12 p.m. at 36-39; Carter, 4/30/12 p.m. at 136-139).

On March 26, 2004, the Colligan delivered 16 kilos of sham cocaine to George Jones. ICE agents then arrested him minutes later for possession of the 16 kilos of sham cocaine. Subsequent to Jones's arrest, ICE agents searched the house in Florida where Jones was living. Various documents dated belonging to Greg Sitzmann that were stored in boxes in one of the bedrooms were taken. The agents also seized Jones's Suburban which had an altered gas tank (Chung, 5/1/12 p.m. at 106-127).

---

[10] Very low purity cocaine.

[11] The vast majority of prosecutors across the U.S. will not authorize such "stings" unless the target of the sting is bringing very large amounts of money to the transaction which can be seized with the sting targets' arrest. Here, law enforcement knew that Jones did not have any money (*Buss*, 8/16/11 at 21-22). The prosecution of George Jones, under the facts presented, is tantamount to handing a sandwich to a starving man and then prosecuting him for eating that sandwich. The fact that George Jones was an old, very sick man would further convince prosecutors that such a sting would be detrimental to reasonable law enforcement.

[12] While it is not clear how George Jones and his attorney addressed this issue or whether it was even raised as an issue, there is a significant issue how this wire transfer could provide venue in D.C. even as to George Jones The March, 2004 Jones-Colligan activities solely involved a government "sting" where the government itself was the supplier of the cocaine to George Jones and the entire transaction was orchestrated by government informant Terrence Colligan at the direction of ICE Special Agent William Buss. It is elementary that an individual cannot conspire with a government agent. *United States v. Iennaco, supra*, 893 F.2d at 397 n.3; *Sears v. United States*, 343 F.2d 139 (5th Cir. 1965). Under no stretch of the law could this government orchestrated "sting" be part of any conspiracy involving Gregory Sitzmann. Since George Jones could not, under the law, conspire with government agent Terrence Colligan, there could be no conspiracy charge even as to those two. Accordingly, the Western Union money transfer could not be an overt act in furtherance of a non-existent conspiracy. Moreover, the money transfer in D.C. also could not give venue in D.C. to any substantive narcotics charge as Jones only possessed the sham cocaine in the Southern District of Florida.

II.     **DUE TO THE FAILURE OF THE GOVERNMENT'S PROOF
ON THE ISSUES OF VENUE, STATUTE OF LIMITATIONS,
AND MULTIPLE CONSPIRACIES, DEFENDANT SITZMANN
IS ENTITLED TO AN ACQUITTAL UNDER RULE 29**

A.     **The Rule 29 Standard**

Rule 29 mandates acquittal where the evidence is insufficient to sustain a conviction.

Rule 29(c) authorizes a court to set aside a guilty verdict and enter a judgment of acquittal in

response to a defendant's timely motion.  Evidence is insufficient to sustain a conviction if,

viewing the evidence in the light most favorable to the government, a reasonable trier of fact

could not have found that the prosecution met its burden of proof.  *Jackson v. Virginia*, 443 U.S.

307, 319, 324 (1979); *United States v. Battle*, 613 F.3d 258, 264 (D.C. Cir. 2010).

B.     **The Defendant is Entitled to Acquittal under Rule 29  Because the
Government Has Failed to Prove Venue**

The government has the burden of establishing that venue is proper by a preponderance

of the evidence.  *United States v. Nwoye*, 663 F.3d 460 (D.C. Cir. 2011); *United States v. Haire*,

371 F.3d 833, 837 (D.C. Cir. 2004); *United States v. Lam Kwong-Wah*, 924 F.2d 298, 301 (D.C.

Cir. 1991).  Venue must be proven by evidence that was presented in support of the indictment

that was returned in this case and not under some new theory developed post indictment.  *Russell*

*v. United States*, 369 U.S. 749, 769-70 (1962).

In this matter, the government was required by both Constitutional[13] and statutory

provisions to prove by a preponderance of the evidence that the conspiracy charged in Count

One was committed in the District of Columbia.  No evidence was produced at trial that Greg

Sitzmann ever had any drug related contact with the District of Columbia.  Indeed, the only

evidence that touched the District of Columbia was the artifice used during the March 2004 sting

---

[13] Art. III, §2, ch. 3 and Amend. VI, United States Constitution; 18 U.S.C. §3237; and Rule 18, Fed. R. Crim. P.,
which are discussed further *infra* at 27-29.

perpetrated against George Jones where ICE agents directed government informant Terrence

Colligan to have George Jones wire $1,000 to the District of Columbia on the government –

created pretense that Colligan's car had broken down in the District of Columbia and that

Colligan needed $1,000 to get it repaired.

What is plainly obvious is that this wire transfer was not in furtherance of the conspiracy

charged in Count One.  In fact, it was not part of any conspiracy.  The underlying "sting" or

"reverse" involving Jones and Colligan was engineered entirely by the government, and the

government cannot, as a matter of law, be a conspirator.  *Ienneco*, 893 F.2d at 397 n.3.  This

criminal activity by Jones never could have happened, indeed was impossible, but for the

government supplying the cocaine used to arrest Jones.

As the government has stated, the request for this money to be wired to the District of

Columbia was simply to see if George Jones "was serious" and "not wasting the government's

time" (Buss, 08/16/11 at 37).  Moreover, as the government twice admitted, Sitzmann had no

connection of the transfer of funds from Florida to Washington (Buss, 8/16/11 at 24, 25).  The

sting on George Jones was carried out to try to create favorable sentencing information for

Colligan that could be used at Colligan's sentencing to try to convince the Court not to send

Colligan to prison.  Agent Buss had promised Colligan that he (Buss) would work hard to try to

keep a judge from sentencing Colligan to prison (Buss, 08/16/11 at 55).  This wiring of money

was solely part of a "sting" or "reverse" on George Jones in order to permit one or more criminal

charges on George Jones – charges that were only possible because the United States

government was supplying cocaine.  The government believed that having Jones, an old, sick

man locked up in jail would pressure him into becoming a witness against Greg Sitzmann (Buss,

08/16/11 at 55).  Because Florida prosecutors refused to even consider bringing charges against

George Jones, the wire transfer was a purely manufactured attempt to try to get jurisdiction and venue in the District of Columbia with regard to Jones where prosecutors could press charges and lock him up until he agreed to testify.  (Buss, 4/30/12 a.m. at 86-87).

Clearly, the wiring of the money was not in furtherance of the conspiracy charged in Count One but, rather, was merely a government artifice to try to bring George Jones within the judicial district of the District of Columbia.[14]  Whether this wire transfer was even capable of establishing venue in D.C. for a prosecution of George Jones is very questionable.  Since there could be no conspiratorial agreement between Jones and government agent Colligan, there was no venue created in D.C. for conspiracy.  Moreover, it would not provide venue for any substantive drug charge because the drugs were only possessed by Jones in Florida.  Since the wire would not create venue in D.C. for a §846 charge as to Jones, it is impossible that this wire transfer could establish venue in the conspiracy prosecution of Greg Sitzmann.  The government cannot bootstrap a non-conspiratorial wire transfer by George Jones into a conspiratorial overt act establishing venue with regard to Sitzmann.

As noted above, this Western Union wire transfer cannot establish venue in the prosecution of Greg Sitzmann because it is legally impossible for there to have been any conspiracy between the government and George Jones.  Where two individuals engage in a narcotic transaction and one of them is a government agent, it is legally impossible to have a conspiracy because the government agent is secretly intending to frustrate the ostensible agreement.  *See Iennaco*, 893 F.2d at 397 n.3; *United States v. Barboa*, 777 F.2d 1420, 1422

---

[14] Because the government has unlawfully kept George Jones's court file sealed throughout the pendency of the prosecution of Greg Sitzmann, it has not been possible to review the charges that were actually lodged against Jones. The warrant for George Jones's arrest was not for a narcotic conspiracy but rather for a money laundering conspiracy under 18 U.S.C. §1956(h).  In charging such a money laundering conspiracy, the government recognized the difficulty of trying any substantive legal basis to charge a narcotic conspiracy.  This wire transfer was insufficient to establish venue for a narcotic offense.

(10th Cir. 1985); *United States v. Sears*, 343 F.2d 139, 142 (5th Cir. 1965).  Here, all the

negotiations were between government agent Terrence Colligan and George Jones.

