UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No.  08-242 (PLF) |
| | ) | |
| GREGORY JOEL SITZMANN, | ) | |
| Defendant. | ) | |
| _____ | ) | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION FOR JUDGMENT OF ACQUITTAL OR FOR A NEW TRIAL

The United States of America, by and through its counsel, the United States Attorney for

the District of Columbia, respectfully responds to and opposes defendant Gregory Sitzmann's

motion for judgment of acquittal, or in the alternative, for a new trial. (Def. Mot., Dkt. No. 215).

As grounds for this opposition, the government relies on the following points and authorities, and

any other points and authorities raised at a hearing on this matter.

I.      BACKGROUND

On August 7, 2008, defendant Gregory Sitzmann was indicted by a federal grand jury for

Conspiracy to Distribute and Possess with Intent to Distribute More than Five Kilograms of

Cocaine, in violation of 21 U.S.C., Sections 841(a)(1), 841(b)(1)(A)(ii) and 846. The indictment

alleged that the conspiracy commenced no later than the 1990s and continued until at least 2004,

the exact dates being unknown to the grand jury, that the defendant knowingly, willfully and

intentionally conspired with people, both known and unknown to the grand jury, to distribute and

possess with intent to distribute cocaine, and that the conspiracy was conducted in the United

States and several foreign countries, including Colombia, Mexico, Canada, Spain, France and

Italy.

On May 21, 2012, after a six week trial, a federal jury found the defendant guilty of the single conspiracy charged in the indictment. The evidence at trial established that Sitzmann was the leader of a drug trafficking organization that operated domestically and internationally. Sitzmann used and conspired to use numerous individuals and artifices to transport large shipments of cocaine.  Defendant's co-conspirators included the following individuals: George Jones, James Fields, Billy Long, Gary Paulson, Robert Campeau, Robert Barnaby, Jerry Harvey, John Sager, and members of the Canadian Hells Angels, including Normand Theoret.

After more than eight months of preparation, the defense filed a motion for acquittal or a new trial based primarily on issues already litigated in pre-trial motions and during trial.  The defense begins its motion with a 16-page "Case Overview" section which, as we will discuss below, has very little basis in fact or law.  Defendant then provides his arguments as to why he is entitled to an acquittal under Rule 29.  He argues that the government failed in its proof on venue, statute of limitations and multiple conspiracies.

In the alternative, the defense argues that if the Court does not direct an acquittal, the defendant is entitled to a new trial under Rule 33.  The defendant argues the following: (1) the Court improperly denied defendant's request to have venue decided by the jury; and (2) the Court improperly admitted alleged irrelevant evidence and prejudicial other crimes evidence.  The defendant also argues, apparently to support his Rule 33 motion, that the government engaged in improper bolstering, grand jury abuse, that it used George Jones' guilty plea as substantive evidence of Sitzmann's guilt, and that it constructively amended the indictment.  The defendant also argues that the Court improperly admitted the Jones/Colligan recorded communications as co-conspirator statements and in violation of the Confrontation Clause.  All of these allegations

are either factually or legally groundless, and virtually all of these arguments have already been addressed and rejected by the Court.

As will discuss below, the defense has adopted the well-worn strategy of attempting to re-litigate the case before the Court after losing the case in front of a jury.  In doing so, the defense has again resorted to another predictable tactic of attacking the prosecution with groundless and conclusory allegations, instead of providing facts, evidence and legal authority to support its motion.  Rather than proffering evidence, the memorandum is filled with vitriolic and empty rhetoric which assumes (without factual support) that all actions by the government were improper and conducted with malicious intent.  The defendant's strategy, to the extent we can decipher it, is to attempt to shift the focus from his criminal culpability to the actions of the government, another not so novel approach.  To do this, he sputters unfounded and, as we will show below, contrived allegations, but proffers little, if any, actual evidence.[1]  Defendant's

---

[1]  As an example, one of the main defense claims is that the government introduced extrinsic evidence of other crimes <u>without</u> providing prior notice and <u>without</u> first receiving permission from the Court.  Def. Mot. 26, 32-33.  It argues that "[b]y not serving notice as it was required to do, the government was able to run through evidence designed to overwhelm the jurors with evidence of Sitzmann's propensity for wrongdoing and bad character."  Def. Mot. 33.  The defense complained that "[w]ithout any prior notice to the Court and the defense, the government introduced evidence through Jerry Harvey that Sitzmann routinely smuggled 300 to 500 kilos by airplane from Columbia [sic] to the Bahamas and by boat into the United States notwithstanding it had not given notice nor [sic] obtained permission from the Court."  Def. Mot. 32.  However, the government filed a Memorandum on the Admissibility of Certain Intrinsic Evidence, or in the Alternative, Motion to Admit Other Crimes Evidence Pursuant to Federal Rule of Evidence 404(b).  Dkt. No. 146.  In this filing, the government provided specific notice that it planned on introducing evidence from Harvey that Sitzmann consulted with Harvey during the 1980s about drug smuggling techniques and Sitzmann told Harvey that he was smuggling hundreds of kilograms of cocaine from Colombia to the Bahamas and then into the United States.  Dkt. No. 146 at 4.  On April 13, 2012, the Court filed an Opinion and Order on the government's motion.  Dkt. No. 165.  The Opinion and Order was also published at <u>United States v. Sitzmann</u>, 856 F. Supp. 2d 55 (D. D.C. 2012).  In the Court's Opinion and Order, the Court reserved its ruling on this aspect of Harvey's testimony until it heard Harvey's testimony outside the hearing of the

motion is without merit and should be denied.  Each of the issues raised by the defense will be discussed in turn.

## II.     DEFENDANT IS NOT ENTITLED TO ACQUITTAL UNDER RULES 29

The defendant claims the court should acquit the defendant or, alternatively, grant a new trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure. The defense, however, fails to meet the standards under these rules. As it was proved at trial, and as the government will reiterate in this motion, the defendant was properly convicted.

### A.     The Rule 29 Standard

Under Rule 29, a judgment of acquittal would be proper when "the evidence is insufficient to sustain a conviction." Fed. Rule Crim. P. 29(a).  "The standard for overturning a guilty verdict on the grounds of insufficiency of evidence is, of course, a demanding one." United States v. Lam Kwong-Wah, 924 F.2d 298, 302 (D.C. Cir. 1991).  A conviction should be overturned only where the evidence is such that, viewing it in the light most favorable to the government, a reasonable trier of fact could not have found guilt beyond a reasonable doubt.  Id. (citing Jackson v. Virginia, 443 U.S. 307, 318-19 (1979); United States v. Thomas, 864 F.2d 188, 191 (D.C. Cir. 1988).  "Put another way, the Court may grant a motion for judgment of acquittal only where 'a reasonable juror must necessarily have had a reasonable doubt as to the

---

jury. Dkt. No. 165 at 11, n. 3.  On April 19, 2012, in the middle of trial, the Court held an evidentiary hearing to address these issues, which the defense wrongly argues the Court was not given the opportunity to address.  (Trial Tr. 4/19/12 a.m. at 4-27.)  Harvey testified before the Court, was cross-examined by the defense, and provided more specific detail about the evidence the government sought to introduce.  As a result, the Court ruled in the government's favor and allowed Harvey to testify about Sitzmann's statements that he was smuggling 300-500 kilograms of cocaine from Colombia, through the Bahamas and into the United States in the mid to late 1980s.  (Trial Tr. 4/19/12 a.m. at 24-26.) We note that the defense is the party that ordered the trial transcript and cited it extensively in its motion.

defendant['s] guilt.'" United States v. Safavian, 644 F. Supp. 2d 1, 8 (D. D.C. 2009) (emphasis in original) (quoting United States v. Weisz, 718 F.2d 413, 437 (D.C. Cir. 1983). The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. The court must draw no distinction between direct and circumstantial evidence and giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact. United States v. Battle, 613 F.3d 258, 264 (D.C. Cir. 2010); Lam Kwong-Wah, 924 F.2d at 302-303; United States v. Borda, 768 F. Supp. 2d 289, 292 (D. D.C. 2011); United States v. Cabrera, 734 F. Supp. 2d 66, 82 (D. D.C. 2010); United States v. Thomas, 525 F. Supp. 2d 17, 20 (D. D.C. 2007). The Court's task is "not to weigh the evidence and reach its own conclusions." Borda, 768 F. Supp. 2d at 293 (emphasis added); Jackson v. Virginia, 443 U.S. 307, 318-19 (1979). Once the jury enters a guilty verdict, the jury's role as "weigher of the evidence is preserved." Jackson, 443 U.S. at 319 (citations omitted). In other words, the Court is not "a second jury weighing the evidence anew." United States v. Wilkerson, 656 F. Supp. 2d 22, 28 (D. D.C. 2009).

As this brief will illustrate, the evidence was overwhelming and a jury found that the evidence was sufficient to sustain a finding of guilt beyond a reasonable doubt. The defendant simply dislikes the results of his trial and is attempting to re-litigate the case and take another shot with arguments already rejected by the Court. Neither justice nor due process calls for a different result. Therefore, based on the following reasons, the Court should deny the defendant's motion for judgment of acquittal or a new trial.

B.       The Government Proved Venue Was Properly in the District of Columbia

In support of its Rule 29 motion, the defendant argues that the government failed to prove

by a preponderance of the evidence that the conspiracy was committed in the District of

Columbia.  The defense relies upon the assertion that "[n]o evidence was produced at trial that

Greg Sitzmann ever had any drug related contact with the District of Columbia."  Def. Mot. 17.

In doing so, the defense dismisses the significance of George Jones' $1,000 wire transfer to the

District of Columbia to facilitate Terrence Colligan's undercover shipment of approximately 16

kilograms of cocaine to Jones.   It argues that this transaction "was not part of any conspiracy.

The underlying 'sting' or 'reverse' involving Jones and Colligan was engineered entirely by the

government, and the government cannot, as a matter of law, be a conspirator."  Def. Mot. 18.  It

continues: "this Western Union wire transfer cannot establish venue in the prosecution of

Gregory Sitzmann because it is legally impossible for there to have been any conspiracy between

the government and George Jones."  Def. Mot. 19.  The defense, however, misses the point.

For obvious reasons, the defense has taken a very narrow view of the conspiracy at issue

here.  Although the defense may be correct in a cursory way that a conspiracy does not exist

where the only two people involved are a government agent and a defendant, United States v.

Iennaco, 893 F.2d 394, 397 (D.C. Cir. 1990), that is not the case here.  The defense completely

ignores Sitzmann and others as co-conspirators of Jones.  The evidence at trial proved that the

cocaine trafficking conspiracy included as members Sitzmann, Jones, Paulson, Long, Harvey,

Theoret, Campeau, Barnaby, and Sitzmann's "people" to whom Jones was going to redistribute

the cocaine he was acquiring from Colligan.  Although Colligan, as a confidential informant,

could not have been a member of Sitzmann's conspiracy, everyone else mentioned above was, particularly Jones, Sitzmann's most trusted partner in crime. At the time that Sitzmann is under arrest in France, Sitzmann, Jones, Paulson, Maritza Fontecha, Sitzmann's "people" and others are still involved in the conspiracy. This is not a situation where the alleged conspiracy includes only Jones and confidential informant.

Furthermore, within the jury instructions regarding a conspiracy, the Court explicitly addressed the issue of whether a government informant can be a member of the conspiracy. The Court instructed the jury that "[a] person cannot conspire with a government informer who secretly intends to frustrate the conspiracy. A government agent who enters into a purported conspiracy in the secret role of an informer cannot be a co-conspirator." Accordingly, there is nothing in the record that would indicate that the jury would have improperly considered Colligan as a member of the conspiracy or that Jones and Colligan were the only members of the conspiracy. To the contrary, the evidence was overwhelming that Jones and Sitzmann, along with many other individuals, were members of the conspiracy.

The defense also claims, without any analysis, that venue does not lie in the District of Columbia because Sitzmann was incarcerated in France and, allegedly, was not aware that Jones was attempting to acquire 16 kilograms of cocaine. Def. Mot. 20. If the defense is arguing that Sitzmann withdrew from the conspiracy before the 16-kilogram reversal, this claim is without merit.

The Supreme Court recently reiterated, that "[s]ince conspiracy is a continuous offense, a defendant who has joined a conspiracy continues to violate the law through every moment of the conspiracy's existence, and he becomes responsible for the acts of his co-conspirators in pursuit

of their common plot." <u>Smith v. United States</u>, ___ U.S. ___, 133 S. Ct. 714, 719 (internal

quotations and citations omitted); see also <u>United States v. Childress</u>, 58 F.3d 693, 733 (D.C. Cir.

1995) ("Conspiracy is an ongoing offense that lasts, absent one's affirmative withdrawal from the

enterprise, as long as any co-conspirator continues to further common ends").   Accordingly,

there is no factual dispute that at the time of the "reversal," Jones and Sitzmann were co-

conspirators, as they had been from at least their Chicago, New York and Canadian smuggling

days.

   If the defendant is arguing that he was not involved in the wiring of the money to the

District of Columbia because he was in France and did not know about it, that is no defense to

venue.  "It is a well-established rule that 'a conspiracy prosecution may be brought in any district

in which some overt act in furtherance of the conspiracy was <u>committed by any of the</u>

<u>co-conspirators.</u>'" <u>United States v. Lam Kwong-Wah</u>, 924 F.2d at 301 (quoting <u>United States v.</u>

<u>Rosenberg</u>, 888 F.2d 1406, 1415 (D.C. Cir.1989) (emphasis added.); see also <u>Whitfield v. United</u>

<u>States</u>, 543 U.S. 209, 218 (2005) (venue is proper "in any district in which an overt act in

furtherance of the conspiracy was committed, even where an overt act is not a required element

of the conspiracy offense");  <u>United States v. Haire</u>, 371 F.3d 833 (D.C. Cir. 2004), <u>vacated on</u>

<u>other grounds</u>, 543 U.S. 1109 (2005); <u>United States v. Smith</u>, 918 F.2d 1551, 1557 (11th Cir.

1990). The government need only show by a "preponderance of the evidence that either a part of

the conspiracy or any overt act in furtherance of the conspiracy took place in the District of

Columbia." <u>Lam Kwong-Wah</u>, 924 F.2d 301.  It is not a defense to a conspiracy charge that the

defendant never entered the country as long as an overt act in furtherance of the conspiracy

occurred within the United States.  <u>United States v. Perez-Herrera</u>, 610 F.2d 289, 291 (5th Cir. 1980).

In this case, the government established, without any contrary evidence, that the conspiracy continued after Sitzmann's arrest in France and it was evidenced by the actions of Sitzmann and by his longtime co-conspirator, George Jones.  Jones had money wired to the District of Columbia and accepted telephone calls from the District of Columbia for the purpose of facilitating his acquisition of at least 16 kilograms of cocaine from Terrence Colligan, a confidential informant who was ostensibly <u>also working for Sitzmann</u>.  (Buss, 4/30/12, a.m. at 34;[2] Gov. Trial Ex. 730 (Western Union Receipt); Gov. Trial Ex. 40 D (Recorded Communications between Jones and Colligan) and corresponding Transcript, marked but not admitted as Trial Exhibit 40a, at Tapes C1 (Transcripts attached for Court's convenience as Attachment 1.)   The defense fails to acknowledge that Jones had been waiting for Sitzmann to provide the cocaine to Jones when Sitzmann was arrested in France in February 2004.  Gov. Trial Ex. 40 at Tape B2, Clips 4, 10  (Transcripts attached  as Attachment 1.)

The undercover recording of Jones evidences that Jones believed he was acquiring the reversal cocaine from one of his and Sitzmann's co-conspirators, Colligan.  Jones told Colligan, "I didn't know you were coming till yesterday.  Everybody promises maybe they're going to do stuff and haven't been doing stuff.  I'd asked you to come a month ago."  Colligan responded, "I know, but Greg said he was going to take care of it."  Jones then stated: "He didn't take care of nothing."   Later in that conversation, Colligan told Jones, "When I talked to Greg and I told him

---

[2] For consistency purposes, the government adopts the defense's citation style for the trial transcripts.

that I'd talked to you, you had some work for him, he [Sitzmann] says, 'yeah, I know about that, it's, you know, like eighteen dollars [$18,000/kilogram],' um, and he [Sitzmann] says, 'it's too cheap.'  I said, well, after he said it, I said, you know, George asked if I could help him out.  He [Sitzmann] said, 'I'll take care of that.'  OK, that's why I didn't."  Jones responded, "[w]ell he was going to, but like I told him the last time he was here, we were talking about different things, I said, 'Greg, you look like you ain't even going to help me do nothing, are you buddy?'  I got mad; I left the house."  Gov. Trial Ex. 40 at Tape B2, Clips 4, 10  (Transcripts attached  as Attachment 1.)   Accordingly, not having supplied the cocaine to Jones before leaving for France, it was completely logical and foreseeable that Jones would acquire the cocaine from someone else, particularly from someone who was seemingly a co-conspirator.

Contrary to defense representations, further evidence established that Jones' acquisition of the 16 kilograms of cocaine was part of the Sitzmann conspiracy.  Jones intended to redistribute the cocaine from Colligan to Sitzmann's "people" and the profits were to be shared with Sitzmann, as Jones and Sitzmann had always done.  Not having received the cocaine from Sitzmann, Jones attempted to acquire the cocaine from his and Sitzmann's assumed confidant and plotter.  When Jones and Colligan were talking about the profits from the redistribution of the cocaine that Jones was acquiring from Colligan, Jones stated that he would make $1,500 per kilogram to be shared equally with Sitzmann.  Jones explained that $750 per kilogram would go to Sitzmann and $750 would go to Jones.  He further explained that the cocaine was being redistributed to Sitzmann's people: "So this is for his people that I'm doing business with."  Gov. Trial Ex. 40 at Tape B2, Clip 7  (Transcripts attached  as Attachment 1.); (see also Buss, 4/30/12 p.m. at 80-81.)

10

Jones also talked about how close he was to Sitzmann, his partner in crime: "he owes me money, but he's my brother . . . ." During the same conversation with Colligan, Jones discussed how Sitzmann shared the cocaine smuggling profits with Jones, albeit meagerly. Jones stated that "[Sitzmann] went to Europe last month and he made, I don't know what he made, he sent me a 1000 bucks, sent you 500. . . . Jimmy [Nash] sent it for him, yeah. . . . That was the 500 that he sent you. . . . But he didn't send me but a 1000. I got no other way to make a living." Gov. Trial Ex. 40 at Tape B2, Clip 7  (Transcripts attached  as Attachment 1.) Jones again explained his conspiratorial relationship with Sitzmann: "its been since 1999 or 2000 when I gave him all this money and you know I've told you before we've had a good relationship. . . . And when Greg asked a 100, I got 50, when I asked for 100 he got 50 and it wasn't a problem."[3]  Gov. Trial Ex. 40 at Tape B2, Clip 10  (Transcripts attached  as Attachment 1.)

Moreover, there was no factual dispute that Sitzmann also took affirmative steps in continuing his involvement in the conspiracy despite his 2004 arrest in France. The evidence was unchallenged that longtime co-conspirator Jones was the first person Sitzmann wanted to call after his arrest in France. With French Judge Philippe Dorcet on the phone with Sitzmann, Jones was advised that Sitzmann was arrested in France. (Dorcet, 4/18/12, a.m. at 58-62; Buss, 4/30/12, a.m. at 24.) Sitzmann also orchestrated the sale of a Stallion drug smuggling plane while he was incarcerated in France in 2004. In a letter Sitzmann wrote to Jones after Sitzmann's arrest in France, Sitzmann instructed Jones to have co-conspirator Gary Paulson sell

---

[3]  There was also evidence presented in the August 16, 2011 Motions Hearing that Sitzmann had provided cocaine to Jones on many occasions. Transcript of 8/16/11 Motions Hearing at 24-25. Therefore, it would not have been an isolated incident for Jones to have split profits with Sitzmann, particularly when he redistributes the cocaine to Sitzmann's people.

the Stallion kit airplane.  Gov. Trial Ex. 776a.  Sitzmann had acquired the Stallion kit plane in approximately 1999 with proceeds from his drug trafficking in Canada and he intended to use the plane to fly loads of cocaine.  Sitzmann had also put money into the Stallion plane that was Paulson's drug proceeds from the Canadian cocaine smuggling.  It is also telling that the proceeds from the sale of the Stallion were then sent to Sitzmann's girlfriend and co-conspirator Maritza Fontecha through Sitzmann's investigator, Gary McDaniel, and friend, John Dwyer. (Paulson, 4/24/12 p.m. at 95-104, 4/25/12 a.m. at 12-23; see also Gov. Trial Exs. 767, 768 (Stallion purchase documents) and Gov. Trial Ex. 1018 (John Dwyer's passport showing travel to Colombia in 2004).)

There was also no evidence presented by the defense that Sitzmann withdrew from the conspiracy before Jones attempted to acquire the cocaine from Colligan or before the $1,000 was wired to Washington, D.C.  Sitzmann merely argues that he was under arrest in France during the 16 kilogram reversal.[4]  "Conspiracy is an ongoing offense that lasts, absent one's affirmative withdrawal from the enterprise, as long as any co-conspirator continues to further common ends." United States v. Childress, 58 F.3d 693, 733 (D.C. Cir. 1995).  Withdrawal consists of an "affirmative action . . . to disavow or defeat the purpose of the conspiracy."  Smith v. United States, —— U.S. ——, ——, 133 S. Ct. 714, 721 (2013); United States v. James, 609 F.2d 36, 41 (2d Cir.1979).  The burden of establishing withdrawal from a conspiracy rests "firmly on the defendant regardless of when the purported withdrawal took place."  Smith, 133 S. Ct. at 719;

---

[4]  The defendant also argues that he did not know that Jones was attempting to acquire the cocaine from Colligan.  Not only does it not matter whether Sitzmann had actual knowledge, there is no evidence to support this proposition.  To the contrary, in Sitzmann's letters to Jones, Sitzmann provided the means by which Jones could contact him in France. See Gov. Trial Ex. 776a.

United States v. Moore, 651 F.3d 30, 89-90 (D.C. Cir. 2011). Such an affirmative action or disavowal may be either "the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators." United States v. Sadiki Komunyaka, 658 F.3d 140, 143 (2d Cir.2011).