During the course of the back and forth between Jones and Colligan that was recorded in

March, 2004, Jones volunteered that he was going to "share" one-half of his anticipated profit

with Greg Sitzmann in order to assist Sitzmann with his legal expenses in France.  This

spontaneous intention declared by Jones to help his friend Sitzmann did not make Sitzmann part

of the criminal activity being created by the government.  Sitzmann was incarcerated in France

and was not even aware at that time that Colligan was purporting to sell 16 kilos of cocaine to

Jones.  There was never any agreement between Sitzmann and Jones for Sitzmann to share

Jones's profits.

### C.     The Government Cannot Establish Venue in the District of Columbia Through Actions that Violate a Defendant's Constitutional Rights

There is no dispute but that the only possible evidence to establish venue in the District of

Columbia in this case is the $1,000 wire transfer from Florida to the District of Columbia on

March 19, 2004.  There is no dispute that this wire transfer was part of an artifice to try to give

the U.S. Attorney's Office in the District of Columbia some ability to charge George Jones and

lock him up in jail – – to force George Jones to become a witness against Greg Sitzmann.  It is

not disputed that the U.S. Attorney's office in the Southern District of Florida would not

prosecute such a marginal case – even where it happened in its own district.  There is no dispute

that there is no evidence that Defendant Greg Sitzmann was never involved in any drug activity

in the District of Columbia.

The Constitution gives a defendant the right to be tried in the District where the crime

occurred.  Art. III, Section 2, Clause 3; Amend VI.  The government cannot deprive a defendant

of that constitutional right by trick or artifice designed to strip away from that defendant a right guaranteed to him by the Constitution.  The government too must abide by the U.S. Constitution.

Venue is "not a mere technicality."  *United States v. Miller*, 111 F.3d 747, 749 (10th Cir. 1997); *see also United States v. Winship*, 724 F.2d 1116, 1123 (5th Cir. 1984) (the issue of proper venue raises more than a pedantic justice – defeating technicality).  It is a constitutional consideration and an element in every crime.  *Miller*, 111 F.3d at 749; *Haire*, 371 F.3d at 837.

Our Circuit discussed "manufactured venue" in *United States v. Spriggs*, 102 F.3d 1245, 1251 (D.C. Cir. 1997).  The per curiam opinion noted, with regard to "manufactured venue":

> We may assume without deciding that there would be a fatal impropriety where "the key events occur in one district, but the prosecution, preferring trial elsewhere, lures a defendant to a distant district for some minor event simply to establish venue." *United States v. Myers*, 692 F.2d 823, 847 n. 2 (2nd Cir. 1982). The concern over a distant district is critical, as "[t]he provision for trial in the vicinity of a crime is a safeguard against the unfairness and hardships involved when an accused is prosecuted in a remote place."  *United States v. Cores*, 356 U.S. 405 (1958).

The insufficiency of the evidence and the constitutional violation is more significant here, indeed compelling.  It is a "fatal impropriety" falling within the category of "venue entrapment." *Spriggs*, 102 F.3d at 1250.[15]  First, this is not even a situation where the defendant himself is lured to a distant district for some minor event simply to establish venue – the circumstance described in *Spriggs*.  There is no connection by Sitzmann to the District of Columbia.  There is no evidence that Sitzmann was ever in the District of Columbia with regard to Count One. Second, there are dozens of references in the record from the early 2000s forward about how Sitzmann had decided not to engage in drug transactions anywhere in the United States because

---

[15] In *Spriggs,* the court noted it was hard to conceive of a person predisposed to commit a federal crime -- but not in some specific district.  *Id.* at 1251.  In this trial, there was a great deal of evidence that Sitzmann decided in 2000 never to do a drug deal that involved the United States (which includes the District of Columbia), and only transport drugs from South American to Europe.

the U.S. drug laws were too harsh and severe.  The U.S. drug laws were described as being "draconian."  Sitzmann affirmatively sought to avoid the entire United States, which includes the District of Columbia.  And third, the government "sting" was not in furtherance of the conspiracy involving the District of Columbia charged in Count One.

The wired funds were not in furtherance of any conspiracy, much less the conspiracy charged in Count One, as the seller of the drugs, namely Terrence Colligan, was a government agent.  The only connection to Sitzmann was that his long-time friend caused money to be wired to the District of Columbia at the request of a government agent.  It is well established that conspiracies cannot be established by mere friendship or association.  *See, e.g. United States v. Thomas*, 8 F.3d 1552 (11th Cir. 1993).  The wire transfer was not in furtherance of any conspiracy.

Under the circumstances of this case, the only way the court can find venue in this case would be to hold Sitzmann liable for Jones's wiring of money in a government instigated drug transaction while Sitzmann was incarcerated in France.  Venue would have to be based on a transaction that would have been impossible but for government supplied drugs in a matter outside the conspiracy charged in Count One.  After bootstrapping Jones's wire transfer to Sitzmann, the court would then have to condone and approve the government's deliberate denial of Sitzmann's constitutional rights to proper venue provided by Article III and the Sixth Amendment.

There are insurmountable hurdles.  The facts and the law demonstrate that the element of proper venue was not, and could not be established.  Sitzmann is entitled to acquittal as a matter of law.

**D.     In Deciding This Rule 29 Motion, the Court Should not Consider the Testimonies of Gary Paulson, Brian Hill, Bill Long, and Michael Fields as Evidence Because Their Testimony was Secured by Prosecutorial Misconduct and Grand Jury Abuse**

Among the most basic concepts taught to new prosecutors is that they must not abuse the massive powers of the grand jury.  It is elementary that once an indictment is returned against a defendant, it is highly improper for a prosecutor to go back to that grand jury and to use it to obtain additional evidence on that indicted charge.  *United States v. Woods*, 544 F.2d 242, 250 (6th Cir. 1976), *cert. denied sub nom., Hurt v. United States*, 429 U.S. 1062 (1977).  It is a "universal rule" that it is improper to use the grand jury for trial preparation.  *United States v. Brothers Const. Co. of Ohio,* 219 F.3d 300, 314 (4th Cir. 2000); *In re Grand Jury Proceeding (Fernandez Diamante)*, 814 F.2d 61, 70 (1st Cir. 1987); *United States v. Star*, 470 F.2d 1214 (4th Cir. 1972).  The grand jury's power is limited by its function towards the possible return of an indictment.  *Costello v. United States*, 350 U.S. 359, 362 (1956).

The indictment was returned in this case on August 7, 2008, nearly four and one-half years after Sitzmann was incarcerated in France.  Recognizing that its now indicted case was floundering due to deaths of certain witnesses, the government resorted to bringing witnesses to the District of Columbia and having them testify before the grand jury.  Gary Paulson was called before the grand jury on April 23, 2009 – eight and one-half months after the indictment was returned.  His testimony at the grand jury closely mirrored his testimony at trial.  Brian Hill testified before the grand jury on May 20, 2009.  His grand jury testimony was solely focused on Sitzmann and already indicted conduct.  His testimony also related to potential trial testimony against Sitzmann.  Billy Long was called before the grand jury on September 4, 2008.  Michael Fields testified before the grand jury on September 20, 2008.  Fields and Long were only asked questions relevant to potential trial testimony against Mr. Sitzmann.

This government misconduct should not be condoned by the Court.  While this misconduct is also being raised as a ground for a new trial, at a minimum in considering a Rule 29 motion for judgment of acquittal, require that the testimony of the above named witnesses, as well as any other witness who was called to the grand jury post-indictment, be stricken from the record.

### E.   The Defendant is Entitled to Acquittal Because the Government Failed to Present Any Evidence that the Charged Conspiracy in Count One Continued Into the Limitations Period

For a conspiracy charged under 21 U.S.C. §846, the government must prove that the conspiracy charged in Count One continued into the limitations period.  *See, United States v. Butler*, 792 F.2d 1528, 1532 (11th Cir. 1986), *cert. denied*, 479 U.S. 933 (1986).  The indictment in this case was returned on August 7, 2008.  Hence the limitations period extends back to August 7, 2003.  The government must prove that the charged Section 846 conspiracy continued after August 7, 2003.