Accordingly, there has been no factual dispute that Sitzmann's conspiracy continued after he was arrested in France and that Jones' acquisition of the 16 kilograms of cocaine was part of that conspiracy. It is important to again highlight that Jones believed he was acquiring the cocaine from a Sitzmann co-conspirator, that he was going to then redistribute it within the conspiracy to Sitzmann's "people," and the profits were going to be shared with Sitzmann, as they had always done. It is also worth noting that Jones used one of Sitzmann's many drug smuggling bags, bags that Sitzmann had supplied to virtually all his co-conspirators, to hide a kilogram of the substitute cocaine in order to transport the cocaine to Sitzmann's "people." Gov. Trial Ex. 40 at Tape B2, Clip 2, 3, 4, 7, 10, 12, 13, 14, Tape G, Clip 1 (Transcripts attached as Attachment 1.) (See also Buss, 4/30/12 p.m. at 80.) There has been no factual dispute that Sitzmann and Jones were co-conspirators during every aspect of the conspiracy in this case, including U.S. drug trafficking, Canadian drug trafficking and European drug trafficking. There was also no evidence presented that Jones did any freelance drug trafficking during this period. See e.g., Trial Transcripts of Paulson, Campeau, Long; Gov. Trial Ex. 40 at Tape B2, Clips 7, 8, 13, 14 (Transcripts attached as Attachment 1.)

Additionally, Jones continued to maintain Sitzmann's voluminous business records and other property in Jones' home after Sitzmann was arrested in France. Much of these records and property were connected to every facet of Sitzmann's drug smuggling enterprise. They included

13

records of Sitzmann's drug planes, money laundering of the Canadian drug proceeds, and financial records evidencing his European drug trafficking (like bank statements).  The property included approximately seven of Sitzmann's leather drug smuggling bags and plastic heat sealing material that were common to all aspects and operations of the conspiracy.  It also included one of the Suburbans with the fake gas tank that was used by Sitzmann to smuggle cocaine through the United States and into Canada.  (Chung, 5/1/12 p.m.; Gov. Trial Exs. 732-776a, 795, 798; Oren, 4/30/12 p.m.; Barnaby, 4/23/12 a.m.)  These records and property maintained with Jones are symbolic of the cohesiveness and interrelationship of all of the operations that made up the Sitzmann cocaine trafficking conspiracy.

There was overwhelming evidence establishing that the conspiracy continued even after Sitzmann was arrested in France, and Jones' attempt to acquire cocaine from Colligan was in furtherance of the conspiracy.  Sitzmann is liable for the actions of his co-conspirators and he is liable for the overt acts in the District of Columbia.   The defense is simply wrong in arguing that the government did not prove by a preponderance of the evidence that venue is proper in the District of Columbia.

C.      Venue in the District of Columbia Did Not Violate Sitzmann's
Constitutional Rights Under a Manufactured Venue Concept

The defense argues that venue was acquired by violating the defendant's constitutional rights.  Def. Mot. 20-22.  The basis for the argument is that the government, through Colligan, asked Jones to wire money to the District of Columbia to facilitate the smuggling of at least 16 kilograms of cocaine to Florida.  Jones intended for this cocaine to fulfill his need for 20 kilograms of cocaine that was promised by Sitzmann, but had not been delivered before Sitzmann was arrested in France.  The defense complains that this sting operation improperly

14

created venue in the District of Columbia for the prosecution of Jones and, in turn, Sitzmann.[5] This defense claim, however, is a reiteration of the "manufactured venue" argument already litigated and rejected by the Court. Accordingly, it should be rejected now.

"A fundamental precept of common-law adjudication is that an issue once determined by a competent court is conclusive." <u>Arizona v. California</u>, 460 U.S. 605, 619 (1983). "Law-of-the-case doctrine states that the same issue presented a second time in the same case should lead to the same result." <u>LaShawn A. v. Barry</u>, 87 F.3d 1389, 1393 (D.C. Cir.1996). It is up to the court's discretion to decide whether a grave injustice occurred that should allow the review of a previously litigated issue. <u>Naples v. United States</u>, 359 F.2d 276, 277 (D.C. Cir. 1996). This occurs where there is a new and supervening rule of law, or new evidence is presented. <u>Id.</u> In the absence of supervening factors, the rule is that where the evidence is "substantially the same, . . . all matters, questions, points or issues adjudicated" in the prior stage of the proceeding" should not be reconsidered or readjudicated therein." <u>United States v. Singleton</u>, 759 F.2d 176, 182 (D.C. Cir. 1985).

---

[5]  The defense claims "the government unlawfully kept George Jones' court file sealed throughout the pendency" of the trial and that the defendant has been somehow prejudiced. Def. Mot. 19, n. 14.  This is false. On February 3, 2009, more than three years before the trial, the court granted a motion filed by the government to unseal Jones' case to allow defendant's prior counsel to examine it. Court Order dated February 2, 2009, attached as Attachment 2. Moreover, on December 11, 2012, prior to defendant filing the instant post-trial motion, defendant's present counsel asked government counsel whether the Jones court file had been unsealed. Counsel for the government specifically informed defendant's present counsel that the Jones court file had been unsealed for defendant's prior counsel. Accordingly, defendant's present counsel has had personal knowledge that George Jones' court file was unsealed and the defense has had ample opportunity to review the file during the pendency of this case.   It is troubling that notwithstanding his actual knowledge, defendant's present counsel still represented to the Court that the Jones file remained sealed throughout this case. This is emblematic of the irresponsible defense strategy pursued in its motion.

The defendant's arguments are identical to arguments he made prior to trial--that venue was improper because the government violated the defendant's Due Process rights by engaging in "venue entrapment" or "manufactured venue."  See Transcript of Motions Hearing of 8/16/11, Dkt. No. 129.  After the Court heard evidence, including testimony from Officer William Buss, it rejected defendant's arguments in a bench opinion on September 8, 2011.  See Transcript of 9/8/11 Ruling on Pending Motions at 35-41.  The Court made factual findings virtually identical to the facts the defense relies upon now as the basis for its manufactured venue argument.  The Court acknowledged that there was evidence that Jones, a co-conspirator of Sitzmann, was lured into the District of Columbia for venue purposes because the Florida authorities declined to take Jones' case.[6]  The Court also acknowledged that Sitzmann had little or no contact with the District of Columbia.  Id. at 36-38.  However, in ruling against the defendant, the Court stated that it did not believe that there is a "recognized concept of venue manipulation in this district or perhaps anywhere; and if someone is predisposed to commit a crime, it doesn't matter that he's induced to do a part of it in one particular venue as opposed to another."  Id. at 41.  The Court went on to state that "there is no showing of outrageous or reprehensible or obnoxious conduct on the part of law enforcement; no coercion, no brutality, no due process violation; nothing outrageous or reprehensible about Agent Buss' decision to have Jones wire $1,000 to a cooperating witness in Washington, D.C. . . .."  Id.  In ruling that venue was proper in the District of Columbia, the Court stated that " [Sitzmann's] conduct occurred in many districts and many

---

[6]  Defendant's reliance on the fact that the federal authorities in Florida did not want to assume responsibility over the prosecution of Jones is misplaced.  It is reasonable and understandable that the authorities in Florida would not want to assume responsibility over a relatively small portion of a larger investigation that was being handled by officers and prosecutors from another district.

countries.  His conduct allegedly occurred throughout many places in the eastern half of the

United States, as well as in Canada, Colombia, Mexico, Spain, and other countries, his and his

co-conspirators'.  The overt acts were committed in many, many different places, as the amended

bills of particular showed.  There was nothing remote or distant about the District of Columbia,

and there is nothing unfair about having Mr. Sitzmann try it here."  Id.  The Court re-affirmed its

decision at a February 1, 2012 Status Hearing.  Dkt. No. 154 at 27.  Even during trial, the Court

stated to the defense at a bench conference, "if you're trying to show that there's – that the

jurisdiction or venue of the case was manufactured, I think I've already dealt with that. . . .

That's not a question for the jury.  That's a legal question."  (Buss, 4/30/12 p.m. at 84.)

      The defense has presented no facts or reasons why the Court should reach a different

conclusion now.  In fact, the defense failed to alert the Court that it had already ruled on this

issue almost two years ago.  The defense still relies upon the concept of "manufactured venue"

that this Court has already dismissed as being unrecognized and repudiated.  Moreover, the

evidence at trial confirmed the accuracy of the Court's assessment in its September 8, 2011

ruling of the widespread nature of defendant's drug trafficking enterprise, both domestically and

internationally.  As the Court has already held, there is nothing unfair about having Sitzmann's

trial in the District of Columbia.  Accordingly, defendant's attempt to relitigate the manufactured

venue issue should be denied.[7]

---

[7]  For a discussion that further addresses the merits of defendant's manufactured venue argument,
we incorporate herein the Government's Opposition to Defendant's Supplemental Motion for
Transfer of Venue.  See Dkt. No. 123.

D.      There was no Prosecutorial Misconduct or Grand Jury Abuse

In its typical vitriolic but vacuous style, the defense alleges that the government

committed misconduct by having Billy Long, Michael Fields , Gary Paulson, and Brian Hill

testify before the grand jury after Sitzmann was indicted on the one count conspiracy charge on

August 7, 2008.  The defense assumes, without presenting any evidence, that the government had

these witnesses testify before the grand jury in order to obtain additional evidence against

Sitzmann on the indicted charge because certain witnesses had died.  Def. Mot. 23.  The defense

does not disclose to which dead witnesses it is referring.  However, as the Court is aware from

previous motions, these witnesses are probably George Jones and Terrence Colligan.  See Dkt.

Nos. 88, 89.  As discussed below, there was nothing improper with the government continuing its

investigation against other targets and of additional crimes.  Moreover, irrespective of whether

there was anything improper, the defendant was not harmed, and he has no legitimate claim for

acquittal under Rule 29 based on these grounds.   We will address the latter, purely legal issue

first.

Defendant attempts to overturn his guilty verdict pursuant to Rule 29 because witnesses

testified before the grand jury after indictment.  Under Rule 29, a conviction can be overturned

only where the evidence is such that, viewing it in the light most favorable to the government, a

reasonable trier of fact could not have found guilt beyond a reasonable doubt.  United States v.

Lam Kwong-Wah, 924 F.2d 298, 302 (D.C. Cir. 1991), citing Jackson v. Virginia, 443 U.S. 307,

318-19 (1979); United States v. Thomas, 864 F.2d 188, 191 (D.C. Cir. 1988).  The defendant

does not favor us or the Court with any authority that would allow a guilty verdict to be

overturned pursuant to Rule 29 because witnesses testified in front of the grand jury after

18

indictment.  The defendant does not even provide authority for the proposition that the Court should not consider the witnesses' trial testimony in resolving the instant motion.

It would seem logical that the defense would allege some harm or prejudice to support its claim.  However, the defense fails to articulate that the defendant suffered any injury during the trial because these very cooperative witnesses testified before the grand jury.  The defense does not even allege that the government utilized the grand jury transcripts during trial.  To the contrary, it was the defense that benefitted from the witnesses' grand jury testimony.  The defense was given the grand jury transcripts well before the witnesses testified at trial.  Although the government did not use the transcripts during trial, the defense had ample information from the transcripts to prepare its cross-examination of the witnesses.  Because the defense cannot show any prejudice, but, in fact was greatly assisted by the transcripts, the Court should deny the requested remedy.  See United States v. Star, 470 F.2d 1214, 1217 (9th Cir. 1972) (district court properly denied motion to suppress evidence obtained from grand jury witness improperly brought before grand jury by prosecutor solely to prepare for trial and motion to dismiss indictment, particularly since no prejudice was shown).

The government also categorically denies the defense's frivolous and unsupported allegation that the government abused the grand jury process.  Prosecutors are afforded great latitude and discretion in investigating illegal activity.  United States v. Lovasco, 431 U.S. 783, 790-96 (1977) (court provided extensive discussion of the discretion given prosecutors).  The grand jury's power is expansive, but of course is limited by its function toward the possible return of an indictment.  Costello v. United States, 350 U.S. 359, 362 (1956).  A grand jury

cannot be used solely for pre-trial discovery or trial preparation.  United States v. Star, 470 F.2d

1214, 1217 (9th Cir. 1972).

However, it is well recognized that "[a]fter indictment, the grand jury may be used if its

investigation is related to a superseding indictment of additional defendants or additional crimes

by an indicted defendant."  United States Attorneys' Manual 9-11.120 (2009).  "There is no legal

basis for barring a grand jury investigation simply because there is an outstanding indictment

involving persons not being called as witnesses.  There is also no bar to investigation of other

areas of criminal liability for which the defendants or co-defendants may be accountable.  Indeed,

the duties of the grand jury are not performed until every clue and all witnesses are examined in

order to charge the proper person with the appropriate crime."  In re Grand Jury Proceedings, 586

F.2d 724 (9th Cir. 1987) (citations omitted).  United States v. Arnone, 957 F. Supp. 5, 7 (D. D.C.

1997) (defendants failed to prove grand jury abuse when co-defendant's parents testified before

grand jury after co-defendant pleaded guilty where record showed that superseding indictment

was being sought against defendants).  The defendant bears the burden of establishing that the

grand jury process was abused.  United States v. Badger, 983 F.2d 1443, 1458 (7th Cir. 1993);

Arnone, 957 F. Supp. at 7.

Moreover, if the grand jury is being used to obtain evidence against uncharged persons or

of uncharged crimes, evidence produced pursuant to the subpoena can be used at trial to prove

the charges contained in the original indictment.  In United States v. Alred, 144 F.3d 1405, 1413

(11th Cir. 1998), the defendants appealed their convictions for their participation in a marijuana

distribution conspiracy.  The defendants argued that the district court erred by admitting grand

jury testimony the government obtained from the grand jury a week before trial.  In ruling that

there was no grand jury abuse, the court held that "[w]hen it is shown that a subpoena might assist the grand jury in its investigation, the subpoena should issue, even though the prosecutor possibly will use the information procured for a purpose other than obtaining evidence for the particular grand jury investigation." Id. at 1413.  "Although the government may not use a grand jury for discovery concerning a pending prosecution, it may continue an investigation from which information relevant to a pending prosecution may be an incidental benefit." Id. (internal quotations and citations omitted); see also In re Grand Jury Proceedings, 814 F.2d 61, 70 (1st Cir. 1987) ("The prosecutor at a trial, [ ] may use evidence incidentally gained from a grand jury primarily investigating other crimes").

       In the instant case, the defense has not only failed to prove grand jury abuse, the evidence establishes that the grand jury was being used properly.  To support its allegation, the defense alleges, without evidence, that the deaths of Jones and Colligan caused the government to bring Long, Fields, Paulson and Hill before the grand jury in order to obtain additional evidence.  Billy Long testified before the grand jury on September 4, 2008, less then a month after the indictment. Michael Fields testified before the grand jury on September 20, 2008.  Gary Paulson testified before the grand jury on April 23, 2009. Brian Hill testified before the grand jury on May 20, 2009.

       George Jones died on or about August 13, 2008.  The United States did not discovery that Jones died until the defense so advised the government sometime thereafter.  Terrence Colligan died in Mexico on July 27, 2009.  The government did not discover that Colligan died until after defendant's attorney at that time, Mark Carroll, called the government in September 2009 and advised the government that he had information that indicated that Colligan had died.  See Dkt.

No. 90-3 (Telephone Call of 9/12/09).  Sometime after Mr. Carroll's September 12, 2009

telephone call, the government confirmed that Colligan had died in Mexico.

The defense assumes only sinister motives on the part of the government for its

continuation of the grand jury investigation after the one count indictment against Sitzmann.  It

does not even acknowledge the myriad legitimate reasons for the continuation of a grand jury

investigation.

To begin with, the alleged motive surmised by the defense is wrong and baseless.  This is

evidenced by the fact that Colligan died months <u>after</u> the witnesses testified in the grand jury.

Thus, the government could not have intended to use the grand jury to gather evidence to make

up for the death of Colligan when Colligan was still alive and apparently healthy.[8]

The defense has also failed to provide any support for its bare allegation that the

government was attempting to gather evidence from Long, Fields, Paulson and Hill in order to

make up for Jones' death.  The government had already received a detailed statement from Long

before Long was even released from prison in 2007 and he was already more than willing to

cooperate against Sitzmann.  It is important to note that Long had information on the identity of

Sitzmann's market in Spain.  (Long, 5/1/12 a.m. at 9-11; 9/29/05 Statement of Long attached as

Attachment 3.)

The same is true with respect to Michael Fields.  He gave a statement to ICE agents on

December 13-14, 2005. Statement of Fields attached as Attachment 4.)  One of the main pieces

of evidence Michael Fields possessed was knowledge that Sitzmann's money was going to

---

[8]  If the government prosecutors knew that Colligan was ill, it would make sense that they would
have taken his trial deposition.

Switzerland.  See Fields Statement, Attachment 4, at 6.  Accordingly, the evidence that Long

and Fields had to offer was already in the government's possession years before the indictment.

The government had no need to put these witnesses before the grand jury to uncover more

evidence for trial as the defense alleges.

      With respect to Paulson and Hill, they also were interviewed and provided statements to

law enforcement.  In this regard, the report on Paulson's May 11, 2009 statement written by lead

agent Jared Rine provides that the government "is conducting an investigation into the drug

smuggling and money laundering activities of Gregory Joel Sitzmann, et. al."  The report goes on

to provide that Sitzmann is "alleged to have laundered narcotics proceeds for Colombian and

Spanish-based cartels" and that "[a]n investigation to identify assets held by Sitzmann is being

conducted" by the government.  Paulson Statement at 1, attached as Attachment 5.

      There would have been no need to have any of these witnesses testify in front of the grand

jury after indictment unless the grand jury was investigating possible additional charges and

targets.   There should be no mistake, or surprise, that the government's investigation was

ongoing with respect to Sitzmann's money laundering, assets, cocaine suppliers, cocaine markets

and his general importing and exporting of drugs.  A one-count indictment against only Sitzmann

did not begin to address Sitzmann's enterprise.  There is no doubt that the defendant was a large-

scale international drug trafficker and he has been convicted as such in several countries.  He

made millions of dollars from his drug trafficking and had people like Jerry Harvey laundering

his money through banks and corporations in foreign countries like Switzerland and Panama.

(Harvey, 4/19/12 a.m. 118-125 & p.m. 28-49; Paulson, 4/24/12 p.m. 32-95); Fields Statement,

Attachment 4.)  Sitzmann had also earned $6 million for laundering at least $30 million for a

Colombian cartel in 2000.  (Buss, 4/30/12 p.m. at 77-78, 91-96.)  The government also knew that Sitzmann had access to enormous amounts of cash.  Brian Hill testified that Sitzmann had Hill smuggle $1.5 million out of the United States and into Mexico in 1997.  (Hill, 4/25/12 p.m. at 121-132; see also Harvey, 4/19/12 a.m. 118-125 & p.m. 28-49; Paulson, 4/24/12 p.m. 32-95.)

The government was attempting to find Sitzmann's money and other assets, but could find "nothing substantial."  (Buss, 4/30/12 p.m. at 78.)  In 2005 the government commenced a financial investigation and a financial analyst was assigned to the case.  (Buss, 4/30/12 p.m. at 110-111.)  There was also significant evidence that Sitzmann was importing and exporting narcotics.  (Paulson, 4/24/12 p.m. at 32-95; Hill, 4/25/12 p.m. at 108-121).  Sitzmann himself wrote to the government prosecutors that he could assist them in their investigation of suppliers, markets, and money laundering.  Gov. Trial Ex. 890, Sitzmann Letter to Prosecutors dated June 8, 2005.  When Gary Paulson was given informal immunity before testifying before the grand jury, the immunity letter dated April 23, 2009, specifically stated, by statutory reference, that the government was investigating money laundering, illegal drug importation and exportation, and narcotics conspiracy.  See Gov. Trial Ex. 367.

The defendant now would like to convince the Court that the government prosecutors had closed their eyes to his hidden and ill-gotten assets and money laundering.  To the contrary, it would have been irresponsible for the government to ignore this criminal activity.  It would also have been irresponsible for the government to have ignored Sitzmann's higher-level drug suppliers and his drug markets and not make an effort to identify them and prosecute them for their involvement in the conspiracy charged under 21 U.S.C. Section 846 and in their violation of the drug importation and exportation statutes.  See 21 U.S.C. Section 963.  Billy Long was able

to provide information on individuals involved in Sitzmann's Spanish market.  See 9/29/05 Statement of Long at 4, attached as Attachment 3.)   Plus, although the government knew all along from George Jones that Sitzmann was supplying large quantities of cocaine to the Canadian Hells Angels (Transcript of 8/16/11 Motions Hearing at 31-32), it was only after Paulson was interviewed (post indictment) that the government was able to get the name "Norm" as the person in charge of the supply for the Hells Angels in the Montreal area.  (Paulson, 9/24/12 p.m. at 32-33.)  This is evidenced by the fact that while the Canadian Hells Angels were identified as co-conspirators from the beginning of this case, "Norm" was added as a co-conspirator as late as the Second Amended Bill of Particulars filed on March 11, 2010.  Dkt. No. 58.  Moreover, the government did not identify "Norm's" true identity (Normand Theoret) until January 2012.

As evidenced by the testimony of the witnesses, they each possessed evidence of Sitzmann's drug suppliers (Colombians and Mexicans), his drug markets (Canadian Hells Angels and Spanish cartels), assets, money laundering and/or those involved in the importation and exportation of illegal narcotics.  The investigation was not over merely because a one-count indictment was handed down against Sitzmann.

The defense has ignored these legitimate reasons for continuing the grand jury investigation in this case, reasons the defense had knowledge of years ago.  What is troubling is that the defense has made these allegations despite their actual knowledge of the ongoing nature of the government's investigation.  The defense has known that Sitzmann was not the final target in this investigation.  We debriefed Sitzmann or attempted to debrief him on at least three separate occasions, once before indictment in France and twice after indictment.  (Armbruster,

5/12/12 p.m. at 14-20); see also Transcript of 4/22/09 Status Hearing, Dkt. No. 51.  A cooperation plea offer was drafted and sent to his lawyer in July 2008 and it was contemplated that he would testify before the grand jury and at the trial of others, participate in covert activity and he would be required to disclose all his assets.  Draft Cooperation Plea Agreement Dated 7/8/08 at ¶ 6, attached as Attachment 6.

Likewise, the present case remained sealed for several months because it was believed that a cooperation plea would take place.  As Sitzmann knows, the purpose was to continue the investigation against Sitzmann's suppliers, re-distributers, money launderers and assets.  (Further evidence of the debriefings and plea offer can be provided if requested by the Court.)

Even in December 2009, both the defense and the Court were aware that the grand jury was looking into Sitzmann's money laundering and potential hidden asset.  At the December 17, 2009 Status Hearing, Sitzmann and his soon-to-be lawyer, Richard Klugh, complained to the Court that there was an ongoing grand jury investigation regarding the source of the money used to pay Attorney Klugh.  Both the Court and Mr. Klugh recognized that the government was looking for Sitzmann's assets and to seize them.  See Transcript of December 17, 2009 Status Hearing at 7-10.

Despite the government's efforts, a superseding indictment was not returned in this case.  As the Court is aware, and as the defense has repeatedly argued over the course of this case, time was running out, particularly for a superseding indictment within this case.  This is a historical case involving a conspiracy between the 1990s and up to approximately 2004.  After 2009, the statute of limitations became an issue.  The government did not identify Norm Theoret until approximately January 2012, when it determined that he was already incarcerated in Canada in a

murder case.  Without the defendant's cooperation, which the government clearly sought for an extended period, the government's efforts to pursue suppliers and other markets were hampered.