The fact of the matter is that there was no conspiratorial agreement in Count One after August 7, 2003.  While there was evidence of acts in furtherance of a conspiracy involving the smuggling of drugs from Bogota, Colombia, into Europe in 2001 and 2002, those acts were not in furtherance of the charged conspiracy because there was never any intent to possess those drugs within the United States.  A conspiracy to import drugs directly to Europe from Bogota, Colombia is not a violation of any United States law.  *See United States v. Lopez-Vanegas*, 493 F.3d at 1312; *compare, United States v. Delgado-Garcia*, 347 F.3d 1337, 1345 (D.C. Cir. 2004) (even if read contextually, 21 U.S. C. §841(a), unlike the alien smuggling in *Delgado-Garcia* prohibited by 8 U.S.C. §1324(a), does not support extraterritorial application).  Since a drug smuggling venture occurring entirely outside of the United States, with no nexus whatsoever in

the United States, falls outside the purview of U.S. criminal law, such activity is not in violation of the conspiracy charged in Count One.

Viewed in the light most favorable to the government, this case involves two separate conspiracies and multiple acts done by an individual. The first conspiracy prosecuted in the trial, involving the transportation of cocaine across the United States into Canada in 1998 and 1999, could be found by a reasonable juror to be a violation of 21 U.S.C. §§841(a) and 846. But Rule 29 will not permit a reasonable juror to find a violation of 21 U.S.C. §§841(a) and 846 where cocaine was obtained in Colombia and transported directly to Spain.

In sum, the government presented no evidence that a co-conspirator committed any act in furtherance of the conspiracy charged in Count One in the District of Columbia during the limitations period. Defendant Sitzmann is therefore entitled to acquittal.[16]

### F.    Because the Evidence at Trial Established Multiple Conspiracies, Acquittal is Required Where No Conspiracy Occurred in the District of Columbia

Once the grand jury returns an indictment, the prosecutor is bound by the parameters of that indictment.

## III.    ALTERNATIVELY, IF THE COURT DOES NOT DIRECT AN ACQUITTAL, THE DEFENDANT IS ENTITLED TO A NEW TRIAL UNDER RULE 33

### A.    The Rule 33 Standard

Rule 33 of the Federal Rules of Criminal Procedure provides that the Court may vacate any judgment and grant a new trial if the interests of justice so requires. Fed. Rule Crim. P. 33(a). Under Rule 33, a district court is authorized to scrutinize and set aside a jury verdict much broader than the Rule 29 power to grant a motion for judgment of acquittal. *United States v. Kellington* 217 F.3d 1084, 1097 (9th Cir. 2000). Unlike under Rule 29, a trial court deciding a

---

[16] Because there is a companion Motion for New Trial, Fed. Rule Crim. P. 29(d)(i) comes into play. If a district court grants a judgment of acquittal, it "must also conditionally determine whether any motions for a new trial should be granted if the judgment of acquittal is later vacated or reversed." *Id.*

Rule 33 motion is not "obliged to view the evidence in the light most favorable to the verdict, and it may weigh the evidence and evaluate for itself the credibility of the witness." *Id.* While term "interests of justice" is not specifically defined, courts have interpreted it to require a new trial in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial. *United States v. Cabrera*, 734 F.Supp.2d 66, 87-88 (D.D.C. 2010) (Hogan, J.), *citing United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989).

In this matter, there were an extraordinarily large number of errors which by themselves require a new trial.  Considered cumulatively, they absolutely compel a new trial.  These errors and omissions include taking away from the jury the issue of venue; the unfair prejudice injected in the trial by the introduction of Rule 404(b) other crimes evidence, including the fact that much of it came in without any prior notice by the government; multiple instances of grand jury abuse where the government improperly presented witnesses to various random grand juries after the indictment was returned for the purpose of collecting evidence at trial; constructed amendments to the indictment based on the improperly presented grand jury witnesses; repeated misconduct involving "vouching and bolstering" of trial witnesses; and the introduction of a co-conspirator's a guilty plea to suggest that Sitzmann was also guilty.  Lastly, and in a motion which will be presented separately, a new trial is required due to the ineffective assistance of counsel.  It is readily apparent that the friction and animosity between trial counsel and the defendant carried over into the trial where defense counsel not only failed to vigorously defend his client, but affirmatively harmed him by repeatedly opening doors to permit damaging evidence not part of the charged conspiracy to flow into the trial.

**B.     The Defendant Was Improperly Denied the Right to Have Venue Decided By the Jury**

Proper venue is required by the Constitution, by statute, and by the Rules of Criminal Procedure.  Venue is a Constitutional right:  "The Trial of all crimes ... shall be held in the State where said Crimes shall have been committed."  Art. III, §2, cl. 3.  Article III's requirement is reinforced by the Sixth Amendment which gives a criminal defendant the right to a trial "by an impartial jury of the State and district wherein the crime shall have been committed."  Rule 18 of the Federal Rules of Criminal Procedure provides "except as otherwise permitted by statute or these rules, the prosecution shall be had in a district in which the offense was committed."  Under 18 U.S.C. §3237(a), venue for a continuous crime, such as conspiracy, lies in any district where the offense was committed.  Against this clear Constitutional and statutory authority and the equally clear authority from our Court of Appeals that the government bears the burden of establishing venue by a preponderance of the evidence,[17] the government has incorrectly argued that venue is an issue for the court, not for the jury (Tr. 4/30/12 at 113; Tr. 5/2/12 at 71; 76-77; Tr. 5/14/12 at 55).  By its actions, the government deprived Mr. Sitzmann of his venue rights.

The issue of venue initially came up in the government's case-in-chief.  When the defendant was working into venue, the government objected and immediately cut off any questioning on the issue:

> Eliopoulos:     Oh, your honor, Mr. Abbenante brought up the issue of venue.  We'd request an instruction that you have already determined that venue is appropriate in this case.

Tr. 4/30/12 at 113.

---

[17] *See Haire,* 367 F.3d at 837; *United States v. Lam Kwong-Wah,* 924 F.2d 298 (D.C. Cir. 1991); *United States v. Pace,* 314 F.3d 344, 349 (9th Cir. 2002); *United States v. London,* 714 F.2d 1558 (11th Cir. 1983); *United States v. Luton,* 486 F.2d 1021 (5th Cir. 1973), *cert. denied,* 417 U.S. 920 (1974).

The government wanted this instruction to be given right away, claiming that the court had previously determined that venue was proper. *Id.* at 114. At the government's request, the court then instructed the jury:

> During Agent Buss's testimony, the subject of venue was discussed. Venue is a legal question about where a case may be filed and tried. I have already decided that venue is proper in this court. It is not a question for the jury to decide.

Tr. 4/30/12 at 123.

The issue of venue next surfaced in the "Charge Conference" on May 14, 2012, as the result of a requested defense instruction concerning the requirement of proof that the conspiracy occur in the District of Columbia (Tr. 5/14/12 at 52). The government argued that the issue had not been raised in the government's case-in-chief, somehow ignoring the fact that in their case-in-chief they strongly objected to venue being raised by the defense and obtained an instruction that venue was proper as a matter of a prior judicial ruling.

At the charge conference, the government vigorously opposed a venue instruction on multiple grounds – that there was no material issue, that the government was only addressing manufactured venue, that the issue was not timely raised in the government's case-in-chief. The government argued that *United States v. Nwoye*, 663 F.3d 460, 466 (D.C. Cir. 2011), and a paragraph in a concurring opinion in *United States v. Gaudin*, 515 U.S. 506, 522-23 (1995), made clear that venue "is an issue for the Court, not for the jury" (Tr. 5/14/12 at 55, L.7). In response to the Court's question why venue was listed as a standard jury instruction in Judge Sand's book, the government's response was "Well, your honor, we are talking about some very recent cases. Even the *Nwoye* case came out in 2011 ..." *Id.* at 55, L. 23-24. In an amazing disregard for well-established legal precedent, the government contended that the law regarding venue had been changed in recent years, subsequent to when Judge Sand's compiled his book.

28

In the final instructions given to the jury (Dkt. No. 179), no instruction on venue was given to the jury and the court's earlier, incorrect instruction was never corrected. Thus, the jury only heard the incorrect instruction given during the government's case-in-chief. Mr. Sitzmann was denied the right to have the issue of venue decided by the jury under a preponderance standard. Venue was one of his primary defenses and the government and the court took that defense away. Given that this incorrect instruction was never corrected notwithstanding the defense request for a venue instruction, a new trial is required.[18]

### C.    Sitzmann was Unfairly Prejudiced Not Only by Massive Amounts of Irrelevant Evidence, but also by Highly Prejudicial Other Crimes Evidence

With the trial completed, it is clear that the vast majority of the evidence presented over the nearly four week government's presentation was irrelevant evidence and improper "other crimes evidence." A minority of the evidence may have been related to acts done in furtherance of the conspiracy charged in Count One. Repeatedly informing the jury of prior criminal convictions and criminal activities was unfairly prejudicial to Sitzmann as it was clearly propensity evidence introduced to demonstrate Sitzmann's bad character and to distract the jury from the real issues. The prejudicial effect substantially outweighed any probative value.