Once it appeared unlikely that new charges and targets could be indicted within the statute of limitations, the government stopped presenting new testimony to the grand jury.[9]  At that point, if there was a desire to preserve any testimony, a sworn statement or deposition was taken, a distinction the defense fails to appreciate or acknowledge.  (See e.g., Face Sheets of Campeau's 2/24/10 Deposition, Harvey's 4/15/10 Deposition and Sager's 10/21/11 Deposition, attached as Attachment 7.)

The defense has failed to prove any impropriety in witness testifying before the grand jury after indictment.  The government continued its investigation regarding defendant's drug suppliers, drug markets in Canada and Europe, and his money laundering and assets. Consequently, there is no evidence showing that the government sought to abuse the grand jury and the Court should reject defendant's baseless allegations.

### E.   Conspiracy Continued Into the Limitations Period

The defendant claims the government failed to prove that the conspiracy continued into the five-year period ending on August 7, 2008, the date of the indictment.  The defendant attempts to sever his European drug trafficking from the rest of his drug trafficking activity.   He attempts to now artificially split his actions into at least two separate conspiracies, a North American conspiracy and a European conspiracy in an apparent attempt to show that no overt acts occurred within the limitations period for the North American conspiracy.  Def. Mot. at 24-25.  The defense further argues that the government "ignore[s] the fact that the conspiracy

---

[9]  We do not mean to imply that the investigation of all matters has ended.

charged had to be a violation of U.S. law."  Def. Mot. 3.  The defense then goes on to claim that "possession of cocaine in [Colombia] or Europe, where the only intent is to distribute it in Europe (with no intent to ever involve the United States), does not fall within any U.S. legal prohibition."  Def. Mot. 5.  The defense admonishes that "Federal courts in the United States are not international drug courts."  Def. Mot. 6.  The defense makes these representations to the Court, without support from the record,  in an apparent attempt to argue that defendant's illegal activity within the limitations period was part of a separate conspiracy that was all extraterritorial and, thus, not a violation of U.S. laws.  The Court should reject defendant's multiple conspiracies/statute of limitations argument, as it did previously.

On September 8, 2011, the Court addressed, and rejected, the same statute of limitations argument when it was made by the defendant in its motions.  The Court framed the issue as follows: "So there were overt acts showing that the conspiracy continued until 2004, including his drug trafficking in Colombia, Spain, and France, his payment of hush money allegedly to incarcerated co-conspirators, his continued attempts to distribute cocaine into the United States and into Canada from the United States and so forth.  But the defendant also argues that the events were not part of a single conspiracy and that the government's really charging separate conspiracies and throwing everything into one indictment in order to satisfy the statute of limitations."  Transcript of 9/8/11 Ruling at 17-18.

After reviewing the bills of particulars, the Court rejected the multiple conspiracy/statute of limitations argument and held that "these conspirators shared the common goal of making large sums of money from the sale of drugs worldwide; that they used similar instrumentalities to do this; that they participated in the chain of activity in trafficking drugs; that they were

dependent on one another; that the defendant was the ringleader who –the ringleader – the person, certainly, who linked the other participants together." Id. at 20.

The defense now attempts to re-litigate the multiple conspiracy/statute of limitations argument.  However, the defense does not favor us or the Court with any evidence from the record or any analysis to support its claim that there was more than one conspiracy.  Indeed, the defense ignores the mountain of evidence establishing that defendant conspired to traffic in cocaine within the United States, not just extraterritorially, and that his actions from the 1990s until at least 2004 were part of a single conspiracy.  As discussed below, there was significant evidence establishing that there was only one conspiracy to possess and distribute cocaine to various places, including the United States, Canada and Europe, for profit and that there was cocaine trafficking within the United States during the conspiratorial period.

The defense also fails to acknowledge the devastating flaw in its extraterritorial argument:  that during the limitations period, the defendant continued to agree to distribute cocaine within the United States and he admitted that he carried cocaine through the United States before taking it to Europe.  The defense's conclusory argument that there were two conspiracies, not one, is wholly lacking in analytical substance.  In this regard, the defense simply states that the defendant's drug smuggling in Europe was not part of the same conspiracy that operated in North America.  The defense is mistaken.

In United States v. Tarantino, 846 F.2d 1384 (D.C. Cir. 1988), the D.C. Circuit listed several factors to be considered in determining whether the evidence at trial established a single conspiracy or multiple independent conspiracies.  These factors include: (1) whether the conspirators shared a common goal, e.g., the distribution of narcotics; (2) the degree of

29

dependence inherent in the conspiracy, i.e., whether the nature of the conspiracy allows for an inference that the conspirators knew of their link to other conspirators; and (3) the overlap of participants in the various operations claimed to comprise a single conspiracy and a main player coordinated the narcotics enterprise. Tarantino, 846 F.2d at 1392-1393; see United States v. Gaviria, 115 F.3d 1498, 1517 (D.C. Cir. 1997). "The most important of these is whether the conspirators share a common goal, such as the possession and distribution of narcotics for profit." Tarantino, 846 F.2d at 1393; citing United States v. Caporale, 806 F.2d 1487, 1500 (11th Cir. 1986); United States v. Dickey, 736 F.2d 571, 582 (10th Cir. 1984). "The coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan. . . . The goals of all the participants need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes." United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2nd Cir. 1990) (citations omitted). "[D]irect evidence of agreement is not required, however; the jury may infer conspiratorial agreement from the circumstances and the defendant's knowledge." Moore, 651 F.3d at 97, citing Childress, 58 F.3d at 710.

Moreover, "a single conspiracy conviction has been upheld despite a 'lack of significant overlap of some participants' when strong evidence established that a main player coordinated the narcotics enterprise." Tarantino, 846 F.2d at 1393 (quoting United States v. Champion, 813 F.2d 1154, 1166-67 (11th Cir. 1987)). A jury can infer the conspirators' knowledge of their link to other conspirators from the nature of a narcotics conspiracy. Tarantino, 846 F.2d at 1393. Indeed, it is not necessary that the conspirators know the identities of all the other conspirators in order for a single conspiracy to be found, especially where the activity of a single person was

30

central to the involvement of all." <u>Maldonado-Rivera</u>, 922 F.2d at 963 (citations and internal

quotations omitted); see also <u>United States v. Childress</u>, 58 F.3d 693, 709-10 (D.C. Cir. 1995)

("participants in a continuous drug distribution enterprise can be parties to a single conspiracy

even if they do not all know one another, so long as each knows that his own role in the

distribution of drugs and the benefits he derives from his participation depends on the activities

of the others")

     <u>Tarantino</u> made clear that a single conspiracy can have "various operations," and multiple

drug distribution points (including Texas and New Jersey), particularly when evidenced by an

overlap of participants between the operations.  846 F.2d at 1393, 1398.  A single plan or

agreement does not become many plans or agreements because of different phases or laces of

operation; because some members had more vital roles than others, performed different

functions, or were present at different events or transactions; or because personnel changes

occurred.  "Nor do lapses of time, changes in membership, or shifting emphases in the locale of

operations necessarily convert a single conspiracy into multiple conspiracies." <u>Maldonado-</u>

<u>Rivera</u>, 922 F.2d at 963; see also <u>United States v. DeLeon</u>, 641 F2.d 330 (5th Cir. 1981).  "All

that is required is that a participant know of the [other conspirators'] existence and that their

activities further the conspiracy's ends." <u>United States v. Shorter</u>, 54 F.3d 1248, 1255 (7th Cir.

1995).

     The Sixth Circuit cautioned that it is especially easy in drug conspiracy cases "to divide a

single conspiracy into sub-agreements: but if the different subgroups are acting in furtherance of

one overarching plan, a single conspiracy exists." <u>United States v. Ghazaleh</u>, 58 F.3d 240, 245

(6th Cir. 1995).  The Second Circuit has likewise held that "[a] single conspiracy is not

31

transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." See United States v. Tramunti, 513 F.2d 1087, 1105-1106 (2nd Cir. 1975) (court found one narcotics conspiracy even though there were two spheres of operations controlled by separate groups where evidence showed mutual dependence and assistance between groups, including evidence that both groups had common members that could move from one group to the other with ease and mutual trust, member of one group had intimate details regarding other operation, and operations had some common characteristics like sales to common distributors); see also Maldonado-Rivera, 922 F.2d at 963.

The evidence in this case established that Sitzmann was running a single conspiracy to smuggle cocaine to various places around the world from the 1990s until 2004, as the indictment alleges.   There is no doubt that the conspirators in this case shared a common goal -- to make money from the possession and distribution of cocaine.   The evidence showed that the defendant and his conspirators possessed and distributed hundreds of kilograms of cocaine in the United States, Canada and Europe and they made a lot of money doing that.   There is also no dispute that much of these operations were taking place at the same time involving the same core individuals.   These individuals included Gregory Sitzmann, James Fields, and George Jones. These individuals did not just know of their link to each other, they actually knew each other and they new that they were all involved in Sitzmann's drug smuggling conspiracy.   They also knew that Sitzmann was coordinating and controlling the entire narcotics enterprise and all its facets and operations.   Tarantino, 846 F.2d at 1392-1393.

The defense relies on the fact that Sitzmann's conspiracy operated in various places, including the United States, Canada, Colombia, and Europe.  But, the defense ignores all the evidence in the records that proved that these operations involved the same core group of people, all controlled and directed by Sitzmann, with the same goal--to make money from the possession and distribution of cocaine.  Tarantino, 846 F.2d 1393; Maldonado-Rivera, 922 F.2d at 963.  The markets in which Sitzmann chose to distribute the cocaine were relevant only to Sitzmann's ability to maximize his profit and possibly minimizing his risk of being arrested in the United States.  However, his desire for profits was preeminent.  Contrary to the defense's representations that "there was never any intent to possess [European bound] drugs within the United States," Def. Mot. at 24, Sitzmann never abandoned cocaine trafficking within the United States.

Sitzmann acknowledged during his interview with U.S. law enforcement in France that between 1995 and 2000, he and George Jones were involved in cocaine trafficking in New York and Chicago.  Sitzmann stated that in one occasion in Chicago, he and Jones were attempting to acquire three to four kilograms of cocaine from a Mexican supplier who possessed 500-1,000 kilograms of cocaine.  They did not consummate that deal because the supplier was arrested. Sitzmann also admitted during the interview that his "organization" distributed 10 to 20 kilograms of cocaine on each of three or four occasions between 1996 and 1998 in New York. (Armbruster, 5/10/12 p.m. at 44-48, 69.)

George Jones corroborated the Chicago transaction.  Jones stated that he and Sitzmann were in Chicago to acquire 20 kilograms of cocaine from Mexican suppliers, but they wanted to sell a minimum of 500 kilograms to Sitzmann.  Jones confirmed that the deal was not

consummated because the suppliers were arrested.  Gov. Trial Ex. 40 at Tape B2, Clip 13

(Transcripts attached  as Attachment 1.)

At the same time Sitzmann was attempting to acquire cocaine in Chicago and distributing

cocaine in New York, he was smuggling cocaine through the United States and into Canada to

supply the Hells Angels.  George Jones is again part of the core group of individuals involved in

this operation.  Others included James Fields, Gary Paulson and Jerry Harvey.  Gary Paulson

testified that Sitzmann had the cocaine supply and Paulson made arrangements for Sitzmann to

meet Normand Theoret in Canada in approximately 1994 for purposes of Sitzmann supplying the

Canadian Hells Angels.  Paulson testified that Sitzmann and his people transported hundred of

kilograms of cocaine through the United States and into Canada in the mid to late 1990s.

Sitzmann had Jones and Fields transport the cocaine to the Montreal area in modified gas tanks

of Suburbans.   One of the Suburbans was owned in the name of Jones or one of Sitzmann's

companies.  Sitzmann also rented homes and storage facilities in the Montreal area for his

cocaine smuggling.  Sitzmann purchased a freezer and stored boxes filled with kilograms of

cocaine in the freezer which he maintained in the storage facility.  Sitzmann used vacuum sealing

to repackage some of the cocaine in Canada.  Once the cocaine got to Montreal, either Paulson or

Sitzmann would distribute it to the Hells Angels in exchange for millions of dollars in cash.

Sitzmann, Jones and Fields would then carry the cash drug proceeds back into the United States,

much of which was laundered by Jerry Harvey.  (Paulson, 4/24/12 p.m. at 22-27, 31-95;

Campeau, 4/25/12 p.m. at 24-47, Harvey, 4/19/12 a.m. 118-125 & p.m. 28-49; Rhonda Fields,

4/27/12 p.m. at 14, 18-31; Michael Fields, 4/27/12 p.m. at 45-56.)  During this period, Sitzmann

provided leather bags with secret compartments to his co-conspirators for drug and money

smuggling.  Jones, Fields, Paulson and Harvey were all given these bags by Sitzmann.  (Paulson, 4/24/12 p.m. at 57-59; Rine, 4/25/12 a.m. at 76-81; Harvey, 4/19/12 p.m. at 45-49; Rhonda Fields, 4/27/12 p.m. at 25-26; Michael Fields, 4/27/12 p.m. at 52-53; Chung, 5/1/12 p.m. at 109-111;; Gov. Trial Ex. 40 at Tape G, Clip 1  (Transcripts attached  as Attachment 1.)

Sitzmann's drug smuggling enterprise was without a doubt very lucrative.  Jones stated that Sitzmann had him deliver cardboard boxes full of millions of dollars in cash.  On one occasion it was $3 million.  Gov. Trial Ex. 40 at Tape B2, Clip 12  (Transcripts attached  as Attachment 1.)   The members of the conspiracy were all in it for the money.

While Sitzmann was smuggling cocaine through the United States and into Canada by land, he was also trying to smuggle cocaine into the United States by airplane.  In approximately 1997, Sitzmann and Paulson together attempted to recruit Brian Hill to fly a Piper Navajo Panther carrying approximately 500 kilograms of cocaine from Colombia into the United States. Sitzmann and Paulson were clearly co-conspirators and they offered Hill $250,000 for the job. (Hill, 4/25/12 p.m. at 108-113.)  Hill rejected the offer.  Some days after rejecting the cocaine smuggling offer, Sitzmann surreptitiously had Brian Hill smuggle $1.5 million to Mexico in a secret compartment of a truck.  (Hill, 4/25/12 p.m. at 121-132.)

After Hill rejected Sitzmann's air smuggling offer, Sitzmann approached John Sager to fly cocaine loads through the United States.  Sager and Sitzmann had earlier (mid-1990s) talked about drug smuggling together and they agreed to do something at a later date.  So, in approximately 1998, Sitzmann and Sager agreed to acquire a Piper Navajo Panther airplane for purposes of smuggling 250 to 300 kilograms of cocaine per trip from Colombia, over the United States and into Canada.  According to Sager, Sitzmann had the source of cocaine supply in

35

Colombia and the market in Canada.  Sager agreed to acquire the Navajo Panther and be the pilot

to fly the plane to Colombia, pick up the cocaine in Colombia and fly the cocaine-laden airplane

to Canada for redistribution to the Hells Angels.  Although Sager did not ultimately smuggle

cocaine for Sitzmann, the evidence shows, that Sager agreed to join Sitzmann's conspiratorial

enterprise.  (Sager, 4/23/12 p.m. at 54, 68-76, 4/24/12 a.m. at 7-8, 40-41.)

      Sitzmann's cocaine smuggling operation continued into the 2000s.  In late 2000, Terrence

Colligan became a confidential informant and infiltrated Sitzmann's organization.  Colligan

ostensibly became a co-conspirator of Sitzmann and Jones.  Sitzmann, together with Jones and

Colligan, "shined-up" (cleansed) 16 kilograms of cocaine at George Jones' home in Florida.

Buss, 4/30/12 p.m. at 54-62, 107.  George Jones acknowledged the shining up of the cocaine at

his Florida home and complained that Sitzmann had not paid him for it.  Gov. Trial Ex. 40 at

Tape B2, Clip 7  (Transcripts attached  as Attachment 1.)

      Sitzmann, Jones and Fields continued with their cocaine trafficking and extended it into

Europe where Sitzmann was making a higher profit.  In 2001, Sitzmann also recruited Billy

Long, a friend of 30 years, to join the enterprise and smuggle cocaine from Colombia to Spain for

money.  The government established that Sitzmann, Fields and Long took several trips from

Colombia to Spain carrying kilograms of cocaine starting no later than December 2001.

Sitzmann gave Long one of his trademark leather bags to be used for drug and money smuggling.

Sitzmann also utilized heat seals to seal the kilograms of cocaine that Fields and Long

transported to Europe.

      In May 2002, George Jones also traveled to Colombia for the purpose of carrying

kilograms of cocaine for Sitzmann from Colombia to Spain.  He traveled to Colombia and was

expected to carry kilograms of cocaine with Fields and Long.  After arriving in Colombia, Jones

determined that the risks of getting caught were too high.  Jones asked Sitzmann if he (Jones)

could back out and not travel to Spain with the cocaine.  Even though Sitzmann had paid for the

European tickets, Sitzmann allowed Jones to back out of that smuggling trip and return to

Florida.  Long and Fields, however, proceeded and were arrested by Colombian law enforcement

trying to smuggle Sitzmann's eight kilograms of cocaine.  The cocaine was secreted in the false

compartments of four leather bags supplied by Sitzmann.  (Long, 5/1/12 a.m. at 7, 14-66; Gov.

Trial Ex. 535; Gov. Trial Ex. 40 at Tape B2, Clips 2, 3, 7, 14  (Transcripts attached  as

Attachment 1.)

Notwithstanding Sitzmann's European operation, he continued to operate in the United

States with Jones by his side.  Sitzmann admitted in a letter to government counsel that he had

Colligan cut two kilograms of cocaine at Jones' house in 2002 while Sitzmann and Jones were

present.  Gov. Trial Ex. 1025.

Moreover, Sitzmann acknowledged during his interview in France that between

December 15, 2003 and February 2004, he personally smuggled between 14 and 16 kilograms of

cocaine from Colombia to Europe.  He admitted that during at least one of those smuggling trips,

he carried the cocaine through the United States.  (Armbruster, 5/10/12 pm at 29-30, 41-42.)

In January 2004, during Sitzmann's European and U.S. operations and just one month

before Sitzmann was arrested for cocaine smuggling in France, Sitzmann talked to Paulson about

further drug trafficking in Canada.  Sitzmann had asked Paulson to sell the Stallion stealth kit

plane that Sitzmann had acquired for drug smuggling purposes.  This plane was also acquired

with Canadian drug proceeds.  While they were talking about the sale of the plane and also

talking about Sitzmann's European cocaine operation, Sitzmann asked Paulson if he wanted to go back to Canada and distribute cocaine to the Hells Angels.  Paulson declined the offer. (Paulson, 4/24/12 p.m. at 95-101; Paulson, 4/25/12 a.m. at 22-24.)

Notwithstanding Paulson's rejection of Sitzmann's offer, the offer evidences how Sitzmann's cocaine smuggling operation was a continuous enterprise that transcended national borders and was dependent only upon the opportunity to make money.  Moreover, this attempt to reignite the U.S./Canadian operation and Sitzmann's involvement in other U.S. transactions show that the defense's reliance on Sitzmann's desire to avoid U.S. drug laws is misplaced.  The defense relies upon the fact that Sitzmann and Sager talked about limiting the risk of getting caught in the United States to minimize his exposure to what was referred to as "draconian" U.S. drug laws.  Although we have no doubt that Sitzmann wanted to minimize the risk, the evidence establishes that Sitzmann was more than willing to accept that risk if the profits were there. (Sager, 4/23/12 p.m. at 52-53 & 4/24/12 a.m. at 20-21, 40-41.)

Jones membership throughout every facet of the conspiracy is further evidenced by the fact that Sitzmann asked George Jones to participate in his last cocaine smuggling trip to Spain in February 2004, the trip that ended with Sitzmann being arrested in France.  Although Jones backed out of the deal, it is clear that the same core people were involved during the entire span of the cocaine trafficking conspiracy.  Likewise, Sitzmann controlled and coordinated every facet of the cocaine enterprise irrespective of the time frame or location of the drug trafficking operations.  Gov. Trial Ex. 40 at Tape B2, Clips 4, 10  (Transcripts attached  as Attachment 1.)

The defense also discounts the fact that just prior to Sitzmann's arrest in France in February 2004, Sitzmann agreed to supply Jones with 20 kilograms of cocaine within the United

States.  After Sitzmann was arrested, and not having received Sitzmann's 20 kilograms, Jones

acquired 16 kilograms of cocaine in the United States in March 2004 from Terrance Colligan, an

assumed co-conspirator of Sitzmann and Jones, during an undercover operation.[10]  Jones' attempt

to acquire the cocaine was part of Sitzmann's conspiracy and in furtherance of it.  When Jones

and Colligan were discussing how profits were to be shared, Jones stated that kilogram quantities

of the cocaine were to be redistributed by Jones to Sitzmann's people and Jones was going to

share the profits 50/50 with Sitzmann, just like they always had.[11]   See Trial Exhibit 40, Clip 7,

Clip 10, (Transcript attached as Attachment 1, at pp. 12-13, 18-19).  There was no evidence that

Sitzmann's agreement to provide 20 kilograms of cocaine to Jones and Jones' attempt to acquire

the 16 kilograms of substitute cocaine were anything other than connected to Sitzmann's drug

trafficking conspiracy in which Jones was a long-time member.  There was no evidence that

Jones was acting independent of Sitzmann's conspiracy.  To the contrary, Jones thought Colligan

was Sitzmann's co-conspirator and Jones admitted that he had "no other way to make a living"

other than through Sitzmann.  See Trial Exhibit 40, Clip 7 (Transcript attached as Attachment 1,

at 14.)  There was also no evidence presented by the defense that Sitzmann withdrew from the

---

[10] The defense characterized this undercover operation as "tantamount to handing a sandwich to a
starving man."  Def. Mot 16, n. 11.  In a major respect, the defense is correct.  Jones was
awaiting 20 kilograms of cocaine that was promised by Sitzmann.  After Sitzmann was arrested
in France, before any promised cocaine was received by Jones from Sitzmann, Jones was
"starving" for cocaine.  Jones expected to satisfy that hunger with the cocaine from the
undercover operation.

[11] There was also evidence presented in the August 16, 2011 Motions Hearing that Sitzmann had
provided cocaine to Jones on many occasions.  Transcript of 8/16/11 Motions Hearing at 24-25.
Therefore, it would not have been an isolated incident for Jones to have split profits with
Sitzmann, particularly when he redistributes the cocaine to Sitzmann's people.

conspiracy before the 16-kilogram reversal.  Accordingly, he was responsible for that transaction. Smith, 133 S. Ct. at 719.