Under Rule 401 of the Federal Rules of Evidence, "Evidence is relevant is: (a) it has any tendency to make a fact more or less probable than it would be without the evidence, and (b) the fact is of consequence in determining the action."

Under Rule 403 of the Federal Rules of Evidence, "The Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following" unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

---

[18] Mr. Sitzmann also incorporates by reference his Rule 29 arguments concerning venue.

What is clear from the outset is what the prosecutors were trying to do was to exaggerate this case into something much, much larger than the facts justified.  Viewing the evidence in the light most favorable to the government, the government established through Gary Paulson and Robert Campeau that there were two, possibly three, smuggling trips into Canada prior to April 1999 using gas tanks of automobiles.  The government next established through Billy Long that in December, 2001 and March, 2002, Sitzmann had six (6) kilos transported by commercial airlines from Bogota, Colombia, to Europe and that he attempted to send four (4) more kilos to Europe in May, 2002.  The final evidence shows that Sitzmann was arrested with seven kilos in France in February, 2004.

The "hundreds and hundreds" of kilos in the charged conspiracy mentioned by the government in its Opening never appeared.  The smuggling by illegally modified private airplanes with remote landings and water drops never materialized.  There was only idle chatter about the capabilities of different airplanes.  Jerry Harvey's money laundering and lawsuits with Panamanian banks over millions of dollars were completely irrelevant.  John Sager's air smuggling and under water container smuggling and money laundering had nothing to do with Sitzmann.  Robert Campeau's explanation of how "freebasing" was done was entirely irrelevant to Sitzmann.  The history of the Canadian chapters of the Hells Angels had no relevance.  All this "evidence" simply confused the issues, wasted time, and had the clear potential to mislead the jury.

The government's goal in this matter was to make Sitzmann a habitual criminal and a person of bad character.  The testimony of Jimmy Fields' two children, Michael and Rhonda, served no purpose other than to show that Sitzmann was responsible for their father's death and that he stiffed their mother after promising to take care of her in the event Jimmy Fields was

arrested or died.[19]  The government's improper speaking objection "Objection, goes to safety"

(Harvey, 4/19/12 p.m. at 69) and Agent Buss's unsolicited and volunteered statement that

Terrence Colligan was "sacred to death of Sitzmann." (Buss, 4/30/12 at 108) were designed to

show that not only was Sitzmann a drug dealer, but also a very dangerous one.

     The other crimes evidence presented at trial included Mr. Sitzmann's convictions for

drug smuggling in the Bahamas and in Florida in 1986.  It also included his conviction for

attempting to fraudulently obtain a driver's license, his possession of drugs in France in 2004,

evidence of bribing foreign police and government officials in 1985, and repeated claims of

money laundering.

     The fact that the government spent the first three days of the trial establishing Sitzmann's

bad character and propensity to be a major drug smuggler is telling and obvious.  The obvious

goal was to predispose the minds of the jurors to believe that Sitzmann was a really bad person

who deserves to be incarcerated for the rest of his life.  The object was to strip away the

presumption of innocence at the very outset of the trial, thus obviating scrutiny of the evidence

and legal issues by the jurors.  A fair verdict in this case could only be achieved if the jurors

carefully applied the law to the facts.  Predisposed jurors do not do this.  As this Circuit wrote in

*United States v. Linares*, 367 F.3d 941, 945 (D.C. Cir. 2004):

> "A concomitant of the presumption of innocence is that a
> defendant must be tried for what he did, not for who he is." *United
> States v. Daniels*, 770 F.2d 1111, 1116 (D.C. Cir. 1985) (additional
> cites and quotation marks omitted).  Introducing evidence of a
> defendant's prior crimes and other bad acts – so called propensity
> evidence – may conflict with this principle.  As the Supreme Court
> explained:  'The [character] inquiry is not rejected because
> character is irrelevant; on the contrary, it is said to weigh too much

---

[19] Michael Fields testified that Sitzmann agreed to take care of Michael's mother if something happened to Jimmy
Fields.  "He was like don't worry about it Mike, I'll take care of her."  Fields then testified that Sitzmann did do
anything for his mother (M. Fields, 4/27/12 p.m. at 62).

> with the jury and to so overpersuade them as to prejudge one with
> a bad general record and deny him a fair opportunity to defend
> against a particular charge.  The overriding policy of excluding
> such evidence, despite its admitted probative value, is the practical
> experience that its disallowance tends to prevent confusion of
> issues, unfair surprise and undue prejudice.'  *Michelson v. United
> States*, 335 U.S. 469, 475-76 (1948) (footnote omitted).

Judge, now Justice Breyer, stated this problem succinctly in *United States v. Moccia,* 681

F.2d 61 (1st Cir. 1982):

> Although ... propensity evidence is relevant, the risk that a jury
> will convict for crimes other than those charged – or that, uncertain
> of built, it will convict any way because a bad person deserves
> punishment – creates a prejudicial effect that outweighs ordinary
> relevance.

*Id.* at 63, *quoted in Old Chief v. United States,* 519 U.S. 172, 181 (1997).

### 1. The Government Introduced Extrinsic Evidence of Other Crimes Without Providing Prior Notice

Rule 404(b) requires the government to give reasonable notice in advance of trial of its

intent to introduce other crimes evidence at trial.  Without any prior notice to the Court and the

defense, the government introduced evidence through Jerry Harvey that Sitzmann routinely

smuggled 300 to 500 kilos by airplane from Columbia to the Bahamas and by boat into the

United States notwithstanding it had not given notice nor obtained permission from the Court.

The government introduced evidence that Sitzmann bribed government officials in foreign

countries in order to smuggle drugs (Harvey, 4/19/12 a.m. at 111-112).  The government did not

serve notice of this bribery evidence and did not have the permission of the court.  The

government had Harvey describe Sitzmann's involvement in massive money laundering

schemes.[20]  The government gave no prior notice of this other crimes evidence and did not have

the permission of the court.  Also without notice, the government introduced evidence of

Sitzmann's attempt to fraudulently obtain a driver's license,[21] and possession of drugs overseas

with the intent to distribute.[22]  By not serving notice as it was required to do, the government was

able to run through evidence designed to overwhelm the jurors with evidence of Sitzmann's

propensity for wrongdoing and bad character.  The non-noticed evidence, particularly when

combined with the 404(b) evidence the Court authorized to be presented (based on

misrepresentations by the government), overwhelmingly established Sitzmann's bad character

and predisposition.  The failure to provide notice deprived the court of the opportunity to weigh

the effects of all this other crimes evidence under Rule 403, Fed. R. Evid.

### 2.    The Court Erroneously Admitted 404(b) Evidence Based on Government Misrepresentations About Its Evidence

The government claimed it needed to introduce Sitzmann's 1985 conviction in the

Bahamas and his 1987 conviction in Florida to establish "credibility" and "trust" with his "soon

to be co-conspirators" when they were jailed at MCC.  Dkt. No. 146, Gov't Motion.  Yet, as

demonstrated above, there was never any agreement reached by Sitzmann and/or Paulson, Sager,

---

[20] The government made repeated references that Sitzmann was a money launderer, thereby suggesting to the jury that he had millions of dollars waiting for him if he were to be acquitted.  While the allegations of money laundering were frequent, the actual evidence was small.  The fact of the matter is that the government could not indict a money laundering count so it simply made accusations in order to unfairly prejudice Sitzmann and poison the minds of the jury.

[21] Without any prior 404(b) notice and without the court's permission, the government presented two witnesses who were formerly employed by the Florida Department of Motor Vehicles in 1994 and introduced Sitzmann's 1994 Florida conviction for attempting to obtain a Florida driver's license under a false name.  Significant time was spent proving every aspect of this offense including presenting the photo array from which Sitzmann's photo was selected.  Sitzmann's actions in trying to get a driver's license under a false name was not connected to any conspiracy, and certainly not connected to the conspiracy charged in Count One.  Contrary to the government's unsupported representations to the jury that this activity was being done to smuggle drugs, the fact is that such a driver's license could have been sought for any one of a dozen reasons.