Accordingly, Sitzmann is responsible for Jones' acquisition of cocaine from Colligan. "Since conspiracy is a continuous offense, a defendant who has joined a conspiracy continues to violate the law through every moment of the conspiracy's existence, and he becomes responsible for the acts of his co-conspirators in pursuit of their common plot."  Smith, 133 S. Ct. at 719 (internal quotations and citations omitted); see also United States v. Childress, 58 F.3d 693, 733 (D.C. Cir. 1995) ("Conspiracy is an ongoing offense that lasts, absent one's affirmative withdrawal from the enterprise, as long as any co-conspirator continues to further common ends").

In February 2004, Sitzmann was then arrested in France while attempting to smuggle seven kilograms of cocaine from Spain to Italy.  Like past smuggling operations, he used the secret compartments of his leather bags, this time to secret the cocaine.  Each kilogram of cocaine was wrapped with plastic and a silvery, aluminum-type bag, similar to the silvery, aluminum-type bags recovered from Sitzmann's belongings at George Jones' Florida home. (Courreges, 4/17/12 p.m. at 22-34; Chung, 5/1/12 at 113.)

As we discussed above, defendant's arrest in France in February 2004 did not end the conspiracy or Sitzmann's involvement in the conspiracy.  The evidence was undisputed that George Jones was the first person Sitzmann wanted to call after his arrest in France.  (Dorcet, 4/18/12, a.m. at 58-62; Buss, 4/30/12, a.m. at 24.)   Sitzmann orchestrated the sale of his Stallion drug smuggling plane while he was incarcerated in France.  Gov. Trial Ex. 776a.  After Paulson sold the Stallion, the sale proceeds were delivered to Sitzmann's girlfriend and co-conspirator

Maritza Fontecha through Sitzmann's investigator, Gary McDaniel, and friend, John Dwyer. (Paulson, 4/24/12 p.m. at 95-104, 4/25/12 a.m. at 12-23.); see also Gov. Trial Exs. 767, 768 (Stallion purchase documents) and Gov. Trial Ex. 1018 (John Dwyer's passport showing travel to Colombia in 2004.)  Evidence of the sale of the Stallion plane, like all of the financial transactions introduced into evidence in this case, are overt acts and part of the evidence against the defendant in the underlying drug conspiracy.  <u>Tarantino</u>, 846 F.2d at 1396; <u>Arnold</u>, 117 F.3d at 1315.

When the defense claims that the evidence did not show any domestic drug trafficking, that there were multiple conspiracies and that the charged conspiracy did not continue into the limitations period, it ignores the extensive factual record.  Like in <u>Tarantino</u>, evidence established the existence of a conspiracy in which the defendant was the main player who coordinated the trafficking of narcotics to various places around the world for profit.  Throughout the conspiracy, the defendant used a core group of people to achieve his drug trafficking goals, whether in the United States or abroad.  They included George Jones, James Fields and Gary Paulson.  The defendant utilized his closest co-conspirators, George Jones and James Fields, during every facet of the conspiracy, including trafficking cocaine in the United States, Canada and Europe.  George Jones stated that he knew Sitzmann for 30 years, that Sitzmann was his "bud" and his "brother."  Gov. Trial Ex. 40 at Tape B2, Clips 3, 7  (Transcripts attached  as Attachment 1.)   Likewise, James Fields was a longtime friend of Sitzmann's since at least the 1970s.  Fields' daughter, Rhonda Fields met Sitzmann when she was approximately 10 years old and she was 47 years old when she testified at trial.  Sitzmann was such a close family friend that

she called Sitzmann "Uncle Greg" while she was growing up.  Rhonda Fields, 4/27/12 p.m. at 9-12.)

The defendant was not only a "core participant" who was linked to the other conspirators in this case, he was the leader of the organization who directed the others to perform their various roles.  In short, the defendant was the head of the enterprise and served as the common link that tied together all of the other individual conspirators in this case into a single overarching conspiracy.  See Gaviria, 116 F.3d at 1517 (single conspiracy proven where "core participants" connect other conspirators); see Mathis, 216 F.3d at 23-24 (overlap satisfied where main conspirators work with all participants).

It is also important to note that the defendant has neither defined nor identified the several conspiracies that he claims the evidence showed. Indeed, because Sitzmann fails to explain in what way the government's evidence fell short of establishing the existence of a single conspiracy, to identify evidence supporting his contention that multiple conspiracies existed, and even to advance his conception of the dates and members of the several conspiracies that he claims operated, his challenge fails.

Not only is there an extraordinary amount of evidence establishing that the defendant's conspiracy extended into the limitations period, the Court specifically instructed the jury on the law regarding all the issues the defense now raises:  "Extraterritorial Application of Conspiracy Statute," "Co-Conspirator Liability," and "Statute of Limitations."[12]   The Court told the jury that it "must find beyond a reasonable doubt that the conspiracy involved an agreement to do either

---

[12]  The government relies upon the jury instructions provided by the Court to the parties on May 15, 2012.

one or both of the following:  (1) distribute such cocaine within the United States; or (2) possess

such cocaine within the United States with the intent to distribute it anywhere in the world."

With respect to co-conspirator liability, the Court instructed the jury, in part, "[a] defendant is

responsible for an offense committed by another member of the conspiracy if the defendant was a

member of the conspiracy when the offense was committed and if the offense was committed in

furtherance of, and as a natural consequence of, the conspiracy."  As part of this instruction, the

Court told the jury that it had to find beyond a reasonable doubt that the offense committed by

another member of the conspiracy was a "reasonably foreseeable consequence of the conspiracy.

It is not necessary to find that the crime was intended as a part of the original plan, only that it

was a foreseeable consequence of the original plan."  With respect to the limitations period, the

Court instructed the jury as follows:

> Once a conspiracy is shown to exist, it is presumed to
> continue until it is shown to have terminated, and each conspirator
> is presumed to continue as a member of the conspiracy until either
> his withdrawal is demonstrated or the conspiracy ends.  A person's
> arrest and incarceration does not necessarily end that person's
> participation in a conspiracy.
>
> The government need not prove that the conspiracy started
> and ended on the dates charged in this indictment – from on or
> about at least the 1990's through at least 2004 – but it must show
> that the agreement existed at some point within the period set forth
> in the indictment.
>
> In addition, the crime of conspiracy charged in this case
> carries a five year statute of limitations.  The indictment was filed
> on August 7, 2008.  Therefore, the government must prove beyond
> a reasonable doubt that the conspiracy alleged in the indictment
> was in existence at anytime during the five-year limitations period
> – that is, that it was in existence on or after August 7, 2003, and
> that the defendant was a member of the conspiracy at anytime on or
> after that date.  In other words, the government must prove beyond
> a reasonable doubt: first that on or after August 7, 2003, there was

43

an agreement to either distribute 5 or more kilograms of cocaine or possess with the intent to distribute 5 or more kilograms of cocaine; and <u>second</u>, that on or after August 7, 2003, the defendant was a member of that conspiracy.

In making that decision, you may also consider any act of the defendant, whether legal or illegal, foreign or domestic, committed on or after August 7, 2003, if you find that that act was performed in furtherance of the conspiracy. You may also consider any such act committed by any of the defendant's co-conspirators because, as discussed earlier, an act by any one of the defendant's co-conspirators while the conspiracy is ongoing and while the defendant is a member of the conspiracy is considered an act committed by the defendant.

The Court also instructed the jury on the defendant's sweeping "Theory of Defense." That theory included statute of limitations, immunity, withdrawal from the conspiracy, and that his actions after 2000 were extraterritorial and unrelated to any conspiracy that existed previously.

After the jury was instructed that it was required to find beyond a reasonable doubt that the charged conspiracy involved an agreement to traffic in cocaine within the United States, and other places around the world, that the conspiracy alleged in the indictment was in existence at anytime during the five-year limitations period, and that the defendant was a member of the conspiracy at anytime during that period, the jury convicted the defendant of the charged conspiracy. Accordingly, with all the evidence of the domestic drug trafficking within the conspiracy and all the evidence proving the existence of the conspiracy during the limitations period, there should be no surprise that the jury properly convicted the defendant.[13]

---

[13] Contrary to the defense argument, it is irrelevant whether Sitzmann's extraterritorial drug trafficking violated federal law. The defense fails to understand or acknowledge that including non-federal offenses as objects of the conspiracy is appropriate provided that the indictment also alleges at least one object that constitutes a federal offense. <u>United States v. Croft</u>, 124 F.3d

44

Viewing the evidence in the light most favorable to the government, the court should find there was ample evidence that the conspiracy continued into the limitations period.

      F.      Defendant's Argument in Section III, F of Defendant's Motion is Not Discernable

Under the heading "Because the Evidence at Trial Established Multiple Conspiracies, Acquittal is Required Where No Conspiracy Occurred in the District of Columbia," the defense provides a one-sentence argument that reads as follows: "Once the grand jury returns an indictment, the prosecutor is bound by the parameters of that indictment." Def. Mot at 25. Nothing else is provided. We cannot discern what argument the defense is attempting to make here. If it is arguing that there were no overt acts in the District of Columbia, we refer the Court to the evidence and arguments to the contrary, above. If it is arguing that the indictment is somehow flawed on its face for venue purposes, the defense has waived the venue argument for not raising it before trial, or at least before the close of the government's case. United States v. Knox, 540 F.3d 708, 713-14 (7th Cir. 2008); citing Wright's Federal Practice & Procedure: Criminal § 306).

## III.    THE DEFENDANT IS NOT ENTITLED TO A NEW TRIAL UNDER RULE 33

      A.      The Rule 33 Standard

The Court may "grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Under Rule 33, the defendant bears the burden of showing that a new trial is justified.

---

1109, 1115 (9th Cir. 1997) (indictment properly charged defendants with conspiracy to murder the U.S. Attorney, a federal crime, and other persons who were not federal officials and also charged other non-federal criminal activity as objects of the conspiracy).

Thomas, 525 F. Supp. 2d at 21.  "A new trial should be granted only if the defendant has shown that the error was substantial, not harmless, and that the error affected the defendant's substantial rights." Safavian, 644 F. Supp. 2d 1, 8 (internal quotations omitted).  "A jury conviction should not be reversed on the basis of insufficient evidence unless the court can conclude, that as a matter of law, no reasonable juror could have convicted on the evidence presented." United States v. Gray, 292 F. Supp. 2d 71 (D. D.C. 2003).  In making this determination, the judge may balance all of the trial evidence, eye-witness accounts of the defendant's criminal activities; and conduct in furtherance of the conspiracy. Cabrera, 734 F. Supp. 2d at 90.  The Court may use these considerations to determine if a miscarriage of justice occurred. Id.

> B.  The District Court Properly Decided the Issue of Venue.

The defendant claims a new trial is warranted because the Court did not provide a jury instruction on venue.  The defense again fails to provide any analysis as to why the Court should have instructed the jury on venue.  Defendant's argument is conclusory and boils down to: The Court should have given a venue instruction.  As discussed below, the defendant is mistaken. The Court properly decided the issue of venue and the Court should not revisit the issue here.

During the pre-trial and trial stages of this case, the defense argued that venue was improper in the District of Columbia under a single theory – manufactured venue/venue entrapment.[14] See Dkt. No. 88 at 8.  In a bench opinion on September 8, 2011, the Court rejected this theory and ruled that it did not believe that there is a "recognized concept of venue

---

[14] The defendant also filed motions for change of venue on an interests of justice basis pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure.  See Dkt. Nos. 112, 120.  The Court denied these motions.  See Transcript of 9/8/11 Ruling on Pending Motions at 35-45, and Order, Dkt. No. 125.

manipulation in this district or perhaps anywhere; and if someone is predisposed to commit a crime, it doesn't matter that he's induced to do a part of it in one particular venue as opposed to another." Transcript of 9/8/11 Ruling on Pending Motions at 41. The Court went on to state that "there is no showing of outrageous or reprehensible or obnoxious conduct on the part of law enforcement; no coercion, no brutality, no due process violation; nothing outrageous or reprehensible about Agent Buss' decision to have Jones wire $1,000 to a cooperating witness in Washington, D.C. . . .." Id. The Court re-affirmed its decision at a February 1, 2012 Status Hearing. Dkt. No. 154 at 27.

During trial, after an attempt by the defense to resurrect the manufactured venue issue before the jury through Agent Buss, the Court stated to the defense at a bench conference, "if you're trying to show that there's – that the jurisdiction or venue of the case was manufactured, I think I've already dealt with that. . . . That's not a question for the jury. That's a legal question." Buss, 4/30/12 p.m. at 84.

The defense fails to mention in its motion that this is what precipitated the government's request for a jury instruction on venue. Id. at 113. Not having proffered any other argument on venue, the defense agreed to the propriety of such a jury instruction and a stipulated instruction was given to the jury by the Court. Id. at 114, 121-122.

The next time we can find where the defense raised venue as an issue was in an email on May 13, 2012, and during the charging conference the following day on May 14, 2012. It was then, for the first time, that the defense requested an instruction telling the jury that venue was an element of the offense. The defense requested the following: "In addition to the other elements of the offense, the government has the burden of proving that some part of the offense occurred

47

in the District of Columbia.  If you find that there was a conspiracy, but it was not in or did not involve the District of Columbia, then you must acquit the defendant, notwithstanding any other issues in the case."  Dkt. No. 180, Tab J.  (Trial Tr. 5/14/12 at 52.)  This issue was first raised after the government had rested its case in chief, after the defense had rested its case and after the government had rested its rebuttal case.  (Armbruster, 5/10/12 p.m. at 77.)

The government objected to this instruction on several grounds: (1) venue was not an element of the offense and remained a question to be decided by the judge by a preponderance of the evidence, United States v. Gaudin, 515 U.S. 506, 510 (1995) (concurring opinion by three justices), discussed in United States v. Nwoye, 663 F.3d 460 (D.C. Cir. 2011); (2) the defense did not timely raise the venue issue "that some part of the offense occurred in the District of Columbia," and did so only at the charging conference; and (3) there was no genuine issue of material fact with regards to proper venue because the defense had not disputed that $1,000 was wired by Jones to the District of Columbia and at least one telephone call was made from the District of Columbia to Jones.  United States v. Haire, 371 F.3d 833, 839-40 (D.C. Cir. 2004), vacated on other grounds, 543 U.S. 1109 (2005) (venue may present a question for the jury only "when the following three conditions are met:  (1) the defendant objects to venue prior to or at the close of the prosecution's case-in-chief, (2) there is a genuine issue of material fact with regard to proper venue, and (3) the defendant timely requests a jury instruction").  (See Trial Tr. 5/14/12 at 53-55; Email to the Court dated 5/14/12, which was inadvertently omitted from Dkt. No. 180, attached hereto as Attachment 8.)

On May 15, 2012, the Court ruled that the three-part test outlined in Haire, 371 F.3d at 840, for submitting the issue of venue to the jury was applicable.[15]  The Court also held  that the defendant satisfied the first and third prongs of the Haire test, by having properly objected to venue and requested a venue instruction.

The Court found, however, "that the second prong of the test is not met, because there is no 'genuine issue of material fact with regard to proper venue.'" Dkt. No. 180, Tab LL.  The Court went on to hold that "[w]hile it is a question of fact whether any conduct occurred within the District of Columbia that establishes venue here, in this case there is no genuine material issue about whether such conduct occurred, because it is not disputed that Mr. Sitzmann's co-conspirator Mr. Jones, through Mr. Mesa, caused money to be wired to Mr. Colligan in the District.  Mr. Mesa and Agent Buss testified to this effect, business records from Western Union introduced at trial fully support Mr. Mesa's testimony, and no evidence to the contrary was

---

[15]  We still believe that venue is a question for the judge, not the jury.  First, venue is not an element of the offense and need only be proved by a preponderance of the evidence.  See e.g., Lam Kwong-Wah, 924 F.2d 301; United States v. Rommy, 506 F.3d 108, 119 (2d Cir. 2007), cert. denied, 552 U.S. 1260 (2008); United States v. Muhammad, 502 F.3d 646, 652 (7th Cir. 2007), cert. denied, 552 U.S. 1144 (2008); United States v. Lanoue, 137 F.3d 656, 661 (1st Cir. 1998); United States v. Griley, 814 F.2d 967, 973 (4th Cir. 1987).   "[U]nlike the substantive facts which bear on guilt or innocence in the case[,] venue is wholly neutral; it is a question of procedure, more than anything else, and it does not either prove or disprove the guilt of the accused."  Wilkett v. United States, 655 F.2d 1007, 1011-1012 (10th Cir. 1981), cert. denied 454 U.S. 1142 (1982).  Because the propriety of venue has no bearing on guilt or innocence and because it has never been elevated to the status of an "element fo the crime," it does not implicate the requirements under the Fifth and Sixth Amendment that a criminal conviction "rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt."  Gaudin, 515 U.S. 506, 510 (1995); see also In re Winship, 397 U.S. 358, 364 (1970).  Accordingly, we believe that venue is an issue for the judge, not jury.  Even the D.C. Circuit, in the case of United States v. Nwoye, 663 F.3d 460 (D.C. Cir. 2011), acknowledged that "three justices concurred in Gaudin to explain that venue remained a question to be decided by the judge by a preponderance of the evidence."  The D.C. Circuit stated, however, that "[w]e have not decided the question, and need not resolve it here."  Id.

introduced by the defendant or developed on cross-examination."  Id.  The Court stated that

"[t]he case law is clear that in a conspiracy prosecution even a single overt act within the District

of Columbia is sufficient to establish venue here."  Id., citing United States v. Nwoye, 663 F.3d

at 466; United States v. Lam Kwong-Wah, 924 F.2d 298, 301 (D.C. Cir. 1991).  Therefore, the

Court concluded, that "because there is no genuine issue of material fact with regard to proper

venue, there is no reason to submit the question to the jury, particularly in light of the potential

for confusion that such an instruction might cause."  Id., citing United States v. Massa, 686 F.2d

526, 530-31 (7th Cir. 1982) (stating that venue is "more akin to jurisdiction than to the

substantive elements of the crime" and "is therefore particularly suited to determination by the

court as a matter of law where venue is not disputed and the Government presents sufficient

evidence of venue to meet the preponderance of the evidence standard").

    The defense has provided no analysis as to why the Court should have instructed the jury

on venue.  The Court, however, heard all the evidence, analyzed the law and determined that

venue was not a question for the jury in this case.  The case law clearly supports the Court's

decision.

    Moreover, under law of the case doctrine, the court should preclude the defendant from

arguing venue again. Arizona v. California, 460 U.S. 605, 619 (1983);  Naples v. United States,

359 F.2d 276, 277 (D.C. Cir. 1996).   In the absence of supervening factors,  the general rule is

that where the evidence is "substantially the same, . . . all matters, questions, points or issues

adjudicated" in the prior stage of the proceeding" should not be reconsidered or readjudicated

therein."  United States v. Singleton, 759 F.2d 176, 182 (D.C. Cir. 1985).  "Law-of-the-case

doctrine states that the same issue presented a second time in the same case should lead to the same result."  LaShawn A. v. Barry, 87 F.3d 1389, 1393 (D.C. Cir.1996).

The Court has already considered and resolved the issue of venue in accordance with case law.  The defendant's arguments, to the extent he has articulated them, are not new in any respect.  The defense has provided no reasons why the Court should reconsider venue now.

> C.  The Intrinsic and Rule 404(b) Evidence Was Properly Admitted

The defense next argues that the government introduce some irrelevant and prejudicial other crimes evidence, most of which was allegedly introduced without notice to the defendant and without permission from the Court.  He complains that the following evidence and statements allegedly elicited by the government might have confused the issues, wasted time and had the potential to mislead the jury: that the conspiracy involved hundreds of kilograms of cocaine as mentioned in the government's opening statement; discussions regarding cocaine smuggling by illegally modified private airplanes; Jerry Harvey's money laundering; John Sager's air smuggling, underwater smuggling and money laundering; Robert Campeau's freebasing; and the history of the Canadian Hells Angels.  Def. Mot. at 10, 12, 30.

The defense also complains that the following evidence or statements was intended to show that Sitzmann is a person of bad character: Michael and Rhonda Fields testifying that Sitzmann promised to take care of their mother after their father, James Fields, was arrested and convicted for attempting to smuggle Sitzmann's cocaine out of Colombia; that one of the prosecutors stated that his objection "goes to safety" in response to a defense attempt to get a government witness' home location; and when Buss stated that Colligan was "sacred [sic] to death of Sitzmann."  Def. Mot. at 30-31.

The defense objects most strenuously to the evidence of Sitzmann's drug smuggling cases in the Bahamas and Florida; his conviction for attempting to fraudulently obtain a driver's license in Florida in 1994; his possession of cocaine in France in 2004; his bribing of foreign officials; and claims of money laundering with Harvey.   Def. Mot. at 8-9, 31.

Despite present defense counsel's apparent unfamiliarity with the case, he continues to allege bad motives on the part of the government for the introduction of the evidence.   We will address his complaints in the same order in which he has made them.

> 1.   Government Gave Notice of, and Court Approved, Harvey's Testimony About Sitzmann Smuggling 300-500 Kilograms of Cocaine From Colombia, Through Bahamas, and Into United States

The defense claims the government introduced extrinsic evidence of other crimes <u>without</u> providing prior notice and <u>without</u> first receiving permission from the Court. Def. Mot. 26, 32-33. It argues that "[b]y not serving notice as it was required to do, the government was able to run through evidence designed to overwhelm the jurors with evidence of Sitzmann's propensity for wrongdoing and bad character."  Def. Mot. 33.  Its main complaint is that "[w]ithout any prior notice to the Court and the defense, the government introduced evidence through Jerry Harvey that Sitzmann routinely smuggled 300 to 500 kilos by airplane from Columbia [sic] to the Bahamas and by boat into the United States notwithstanding it had not given notice nor [sic] obtained permission from the Court."  Def. Mot. 32.  This is a blatantly false, and unfortunately, just another example of the defense challenging the prosecution's ethics and conduct by slinging gross misrepresentations.

On February 13, 2012, the government filed with the Court a Memorandum on the Admissibility of Certain Intrinsic Evidence, or in the Alternative, Motion to Admit Other Crimes

Evidence Pursuant to Federal Rule of Evidence 404(b).  Dkt. No. 146.  In this filing, the

government provided specific notice that it planned on introducing evidence from Harvey that

Sitzmann consulted with Harvey during the 1980s about drug smuggling techniques and

Sitzmann told Harvey that he was smuggling hundreds of kilograms of cocaine from Colombia to

the Bahamas and then into the United States.  Dkt. No. 146 at 4.

On April 13, 2012, the Court filed an Opinion and Order on the government's motion.

Dkt. No. 165.  The Opinion and Order was also published at United States v. Sitzmann, 856 F.