[22] Even the cocaine possessed by Sitzmann in France was other crimes evidence covered by Rule 404(b).  The evidence showed that Sitzmann traveled from Bogota, Colombia to Madrid, Spain, where he rented a car and drove into France.  There was no connection to any conspiracy for all intents and purposes.  He simply had it in his possession.

or Harvey while at MCC.  Sager and Harvey not only were not "soon to be conspirators" in 1990, they were never conspirators.  The evidence plainly showed that Paulson did not become a conspirator until 1997 (Paulson, 4/24/12 p.m. at 29-31).

The government gained permission from the Court to introduce evidence of the defendant's incarceration at MCC Miami, along with Paulson, Harvey and Sager, based on the representation that "it was there that defendant and Paulson agreed to traffic in illegal narcotics…" and that it was there "Defendant also talked with Jerry Harvey about illegal drug trafficking and money laundering while both were inmates at MCC" and "Defendant asked Jerry Harvey to look into a King Air airplane that the defendant was contemplating using for drug smuggling…(Dkt. 146, Govt's Motion at 3-4)."  The Court admitted this evidence as intrinsic evidence based on the government's representations...that "these conversations are relevant to proving the inception of the very conspiracy that the grand jury has charged.  "However, as the government clearly knew from Paulson's grand jury testimony, and Sager's sworn statement, there was never any agreement between Paulson and Sitzmann entered into at MCC.  *See* Attachment 1.

As to Harvey, the government knew prior to filing its Rule 404(b) motion that Harvey never described any agreement.  In fact, Harvey did not even know why Sitzmann was at MCC. What Harvey told the government on April 15, 2010, under oath, was:

> Q:    Did you serve time in jail:
>
> A:    Yes, I did.
>
> Q:    Did you recall seeing Mr. Sitzman [sic] in jail?
>
> A:    Yes, I did.
>
> Q:    During what period:
>
> A:    that would have been around 1989 and 1990.

Q:     And where did you see him?

A:     At the MCC in Miami, Florida.

Q:     MCC?

A:     Yeah.

Q:     Okay.  What were you doing there?

A:     I was waiting to go to trial on a tax case.

Q:     And do you know what he was doing there:

A:     He said he was waiting to go to trtial.  I don't know what for.  He just said he was waiting to go to trial.

Q:     When did you get out of MCC in Miami?

A:     June 4th, 1990.

The government further represented to the Court:

> It was as a result of the defendant's arrest in the 1990 case, the level of drug trafficking for which he was charged which increased his drug trafficking stature, the conspiratorial opportunity that resulted from his incarceration at the Miami Correctional Center (sic), and the trust that developed between these inmates that led to the formation of the international drug conspiracy at issue here.  It was at the Miami Correctional Center that the conspiracy began to take shape, including with respect to trafficking cocaine through the United States and into Canada and into Europe and contemplating the use of airplanes.

(Dkt. #146, Govt's 404(b) Motion at p. 10-11).

The problem, however, is none of this was true.  There was no plan or conspiracy beginning to take shape or developed trust or even contemplated uses of airplanes to traffic cocaine through the United States into both Canada and Europe.

In its Rule 404(b) opinion (Dkt. #169), the Court noted how the government represented that it was:

> The defendant's substantial prior experience with international
> drug trafficking that gave him the opportunity to establish
> relationships with Paulson and Sager, and to reconnect with
> Harvey, which led to development of the conspiracy charged in
> this case.  As the government put it during the motions hearing,
> "it's the level of his drug trafficking back at that point and the
> reason that he was arrested in that case [in 1987] where he is
> attempting to traffic in large-scale cocaine that gives him the
> credibility to be able to communicate with these other drug
> traffickers."

The fact of the matter this entire representation, as the government knew, was pure

creative writing – all made up.  There was never a "credibility" issue because no one agreed to

do anything.  When Sager was debriefed under oath on October 21, 2011, he didn't know

anything about the Bahamian or Florida cases.  The most that Sager could say that he knew about

Sitzmann when they were incarcerated together at MCC Miami was that "he was in prison with

some kind of drug charge.  I wasn't sure exactly what."  *See* Attachment 2.

It was no different with Paulson.  When he was asked before the grand jury why

Sitzmann was in MCC Miami, the most he could say was that Sitzmann was there "for some

kind of charge like … Like a conspiracy charge."  When asked "did it involve drugs?", Paulson

answered "yes."  All Paulson could recall that Sitzmann told him about his (Sitzmann's) case

was a plane running out of gas and crashing on a beach in Colombia.  Paulson testified "I don't

remember the real specifics of his case" other than it involved "smuggling."  *See* Attachment 1,

Paulson G.J., p. 8-9.

Clearly, Sitzmann's crimes in the Bahamas and Florida played no role  in the

"opportunity to establish relationships with Paulson and Sager" or establish "credibility" as the

government represented to the Court.  Since the facts of those Sitzmann cases were not even

known by Paulson and Sager, those facts certainly did not give Sitzmann "the credibility to be

able to communicate with these other drug traffickers" as the Court found in reliance on the government's misrepresentations (Dkt. No. 169, Opinion and Order at 12).

The Court further found that "evidence of the defendant's drug smuggling activity in late 1986 and early 1987 is probative of his ability to traffic in large quantities of illegal drugs, Motion at 13, and, in particular, of his familiarity with the use of private planes to transport large quantities of drugs across continents." *Id.* at Dkt. 169 at 1112-13. Of course, private airplanes had nothing to do with the charged conspiracy. According to the evidence that the government presented at trial, the cocaine in 1998 and 1999 was transported by semi-tractor trailer trucks across the middle of the United States into Canada via the Ambassador Bridge near Detroit. Once in Canada, it was transported by GMC or Chevy Suburbans to Quebec. As the photos of the Suburbans introduced by the government at trial reveal, neither had wings and there was no evidence they could fly. There was no evidence presented at any time after 1987 that Sitzmann used a private airplane to smuggle or attempt to smuggle drugs. The only other airplanes ever mentioned during the trial in connection with drug trafficking were commercial airplanes.

There was never any issue as to Sitzmann's "ability" to supply cocaine. The facts were simply that Paulson provided a market in Canada for whatever cocaine Sitzmann was able to secure – whether it was five kilos or 50 kilos. Sitzmann never had to prove to any co-conspirator that he had the ability to secure cocaine. Sitzmann's deal with Paulson in 1998 and 1999 was simply to use Paulson's contact (Norm) in Canada to purchase the cocaine and Paulson would share in the profits. Paulson testified that his trust in Sitzmann came in 1997 or 1998 when Sitzmann paid Paulson $10,000 simply for producing a buyer for 300-400 pounds of marijuana (*See* Attachment 1 at p. 8-10)

Hence, the reason by the government given for introducing the Bahamian and Florida drug convictions never existed.  It was simply additional propensity evidence showing that Sitzmann was a drug smuggler and will always be a drug smuggler if he is not incarcerated.

The Court also admitted Sitzmann's convictions in the Bahamas and Florida were relevant to Sitzmann's use of small planes in the conspiracy set forth in Count One (Dkt. No. 169).  The government's proffer that because Sitzmann used private airplanes in those earlier cases, it would explain his use of small planes in the charged conspiracy.  But there was not a shred of evidence at trial that Sitzmann ever used a private aircraft to smuggle drugs or money after 1987.  Without any evidence to support its rebuttal closing argument at trial, the government argued:

> Mr. Sager ... and we know that the defendant bought his airplane (Velocity]; why?  It was a drug plane; why?  Because he is a drug dealer.

(Rebuttal, 5/16/12 at p. 39.)

The Court admitted the Bahamian and Florida convictions as being probative of the defendant's knowledge that he was, in fact, carrying cocaine and not Euros when he was arrested in France.  This was another pretext by the government to induce the Court to admit the prior convictions.  There was never any mention at the trial that the defendant claimed he was carrying Euros and not cocaine.  It was never an issue.  Sitzmann never claimed that he thought he was carrying kilos of flour.  The Court admitted the two prior convictions to show the absence of mistake or accident, and analogized this to *United States v. Bowie*, 232 F.3d 923 (D.C. Cir. 2000) where the Court of Appeals approved the admission of evidence that Bowie had possessed and passed counterfeit notes on a prior occasion because it decreased the likelihood that Bowie accidentally or incorrectly possessed the counterfeit notes for which he was on trial.  *Id.* at 930.