Supp. 2d 55 (D. D.C. 2012).  In the Court's Opinion and Order, the Court reserved its ruling on

this aspect of Harvey's testimony until it heard Harvey's testimony outside the hearing of the

jury.  Dkt. No. 165 at 11, n. 3.  On April 19, 2012, starting at 9:22 a.m., in the middle of trial, the

Court held an evidentiary hearing (outside the presence of the jury) to address these issues, which

the defense wrongly argues the Court was not given the opportunity to address.  (Transcript

4/19/12 a.m. at 4-27.)  During this hearing, Harvey testified before the Court, and was cross-

examined by the defense, and provided more specific detail about the evidence the government

sought to introduce.  As a result, the Court ruled in the government's favor and allowed Harvey

to testify about Sitzmann's statements that he was smuggling 300-500 kilograms of cocaine from

Colombia, through the Bahamas and into the United States in the mid to late 1980s.  (Trial

Transcript 4/19/12 a.m. at 24-26.)[16]  Consequently, Harvey testified about this operation.

In describing this operation, Harvey also stated that Sitzmann paid off people in the

Bahamas to allow the planes carrying the cocaine to land.   (Harvey, 4/19/12 a.m. at 111-12.)

The defense takes issue with this statement by Harvey, too.  Although this statement by Harvey

---

[16]  We note that the defense is the party that ordered the transcript and cited it extensively in its
motion.

was not specifically elicited by the prosecutor and was very brief, it was an integral part of the

drug smuggling operation and credibly explained how Sitzmann would have been allowed to

land drug planes in the Bahamas in the first place.  It was well within the Court's Order allowing

the facts of this operation into evidence.  Hence, it is no surprise that Sitzmann's trial attorney,

who was present during the evidentiary hearing, did not object to Harvey's statement.

           2.       Sitzmann's Acts of Money Laundering Were Overt Acts in the
                         Conspiracy and Were Identified in the Bill of Particulars and in
                         Discovery

The defense argues that the government improperly introduced Harvey's testimony

regarding Sitzmann's money laundering during the conspiracy.  Def. Mot. 31, 33.  Likewise, it

argues that Harvey was never a co-conspirator of Sitzmann's.  The defense states that "[t]he

government claimed that Jerry Harvey was a co-conspirator, but the evidence at trial showed that

Jerry Harvey never agreed or conspired with Greg Sitzmann to violate any drug laws.  He was

never involved in Sitzmann's drug smuggling."  Def. Mot. 8.  The defense is now attempting to

convince the Court to find, erroneously, that evidence of money laundering should not have been

admitted because money laundering is a totally separate endeavor from a drug trafficking

conspiracy.  Def. Mot. 8.  Although the defense criticizes the prosecution's knowledge of

conspiracy law (Def. Mot. 1-30, it is the defense that fails to understand or acknowledge some of

the most basic and fundamental principals of conspiracy law.

Although disregarded by the defense, the evidence established that Harvey was

Sitzmann's drug smuggling adviser and moneyman.  Harvey testified that Sitzmann knew about

Harvey's prolific drug smuggling history and Harvey knew the same about Sitzmann.  Harvey

also knew that in the mid-1990s, Sitzmann was smuggling cocaine through the United States to

the Hells Angels in Canada.   He knew that Sitzmann was moving the cocaine in secret

compartments in the gas tanks of automobiles and that he was moving the cash drug proceeds

from Canada to the United States and Mexico the same way.

Harvey admitted that he was a participant in Sitzmann's illegal activity.   He

acknowledged that he helped Sitzmann pick up one of the automobiles from the mechanic that

installed the gas tank with the secret compartment.  (Harvey, 4/19/12 a.m. at 110-124.)  He also

admitted that Sitzmann frequently consulted with Harvey on the drug smuggling capabilities of

airplanes and Harvey would give advice to Sitzmann in this regard.  (Harvey, 4/19/12 a.m. at

113.)  Harvey also inspected Sager's Velocity airplane for Sitzmann in the mid-1990s.  Harvey

believed Sitzmann was going to use it in his business.  Sitzmann purchased the plane and,

contrary to the assertion of the defense (Def. Mot. 10), did use it for drug smuggling.[17]  (Harvey,

4/19/12 p.m. at 9-12, 16.)

Harvey also laundered hundreds of thousands of dollars of Sitzmann's illegal drug

proceeds.  Sitzmann smuggled millions of dollars in drug proceeds from Canada to the United

States.  In 1998-1999, at the height of the Canadian smuggling, Harvey accepted $500,000 in

cash from Sitzmann to launder.   Then, at Sitzmann's request, Harvey ordered that the money be

wired from a Switzerland bank account to an account at BAC Panama in the name of one of

Sitzmann's corporations, Bangel.  Sitzmann then arranged to buy a Piper Navajo Panther airplane

---

[17]  This was also corroborated by John Sager.  Sager testified that Sitzmann talked to him about
the Velocity before Sitzmann purchased the plane from the Sheriff's auction.  Sager told
Sitzmann about the planes capabilities, including that it could carry a large load from Colombia
to Canada, if the plane was modified.  Sager also told Sitzmann that he had planned to smuggle
150 kilograms of cocaine in the Velocity from Colombia to Canada.  (Sager, 4/23/12 p.m. at 26-
31, 57-61.)

(tail number N97CK) for approximately $187,000 and used his laundered drug money to make the purchase.[18]  (Harvey, 4/19/12 p.m. at 33-40; Govt. Trial Exh. 759, 760, 760a, 440-448.) Harvey also held hundreds of thousands of additional cash for Sitzmann in the mid- to late-1990s.  (Harvey, 4/19/12 p.m. at 40)

Despite the defense's present attempt to argue the contrary, money laundering is an integral and vital facet of drug trafficking.  This is established by Harvey's testimony and the testimony of the governments narcotics expert, Fred Stacey.  (Stacey, 5/2/12 at 124-127).  There is also no doubt that this is the law.  See United States v. Tarantino, 846 F.2d 1384 (D.C. Cir. 1988) ("laundering of funds was a part of the plan to distribute cocaine; the conspirators … well knew that the cocaine money had to be "cleaned up" to be useful to them … [and therefore] laundering the cocaine profits thus facilitated the attainment of the conspiracy's goals; money launderers play an essential part in a narcotics chain conspiracy").  We note that defendant's present counsel was on the prosecution team in Tarantino that argued successfully that money laundering is essential to the goals of a conspiracy to distribute drugs.  "Because it is in the nature of large scale drug dealings that means will be needed to conceal the source of considerable illegal proceeds," courts have "found laundering to be an integral part of [a drug] conspiracy."  United States v. Arnold, 117 F.3d 1308, 1314-15 (11th Cir. 1997), quoting United

---

[18]  We note that Sitzmann acquired this plane after Sager agreed in 1998 to fly cocaine from Colombia, over the United States and into Canada with a Piper Navajo Panther.  (Sager, 4/23/12 p.m. at 65-76.)  After a DEA drug dog alerted on the plane in September 2000, Sitzmann sold the plane in November 2000.  (Sanders, 4/27/12 a.m. at 11; Govt. Trial Ex 445.)  Immediately after purchasing the plane, the new buyer found illegal copper piping for auxiliary fuel tanks that are commonly used for long-range drug smuggling.  (Sanders, 4/27/12 a.m. at 12-14.)  Contrary to the defense argument, there was more than enough evidence with which a jury could reasonable infer that Sitzmann possessed the plane for drug trafficking.

States v. Bolinger, 796 F.2d 1394, 1407-08 (11th Cir. 1986), modified on other grounds, 837

F.2d 436 (11th Cir.), cert. denied, 486 U.S. 1009 (1988); U.S. v. Mangual-Santiago, 562 F.3d

411 (1st Cir. 2009); United States v. Dela Espriella, 781 F.2d 1432, 1436 (9th Cir.1986); United

States v. Orozco-Prada, 732 F.2d 1076, 1080 (2d Cir.), cert. denied, 469 U.S. 845 (1984); United

States v. Metz, 608 F.2d 147, 153 (5th Cir. 1979), cert. denied, 449 U.S. 821 (1980); see also

United States v. Garcia Torres, 280 F.3d 1, 4 (1st Cir. 2002) (a conspiracy to distribute or possess

with intent to distribute illegal narcotics may have related functions like accounting,

communications and strong-arm enforcement, and a person "who joined with the drug dealers to

perform one of those functions could be deemed a drug conspirator").

  Accordingly, as adviser and money launderer, Harvey was a co-conspirator in Sitzmann's

drug trafficking organization and their money laundering related transactions were overt acts in

the conspiracy, and properly admitted.

  The defense is again mistaken when it claims that the government did not provide notice

of its intent to use evidence of Sitzmann's money laundering.  It suffices to say that the

government's Third Amended Bill of Particulars detailed Sitzmann's money laundering activity

as overt acts and the government provided the underlying evidence in discovery.  See Dkt No.

116 at ¶¶ 9-10, 74-81, 104-106, 124, 132, 159- 162.

    3. Sitzmann's Attempt to Acquire a Fraudulent ID Was an Overt Act
     in the Conspiracy and Notice of the Government's Attempt to
     Introduce the Evidence was Given to the Defense.

  The defense claims the "government did not present a shred of evidence that [Sitzmann's]

attempt to obtain [a] fraudulent Florida driver's license [in 1994] was in any fashion connected to

any narcotics conspiracy." Def. Mot. 9. The defense characterizes this evidence as "other crimes

evidence" and then complains that the government introduced the evidence without prior approval from the Court.  Def. Mot. 9, 31, 33.  The defense again attacks the prosecution's ethics by arguing that "[w]hen it introduced this evidence from January, 1994, the government knew the charged conspiracy had not yet been formed [in 1994]"  and the "only purpose that it served in the trial was to unfairly prejudice Sitzmann by further showing his bad character and criminal predisposition . . .."  Def. Mot. 9.

This argument shows, at the very least, a lack of understanding of the record.[19]  The government provided substantial evidence that while incarcerated in MCC, Sitzmann was putting the pieces, including the people, together to traffic in cocaine after his release in 1990.  The government also provided specific notice to the defense that it intended to introduce defendant's attempt to acquire a fraudulent ID as an overt act in the conspiracy.

It was at MCC that Sitzmann and Paulson talked about and agreed to smuggle cocaine together.  Sitzmann told Paulson that he already had the source of cocaine supply.[20]  In turn, Paulson told Sitzmann that he (Paulson) had a very good market for cocaine.  They agreed that after Sitzmann was released from prison, Paulson would arrange to have Sitzmann introduced to the people to whom Sitzmann and Paulson would smuggle cocaine.  (Paulson, 4/24/12 p.m. at

---

[19] Even though the defense has had more than eight months to prepare its motion, we attribute this and other defense assertion to a "lack of understanding."  However, we are also reminded of an old Chinese proverb:  "Mistakes occur through haste, never through doing a thing leisurely."

[20]  Sitzmann's admission that he had the source of cocaine supply is also evidence that Sitzmann was in a conspiratorial relationship by this time to traffic in cocaine with unknown suppliers of cocaine.  See Rogers v. United States, 340 U.S. 367, 375 (1951) (identification of co-conspirators is not necessary for conspiracy conviction); United States v. Obialo, 23 F.3d 69, 72 (3d Cir. 1994); United States v. Goodwin, 492 F.2d 1141 (5th Cir. 1974) (an individual can be convicted of conspiracy with "unknown person").

22-27.)   After Sitzmann was released from prison, but while Paulson was still in prison, Paulson

did make arrangements for Sitzmann to meet co-conspirator Normand Theoret in Canada in

approximately 1994, as they had agreed to in jail.[21]  (Paulson, 4/24/12 p.m. at 22-29.)  There

should be no question that Sitzmann and Paulson were in a conspiratorial relationship at MCC.

It was also at MCC, that Sager and Sitzmann talked about the use of small airplanes for

drug smuggling purposes.  (Sager, 4/23/12, p.m. at 40-43.)  They talked about the drug

smuggling capabilities of various airplanes, including the Piper Navajo.  They also talked

frequently about the use of kit planes, like the Velocity, because both men were interested in drug

smuggling airplanes.  (Sager, 4/23/12, p.m. at 42-43, 50.)

It was at this time that Sitzmann and Sager also talked about sources of cocaine supply

and markets to deliver cocaine.  They discussed international drug trafficking, including to

Canada and Europe, that cocaine commands higher prices at those locations and drug trafficking

laws are more lenient and less "draconian" there, all a prelude to, and preparation for, the

conspiracy at issue here.[22]  (Sager, 4/23/12, p.m. at 52-53.)  It was at MCC where Sitzmann was

acquiring needed knowledge for the conspiracy he was embarking on that included drug

---

[21]  This was also corroborated by Robert Campeau, Paulson's brother-in-law.  Campeau testified
that in 1994 or early 1995, Paulson asked Campeau to show Sitzmann around the Montreal area,
which he did.  (Campeau, 4/25/12 p.m. at 13-14.)  Moreover, the fact that Sitzmann and Paulson
did smuggle hundreds of kilograms of cocaine from the United States to Normand Theoret in the
1990s is further evidence that a conspiratorial relationship existed between Sitzmann, Paulson
and others at the time Sitzmann, Paulson, Harvey and Sager were incarcerated at the MCC in the
late 1980s-1990.  (Paulson, April 24, 2012, p.m. at 31-68.)

[22]  Sager went on to explain that although he would still be violating U.S. laws by flying a plane
load of cocaine over the United States and into Canada, "the chances of being apprehended and
prosecuted in the U.S., you would more have to be caught here was my thinking."  Sager agreed
that he and Sitzmann would not be trying to avoid breaking U.S. laws, they would be trying to
minimize the chance of getting caught in the U.S. (Sager, 4/24/13 a.m. at 40-41.)

trafficking in the United States, Canada and Europe.  The defense is disingenuous, to put it mildly, in now arguing that there was no evidence that a drug conspiracy existed by the time Sitzmann was attempting to acquire a fraudulent ID in 1994.

The government also presented substantial evidence that fake identifications are an essential component to drug trafficking, particularly when attempting to enter a foreign country with prior felony convictions.  Jerry Harvey and Gary Paulson testified that Sitzmann used and provided fake identifications in order to enter Canada for purposes of smuggling cocaine. (Harvey 4/19/12 a.m. at 121; Paulson 4/24/12 p.m. at 54).  Additionally, expert witness Fred Stacey testified that drug smugglers would use fraudulent driver's licenses to enter Canada in order to disguise their true identity.   (Stacey, 5/2/12 at 163-65.)  Accordingly, there was overwhelming evidence from which a jury could find that Sitzmann's attempt to acquire a fraudulent driver's license in 1994 was an overt act in the conspiracy and was an attempt to acquire a necessary tool of the drug smuggling trade.[23]

With respect to providing notice of fake ID case, as an overt act (and not "other crimes evidence"), there is no special requirement to provide notice or seek court approval prior to the introduction of this evidence, other than to produce the evidence in discovery.  However, not only was this evidence provided in discovery, the government had specifically notified the defense prior to trial, by letter dated January 23, 2012, that it intended to introduce this evidence as an overt act in the conspiracy.   Letter dated 1/23/12 attached as Attachment 9.    The

---

[23]  The defense argues that Sitzmann could have sought a fake ID "for any one of a dozen reasons."  Def. Mot. 33, n. 21.  We do not understand what relevant point the defense is attempting to make at this stage of the proceeding.  What is clear, however, is that there was a very substantial amount of evidence from which the jury could easily infer that Sitzmann's reason for the fake ID was to help him smuggle cocaine.

government also represented to both the Court and the defense in open court on February 1,

2012, that defendant's attempt to acquire the fraudulent ID was an overt act in the conspiracy.

Transcript of 2/1/12 Status Hearing at 45, Dkt. No. 154.  Finally, the government included

Sitzmann's 1994 Florida conviction for attempting to acquire the fraudulent ID in its Amended

Rule 609 notice that was filed on February 13, 2012.  Dkt. No. 147.  The defense's present

attempt to besmirch the integrity of the government prosecutors and argue that this evidence was

irrelevant, improperly introduced and that the defense was surprised by the introduction is simply

ludicrous.

> **4.**     **Sitzmann's European Drug Smuggling was Part of the Single
>           Conspiracy, Were Overt Acts in the Conspiracy and Not Governed
>           by Rule 404(b)**

In a footnote, the defense argues that "[e]ven the cocaine possessed by Sitzmann in

France was other crimes evidence covered by Rule 404(b).  The evidence showed that Sitzmann

traveled from Bogota, Colombia to Madrid, Spain, where he rented a car and drove into France.

There was no connection to any conspiracy for all intents and purposes.  He simply had it in his

possession."  Def. Mot. 33, n. 22.

As we have discussed extensively in this opposition, above, Sitzmann's European

smuggling operation was just one aspect of his drug trafficking enterprise.  Just like he did with

the U.S. and Canadian cocaine trafficking, he continued to smuggle the same drug, i.e., cocaine,

continued to use the same core people (George Jones and James Fields), continued to use heat

seals to package cocaine, and continued to use his leather bags with hidden compartments to

secrete the cocaine.  The defense not only ignores these facts, but also ignores the fact that

Sitzmann asked Jones to work the very same trip which resulted in Sitzmann's French arrest.  As

we discussed above, it was also significant that the first person Sitzmann called from France after his arrest was Jones, his longtime co-conspirator.

The defendant's argument that the "French Connection" was not part of this, or any conspiracy, and should have been governed by Rule 404(b) is without merit.  It is not surprising that the defense relegated this argument to a footnote.

5.      The Court Correctly Admitted Intrinsic and Rule 404(b) Evidence

The defense claims the Court improperly admitted Intrinsic and Rule 404(b) evidence and attributes it to misrepresentations by the government.  The defense argues that the government incorrectly asserted that there was evidence indicating that Sitzmann, Paulson, Harvey and Sager were co-conspirators "from at least the 1990s," that at least by 1990, the conspiracy was in existence and that the conspiracy was in existence at some point when these four individuals were incarcerated together at MCC.  Def. Mot. 2.  The defense argues "[a]t the very most, the evidence showed that some of the four talked about their prior drug smuggling days and drug smuggling airplanes, but, of course, that conduct does not even come close to being an agreement."  Def. Mot. 2.  The defense went on to represent to the Court that the "evidence at trial showed at most that there was 'talk' about prior smuggling ventures and airplane capabilities . . .."  Def. Mot. 8 (emphasis added).

Notwithstanding its own misrepresentations of the record, the defense then attributes bad motives to the government.  The defense proffered that the "evidence presented at trial showed [that the government's theory of when the conspiracy commenced] was complete fiction."  Def. Mot. 6.  It also represented that "[t]hese arguments [that the conspiracy existed in the 1990s]were

made notwithstanding the fact the evidence at trial proved there was no agreement in the early 1990s." Def. Mot. 2.

The Court properly admitted the Intrinsic and Rule 404(b) evidence, and the government stands by its representations to the Court. As indicated below, however, the defense finds it necessary to distort the record to support its conclusions.

The defense attached to its motion a few pages from Paulson's grand jury transcript in an attempt to show that there was no relationship forming at MCC between Sitzmann and Paulson, that no conspiracy was taking shape there, and that the conspiracy did not begin until the late 1990s after Paulson got out of jailed. Def. Mot. 34. The defense omitted and did not discuss relevant portions of Paulson's grand jury transcript.

Paulson stated that while at MCC he talked to Sitzmann about his background in drug trafficking. (Excepts of Paulson Grand Jury Transcript at 8-12, attached as Attachment 10.) Paulson stated that they talked about the details of Sitzmann's cocaine smuggling case for which Sitzmann was incarcerated at MCC. Although Paulson said that he could no longer (after more than 20 years) remember the "real specifics of [Sitzmann's] case," he remembered that Sitzmann told him that his pilot took off from Florida and was to pick up a load of cocaine, but crashed on the beach in Guarjero, Colombia. (Excerpts of Paulson Grand Jury Transcript at 9-12, attached as Attachment 10.) Paulson stated that Sitzmann told him that the plane, a Cessna 421 or 402, crashed because the pilot didn't know fuel management very well for that plane. Paulson testified that he "couldn't understand how the plane ran out of gas, 400 and some-odd gallons only going less than, you know, 1,000 nautical miles – it should have went 1,800 to 2,000 miles." (Excerpts of Paulson Grand Jury Transcript at 11, attached as Attachment 10.) Paulson also

testified in the grand jury that he trusted Sitzmann early on and that's why he allowed Sitzmann to be introduced to Norman Theoret.  Paulson stated, "[h]e seemed, you know, in the beginning he seemed like a pretty forthright guy, he seemed pretty smart.  You know, I thought that he knew what he was doing and he had some good connections."  (Excerpt of Paulson Grand Jury Statement at 17, attached as Attachment 10.)  Thus, contrary to what the defense represents, trust and Sitzmann's experience as a drug trafficker were vital to Paulson joining Sitzmann's enterprise.

Paulson was also asked in the grand jury, "[w]hen you were in jail with Mr. Sitzman in the mid-80s, did you talk about working together?"  Paulson responded, "[y]eah. Yeah, a lot."  (Paulson Grand Jury Statement at 12, attached as Attachment 10.)  The government did not go into any detail in the grand jury about what was discussed in jail about Sitzmann and Paulson working together.  However, it did at trial.

The defense completely ignores Paulson's trial testimony establishing that Paulson joined Sitzmann's enterprise to traffic in cocaine while they both were incarcerated at MCC.  Paulson testified that he met Sitzman at MCC in about 1988 while both were incarcerated on drug smuggling charges.  Paulson testified that Sitzmann told him that he (Sitzmann) was incarcerated at MCC on a drug conspiracy case and that Sitzmann's case stemmed from a failed attempt to pick up a plane load of drugs in Colombia.  (Paulson, 4/24/12 p.m. at 17-18.)  While housed at MCC, they spent a lot of time together, talked extensively about drug smuggling and became good friends. (Paulson, 4/24/12 p.m. at 19; see also Sager, 4/23/12, p.m. at 47-49.)

With their relationship solidified, it was at MCC that Sitzmann and Paulson agreed to smuggle cocaine together, contrary to the representations of the defense.  Sitzmann told Paulson

that he already had the source of cocaine supply.[24]   In turn, Paulson told Sitzmann that he (Paulson) had a very good market in Canada to which they could smuggle cocaine.  Sitzmann and Paulson agreed at MCC that after Sitzmann was released from prison, Paulson would arrange to have Sitzmann introduced to the people to whom they would smuggle cocaine in Canada. (Paulson, 4/24/12 p.m. at 22-27.)   Accordingly, there was more than enough evidence that the conspiracy was coming together in MCC.