The Bowie logic does not carry to the instant facts.  While counterfeit notes may be probative of later possessed counterfeit notes, evidence that Sitzmann attempted to fly to Colombia on two occasions to pick up 350 kilos of cocaine, and evidence that Sitzmann was standing on a runway in the Bahamas near a plane carrying 263 kilos of cocaine, some 17 and 19 years earlier, would not be probative on the issue that he would know that cocaine was not currency.  And, to bring this to the full extent of unfair prejudice, the Court's ruling is essentially that 404(b) other crimes evidence (the 1985 and 1987 convictions) were admissible to explain other 404(b) other crimes evidence (his possession of cocaine in France in 2004).  Under any analysis, Sitzmann's sole possession of cocaine in Europe in February 2004 without any other facts is 404(b) evidence – because there was no evidence to connect it to §§841(a) and 846 conspiracy.  Hence, when the Court admitted the 1985 Bahamas and the 1987 Florida convictions to establish knowledge and not mistake, with regard to the 2004 possession of cocaine in France, the Court was permitting earlier 404(b) evidence to explain subsequent 404(b) evidence.

The Court also erroneously admitted the Bahamas and Florida convictions on the theory that they explained "the background, formation, and development of the illegal relationship and, more specifically, to help the jury understand the basis for the co-conspirators' relationship of mutual trust."  Opinion and Order, Dkt. No. 169 at 12.  First, they were not co-conspirators and second, there was never any issue of mutual trust.  Mutual trust was not an issue because Sager and Harvey were never co-conspirators and Paulson did not, viewing the evidence in the light most favorable to the government, become a co-conspirator until 1997.  Moreover, the cases cited by the court in support of admitting Sitzmann's Bahamian and Florida convictions are factually distinguishable.  In *United States v. Santana*, 342 F.3d 60, 67 (1st Cir. 2003), in *United States v. Vega*, 285 F.3d 256, 261 (3rd Cir. 2002); and in *United States v. Pascarella*, 84 F.3d 61,

72-73 (2d Cir. 1996), the various Courts of Appeals approved the admission of evidence concerning prior conspiracies where many members of the prior conspiracy later became members of the subsequent conspiracy on trial.  The reason the prior conspiracy was relevant was because it showed why these same members from the prior and charged conspiracies were able to work together.  That was not the situation in this matter.  No one involved in either the Bahamian case or in the Florida case continued on to work with Sitzmann with regard to the conspiracy charged in Count One of the Indictment.

The Court adopted the government's theory of permitting the 1985 Bahamas and the 1987 Florida convictions into evidence because it explained Sitzmann's ability to establish credibility and trust with his "soon to be co-conspirators" when he was jailed in 1990 in MCC. What this is saying is that Sitzmann's prior Bahamian and Florida convictions were admitted to show that Sitzmann was a big-time drug dealer – that Sitzmann's credibility flowed from the fact that he is a person of really bad character, and that bad guys can trust bad guys.  This is guilt by reputation that clearly violates both Rule 404(b) and Rule 403, Fed. R. Evid.

Upon analysis of the reasons given by the Court in admitting Sitzmann's prior convictions, which are in large measure based on misrepresentations in the government's motion, the admission of was error requiring a new trial.

IV. **THROUGHOUT THE TRIAL, THE GOVERNMENT IMPROPERLY ENGAGED IN VOUCHING FOR THEIR WITNESSES CREDIBILITY AND IMPROPERLY ATTEMPTING TO BOLSTER SUCH TESTIMONY**

It is misconduct for a prosecutor to vouch for the credibility of a witness.  "It is for the jury, and not the prosecutor to say which witnesses are telling the truth." *United States v. Wilson*, 605 F.3d 985, 1021 (D.C. Cir. 2010), *quoting from United States v. (Xavier) Brown*, 508 F.3d 1066, 1075 (D.C. Cir. 2007) and *Harris v. United States*, 402 F.2d 656, 658 (D.C. Cir.

1968).[23]   "When a prosecutor vouches for a witness's credibility, it may convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant; thereby jeopardizing the defendant's right to be tried solely on the basis of the evidence presented to the jury." *United States v. Wilson, supra,* at 1021-22, *quoting from United States v. Young*, 470 U.S. 1, 18 (1985).  The suggestions and insinuations by a prosecutor that the government knows or believes a witness is telling the truth "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."  *Id.* at 19; *United States v. (Xavier) Brown,* 508 F.3d at 1075-76 (improper for prosecutor to inject his personal assessments of the credibility of witnesses or suggesting to jury that the prosecutor was capable of monitoring a witnesses truthfulness), *see United States v. Cormier*, 468 F.3d 63, 73 (1st Cir. 2006) (prosecutor's statement that witnesses are telling the truth is improper); *United States v. Cornett*, 232 F.3d 570, 575 (7th Cir. 2000) (prosecutor's statement that witnesses take an oath to follow the law improperly vouches for the witness' testimony); *see also United States v. Reed*, 522 F.3d 354, 360 n.6 (D.C. Cir. 2008) (prosecutor's rhetorical questions whether an agent would risk his career by testifying falsely was improper vouching).  The test for improper vouching is whether the jury could reasonably believe that the prosecutor was personally vouching for the witness' credibility.  *United States v. Roberts*, 618 F.2d 530, 537 (9th Cir. 1980).

In this case, the government vouched for witnesses and attempted to bolster their testimony during the government's case-in-chief, when the witness' credibility had not even

---

[23] "Even the most inexperienced prosecutor should be aware that it is improper and highly inappropriate to interject his or her personal opinions of the defendant's veracity into the decision making process."  *United States v. Anchondo-Sandoval*, 919 F.2d 1234, 1238 (5th Cir. 1990).

been challenged by the defense.  The vouching and bolstering by the government began in its

opening statement (when Mr. Eliopoulos) stated:

> Now these witnesses, particularly the witnesses that have been
> given immunity for their statement, or a person like John Sager,
> who will testify in the hope of getting leniency from the judge that
> sentences him, one thing you need to remember is that they are all
> obligated to tell the truth.  They must tell the truth.  They could be
> the subject to the penalties of perjury, obstruction of justice, and
> they have to tell the truth both during the examination by the
> Government attorneys or Mr. Abbenante.

(Tr. 4/17/12 at p. 30).

In questions to Jerry Harvey about his immunity agreement, Harvey was asked by AUSA

Khandelwal:

> Q:      Now what – – does that agreement allow you to say
>         anything you want to on the stand?
>
> A.      Well, my attorney said come up here and tell the truth.
>
> Q.      And does that agreement require that?
>
> A.      Yes
>
> Q:      And what happens if you don't tell the truth?
>
> A:      I get charged with perjury.

(Harvey, 4/19/12 a.m. at 102-103).  The government was suggesting to the jury that Harvey was

in fact the truth because the government would otherwise charge him with perjury.

When John Sager testified, the prosecutor again insinuated that the witness was telling

the truth because that is what the prosecutor personally told him to do.  The prosecutor further

suggested to the jury that he could tell when Sager was not telling the truth because the

prosecutor knew all the other evidence and would know if Sager was not being truthful.  Mr.

Eliopoulos made himself an issue in the trial through the following colloquy with Mr. Sager:

Q.      What has the government, what have I asked you to do in this case with respect to your cooperation?

A.      Well, since the first time you sat down with me, you told me not to lie.  That's what I've done.

Q.      And have I told you to tell me the truth irrespective of whether it hurts me or helps me?

A.      Yes, you have.

Q.      What would happen if you do lie?

A.      Well, I know for certain, of course, no one is going to try to do anything to help me.  I would of course know that.  But I could be charged with perjury or obstruction, or I guess it would actually even raise my guidelines or make my sentence bigger in Florida.

Q.      Could you be charged separately?

A.      Yes.

Q.      What could you be charged with?

A.      Well, I guess perjury or obstruction of justice separately.

Q.      And has the government told you about anything with respect to its case and what evidence we have?

A.      No, you told me nothing.  All you did was ask questions, you know.

Q.      So in other words, you don't know what other evidence we have that might contradict what you have?

A.      No, I have no idea what other evidence you have.

(Sager, 4/23/12 p.m. at 23-24).

        Later, Mr. Eliopoulos asked Sager:

Q.      And have I given you any instructions as to your honesty?

A.      Yeah.  You've told me not to lie; whether it hurts or helps, don't lie.

(Sager, 4/24/12 a.m. at 43).