The defense also overlooks the fact that after Sitzmann was released from prison, but while Paulson was still in prison, Paulson did make arrangements for Sitzmann to meet co-conspirator Normand Theoret in Canada in approximately 1994, as they had agreed to in jail. Sitzmann paid $1,500 to Paulson's wife in Canada on one or two occasions.   (Paulson, 4/24/12 p.m. at 22-29.)   This was also corroborated by Robert Campeau, Paulson's brother-in-law. Campeau testified that in 1994 or early 1995, Paulson asked Campeau to show Sitzmann around the Montreal area, which he did.  (Campeau, 4/25/12 p.m. at 13-14.)  Customs records also show that Sitzmann was in Montreal in September, October and December of 1995.  (Trial Ex. 850; Rine, 4/18/12 at 112-15.)  Moreover, the fact that Sitzmann and Paulson, along with George Jones, James Fields, Robert Campeau, Robert Barnaby and others did smuggle hundreds of kilograms of cocaine from the United States to Normand Theoret in the 1990s is further evidence that a conspiratorial relationship existed between Sitzmann, Paulson and others at the time Sitzmann, Paulson, Harvey and Sager were incarcerated at the MCC in the late 1980s-1990. (Paulson, April 24, 2012, p.m. at 31-68.)

---

[24]  Again, Sitzmann's admission that he had the source of cocaine supply is evidence that Sitzmann was already in a conspiratorial relationship by this time to traffic in cocaine with unknown suppliers of cocaine.

The government's representations to the Court in its Intrinsic Evidence/Rule 404(b) Motion were correct.  The defense is disingenuous, to put it mildly, in now arguing that there was no evidence that a drug conspiracy existed at MCC.

The defense also conveniently snubs the evidence presented about the relationships that developed between Sitzmann and Paulson, and between Sitzmann and John Sager when they met at MCC in the late 1980s.  The same is true with the revived relationship between Jerry Harvey and Sitzmann when they were incarcerated at MCC during the same time period.  As the Court has already held, this evidence was admissible as either intrinsic evidence, Rule 404(b) evidence, or both.  This evidence was "relevant to proving the inception" of the conspiracy and "to explain the background, formation, and development of the illegal relationship and, more specifically, to help the jury understand the basis for the co-conspirators' relationship of mutual trust."  Dkt. 165 at 4-5, 11-12, quoting  United States v. Santana, 342, F.3d 60, 67 (1st Cir. 2003) (evidence of prior cocaine conspiracy properly admitted in prosecution of subsequent cocaine conspiracy), citing United States v. Vega, 285 F.3d 256, 261 (3d Cir. 2002) (evidence of prior drug conspiracy properly admitted to demonstrate defendant's relationship with member of charged conspiracy).  "'[A]ssociation with conspirators is evidence of participation in the conspiracy . . ..'"  Childress, 58 F.3d at 708, quoting United States v. Rengifo, 858 F.2d 800, 808 (1st Cir. 1988)).  In this regard, and as discussed above, it was at MCC that Sitzmann and Paulson met, became very good friends and discussed drug smuggling extensively.  It was also at MCC that Sitzmann integrated Paulson into his cocaine smuggling plan, in which Sitzmann already had his source of cocaine supply lined up, and they agreed to traffic in cocaine.  Sitzmann, along with his co-conspirators,

including Paulson, Jones, Fields and Sitzmann's source of supply, smuggled cocaine through and in the United States (including Chicago, New York, and Detroit), Canada, and Europe.

It was also at MCC where John Sager and Sitzmann met and developed their relationship. Sager testified that he met Sitzmann at MCC in the late 1980s. They talked extensively about drug smuggling and developed a "trusting relationship." (Sager, 4/23/12, p.m. at 43.) Contrary to the defense's assertion, Sager understood from talking to Sitzmann and from the circumstances of Sitzmann's incarceration, that Sitzmann was in jail for the importation of large quantities of illegal drugs. (Sager, 4/23/12, p.m. at 39.) While in MCC, Sager and Sitzmann talked about the use of airplanes for drug smuggling purposes. (Sager, 4/23/12, p.m. at 40-43.) They talked about the drug smuggling capabilities of various airplanes, including the Piper Navajo. They also talked frequently about the use of kit planes, like the Velocity, because both men were interested in drug smuggling airplanes. (Sager, 4/23/12, p.m. at 42-43, 50.)

It was also at MCC that Sitzmann and Sager talked about sources of cocaine supply and markets to deliver cocaine. They discussed international drug trafficking, including to Canada and Europe, that cocaine commands higher prices at those locations and drug trafficking laws are more lenient and less "draconian" there, all a prelude to, and preparation for, the conspiracy at issue here.[25] (Sager, 4/23/12, p.m. at 52-53.) It was at MCC where Sitzmann acquired knowledge for use in the conspiracy on which he was embarking.

---

[25] Sager went on to explain that although he would still be violating U.S. laws by flying a plane load of cocaine over the United States and into Canada, "the chances of being apprehended and prosecuted in the U.S., you would more have to be caught here was my thinking." Sager agreed that he and Sitzmann would not be trying to avoid breaking U.S. laws, they would be trying to minimize the chance of getting caught in the U.S. (Sager, 4/24/13 a.m. at 40-41.)

Sager also confirmed that at MCC, Sitzmann showed a lot of respect for Jerry Harvey, a very successful drug trafficker and money launderer.  (Sager, 4/23/12, p.m. at 44.)  Harvey had a long history with Sitzmann, and at MCC Harvey gave certain court pleadings to Sitzmann that helped Sitzmann get out of jail in 1990.[26]  (Harvey, 4/19/12, a.m. at 116-117.)

This evidence was relevant and important in explaining to a jury how and why Paulson became a co-conspirator while still incarcerated at MCC, and why Sager and Harvey would soon join Sitzmann's conspiracy.  Obviously, as testified to by Sager, these individuals trusted each other from their days at MCC.  This evidence was critical for a jury to be able to infer that mutual respect and a trusting relationship developed at MCC between Sitzmann and each of these individuals, a cornerstone for any conspiracy, including the one at issue.  Further, this evidence shows the knowledge and expertise that Sitzmann was acquiring and putting in place at the inception of the conspiracy from Paulson, Sager and Harvey, who either joined the conspiracy at MCC or did soon thereafter.

The defense's claim that Harvey and Sager never became Sitzmann's conspirators and trust between them and Sitzmann was not relevant, is unsupportable.  As we discussed above, Harvey was Sitzmann's drug smuggling adviser, airplane consultant and the launderer of Sitzmann's drug proceeds.  Harvey was a co-conspirator.   Tarantino, 846 F.2d at 1397.  As for

---

[26]  Harvey provided a pretrial sworn statement that described the trust and respect that developed between Sitzmann and Harvey over the years before and after their incarceration at the MCC. The evidence included Harvey's knowledge of Sitzmann's extensive cocaine smuggling through the Bahamas and Harvey's assistance in Sitzmann's escape from the Bahamian prison in 1986. Much of Harvey's past relationship with Sitzmann, including Harvey's assistance in Sitzmann's 1986 escape from the Bahamian prison, was not admitted into evidence at trial pursuant to the Court's Intrinsic Evidence/Rule 404(b) ruling.  (See Dkt. No. 165; Excerpts of Harvey Sworn Statement of 4/15/10 at 29-34, attached as Attachment 11.)

Sager, he agreed in 1998 to fly cocaine from Colombia, over the United States and into Canada with a Piper Navajo Panther.  (Sager, 4/23/12 p.m. at 65-76.)  A jury could easily infer that he was a co-conspirator despite the fact that he did not actually smuggle cocaine for Sitzmann.

Accordingly, when Sitzmann, Paulson, Sager and Harvey were incarcerated at MCC, they all knew that Sitzmann was a high-level drug smuggler.[27]  As testified to by Paulson, "I thought that [Sitzmann] knew what he was doing and he had some good connections."  (Paulson Grand Jury Transcript at 17, attached as Attachment 10.)   The defense, in an attempt to besmirch the integrity of the prosecution and refute that Paulson, Harvey and Sager knew anything about Sitzmann's past drug smuggling, resorts to crafty representations to the Court supported by excerpts from the record that are out of context, incomplete and misleading.

The defense also ignores that the Court admitted the Rule 404(b) evidence for many reasons in addition to enabling the government to establish the basis for a trust relationship.  The Court held that defendant's prior drug smuggling activity "is admissible to establish the experience possessed by the defendant that gave him the ability and knowledge required to carry out his alleged role in the charged conspiracy."  Dkt. No. 165 at 12-13, citing United States v. Latney, 108 F.3d 1446, 1448 (D.C. Cir. 1997).  The Court also held that his prior drug smuggling activity was probative of his intent to possess cocaine with the intent to distribute it as a part of the charged conspiracy.  Dkt. No. 165 at 13, citing United States v. Clarke, 24 F.3d 257, 265 (D.C. Cir. 1994).  This was relevant to the 7 kilograms of cocaine that was found by French police in 2004 secreted in the secret compartments of leather bags.  The Court further held that Sitzmann's prior drug smuggling was admissible to establish that Sitzmann actually knew he

---

[27]  However, Harvey did not believe that Sitzmann was at Harvey's level during Harvey's heyday.

possessed cocaine in the hidden compartments of the leather bags.  Dkt. No. 165 at 13, citing

United States v. Bowie, 232 F.3d 923, 930 (D.C. Cir. 2000).  Although the defense did not argue

in this case that Sitzmann believed he was carrying one million euros, not cocaine, as he claimed

with the French authorities, the government still needed to prove that he knew he possessed

cocaine despite the fact that it was secreted in hidden compartments in the trunk of the car.  His

prior cocaine smuggling was probative regarding that issue.  Id. ("Evidence that Bowie possessed

and passed counterfeit notes on a prior occasion was relevant because it decreased the likelihood

that Bowie accidentally or innocently possessed the counterfeit notes.").

    We also note that the defense has argued in the instant motion that there was no evidence

indicating that Sitzmann's acquisition of the Velocity airplane, a stealth drug plane, was intended

for drug smuggling or that Sitzmann knew his Piper Navajo Panther had extra fuel piping for

long-haul drug smuggling.  Def. Mot. 10, 12.  Defendant's prior drug smuggling is classic Rule

404(b) evidence to help show, along with other evidence presented, that the planes defendant had

during the conspiracy were intended for drug smuggling and their drug smuggling capabilities

were not possessed innocently or the result of mistake or accident.  Id.

    In sum, the Court should reject the defendant's claim that he was unfairly prejudiced by

irrelevant other crimes evidence.

    6.    Defendant's Complaints About the Introduction of Other Evidence
          Are Without Merit

    The defendant also voices, without discussion, his dissatisfaction with the introduction of

some scattered and isolated evidence.  Virtually all of the evidence was introduced in a fleeting

manner.  He complains that the following evidence and statements allegedly elicited by the

government might have confused the issues, wasted time and had the potential to mislead the

jury: that the conspiracy involved hundreds of kilograms of cocaine as mentioned in the government's opening statement; discussions regarding cocaine smuggling by illegally modified private airplanes; Jerry Harvey's money laundering; John Sager's air smuggling, underwater smuggling and money laundering; Robert Campeau's freebasing; and the history of the Canadian Hells Angels. Def. Mot. at 10, 12, 30. The defendant does not explain how or why this evidence confused the issues, wasted time or misled the jury. If the defendant had his way, the government would have been precluded from introducing any relevant evidence at trial. We can understand this desire, but there is no doubt that it is unreasonable and unsupportable.

The defense also complains that the following evidence or statements was intended to show that Sitzmann is a person of bad character: Michael and Rhonda Fields testifying that Sitzmann promised to take care of their mother after their father, James Fields, was arrested and convicted for attempting to smuggle Sitzmann's cocaine out of Colombia; that one of the prosecutors stated that his objection regarding the disclosure of a witnesses address "goes to safety;" and when Buss stated that Colligan was "sacred [sic] to death of Sitzmann." Def. Mot. at 30-31. We will address these matters in summary fashion in the order presented.

I.  As discussed more fully above, the evidence established that the conspiracy did involve hundreds of kilograms of cocaine, if not over a thousand kilograms. The amount of cocaine being smuggled from the United States into Canada alone was between 200 kilograms to over 300 kilograms of cocaine. That does not include the 500 to 1,000 kilograms Sitzmann's Chicago supplier possessed or the cocaine in any of the New York or European transactions.

ii. Defendant's use of modified private airplanes were overt acts in the conspiracy.

He acquired the Velocity, the Piper Navajo Panther and the Stallion airplanes for his drug trafficking enterprise, with drug proceeds.  He recruited pilots to fly drug smuggling missions into the United States during the conspiracy.

iii.  Jerry Harvey's money laundering and John Sager's air smuggling, underwater smuggling and money laundering were all relevant to show their expertise and explain why Sitzmann would recruit these people into his drug trafficking conspiracy.  As discussed above, Harvey's money laundering of Sitzmann's drug proceeds within the conspiracy were overt acts of the conspiracy.

iv.  Robert Campeau's freebasing with Sitzmann's cocaine showed he was knowledgeable about cocaine, had access to Sitzmann's cocaine, knew about the business Sitzmann was in and was actively involved in the conspiracy.  It also helped to explain why Campeau was eventually "fired" from the conspiracy.  At the very most, this evidence was disparaging to Campeau and assailed his credibility, but did not prejudice the defendant.

v.  The discussion about the history of the Canadian Hells Angels corroborated the evidence that the Hells Angels were in a position to handle the large quantities of cocaine they were being supplied by Sitzmann.  It corroborated the testimony of Paulson, Campeau, Harvey and Sager that Sitzmann supplied, or was attempting to supply, hundreds of kilograms of cocaine to the Hells Angels.

vi.  The fact that Sitzmann promised to take care of the wife of James Fields after Fields was arrested and convicted of attempting to smuggle Sitzmann's cocaine out of Colombia in 2002 is further corroborating evidence that Fields and

72

Sitzmann were co-conspirators and that Sitzmann was the leader of the conspiracy. With this and other evidence, a jury could infer that Sitzmann and Fields were associated and co-conspirators and that Sitzmann was assuming the responsibility of taking care of Fields' wife because Sitzmann was responsible for Fields' arrest and conviction for his involvement in Sitzmann's drug trafficking operation.

vii.   The fact that one of the prosecutors objected to questions that could lead the defendant to the exact house where witness Jerry Harvey resides was proper. The prosecutor gave the Court as limited an objection as possible while signaling to the Court the basis for the objection–safety.[28] A fuller explanation for the objection was provided at the bench, outside the hearing of the jury. The Court then instructed the defense attorney to confine his questioning so as to not reveal where the witness lived. The objection was so short, swift and cryptic, one can hardly say that the jury even understood its significance. (Harvey, 4/19/12 p.m. at 68-72.) The jury was also instructed during the case that objections by the attorneys are not evidence. We do not see any prejudice to the defendant by the objection.

viii.   The same is true with respect to Bill Buss' discussion of Colligan's undercover infiltration of Sitzmann's organization and that Colligan was afraid of Sitzmann.

---

[28] Safety was a concern in light of defendant's connections with Colombian drug cartels, the Hells Angels and other violent drug traffickers. We also note that Sitzmann had threatened to kill Terrence Colligan if he ever betrayed Sitzmann's organization. He told Colligan that the organization would kill Colligan's dogs, his wife and anyone he loved and that Sitzmann would have Colligan watch them get killed before Sitzmann would kill Colligan. See Government's Amended Bill of Particulars at ¶ 134, Dkt. No. 27.

Although that comment was not being elicited by the prosecutor from Buss, it was

very short, fleeting and not material.  Even without Buss' comment, it would be

no surprise to anyone that a civilian acting in an undercover capacity would feel

fear and apprehension.  Buss' statement about Colligan's fear was vague and

harmless.  We note that he defense objected to Buss' comment and the objection

was sustained.  The defense has not pointed to any evidence of "substantial

prejudice" to the defendant by Buss' brief comment, particularly in light of the

overwhelming evidence of guilt and the Court's limiting instruction about

sustained objections.  Moore, 651 F.3d at 53-54.

## IV. THE GOVERNMENT DID NOT ENGAGE IN IMPROPER WITNESS VOUCHING AND BOLSTERING

The defendant also argues, apparently to support his Rule 33 motion, that the government

improperly engaged in improper vouching for its witnesses' credibility and attempted to bolster

their testimony.   Def. Mot. at 40-49.  However, like much of the defendant's arguments in its

motion, no analysis is provided.  The defendant quotes passages from the record, sometimes with

creative use of ellipsis, but provides no legal analysis to support his conclusion of prosecutorial

misconduct.  His arguments have no merit.

The defense relies upon statements, particularly during witness questioning, where the

terms of the witnesses' plea agreements or immunity agreements with the government requiring

honesty were discussed, or where the witnesses stated that they understood that their

responsibility was to tell the truth and provided their understanding of the potential consequences

for not telling the truth.  The witnesses testified about their understanding of their plea

agreements, immunity agreements and their state of mind in testifying.  The prosecutors not only

74

never provided their personal assessment of the witnesses's credibility, the witnesses' testimony about their agreements and state of mind came after the defense spent virtually its entire opening statement attacking the credibility of the government's witnesses.  The defense assailed the witnesses with their agreements with the government, their motivations in testifying, the expected benefits from testifying, their biases against the defendant and even with their health and mental disabilities.   (Trial Tr. 4/17/12 a.m. at 70-77.)

In its opening statement, the defense started off by disparaging the government's tangible evidence against Sitzmann: "You're not going to see any evidence produced in this case of any fingerprints of Mr. Sitzmann on [the evidence].  You're not going to see or hear any evidence of any DNA connection to any of [the evidence].  You're not going to see any of that.  You're not going to see any evidence of any undercover stings where Agent Rine . . . bought cocaine in the United States from Mr. Sitzmann, or that Mr. Sitzmann delivered any money to any police officers in this case.  And you're not going to see any tapes or videos of Mr. Sitzmann violating any laws here in the United States."  (Trial Tr. 4/17/12 a.m. at 70-71.)

After attacking the tangible evidence, the defense attacked the credibility of its witnesses. The defense stated in its opening that the kind of evidence the jury would hear from the government would be from witnesses with whom deals were made, "either immunity agreements or the hope that they are going to come to or make advisements to the judge who is going to sentence one of their witnesses."  (Trial Tr. 4/17/12 a.m. at 71.) The defense opening went on to attack the credibility, honesty and bias of individual witnesses.  The defense attorney stated that Jerry Harvey "has got a criminal background, drug dealer, expert money launderer, knows how to fly planes, knows how to smuggle drugs on planes, millions of dollars.  And he's coming in here

with an immunity agreement . . .. But what [the prosecutor] didn't tell you, okay, was that . . .

this guy is a man that has had millions of dollars all over the place. He's living a large life [in

Florida]. When he came in to this equation here of wanting to cooperate, the thing that he

presents to the government was this sort of like proposal, what I can do for the Government . . ..

[h]e is trying to figure out a way that if he helps the Government, how can he help the

Government in a way to keep all of that illegal money he's got all over the place." (Trial Tr.

4/17/12 a.m. at 72.) The defense attorney also implied some secret agreement existed between

Harvey and the government, separate from the immunity agreement. (Trial Tr. 4/17/12 a.m. at

73.)

      The defense attorney then assailed John Sager's credibility because he is "pending

sentence in Florida" for "conspiracy to – involving thousands of marijuana plants." (Trial Tr.

4/17/12 a.m. at 73-74.) The defense attorney argued that Sager became a fugitive from justice

but he will still come to court against Sitzmann "swearing to tell the truth in front of a federal

judge, and [Sager] is hoping [without a written agreement] that the Government is going to tell

the judge in Florida when he sentences [Sager, that Sager] helped them out here. The defense

attorney also argued that Sager was not credible because Sager manipulated the process by

paying for lawyers for co-defendants while Sager was on the run in Florida. (Trial Tr. 4/17/12

a.m. at 74-76.)

      The defense attorney also told the jury during his opening statement that just because

Sager and Harvey "swear to tell the truth and nothing but the truth, you're going to realize that

when you look at what they've done in the past – and the evidence is going to come out - that

they don't have any respect for this process. They want – they are looking for something out of

this.  They don't like Mr. Sitzmann."  (Trial Tr. 4/17/12 a.m. at 74.)

The defense attorney also attacked Gary Paulson's credibility during the opening

statement.  He stated that Paulson was "another drug dealer.  Another smuggler, okay?  He's

coming in here, he is getting immunity, too.  And he's – I think he's even worked as an informant

before."  (Trial Tr. 4/17/12 a.m. at 75.)  The defense opening also attacked Paulson for seeking a

reward if he assisted in capturing Sager, when Sager was a fugitive.  The defense also argued that

Paulson could not be believed because he was manipulating the process because he was seeking a

reward for the capture of Sager at the same time that Paulson was allegedly providing a false ID

to Sager.  (Trial Tr. 4/17/12 a.m. at 75-76.)  The defense then claimed that Paulson had medical

and memory problems. (Trial Tr. 4/17/12 a.m. at 76.)

The defense opening then attacked Billy Long, Sitzmann's co-conspirator who went to a

Colombian prison for five years because he was attempting to smuggle Sitzmann's cocaine out of

Colombia.  The defense attacked Long's credibility because he had agreed to cooperate if he

could get out of the Colombian prison and never go back.  (Trial Tr. 4/17/12 a.m. at 77.)

At the end of his opening statement, Sitzmann's attorney was up-front with the jury and

told the jury that "I'm going to go after some of these witnesses.  That's my job.  I'm going to go

and question some of these witnesses so that you have a basis upon which to judge whether or

not they are telling the truth or not."  (Trial Tr. 4/17/12 a.m. at 77.)

During cross-examination, as promised, the defense did go after these witnesses and

continued to attack their honesty, bias and general credibility.  The prosecution, during the

examination of some of the witnesses who had potential credibility or bias issues, addressed any

plea or immunity agreements, their understanding of their agreements, the reasons for the

witnesses testifying, whether the witnesses were telling the truth and what they understood the consequences were for not telling the truth, all focusing on their state of mind in testifying. The prosecution did not state, explicitly or implicitly, that it believed that the witnesses were telling the truth.

Vouching occurs when the prosecutor conveys "the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant; thereby jeopardizing the defendant's right to be tried solely on the basis of the evidence presented to the jury." United States v. Wilson, 605 F.3d 985, 1021-22 (D.C. Cir. 2010). Vouching does not exist where the prosecutor's questions focus on the witness's "understanding of the plea agreement and [his/her] state of mind in testifying." Id. at 1023; United States v. Spriggs, 996 F.2d 320, 324 (D.C. Cir. 1993). It is proper for the government to seek evidence regarding any agreement and the witness's state of mind and motivation in testifying, particularly when the defense has put the witnesses credibility and state of mind at issue. Id.; Wilson, 605 F.3d at 1021-1023.

In Wilson, the prosecutor walked a cooperating witness through the details of her plea agreement after the defense had attacked the witnesses credibility. The prosecutor then asked the witness, "What do you think [the judge] would do if you lied?" Wilson, 605 F.3d at 1021. The witness responded, "I'd be locked up." Id. The defense attorney objected, without explanation, and was overruled by the district judge. On appeal, the defendant argued that the prosecutor's questions and the witness' answers "constituted prosecutorial vouching because it implied that the prosecution and the court could monitor and verify whether [the witness] testified truthfully."