The improper vouching and bolstering continued in full force by the prosecution when it called Gary Paulson as a witness.  AUSA Eliopoulos again injected himself squarely into the fact that Paulson would testify truthfully because Eliopoulos told him to do exactly that and that Eliopoulos would know if he was lying and charge him with perjury.  In explaining the immunity that the government had given to Paulson, the following colloquy occurred in the government's direct examination:

> Q.     In fact, if you lied, the Government could prosecute you for perjury or obstruction of justice?
>
> A.     Yes.
>
> Q.     And could prosecute you for any crime but not use your words against you; am I right about that?
>
> A.     Yes.
>
> Q.     Is that your understanding?
>
> A.     That's the way I understand it.
>
> Q.     Now, you and I have met on at least a couple of occasions, correct?
>
> A.     Yes.
>
> Q.     And I advised you that we would request that you appear as a witness in this case, correct?
>
> A.     Yes.
>
> Q.     And you've been subpoenaed to be here; am I right about that?
>
> A.     Yes, sir.
>
> Q.     Has the Government – – anybody connected with the Government, whether me, Mr. Khandelwal, Agent Rine or any other agent involved in this case, have we told you what you needed to say when you appeared as a witness?
>
> A.     No, just the truth.  Just what happened.  That's all you wanted to know.

> Q.      And that's all we want today also; do you understand that?
>
> A.      That's all you're going to get.

(Paulson, 4/24/12 p.m. at 15-16).[24]

The government's improper vouching and bolstering continued with witness Robert

Campeau.  This time it was AUSA Khandelwal's turn to insert himself into the trial.  At the

conclusion of Robert Campeau's testimony, Mr. Khandelwal asked:

> Q.      Now, what have – – myself, Mr. Eliopoulos, Agent Rine,
> any of the other agents in the case, what have we always told you
> to do on the stand?
>
> A.      Just to tell the truth.
>
> Q.      And have you done that today, sir?
>
> A.      Yes.  To the best of my knowledge, yes.
>
> Q.      Thank you.  No further questions.

(Campeau, 4/25/12 p.m. at 87-88).

The improper vouching and bolstering continued with the very next witness.  This time

the witness was Brian Hill, although the prosecutor was again AUSA Khandelwal.  The same

improper series of questions was propounded to witness Brian Hill:

> Q.      Now, what I have always told you to say when you're here
> on the stand?
>
> A.      To tell the truth.
>
> Q.      Have you done that today?
>
> A.      Yes, I have.

(Hill, 4/25/12 p.m. at 139).

---

[24] As will be discussed in more detail below, every question by the prosecutor was leading.  The AUSA, for all
intents and purposes, should have just sat in the witness chair and testified.

On cross, Mr. Hill was simply asked whether he had recently discussed the facts of the case with Paulson and was it because Hill wanted to get his story straight with Paulson.  Hill testified that it was not necessary to get their stories straight when he was telling the truth.  *Id.* at 149-150.

Mr. Khandelwal resorted to an improper redirect examination:

> Q.     Sir, have you told the truth here today?
>
> A.     Yes, I have.
>
> Q.     You understand that you're under oath?
>
> A.     I understand I am under oath, and that means a great deal to me.
>
> Q.     Have any of the agents told you what to say here?
>
> A.     Negative.  No sir.
>
> Q.     Have they simply listened to what you had to say?
>
> A.     That's all they have ever done is listen to what I have to say.
>
> Q.     Has anyone told you what the facts are of this case?
>
> A.     No.
>
> Q.     And have you lied to any member of this jury today?
>
> A.     No, I have not.
>
> Abbenante:     Objection, asked and answered your honor.
>
> Court:  That's fine.
>
> Khandelwal:   Q.     Have you ever lied to this jury?
>
> A.     No, I have not.

(*Id.* at 151-152).

AUSA Khandelwal continued with the government's improper vouching and bolstering with the next two government witnesses, Rhonda Fields and Michael Fields.  As to Rhonda Fields, the government's direct examinations included:

> Q.      ….well, let me ask you this.  You're under oath.  You understand that?
>
> A.      Correct.
>
> Q.      And you understand that that gives an obligation to tell the truth.
>
> A.      Correct.
>
> Q.      The whole truth and nothing but the truth?
>
> A.      Yes, I do.
>
> Q.      All right.  You take that obligation seriously?
>
> A.      Absolutely.
>
> Q.      And you understand that you cannot exaggerate or lie to this jury?
>
> A.      Absolutely.
>
> Q.      Have you done that today?
>
> A.      No.
>
> Q.      Has anyone told you what to say here before this jury?
>
> A.      No.
>
> Q.      What have I always told you to say in the jury?
>
> Abbenante:     Objection.
>
> Court:  Go ahead, it's fine.
>
> Q.      What have I always told you to say?
>
> A.      To tell the truth.
>
> Q.      And have you done that today?

                    A.      Yes.

(R. Fields, 4/27/12 p.m. at 40-42).

        A near repeat performance occurred in the direct examination of Rhonda Fields' brother,

Michael Fields:

                    Q.      All right.  Has anyone told you what to say here in the
                    grand jury?

                    A.      No.

                    Q.      --- I mean, in the trial jury?

                    A.      No.

                    Q.      Have I ever told you what to say here in the grand jury?

                    A.      No.

                    Q.      What have I always told you to say?

                    A.      Speak the truth.

                    Q.      Thank you.

(M. Fields, 4/27/12 p.m. at 64).

        The government's vouching and bolstering continued with witness Billy Long.  At the

outset of Long's testimony, the government emphasized Long's immunity agreement:

                    Q.      Could the government prosecute you for perjury or
                    obstruction of justice if you lie while you are on the stand?

                    A.      Yes.  It is my understanding.

(Long, 5/1/12 a.m. at 13).

        The regularity with which the government insinuated itself as the guarantor of its

witness' honesty and suggested its ability to determine and police their honesty is unprecedented

in prior cases.  No less than eight witnesses were asked to testify how the government insisted on

their honest testimony and how the government would prosecute them for perjury and

obstruction of justice if they lied.  This conduct by the government is exactly what the Supreme

Court in *United States v. Young, supra*, condemned out of concern that it may well cause the jury

to trust the government's judgment rather than its own view of the evidence.  470 U.S. at 19.

The government's pervasive vouching and bolstering of its witnesses, in clear violation of the

law and the prosecutor's duties, created such undue prejudice that a new trial should be granted.

## V.      THE GOVERNMENT IMPROPERLY TRIED TO USE GEORGE JONES' GUILTY PLEA AS SUBSTANTIVE EVIDENCE OF SITZMANN'S GUILT

It is well established that a co-conspirator's guilty plea may not be used as substantive

evidence of the guilt of a defendant on trial.  *Brown*, 508 F.3d 1073; *United States v. Tarantino*,

846 F.2d 1384, 1404-05 (D.C. Cir. 1988).  It is improper for a prosecutor to ask questions for this

purpose.  Yet that is exactly what the government did in this case.

In questioning Agent Buss, Mr. Eliopoulos asked the following <u>leading</u> questions of

retired ICE Agent William Buss:

> Q:      No, Mr. Jones, he was arrested, you mentioned on the 25th of March, 2004:
>
> A:      Correct.
>
> Q:      And what happened to his case:
>
> MR. ABBENANTE:  <u>Objection</u>
>
> THE COURT:       Why don't you be a little more specific.  So he was arrested on the day of the tape we just heard/ is that right?
>
> THE WITNESS:      Yes.
>
> BY MR. ELIOPOULOS:
>
> Q:      <u>And was there a case in Washington, D.C. against him for conspiracy?</u>
>
> A:      Yes.  I had originally obtained an arrest warrant on a criminal complaint.

Q:     And did Mr. Jones plead guilty:

A:     He pled guilty.

Q:     What did he plea:

A:     And signed a plea agreement.

Q:     Okay.  And did he plead guilty to conspiracy to distribute and possess with the intent to distribute at least 5 kilograms of cocaine?

A:     That's correct.

Q:     And did he end up cooperating with the government?

A:     He did.

Q:     And what happened to Mr. Jones?  Is he alive today?

A:     He passed away.

(Buss 4/30/12 a.m. at 47-48.)

## VI.    THE GOVERNMENT VIOLATED DEFENDANT SITZMANN'S RIGHT TO AN INDICTMENT BY A GRAND JURY, ENGAGED IN GRAND JURY ABUSE, AND CONSTRUCTIVELY AMENDED THE INDICTMENT

The Fifth Amendment requires the government to initiate the prosecution of a felony by way of indictment.  A defendant has the right to be tried under the facts presented to the grand jury.  The government cannot alter or enhance an indictment with new theories of conspiracy via a bill of particulars.  *See Russell v. United States*, 369 U.S. 749, 769-70 (1962) (a deficient indictment cannot be cured by information in a bill of particulars as a defendant has the right to an adequately informed grand jury and not to have the indictment rewritten by prosecutors after the indictment has been returned).