As a preliminary matter, the D.C. Circuit in Wilson held that because the defense failed to

articulate the reason for the objection and it was not clear that the objection concerned improper vouching, the Court would review the matter under a plain error standard.  Id. at 1022.  When a defendant "fails to object, or state the specific ground of an objection, plain error review applies."  United States v. Clarke, 767 F. Supp. 2d 12, 24 (D. D.C. 2011), citing United States v. Brown, 508 F.3d 1066, 1071 (D.C. Cir. 2007).  Under the plain error standard, the defendant must demonstrate:  "(1) a legal error that was (2) 'plain' (a term that is synonymous with 'clear' or 'obvious'), and that (3) affected [his] substantial rights."  Id. (quoting United States v. Sullivan, 451 F.3d 884, 892 (D.C. Cir. 2006).  "Additionally, relief for plain error is available only if the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'"  Clarke, 767 F. Supp. 2d at 24, quoting Sullivan, 451 F.3d at 892.  The defendant bears the burden of proving each and every element of the plain error standard.  Id.;  Clarke, 767 F. Supp. 2d at 24.

The Court in Wilson then addressed whether the prosecutor's questioning constituted improper vouching.   The defense argued that the prosecutor's questioning implied that the district judge could monitor and verify the truthfulness of the witness's testimony.  The Court of Appeals held that the question could also be interpreted as "What do you think [the judge would] do if you lied [assuming she knew you were lying]?  These possible interpretations show that the question does not necessarily imply that the judge would have known if [the witness] was lying." Id.  The Court also reasoned that the prosecutor's question made sense in the context of the preceding cross-examination where the defense counsel questioned whether the witness was telling the truth, thereby putting her state of mind in question.  "Thus the question focused on the [witness'] understanding of the plea agreement and her state of mind in testifying.  Moreover,

unlike the vouching in the cases upon which [the defense] relies, it did not express the

prosecutor's personal opinion about [the witness's] credibility.  We conclude that this was hardly

vouching, but was in fact a proper rejoinder to the cross-examination concerning the motive of

the witness. This was not plain error, if it was error at all." Id. at 1022-23; see also United States

v. Clarke, 767 F. Supp. 2d 12, 86 (D. D.C. 2011).

The D.C. Circuit in Spriggs held that evidence of the contents of a cooperation agreement

does not unduly bolsters the credibility of a government witness.  996 F.2d at 323-324.  In

Spriggs, the cooperating witness testified on direct examination that by the terms of the plea

agreement he could be prosecuted for perjury if he lied.  Id.  After reviewing case law from other

circuits, the D.C. Circuit agreed with the majority position that evidence of a cooperation

agreement does not unduly bolster the credibility of a government witness.  The Court stated,

"We think the majority position is the better reasoned.  Simply put, we are not persuaded that

evidence of the contents of a cooperation agreement unduly bolsters the credibility of a

Government witness." Id.  The Court went on to state that "insofar as the agreement provides that

if the witness lies the agreement is revokable, that the witness is liable to prosecution for perjury,

and that his perjurious testimony may be used against him, it adds nothing to the law – as the

defense is free to bring out upon cross-examination."  Id.

In the present case, defendant failed to object to virtually all of the questions or

statements he now complains about.  With respect to those very few objections that were made,

the defense either did not articulate the grounds for the objection or objected on grounds different

from what the defense presents now.  Accordingly, the plain error standard applies.  Brown, 508

F.3d at 1071; Sullivan, 451 F.3d at 892; Clarke, 767 F. Supp. 2d at 24.

The defense's present objections are misplaced, grounded on its misunderstanding of the

law.  The government did not improperly bolster the credibility of any of the witnesses.  Its

opening statement and witness questioning went to the witnesses' understanding of any

agreements with the government or the witnesses' state of mind in testifying.  Unlike the

vouching in the cases upon which [the defense] relies, it did not express the prosecutor's personal

opinion about the witness's credibility.  The prosecution did not state or imply that it believed

that the witnesses were credible and truthful.

With respect to the comment in the opening statement to which the defense has taken

issue (Def. Mot. 42), the government was informing the jury that the government's cooperating

witnesses, "particularly the witnesses that have been given immunity for their statement, or a

person like John Sager, who will testify in the hope of getting leniency from the judge that

sentences him," all were required to tell the truth or they "could be subject to the penalties of

perjury [or] obstruction of justice, and they have to tell the truth both during the examination by

the Government attorneys or [defendant's attorney]."  (Tr. 4/17/12 at 30.)  The government did

not opine on the witnesses' credibility and did not imply that it would somehow know if the

witnesses were lying.  The government's comments went to the witnesses' understanding of their

agreements, their incentive to tell the truth and their understanding of the potential consequences

if they were not truthful.  Even a cursory review of Jerry Harvey's immunity agreement will

demonstrate that it contains provisions virtually identical to what the government stated in those

few sentences in the opening statement about which the defense now complains.   (Gov. Trial Ex.

280 attached as Attachment 12.)   Moreover, "such a focus on a defendant's motivation to be

truthful is not improper vouching."  Clarke, 767 F. Supp. 2d at 85 (prosecutor's comments that

cooperating witnesses had strong incentive to tell the truth because court would consider the truthfulness of their testimony at time of sentencing and that their cooperation agreements required them to tell the truth were not improper vouching).   As in <u>Wilson</u>, 605 F.3d at 1021-23, and <u>Spriggs</u>, 996 F.2d at 323-324, the brief comment in the opening statement here did not amount to plain or any other type of error.  To the contrary, it was proper.

The government did not improperly vouch for Jerry Harvey. The government asked Harvey whether his immunity agreement required him to tell the truth and asked him "what happens if you don't tell the truth."  Harvey stated, "I get charged with perjury."  (Harvey, 4/19/12 a.m. 102-103).  Contrary to what the defense argues, the government was not suggesting to the jury that Harvey was telling the truth or that it would somehow know if he was telling the truth.  The government was simply eliciting Harvey's understanding of the terms of the immunity agreement.  In fact the agreement specifically states that he must supply complete and truthful information and that he remains subject to prosecution for perjury or for giving false statements. (Gov. Trial Ex. 280 attached as Attachment 12.)   As the Court instructed the jury, an immunized witness "is under the same obligation to tell the truth as is any other witness, because the grant of immunity does not protect him against a prosecution for perjury or false statement, should he lie under oath."  Jury Instruction 2.204 Testimony of Immunized Witness.

The exchange with Sager was very similar to  the question and answer discussed in <u>Wilson</u>, where the prosecutor asked, "What do you think [the judge] would do if you lied?" <u>Wilson</u>, 605 F.3d at 1021-1023.  The witness responded, "I'd be locked up."  <u>Id.</u>   The questions to Harvey were tied even more directly to the immunity agreement and to his state of mind.  See also <u>Clarke</u>, 767 F. Supp. 2d at 86.  There was nothing improper about Harvey's testimony.

It was also proper to ask Sager what he believed was expected of him even though he was testifying without any formal agreement.  The prosecution asked Sager to explain what was requested of him by the prosecution.  Sager testified that he was told "not to lie."  Sager was also asked to give his understanding of what would happen if he lied.  Sager testified that the government would not provide him with any assistance regarding his sentencing in Florida and that he could be charged separately for perjury or obstruction of justice.  The prosecution also asked Sager whether the government shared its evidence with him and whether he knew what evidence the government had.  Sager said he did not.  (Sager 4/24/12 a.m. at 43.)

Similar to <u>Wilson</u>, the questions and answers went specifically to Sager's state of mind in testifying, including his motivation to be truthful.   The government was eliciting Sager's understanding of what would happen if he lied.  He stated he would not get assistance from the government and that he could still be prosecuted for perjury.  This focus on Sager's motivation to be truthful is not improper vouching.  <u>Clarke</u>, 767 F. Supp. 2d at 85.  Sager also testified about whether there were any undue influences on him regarding the substance of his testimony, particularly from the government, which also went to any potential biases in favor of the government.  In this regard, the exchange about whether the government shared its evidence with Sager was presented for purposes of showing Sager's motivation to tell the truth.  It also countered the suggestion by the defense during its opening statement that Sager had no respect for his oath or the Court process, and he would say or do anything.  To the contrary, Sager knew that he was not made privy to the government's evidence, and he knew that he could not just regurgitate the government's case or walk a tightrope with the government's evidence.  This went to his motivation to be truthful.  There was also no implication that the government was

83

opining that Sager was being truthful or that the government or the Court had already made an assessment of Sager's testimony.  <u>Wilson</u>, 605 F.3d at 1021-1023; <u>Clarke</u>, 767 F. Supp. 2d at 85.

The same is true with the other witnesses that are the subject of the defendant's bolstering argument.  The exchanges with those witnesses do not indicate that the government was attempting to supplant the jury's evaluation of the witnesses' credibility with the government's. With respect to Paulson, the defense admits that the colloquy complained of "explain[ed] the immunity that the government had given to Paulson."  Def. Mot. 44.  The prosecution asked Paulson if he understood that he could be prosecuted for perjury or obstruction of justice if he lied and asked whether "anybody connected with the Government . . ., have we told you what you needed to say when you appeared as a witness?"  Paulson responded, "No, just the truth." (Paulson, 4/24/12 p.m. at 15-16.)

Similarly, the government prosecutors asked Robert Campeau and Brian Hill what the prosecutors had asked the witnesses to do when testifying.  The witnesses stated that they were told to tell the truth.   (Campeau, 4/25/12 p.m. at 87-88; Hill, 4/25/12 p.m. at 139.)  Moreover, Hill was cross-examined by the defense about whether he had discussed his testimony with Paulson, implying that Paulson and Hill were not credible because they were attempting to get their stories straight.  The defense even reminded Hill that he was under oath.  (Hill, 4/25/12/ p.m. at 149-150.)  On redirect, Hill was asked whether he told the truth, whether he understood that he was under oath, whether anyone told him what to say or what the facts of the case were." (Hill, 4/25/12 p.m. at 151-152.)

There was nothing improper about the testimony of Paulson, Campeau and Hill.  Their testimony was properly aimed at eliciting their understanding of any agreement with the

government and their state of mind in testifying, including any potential biases.  Nothing in the

prosecutors' questioning represented or even implied that the prosecutors' had already made a

determination on the witnesses' veracity.  Wilson, 605 F.3d at 1021-1023.

With respect to Rhonda Fields, the defense strategically uses ellipsis at the beginning of

its quote from her testimony that is the subject of its present complaint.  True to form, the

defense omits an important colloquy that puts the entire quote in context.  Rhonda Fields

expressed some bias against the defendant for putting in motion the events that led to her father's

arrest, conviction and ultimate death in a Colombian prison.  The prosecutor then asked, "Do your

feelings towards the defendant, do they color your testimony here today?"  Ms. Fields asked that

the question be rephrased.  The prosecutor then asked questions about whether Ms. Fields

understood that she was under oath, that she was obligated to tell the truth, that no one influenced

her testimony, that she was only told to tell the truth, and that she has been truthful.  (Rhonda

Fields, 4/27/12 p.m. at 40-41.)

The exchange between Rhonda Fields and the prosecutor was proper.  It addressed the

witness' bias and whether she understood that she was under oath and obligated to tell the truth.

It went strictly to Rhonda Fields' state of mind.  There was nothing even remotely suggesting that

the government was of the opinion that she was being honest.

The same is true with respect to the testimony of Michael Fields.  He was asked whether

he was subjected to any undue influences by the government regarding what to say in front of the

jury and whether he was told to tell the truth.  Again, there was nothing improper about this

exchange as it went completely to the witness' state of mind.   The prosecution may ask

questions that reveal the witness's state of mind and motivation to tell the truth.  Wilson, 605

F.3d at 1023; <u>Clarke</u>, 767 F. Supp. 2d at 86.

       With respect to Billy Long, the defense complains that the prosecution asked Long if he understood that the government could prosecute him for perjury or obstruction of justice if he lied.  (Long, 5/1/12 a.m. at 13.)  Like with Harvey, Sager and Paulson, this line of questioning was proper. The government only asked what the witness understood to be the terms and ramifications of his immunity agreement.  This questioning went squarely to Long's motivation to be truthful.  The government did not state, suggest or imply that it believed the witness was telling the truth or that it would somehow know if the witness was lying.

       As evidenced from the foregoing, the defense's arguments on improper vouching and bolstering are completely devoid of substance.  The government properly addressed the witnesses' understanding of their respective agreements with the government, the witnesses' state of mind in testifying, their motivation to be truthful, their incentive to lie, their biases, and other potential influences on their testimony.  During defendant's opening statement, the defense attacked the credibility and motivations of many of the government's key witnesses and it made clear that it was going to "go after" the government's witnesses.  It is disingenuous for the defense to now argue, with any factual or legal support, that the government was improperly vouching for the witnesses' veracity  when it was simply addressing their state of mind, motivation to be truthful, incentive to lie, biases, and other potential influences on their testimony.  <u>Wilson</u>, 605 F.3d at 1021-1023.

       Even if we assume, <u>arguendo</u>, that the government's questioning was vouching or bolstering (which it was not), it was harmless error, not plain error.  The Court gave several cautionary instructions to the jury regarding witness credibility.  The Court properly instructed

the jury that "You are the sole judges of the facts. While it is my responsibility to decide what is

admitted as evidence during the trial, you alone decide what weight, if any, to give to that

evidence. <u>You alone decide the credibility or believability of the witnesses</u>."  Jury Instruction

2.102 Function of the Jury (emphasis added).

     The Court reiterated and enhanced this language in another instruction to the jury: "In

determining whether the government has established the charge against the defendant beyond a

reasonable doubt, you must consider and weigh the testimony of all the witnesses who have

appeared before you.  You are the sole judge of the credibility or believability of the witnesses.

In other words, you alone are to determine whether to believe any witness and the extent to

which any witness should be believed."  Jury Instruction 2.200 Credibility of Witnesses.  In this

instruction, the Court went through an extensive list of what the jury could consider in

determining a witness's credibility, including whether the witness has any motive for not telling

the truth, whether the witness has an interest in the outcome of the case, and whether the witness

has any bias, friendship or hostility towards either side of, or other people concerned with, the

case.

     The Court also instructed the jury that "the testimony of [an accomplices] should be

considered with caution.  You should give the testimony of such witnesses as much weight as in

your judgment it deserves."  Jury Instruction 2.202 Accomplices Testimony.  Similarly, the Court

instructed the jury on immunized witnesses: "You should consider whether a witness who

[received immunity] and incriminates another may have a motive to lie.  However, you may also

consider that the witness is under the same obligation to tell the truth as is any other witness,

because the grant of immunity does not protect him against a prosecution for perjury or false

statement, should he lie under oath.  The testimony of a witness to whom immunity has been

granted should be considered with caution.  You should give the testimony as much weight as in

you judgment it deserves.  Jury Instruction 2.204 Testimony of Immunized Witness.

The Court also instructed the jury on the testimony of informers, in particular John Sager.

After describing an informer's arrangement with the government, the Court stated, "when an

informer testifies, his testimony should be treated with caution.  You may consider whether the

benefit this person hopes to receive from the government has motivated him to testify falsely

against the defendant.  You should give the testimony as much weight as in your judgment it

deserves."  Jury Instruction 2.205 Informer's Testimony.

The Court also instructed the jury: "Sometimes a lawyer's question suggests the existence

of a fact, but the lawyer's question alone is not evidence.  Whether or not something is in

evidence depends on the witness's answer to the lawyer's question."  Jury Instruction 1.104

Question Not Evidence.  Similarly, the Court instructed the jury that the statements and

arguments of the lawyers are not evidence.  Jury Instruction 2.105 Statements of Counsel.

Even if the governments questioning can be considered improper vouching, which they

are not, there was no prejudice to the defendant because the Court provided extensive cautionary

jury instructions.  In United States v. Boyd, 54 F.3d 868 (D.C. Cir. 1995), the prosecutor

improperly asked the defendant on cross-examination why the police would offer false testimony.

During closing arguments, the prosecutor vouched for the police witnesses' credibility by

"indicating that they would not lie on the stand and thereby jeopardize their careers or risk

prosecution.  Id. at 870-71. The court held that the prosecutor's statements "impermissibly

infringed on the jury's right to make credibility determinations." Id. at 871.  However, the court

held that the error did not "seriously affect[ ] the fairness, integrity or public reputation of

judicial proceedings." Id. at 872. The court reasoned that the trial court "specifically instructed

the jurors that the statements and arguments of counsel are not evidence." Id.  The Court further

instructed the jury that a witness's testimony "should be considered by them just as any other

evidence in the case, and that in no event should they give either greater or lesser credence to the

testimony of any witness merely because he or she is a police officer." Id.; see also Moore, 651

F.3d at 62 (impermissible vouching by prosecutor during closing argument that "[t]hey're telling

the truth about their experiences" was harmless because it was in response to defendants' attacks

on credibility of witnesses during defense closings and court gave jury instruction that jury alone

determined the weight, the effect and the value of the evidence and the credibility of the

witnesses); Childress, 58 F.3d at 715-719 (prosecutor's comments were a fair response to defense

arguments, did not amount to "substantial prejudice" to defendants or both.)

In the instant case, the Court provided extensive and proper jury instructions to cure any

harm.  Moreover, the government's evidence of the defendant's guilt was overwhelming and

compelling.  The government presented many witnesses with firsthand knowledge of Sitzmann's

drug trafficking operations.  It presented the recorded conversations of Sitzmann's closest co-

conspirator, George Jones, which provided detailed evidence of the conspiracy.  It even provided

Sitzmann's confession contained in letters to the government and in his debriefing in France.

Finally, the matters about which the defendant complains was of "minimal importance" when

compared to the more critical and detailed aspects of the witnesses' testimony and compared to

the overall strength of the government's case, including the evidence corroborating the

witnesses' testimony.

Accordingly, there was no improper vouching of any witness.  Even if there was, it did

not "impermissibly and prejudicially interfere with the jury's ability to assess the evidence, and

the defense was not "substantially prejudiced."[29]  Moore, 651 F.3d at 53-54, 63-64.

## V.     THE GOVERNMENT DID NOT IMPROPERLY USE GEORGE JONES' GUILTY PLEA

 In a one page argument, the defense argues that it was improper for the prosecution to

ask a question about the nature of the charge George Jones pleaded guilty to under his plea

agreement.  Def. Mot. at 50.  The government was questioning Agent William Buss to elicit a

chronology regarding the undercover operation against George Jones, the search warrant

executed on his home, Jones's arrest, plea, and finally, his death.  During this chronology, the

government asked Buss whether Jones pleaded guilty and to what charge – conspiracy.  The

government did not elicit any information about the plea agreement's proffer of evidence,

including the identity of Jones's co-conspirators.  (Buss, 4/30/12 a.m. at 45-49.)

Although the defense is correct in its two-sentence conclusory argument that it is

improper to use a witness's guilty plea as substantive evidence of the defendant's guilt, that was

not the case here.  Tarantino, 846 F.2d at 1405; see also Brown, 508 F.3d at 1073.  A guilty plea

is admissible to "show the witness' acknowledgment of his role in the offense and to reflect on

his credibility."  Tarantino, 846 F.2d at 1405.  In Tarantino, a co-conspirator testified that he

pleaded guilty to "the same conspiracy counts for which the defendants were being tried."  Id. at

1404.  The court held the plea was admissible because it was not used as substantive evidence of

---

[29]  We note that the defense does not point to any evidence of actual prejudice resulting from any alleged vouching.  Prejudice cannot be presumed.  Childress, 58 F.3d at 704-05.  The Supreme Court expressed its "admonition against letting the guilty go free to punish prosecutorial misconduct." United States v. Hasting, 461 U.S. 499, 506-07 (1983).

the defendants' guilt.  Id.  The court reasoned that the government "never attempted to argue or even hint that [the co-conspirator's] guilty plea had any bearing on the defendant's guilt or innocence."  Id. at 1405.

The prosecution may reference "the plea agreement in the context of a larger discussion about the evidence of a conspiracy generally and the credibility of Government witnesses."  Brown, 508 F.3d at 1073.  In Brown, the defense argued that the prosecution made "improper comments that invited the jury to consider the guilty pleas of other members of the conspiracy as substantive evidence of [the defendant's] guilt."  Id. at 1072.  The court rejected the defense's arguments and ruled that the statements were admissible to show the witness' acknowledgment of his role in the offense and to reflect on his credibility.  Id. at 1073.  The Court also ruled that the defense failed to demonstrate that the statements were prejudicial because the trial court provided cautionary jury instructions regarding witnesses who signed plea agreements.  Id.

Here, the government introduced Jones' guilty plea for a completely innocuous reason – merely to complete the time line on George Jones, from the 16-kilogram reversal to his death.  The government never attempted to connect the defendant to Jones' plea of guilty to an undefined conspiracy.   Pursuant to Tarantino, 846 F.2d at 1405, the details of Jones' guilty plea might have been admissible to demonstrate that a conspiracy existed and that Jones was involved in Sitzmann's conspiracy, but no such attempt was made.  The government never hinted or argued that Jones' guilty plea had any bearing on Sitzmann or Sitzmann's guilt.  Buss' testimony was strictly confined to the fact that Jones did "plead guilty to conspiracy to distribute and possess with the intent to distribute at least 5 kilograms of cocaine."  (Buss, 4/30/12 am at 47-48).  Nowhere in the few questions and answers about Jones' plea is Sitzmann's name mentioned

and at no time did the government make any connection between Jones' plea and Sitzmann.

The fact that Jones' pleaded guilty to an undefined conspiracy charge was also harmless. There was no "substantial risk that the jury" would look to Jones' plea to determine Sitzmann's guilt. The government may introduce plea agreements that do not facially incriminate the defendant or invite a direct inference of guilt. United States v. Clarke, 767 F. Supp. 2d 12, 33 (D. D.C. 2011). It is also harmless to admit minutely-detailed plea agreements containing inadmissible statements implicating the defendants that are consistent with the overwhelming objective evidence. Schneble v. Florida, 405 U.S. 427, 430-32 (1972) ("the 'minds of an average jury' would not have found the State's case significantly less persuasive had the testimony as to [the co-defendant's] admissions been excluded"). Accordingly, Buss' testimony regarding George Jones' plea of guilty to an unspecified conspiracy charge was not improper.