As noted above, once an indictment is returned against a defendant, it is highly improper for a prosecutor to use the grand jury for trial preparation.  *United States v. Star*, 470 F.2d 1214 (4th Cir. 1972).  The grand jury's authority stops with the return of an indictment.  *Costello v*

*United States*, 350 U.S. 359, 362 (1956).  However, where the indicted theories of conspiratorial liability are changed or expanded by the prosecutor after the indictment has been returned, a constructive amendment occurs as the defendant may be convicted on conspiracies never considered by a grand jury.  This violates the Fifth Amendment's grand jury clause, which guarantees a defendant the right to be tried on the indictment returned by the grand jury.  *See Stirone v. United States*, 361 U.S. 212, 217-219 (1960) (amendment of the indictment violates the Fifth Amendment's Grand Jury Clause).

*Russell's* requirement that the indictment be based on evidence presented to the indicting grand jury is particularly important where the conspiracy charged, such as the conspiracy that is charged here – namely 21 U.S.C. §846, does not require that any overt acts be pleaded.  The fact that no overt acts are required does not mean that the government is free to violate the Fifth Amendment.  Where the potential for multiple conspiracies are presented at trial, it is essential under the Grand Jury Clause to ensure that the conviction be based on conspiracy evidence presented to a grand jury.

Prior the trial, Mr. Sitzmann's then counsel (Richard Klugh) filed motions questioning how the government was able to keep changing the terms and theories of the indictment by filing a bill of particulars followed by three amended bills of particulars.  (*See* Dkt. Nos. 66, 68, 72, 74, 82, 116; *see* Motions Tr. 7/12/10 at 13-41).  What the government failed to inform the Court was that it had been improperly presenting witnesses to various grand juries after the indictment was returned for the purpose of collecting additional evidence on the already indicted §846 conspiracy charge.  Post-indictment, the government subpoenaed various witnesses, including Gary Paulson, Brian Hill, Bill Long, and Michael Fields and presented their testimonies to three different grand juries.  Their grand jury testimonies solely focused on getting new trial evidence

against Gregory Sitzmann on the already indicted case.  Had the government told the Court and defense counsel that it was still putting witnesses in the Grand Jury, appropriate sanctions, including dismissal of the indictment, could have been presented to the Court prior to trial.  The government chose to conceal their misconduct from the Court.

As noted at the outset of this Memorandum, it appears that the government hastily returned this indictment on August 7, 2008 when it learned that Sitzmann was arriving at Dulles Airport on August 8, 2008.  As of August 7, 2008, they had not presented to the grand jury or secured sworn statements from John Sager, Jerry Harvey, Gary Paulson, Brian Hill, Billy Long or Robert Campeau – the main witnesses in Sitzmann's trial.  It appears that the government decided that it would indict the most expansive timeframe possible and that it would then later fill in additional theories of liability.  It also appears that no evidence of venue was presented as the government believed that it had venue under 18 U.S.C. §3238.

It is requested that the Court order the government to produce to defendant all the evidence presented to the November 15, 2007 grand jury prior to the August 7, 2008 return of the indictment in order to have the facts necessary to resolve this motion.

## VII.   THE GOVERNMENT'S RELIANCE ON JONES'S AND COLLIGAN'S TAPE RECORDED STATEMENTS FOR THE TRUTH OF THE MATTERS ASSERTED VIOLATED SITZMANN'S CONFRONTATION RIGHTS UNDER THE SIXTH AMENDMENT

During the government's closing opening statement, and during its closing examination of William Buss, the government treated the recorded statements of both Jones and Colligan as testimonial evidence for the truth of the matters asserted in violation of the Sixth Amendment's Confrontation Clause.

The government introduced the tapes over objection, claiming that they were co-conspirator declarations under Rule 801(d)(2) and thus not subject to the hearsay rule.  This

would be an accurate statement of the law if the evidence supported the conclusion that the

Jones-Colligan transaction was part of the conspiracy charged in Count One, and that the

statements made on the tape by both Colligan and Jones were in furtherance of that conspiracy.

A statement is in furtherance of the conspiracy if it tends to promote or facilitate the criminal

activity.  This might include enhancing a co-conspirator's usefulness to the conspiracy, keeping a

co-conspirator informed about the progress of the conspiracy, and motivating a co-conspirator to

continue to participate in the conspiracy.  *United States v. Tarantino,* 846 F.2d 1384 (D.C. Cir.

1988).  On the other hand, mere declarations of past events or idle/casual conversations fall

outside of Rule 801(d)(2)(E).  *United States v. Manfre,* 368 F.3d 832, 838 (8th Cir. 1984)

(statement which simply described past criminal activities not Rule 801(d)(2)(E) declaration);

*United States v. Cornett,* 195 F.3d 776, 783 (5th Cir. 1999)(same); *United States v. Moran,* 493

F.3d 1002, 1010 (9th Cir. 2007)(idle conversations and statements of personal objectives outside

conspiracy not admissible under Rule 801(d)(2)(E).

As defendant Sitzmann has contended throughout, the Jones-Colligan deal in March,

2004 was not part of a conspiracy because Colligan was a government agent and one cannot

conspire with the government.  Moreover, this transaction was not part of the conspiracy charged

in Count One.  Under this theory, the taped statements should never have been admitted at the

trial.  The fact that the government used the statements on the tape substantively in their

arguments to the jury and in their evidentiary presentation violates *Crawford v. Washington,* 541

U.S. 36 (2004).

But even if the Court finds that the Jones-Colligan sting was part of the conspiracy

charged in Count One, the government still violated Mr. Sitzmann's Sixth Amendment

Confrontation rights.  It is clear that what ever Colligan stated during his tape recorded

conversations with George Jones, they were not co-conspirator statements because Colligan was a government agent.  His statements were not only pure hearsay, they were also entirely unreliable because he was trying to further the government's investigation.  Colligan was trying to gain as many favorable statements as he could in order to impress the government into recommending a lower sentence for himself.  Failing to recognize this, the government treated Colligan's words as testimonial evidence against Sitzmann.

Throughout Agent Buss's testimony, the government would play clip after clip of Colligan speaking and then ask Buss to describe "what Colligan was referring to."  *See, e.g.,* Buss, 4/30/12 a.m. at 27-32.  For example, Colligan made a reference to "shining up those keys." It was followed by the prosecutor's request to Agent Buss to explain what Colligan was talking about.  It was error to allow this hearsay evidence to come in; the error was compounded when the government conducted an extensive examination about what past events Colligan was talking about in Colligan's taped comments.

The same confrontation issues occurred with regard to Jones's statements on the tape recordings.  Clearly recitations of events occurring in the distant past are not co-conspirator declarations under Rule 801(d)(2)(E).  Yet, the government used such statement for the truth of the matter asserted in violations of Sitzmann's confrontation rights.  The government used Jones's tape recorded statements as corroboration of Sitzmann's prior smuggling activities. Sitzmann, however was not able to cross examine Jones as Jones had passed away.

## VIII.   THE CUMULATIVE EFFECT OF ALL THESE ERRORS HAVE DEPRIVED MR. SITZMANN OF A FAIR TRIAL

The cumulative error doctrine, normally reserved for appellate review, is wholly warranted here.  While Mr. Sitzmann believes that the specific errors described above considered in isolation would warrant the grant of a new trial, the synergistic prejudice created after

aggregating all the government's errors, show that Mr. Sitzmann has been denied his right to a fair trial. The cumulative effect of these errors is such to warrant a new trial on a level playing field. *See Brown,* 508 F.3d at 1076.

The outside influences and other crimes evidence were so strong that it was impossible for Mr. Sitzmann to get a fair trial.

## IX.    CONCLUSION

For the foregoing reasons, it is respectfully requested that the Court grant an acquittal to Mr. Sitzmann.

In the alternative , if the Court does not grant an acquittal, it is respectfully requested that the Court grant Mr. Sitzmann a new trial in the interests of justice.

Dated:  January 22, 2013                    Respectfully submitted,


                                            /s/Paul L. Knight_____
                                            Paul L. Knight (D.C. Bar No. 911594)
                                            Nossaman LLP
                                            1666 K Street, N.W., Suite 500
                                            Washington, DC  20006
                                            Telephone:  (202) 887-1400
                                            Facsimile:  (202) 466-3215