## VI.    THE GOVERNMENT DID NOT VIOLATE SITZMANN'S RIGHT TO AN INDICTMENT BY A GRAND JURY, DID NOT ENGAGE IN GRAND JURY ABUSE, AND DID NOT CONSTRUCTIVELY AMEND THE INDICTMENT

The defense argues that the government constructively amended the indictment in this case, thus violating his right to be indicted by a grand jury. The Court had previously rejected defendant's argument that the Bills of Particulars had constructively amended the indictment. Transcript of 9/8/11 Ruling on Pending Motions at 12-15. To support defendant's present motion, the defense points only to the fact that some witnesses were presented to the grand jury after indictment, which the defense erroneously concludes was improper.[30]  The defense, however, fails to provide any legal authority or analysis to support the proposition that a post-

---

[30]  As we previously discussed extensively, which we will not repeat here, there was nothing improper by the government continuing its investigation of the defendant, his illegal money laundering, his suppliers, re-distributors and his assets.

indictment investigation is at all relevant to a claim that the indictment was constructive amended.  It appears the defense does not understand the concept.

The Supreme Court has held that "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him."  Stirone v. United States, 361 U.S. 212, 217 (1960).  A constructive amendment occurs when the evidence presented at trial proves a crime different from the one charged in the indictment.  Id.  The defendant in Stirone was indicted and convicted in a federal court for unlawfully interfering with interstate commerce in violation of the Hobbs Act, 18 U.S.C. § 1951.  The indictment charged that the affected interstate commerce was the importation of sand.  The Supreme Court found a constructive amendment to the indictment when the trial court instructed the jury that it could convict the defendant if the government proved that the affected interstate commerce was either sand importation or steel exportation, thereby expanding the indicted charge.  The Court held: "It follows that when only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened."  Id. at 218.

"An indictment has been constructively amended [w]hen the trial evidence or the jury charge operates to broaden[] the possible bases for conviction from that which appeared in the indictment."  United States v. Rigas, 490 F.3d 208, 225-26 (2d Cir. 2007) (citations and internal quotation marks omitted).  To establish a constructive amendment, the defendant would have to show "that trial evidence or the jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the

subject of the grand jury's indictment." Id. at 228-29 (internal citations and quotation marks omitted).  However, where "a generally framed indictment encompasses the specific legal theory or evidence used at trial, there is no constructive amendment." Id. (internal citations and quotation marks omitted).  "As a result, an indictment drawn in more general terms may support a conviction on alternate bases, even though an indictment with specific charging terms will not." Id. 228-29 (internal citations and quotation marks omitted).

In the present case, the defendant's argument, based on pure speculation, that there must have been a constructive amendment to the indictment because some witnesses were presented to the grand jury after indictment is without any merit.  The defendant points to nothing that would indicate that the evidence presented at trial proved a crime different from the one alleged in the indictment.  It points to neither evidence nor any jury instructions given by the Court.  The defense fails to even allege that the proof at trial or the Court's instructions to the jury constituted a constructive amendment to the charge in the indictment.  The defense merely speculates, in conclusory fashion, that "it appears that the government hastily returned this indictment on August 7, 2008 when it learned that Sitzmann was arriving at Dulles Airport on August 8, 2008."[31]  Def. Mot. 52.  The defense presents no authority that what it speculates to has any relevancy here.  The extent of the evidence presented to the grand jury or whether witnesses were presented to the grand jury after indictment is irrelevant to a constructive amendment analysis.[32]

---

[31]  The defendant does not disclose the basis for his claim that the indictment was returned the same day that the government learned that he was to land the following day.  That is pure fiction.

[32]  We note that the defense has previously complained that the government had George Jones, defendant's closest co-conspirator who was involved in every facet of the conspiracy, testify before the grand jury "multiple times."  See Defense Motion to Dismiss Based on Pre-Indictment Delay, Dkt. No. 61, at p. 10.  Since Jones died within days of the indictment, his grand jury testimony, given "multiple times," would have been before the indictment.  Now the defense

94

The defense's point of reference is mislaid.  The relevant inquiry involves the charge on the face

of the indictment and the evidence presented at trial.  Stirone, 361 U.S. 218;  Rigas, 490 F.3d at

225-26, 228-29.

A comparison of the indictment and the proof at trial conclusively establishes that there

was no constructive amendment to the indictment here.  On August 7, 2008, Sitzmann was

indicted by a federal grand jury for Conspiracy to Distribute and Possess with Intent to Distribute

More than Five Kilograms of Cocaine, in violation of 21 U.S.C., Sections 841(a)(1),

841(b)(1)(A)(ii) and 846.  The indictment alleged that the conspiracy commenced no later than

the 1990s and continued until at least 2004, the exact dates being unknown to the grand jury, that

the defendant knowingly, willfully and intentionally conspired with people, both known and

unknown to the grand jury, to distribute and possess with intent to distribute cocaine, and that the

conspiracy was conducted in the United States and several foreign countries, including

Colombia, Mexico, Canada, Spain, France and Italy.

The government's evidence at trial, some of which has been discussed above, effectively

mirrored the indictment.[33]  The government presented evidence that the conspiracy began in the

1990s, that it continued until at least 2004, that the defendant conspired with people to distribute

---

takes the opposite approach and argues that "it appears that the government hastily returned this
indictment" and may have given an abbreviated presentation to the grand jury.  This is all
irrelevant.  "Nowhere in the criminal law do we require all evidence presented at trial to be
presented to the grand jury; it is custom and practice to present just enough to get the
indictment."  United States v. Staggs, 881 F.2d 1527, 1535 (10th Cir. 1989); accord Roberts v.
United States, 752 A.2d 583 (D.C. App. 2000).  The government's development of additional
evidence to support an indictment already handed down is certainly within the government's
prerogatives.

[33]  "[P]roof at trial need not, indeed cannot, be a precise replica of the charges contained in an
indictment."  Rigas, 490 F.3d at 228 (citations and internal quotation marks ommited).

and possess with the intent to distribute more than five kilograms of cocaine, and that the

conspiracy was conducted in the United States and several foreign countries, including

Colombia, Mexico, Canada, Spain, France and Italy.  The defense might have a better argument

if the government's evidence proved a heroin conspiracy, not a cocaine conspiracy, or that it took

place in China, not in the locations identified in the indictment, or that it took place after 2005,

not within the indicted period.  The government proved the crime alleged in the indictment and

the jury convicted the defendant of that crime.  Defendant's constructive amendment argument is

baseless.  The Court should reject the defendant's latest constructive amendment argument like it

did in response to defendant's more substantive pretrial motion.[34]  Transcript of 9/8/11 Ruling on

Pending Motions at 12-15.

## VII.   JONES' RECORDED STATEMENTS WERE PROPERLY ADMITTED AS CO-CONSPIRATOR DECLARATIONS AND STATEMENTS AGAINST PENAL INTEREST

The defense argues that clips of undercover recorded statements of George Jones made in

connection with his acquisition of 16 kilograms of cocaine were improperly admitted into

evidence.  The recorded conversations, which were made during telephone calls and personal

meetings between Jones and Terrence Colligan.

The defense claims that the clips of the recorded conversations were admitted by the

Court over the defense objections.  On April 30, 2012, the government moved the recorded

conversations into evidence.  The defense objected and a discussion occurred at the bench.  At

---

[34]  The defense also seeks all the evidence presented to the grand jury prior to the indictment.
The defense presents no authority and articulates no "particularized need" for the request.  United
States v. Naegele, 474 F.Supp.2d  9 (D. D.C. 2007).  "Speculation and surmise as to what
occurred before the grand jury is not a substitute for fact." United States v. Wilson, 565 F.Supp.
1416, 1436 (S.D.N.Y. 1983).  Moreover, as discussed above, the indictment is what is relevant to
a constructive amendment analysis.

the bench, the Court advised the defense that it would admit the evidence provisionally and that

if it appeared after the recordings were played that the recorded conversations were not properly

admitted, the defense would be able to move to strike the evidence.  (Buss, 4/30/12 a.m. at 13-

20.)  The recorded conversations were played and the defense did not move to strike the evidence

thereafter.  The admissibility of the recordings was clear.  Accordingly, because the defense

waived its right to move to strike, the plain error standard of review applies.[35]   Wilson, 605 F.3d

at 1022; United States v. Ayala-Pizarro, 407 F3d 25, 27-28 (1ˢᵗ Cir. 2005) ("because the

objection was denied conditionally, subject to a later motion to strike, and [defendant] made no

later motion to strike, review is for plain error"); Wilson v. Williams, 182 F.3d 562, 566-67 (7ᵗʰ

Cir. 1999); see also Gant v. United States, 518 A.2d 103, 113 (D.C. 1986) (untimely motion to

strike testimony waived and plain error review appropriate where defense elicited additional

testimony from witness on cross-examination and did not move to strike until two other

witnesses had testified).

A.     Jones's recorded statements are admissible co-conspirator declarations.
       Fed. R. Evid. 801(d)(2)(E)

The recorded statements of Jones were admissible under Federal Rule of Evidence

801(d)(2)(E), co-conspirator declarations.   Pursuant to that Rule, the government may introduce

a statement offered against the defendant and is a statement "made by the [defendant's]

coconspirator during and in furtherance of the conspiracy."  A statement is admissible under Rule

---

[35]  As discussed below, irrespective of what standard of review is applied, there was "no error –
clear, plain, or otherwise –" in the admission of the recorded conversations.  United States v.
Brockenborrugh, 575 F.3d 726, 735 (D.C. Cir. 2009) (defense counsel failed to renew objection
or move to strike alleged co-conspirator statements, but court did not need to decide which
standard of review was appropriate because "no error – clear, plain, or otherwise – was
committed in admitting [the co-conspirator statements]."

801(d)(2)(E) where the district court finds by a preponderance of the evidence: (1) that a

conspiracy existed and that both the defendant and declarant were members of that conspiracy;

and (2) that the statement was made in furtherance of the common goal of the conspiracy.

United States v. Loza, 763 F. Supp. 2d 108, 111-112 (D. D.C. 2011) (J. Friedman); see also

Bourjaily v. United States, 483 U.S. 171, 175 (1987); United States v. Brockenborrugh, 575 F.3d

726, 735 (D.C. Cir. 2009); United States v. Gewin, 471 F.3d 197, 201 (D.C. Cir. 2006); United

States v. Thomas, 525 F. Supp. 2d 17 (D. D.C. 2007).   "Any finding by the court that the

requirements of Rule 801(d)(2)(E) are met must be based at least in part 'on some independent

evidence of the conspiracy' – that is, on evidence other than the statements whose admissibility is

in question." Loza, 763 F. Supp. 2d at 111-112, quoting Gewin, 471 F.3d at 201.   "[M]ere

narratives of past successes and failures, for example, are not admissible." Tarantino, 846 F.2d

at 1412; United States v. Beech–Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir. 1989).

Though the Rule requires that both the declarant and the party against whom the statement is

offered be members of the conspiracy, "there is no requirement that the person to whom the

statement is made also be a member." Id.

    In addition to the more obvious types of communications to implement a conspiratorial

operation, statements that may be found to be in furtherance of the conspiracy include statements

that provide motivation for continued participation in the conspiracy; or to provide reassurance in

the conspiracy, or encourage a co-conspirator or other person to advance the conspiracy, or

enhance a co-conspirator's or other person's usefulness to the conspiracy, or seek to induce

assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or

status of the conspiracy.  Tarantino, 846 F.2d at 1411-12 (statements describing past events

admitted because it was "quite plausible that the statements regarding profits could have served as motivation for [co-conspirator's] continued participation"); Beech–Nut Nutrition Corp., 871 F.2d at 1199 (statement by co-conspirator to person outside conspiracy that another co-conspirator said that "they got away with it, that the matter was dead" was admissible under Rule 801(d)(2)(E) because trial court could have inferred that statement made to reassure outside person and encourage him not to reveal incriminating information"); United States v. Maldonado-Rivera, 922 F.2d 934, 958-59; United States v. Rahme, 813 F.2d 31, 35–36 (2nd Cir. 1987); United States v. Ammar, 714 F.2d 238, 252 (3d Cir. 1983).

Preliminary questions as to whether a proffered statement meets the requirements of Rule 801(d)(2)(E) are to be determined by the trial court by a preponderance of the evidence. See, e.g., Bourjaily v. United States, 483 U.S. at 181; Maldonado-Rivera, 922 F.2d at 958-59; United States v. Beech–Nut Nutrition Corp., 871 F.2d at 1198.  Generally, "[t]he finding that a given statement was uttered by a coconspirator 'in furtherance' of a conspiracy will not be disturbed on appeal unless it is clearly erroneous.[36]   Where there are two permissible views of the evidence, the court's choice between them cannot be deemed clearly erroneous."  Maldonado-Rivera, 922 F.2d at 958-59 (internal citations omitted).

In the present case, the clips of Jones' recorded statements were properly admitted at trial. The statements meet the three requirements under Rule 801(d)(2)(E):  (1) Jones and Sitzmann were clearly co-conspirators; (2) the statements between Jones and Colligan were in furtherance of Sitzmann's conspiracy; and (3) there is an overwhelming amount of independent evidence to show there was a conspiracy at the time the statements were made.

---

[36]  But, as discussed above, the plain error standard should apply because the defense opted to not renew its objection on the admissibility of this evidence or to move to strike the evidence.

The defense attempts to defeat the admissibility of Jones' recorded conversations by arguing that "the Jones-Colligan deal in March, 2004 was not part of a conspiracy because Colligan was a government agent and one cannot conspire with the government." Def. Mot. 53. This argument misses the relevant inquiry. The important issue is whether Jones, as the declarant, is a co-conspirator with the defendant. It is irrelevant whether the person to whom the statements are being made is a government agent or someone outside the conspiracy. Beech–Nut Nutrition Corp., 871 F.2d at 1199; United States v. Thomas, 525 F. Supp. 2d 17, 34 (D. D.C. 2007).

The defense does not appear to contest that Jones and Sitzmann were co-conspirators. We will not reiterate again here the deluge of evidence establishing that they were co-conspirators during every aspect of their cocaine trafficking conspiracy, including trafficking in and through the United States, Canada, Colombia, and Europe. It suffices to say that virtually every significant witness testified about Jones' participation in the conspiracy with Sitzmann, including Colligan and Campeau for Canada, and Billy Long for Colombia and Europe. Sitzmann even identified Jones as a co-conspirator in his letters to the government and during his debriefing in France. (Armbruster, 5/10/12 p.m. at 31-33, 45.) French Judge Philippe Dorcet testified that Jones was the first person Sitzmann called upon his arrest in France in February 2004, which was corroborated by Sitzmann's letters to Jones. Sitzmann also wrote to Jones from jail in France to orchestrate the sale of Sitzmann's Stallion drug plane that Sitzmann acquired with drug proceeds. Jones also continued to maintain Sitzmann's records and other property, including his drug smuggling paraphernalia, until Jones was arrested in March 2004. And of course, the Jones' recorded statements confirm that Sitzmann and Jones were co-conspirators.

100

The defense also argues that the 16-kilogram reversal was not part of the conspiracy with which Sitzmann was charged.  Again, we will not reiterate here the overwhelming evidence establishing that the conspiracy with Sitzmann and Jones was still in existence when the recorded conversations were made.  It is enough to say that Sitzmann did not withdraw from the conspiracy, he was still attempting to smuggle cocaine into Europe when he was arrested, Sitzmann, Jones and Paulson were trying to sell the Stallion, and Jones was maintaining Sitzmann's records and property at his home until Jones was arrested.  There was also no evidence that Jones' acquisition of the 16 kilogram of cocaine was not part of the Sitzmann conspiracy.  Jones was even using Sitzmann's smuggler's bags.  As evidenced by Jones' recorded statements, the 16 kilograms of cocaine were being redistributed to members of Sitzmann's organization and the profits were going to be shared equally between Sitzmann and Jones.  The independent evidence and the recordings confirm that the conspiracy was ongoing when the statements were made.

The defense also seems to argue, without authority, that the Court should not have admitted those statements in the recordings that were uttered by Colligan since he was a confidential informant and not a co-conspirator.  First of all, it was Jones' statements that the government relied upon during the trial.  Those were the ones that incriminated Sitzmann. Colligan's statement's were only relevant to the extent they were needed for purposes of understanding Jones' statements.   Admitting only Jones' portion of the conversation would have been nonsense and incomprehensible.  The defense points to two instances in which the government asked Agent Buss to explain what Colligan said.  However, even a cursory review of the transcript will show that those questions were asked simply to help explain Jones' statement.

For example, a jury is not going to understand what Jones was talking about when he and

Colligan mentioned  "fish scales" in the context of cocaine.  See Buss, 4/30/12 a.m. at 27-28.

Buss explained the meaning of that term.

  Aside from the above argument, the defense does not seem to dispute that the clips of the

recorded statements were in furtherance of the conspiracy.  The statements were about Jones'

attempt to acquire the 16 kilograms of cocaine from Colligan, his and Sitzmann's feigned co-

conspirator.  They discussed how Sitzmann failed to provide 20 kilograms of cocaine to Jones

initially and that the 16 kilograms of cocaine from Colligan was to be a substitute for Sitzmann's

cocaine.  They further discussed the redistribution of the cocaine to Sitzmann's organization and

the sharing of profits with Sitzmann.  In addition, Jones told Colligan about the recent

developments in the conspiracy, finances, and the sharing of profits by Sitzmann.  These

discussions were about the European aspects of the conspiracy; Jones' involvement in that

operation and his avoidance of being arrested in that operation; and the increased profits from the

European operation.    Jones provided assurances for the continued survival of the conspiracy

despite setbacks.  They talked about Sitzmann's arrest in France for drug trafficking; efforts to

assist Sitzmann gain access to funds while in France, including by selling drug planes; assurances

to Colligan that the conspiracy was still ongoing despite this setback; that Sitzmann and the

organization have had many successes, like in Canada, and many setbacks, like the arrests of

Fields and Long and Sitzmann's sickness in Colombia, but they continue to prevail and succeed.

Jones' statements were in furtherance of the conspiracy as they were intended to provided

motivation for Colligan's continued participation in the conspiracy, to enhance the stature of

Jones as a drug trafficker in the eyes of Colligan, to provide reassurance for the continued

viability and success of the conspiracy, to induce and encourage Colligan to supply the needed cocaine to Jones.  They also were intended to foster trust and cohesiveness between Sitzmann, Jones and Colligan.

Accordingly, the defense has not shown that the admission of Jones' recorded conversations was plain error, clear error or error of any kind.[37]

B.     The Sixth Amendment Is Not Applicable To Co-Conspirator Statements

The defense also claims that the Jones' co-conspirator statements violated defendant's confrontations rights under the Sixth Amendment.  The Confrontation Clause of the Sixth Amendment affords the accused the right to confront the witnesses against him.  Williams v. Illinois, 132 S. Ct. 2221, 2232 (2012).  The Confrontation Clause "refers to testimony by 'witnesses against' an accused."  Id. at 2225.  The Confrontation Clause applies to statements that are, "(a) out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct, and (b) formalized statements such as affidavits, depositions, prior testimony, or confessions."  Id.; Giles v. California, 554 U.S. 353, 374 at n. 6 (2008) (Rule 801(d)(2)(E) co-conspirator statements do not violate the Confrontation Clause); Crawford v. Washington, 541 U.S. 36 (2004).

Jones'  co-conspirator statements under Rule 801(d)(2)(E) do not possess either of the characteristics discussed in Williams.  First, Jones' statements were recorded surreptitiously at a time when he was acting within a criminal conspiracy.  He was not working for the police or otherwise attempting to target Sitzmann or anyone else for criminal conduct.  Second, the recorded statements were not formalized statements such as a confession, deposition or affidavit.

---

[37]  It is also clear that Jones' statements were admissible under Fed. R. Evid. 804(b)(3) as declarations against penal interest.

Jones's co-conspirator declarations do not have either of the characteristics needed to run violate

the Confrontation Clause.  Sitzmann's Sixth Amendment rights are not implicated when

evidence is introduced under Rule 801(d)(2)(E).

### VIII.   CUMULATIVE EFFECT DOCTRINE DOES NOT APPLY

The cumulative error doctrine does not apply where the rulings complained of are not

found to be error.  Where the individual effect of each error is negligible, then the cumulative

effect does not warrant a reversal.  United States v. Brown, 508 F.3d 1066, 1075 (D.C. Cir.

2007);  United States v. Simmons, 431 F. Supp. 2d 38, 54 (D. D.C. 2006).  The defense has

failed to establish the legitimacy of any of the issues it has raised in this case.  Each alleged error,

even if proved, would not warrant acquittal or new trial, and cumulatively they would not

warrant a new trial or acquittal, particularly in light of the overwhelming evidence against the

defendant.

### IX.   DEFENDANT FAILED TO FILE A TIMELY RULE 33 MOTION ON INEFFECTIVE ASSISTANCE OF COUNSEL

The court should preclude the defendant from filing a supplemental motion under Rule 33

based on ineffective assistance of counsel.  Defendant mentions in a few sentences that in a

separate motion he will argue that the defendant suffered substantial prejudice from ineffective

assistance of counsel.  Def. Mot. 26.  The Court should preclude any subsequent motion because

it is untimely.

A motion for new trial based on grounds other than newly discovered evidence, must be

filed within 14 days of the verdict, or within such additional time as the Court may fix during

those 14 days.  United States v. Marquez, 291 F.3d 23, 25 (D.C. Cir. 2002); Fed. R. Crim. P.

33(b)(2).  "If the defendant fails to make a motion for a new trial within [14 days] and the court

fails to "fix" a new due date for the motion during that period, the court loses jurisdiction and cannot grant such a motion at a later time." Marquez, 291 F.3d at 25; see also United States v. Hall, 214 F.3d 175, 176-78 (D.C. Cir. 2000).  The same is true with the filing of supplemental motions after the deadline that was timely fixed by the Court.  The Court has no jurisdiction to hear any new grounds contained in any supplemental motions.  United States v. Thomas, 525 F. Supp. 2d 17, 35-36 (D. D.C. 2007).

The defendant has failed to file a timely motion based upon an ineffective assistance of counsel claim and has failed to timely request, and receive, an extension of time to file such a motion under Rule 33(b)(2).  Any such motion filed now under Rule 33(b)(2) would be untimely.[38]

## X.   CONCLUSION

The Court instructed the jury in this case that their "verdict must be unanimous." Unanimity Instruction  2.405.  Indeed, after a trial that lasted almost 2 months, a twelve-member jury found defendant guilty of a single conspiracy to distribute and possess with the intent to distribute at least five kilograms of cocaine.  "Perpetual litigation of any issue  . . .  threatens to deny justice." Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 816 n.5 (1988). The defense has filed an extensive motion that relies almost exclusively on venomous rhetoric, and is devoid of any credible analysis, both with respect to the record and the case law.  The Court should deny defendant's motion for new trial or acquittal.

---

[38]  The defendant would still have other avenues to present his claim for ineffective assistance of counsel.  See Marquez, 291 F.3d at 29.

Respectfully submitted,

RONALD C. MACHEN, JR.
UNITED STATES ATTORNEY


_____/s_____

GEORGE ELIOPOULOS
Assistant United States Attorney
D.C. Bar No. 390601
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-6957