UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

—————————————————— )
                                                    )
UNITED STATES OF AMERICA         )
                                                    )
         v.                                         )          Criminal No. 08-0242 (PLF)
                                                    )
GREGORY JOEL SITZMANN,         )
                                                    )
         Defendant.                           )
—————————————————— )


OPINION AND ORDER

        After a 23-day jury trial in April and May 2012, defendant Gregory Joel Sitzmann

was found guilty on a single count of conspiracy to distribute and possess with the intent to

distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841 and 846.  The

government alleged that from at least the 1990s to at least 2004, Mr. Sitzmann conspired with

numerous other individuals to distribute large quantities of cocaine in a smuggling operation that

spanned the United States, Mexico, Canada, Colombia, the Bahamas, Spain, France, Italy, and

elsewhere.  See Indictment at 1 (Aug. 7, 2008); Third Amended Bill of Particulars (Aug. 11,

2011).  Mr. Sitzmann has now moved for judgment of acquittal or, in the alternative, for a new

trial under Rules 29 and 33 of the Federal Rules of Criminal Procedure.  For the reasons

explained below, the Court will deny his motion.


I.  LEGAL STANDARDS

        Under Rule 29 of the Federal Rules of Criminal Procedure, the Court must enter a

judgment of acquittal on any offense charged for which the evidence is insufficient to sustain a

conviction.  United States v. Williams, 825 F. Supp. 2d 128, 132 (D.D.C. 2011).  In ruling on a

motion for judgment of acquittal, the Court must "'consider[] the evidence in the light most favorable to the government and determin[e] whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt.'"  United States v. Kayode, 254 F.3d 204, 212 (D.C. Cir. 2001) (quoting United States v. Harrington, 108 F.3d 1460, 1464 (D.C. Cir. 1997)).  The Court must "accord[] the government the benefit of all legitimate inferences," United States v. Weisz, 718 F.2d 413, 437 (D.C. Cir. 1983), and accept the jury's verdict of guilt if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  United States v. Arrington, 309 F.3d 40, 48 (D.C. Cir. 2002) (emphasis in original) (quotations omitted).  Put another way, the Court may grant a motion for judgment of acquittal only where "a reasonable juror *must necessarily* have had a reasonable doubt as to the defendant['s] guilt."  United States v. Weisz, 718 F.2d at 437 (emphasis in original).

Rule 33(a) of the Federal Rules of Criminal Procedure provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  FED. R. CRIM. P. 33(a).  "[A]ny error sufficient to require a reversal on appeal is an adequate ground for granting a new trial."  3 CHARLES ALAN WRIGHT & SARAH N. WELLING, FEDERAL PRACTICE & PROCEDURE § 589, at 547 (4th ed. 2011).  A new trial should be granted only if the defendant has shown that "the error was substantial, not harmless, and that the error affected the defendant's substantial rights."  United States v. Williams, 825 F. Supp. 2d at 132 (quoting United States v. Safavian, 644 F. Supp. 2d 1, 8 (D.D.C. 2009)).  Whether to grant a motion for a new trial is "a decision committed to the Court's sound discretion."  Id. (quoting United States v. Neill, 964 F. Supp. 438, 441 (D.D.C. 1997)).

## II.  MOTION FOR JUDGMENT OF ACQUITTAL

### A.  Failure to Prove Venue

Mr. Sitzmann maintains that he is entitled to a judgment of acquittal because the government failed to prove that venue was proper in the District of Columbia.

"The Government bears the burden of establishing by a preponderance of the evidence that venue is proper with respect to each count charged against the defendant." United States v. Morgan, 393 F.3d 192, 195 (D.C. Cir. 2004) (citing United States v. Haire, 371 F.3d 833, 837 (D.C. Cir. 2004), vacated on other grounds, 543 U.S. 1109 (2005)); see United States v. Auernheimer, 748 F.3d 525, 533 (3d Cir. 2014).  Proper venue in criminal proceedings is no mere technicality, having been "a matter of concern to the Nation's founders." United States v. Morgan, 393 F.3d at 195 (quoting United States v. Cabrales, 524 U.S. 1, 6 (1998)).  "Indeed, the Constitution 'twice safeguards the defendant's venue right:  Article III, § 2, cl. 3, instructs that Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed'; the Sixth Amendment calls for trial 'by an impartial jury of the State and district wherein the crime shall have been committed.'" Id. (quoting United States v. Cabrales, 524 U.S. at 6); see United States v. Cores, 356 U.S. 405, 407 (1958) ("The provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place.").

Reflecting these safeguards, Rule 18 of the Federal Rules of Criminal Procedure provides that, unless otherwise permitted by statute or the Rules, "the government must prosecute an offense in a district where the offense was committed." FED. R. CRIM. P. 18.  Where, as here, the statute proscribing the offense does not contain an express venue provision, "'[t]he locus delicti must be determined from the nature of the crime alleged and the location of

the act or acts constituting it.'" United States v. Morgan, 393 F.3d at 196 (quoting United States v. Cabrales, 524 U.S. at 6-7). In a conspiracy prosecution, "venue is proper in any jurisdiction where any co-conspirator committed an overt act in furtherance of the conspiracy." United States v. Watson, 717 F.3d 196, 198 (D.C. Cir. 2013) (citing United States v. Brodie, 524 F.3d 259, 273 (D.C. Cir. 2008), and 18 U.S.C. § 3237(a)); see Whitfield v. United States, 543 U.S. 209, 218 (2005) ("[T]his Court has long held that venue is proper in any district in which an overt act in furtherance of the conspiracy was committed, even where an overt act is not a required element of the conspiracy offense.") (citing United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 252 (1940)); United States v. Fahnbulleh, 752 F.3d 470, 477 (D.C. Cir. 2014); United States v. Lam Kwong-Wah, 924 F.2d 298, 301 (D.C. Cir. 1991). "In determining whether the government has properly established venue, a reviewing court must view the evidence in the light most favorable to the government." United States v. Lam Kwong-Wah, 924 F.2d at 301.

       The conspiracy with which Mr. Sitzmann was charged was alleged to have been carried out in numerous states and other nations. But the only connection between this conspiracy and the District of Columbia was a single wire transfer made by one of Mr. Sitzmann's co-conspirators, George Jones, to an individual named Terrence Colligan, who was posing as a fellow co-conspirator. Mr. Colligan, who had agreed to supply 16 kilograms of cocaine to Mr. Jones in Florida, telephoned him there and requested that Jones wire money to Washington, D.C. to facilitate Colligan's travels. In reality, Colligan had become a government informant, and the wire transfer was a ruse orchestrated by law enforcement in part to establish venue in this jurisdiction. Mr. Sitzmann contends that there is insufficient evidence that the Jones wire transfer was part of any conspiracy to which he, Sitzmann, was a party.

4

Given the centrality of this wire transfer in establishing venue, a little more detail is necessary. The United States Attorney's Office for the District of Columbia, together with agents from U.S. Immigration and Customs Enforcement ("ICE"), began investigating Mr. Jones based on information that they learned from their informant, Mr. Colligan. Their purpose in investigating Jones was largely to gather more evidence on Sitzmann. As they were told by Colligan, and as evidence later introduced at trial showed, Jones served as a driver for Sitzmann in the late 1990s, ferrying cocaine from the United States into Canada. As part of its investigation, the government arranged a series of secretly recorded telephone calls between Mr. Colligan and Mr. Jones. At the time, Jones was located in Florida, while Colligan was in the Washington, D.C. area. Mr. Colligan also traveled to Jones' house in Florida in early March 2004 and made body-wire recordings of conversations between the two men. Through these various conversations, the government learned that Mr. Jones was interested in obtaining cocaine to pass on to buyers. Eventually, Jones and Colligan agreed that Colligan would travel from Washington, D.C. to Florida to supply Mr. Jones with 16 kilograms of cocaine. The government intended to supply Colligan with "sham cocaine" as part of a sting and arrest Jones when the transaction was completed. Trial Tr. (4/30/12) at 7-34.

In a March 19, 2004 recorded telephone call, Mr. Colligan asked Mr. Jones to wire $1,000 to him in Washington, D.C. to facilitate his travel to Florida to deliver the cocaine. See Gov't Trial Ex. 40, Tape C1; id., Tape C2. The government had a two-fold purpose in instigating this wire transfer. First, it wanted "to see some good faith from Jones," who had backed out of an earlier drug transaction. Trial Tr. (4/30/12) at 80. Second, and more relevant here, because prosecutors in Florida had shown no interest in investigating Mr. Jones or Mr. Sitzmann, the government conceived of the wire transfer to the District of Columbia as a way of

establishing venue in Washington, D.C., based on the principle that venue in a conspiracy case

lies in any district where an overt act in furtherance of the conspiracy is committed by any co-

conspirator.  Id. at 87; Hr'g Tr. (8/16/11) at 55.[1]  In response to Colligan's request, Jones

directed a longtime friend, Alexander Mesa, to wire the money to Mr. Colligan, who picked it up

from a Western Union office in Washington, D.C. on March 20, 2004.  Trial Tr. (4/30/12) at

35-40, 136-39.[2]  Mr. Sitzmann, who had been jailed in France the previous month, was not

involved in the wire transfer.  Hr'g Tr. (8/16/11) at 24, 25.

        Sitzmann now argues that Jones' wire transfer was not part of the narcotics

conspiracy alleged against Sitzmann, or part of any conspiracy.  Citing the established

proposition that a government agent cannot be a conspirator, see United States v. Iennaco, 893

F.2d 394, 397 n.3 (D.C. Cir. 1990); Sears v. United States, 343 F.2d 139, 141-42 (5th Cir. 1965),

he maintains, correctly, that no conspiracy existed between Mr. Colligan and Mr. Jones.  "Since

there could be no conspiratorial agreement between Jones and government agent Colligan,"

Sitzmann argues, "there was no venue created in D.C. for conspiracy."  Defendant's Motion for

Judgment of Acquittal or, in the Alternative, for a New Trial ("Mot.") at 19.  The flaw in this

reasoning is that the government did not allege that Sitzmann was part of a conspiracy with

Colligan at the time — rather, Mr. Sitzmann was alleged to have conspired with Mr. Jones (and

---

[1]      The Court held a hearing on August 16, 2011 during which it heard the testimony of former Metropolitan Police Department ("MPD") Officer William Buss that related to several of the arguments made in then pending motions by Sitzmann, including an argument that the government had illegally "manufactured venue" in the District of Columbia through the George Jones wire transfer.  See infra at 23-24 & n.7.  Buss was assigned to a joint MPD-ICE Task Force and was often referred to at trial and in pretrial proceedings as an ICE agent or as Agent Buss.  The same is true throughout this Opinion.

[2]      Later that month, Mr. Colligan delivered 16 kilograms of sham cocaine to Mr. Jones in Florida, who subsequently was arrested, pled guilty to conspiracy to distribute and possess with the intent to distribute at least 5 kilograms of cocaine, and cooperated with the government before his death.  Trial Tr. (4/30/12) at 40-48.

others).  See Sears v. United States, 343 F.2d at 142 ("[G]overnment informers may serve as the

connecting link between co-conspirators.").  Mr. Jones was led to believe that Mr. Colligan was

still part of the same conspiracy.  His act of wiring money to Mr. Colligan in Washington, D.C.

in order to facilitate the transportation of drugs, the government argues, was an overt act in

support of the conspiracy between Mr. Jones and Mr. Sitzmann.  The Court agrees.

       The government furnished sufficient evidence at trial to prove, by a

preponderance of the evidence, that Mr. Jones' wire transfer to Colligan in the District of

Columbia was an overt act in furtherance of a conspiracy with Mr. Sitzmann.  Two weeks before

the wire transfer, Colligan visited Jones in his Florida home wearing a body wire.  The recorded

conversation between the two men — during which they discussed the logistics of a proposed

drug transaction and during which Jones revealed that Sitzmann had recently been arrested in

France — provides evidence that Jones was working on an ongoing basis with Sitzmann to

smuggle drugs.  In the conversation, Jones discusses his previous drug trafficking activities with

Sitzmann and indicates that on the last occasion the two men had spoken in person, Jones had

proposed: "Greg, why don't we try and do something . . . .  If you need me to, I'm down here,

I don't want to sit here, I'll come and help you."  Gov't Trial Ex. 40, Tape B2, at 12.  Mr. Jones

explained to Colligan that "it's been since nineteen ninety-nine, or two thousand, when I gave

him all this money and you know I've told you before we've had a good relationship. . . .  And

when Greg asked a hundred, I got fifty, when I asked for a hundred he got fifty and it wasn't a

problem."  Id. at 19.  At one point, Jones describes how he traveled to Colombia "to smuggle

coke" with Sitzmann.  Id. at 22.  He later describes smuggling drugs to Canada for Sitzmann by

hiding them in the gas tank of his truck.  Id. at 23.

The conversation between Jones and Colligan also illustrates that Mr. Jones was aware of Mr. Colligan's drug trafficking cooperation with Mr. Sitzmann and that Jones understood their collaboration to be ongoing.  The ongoing interrelationship among the three men is evident throughout the conversation.  Mr. Jones mentions that Sitzmann "went to Europe last month and he made, I don't know what he made, he sent me a thousand bucks, sent you five hundred."  Gov't Trial Ex. 40, Tape B2, at 14.  When Jones then complains that Sitzmann "didn't send me but a thousand" and that "I got no other way to make a living," Colligan responds, "No, I'm dead in the water," to which Jones replies:  "I'm dead too."  Id. at 14.  When Mr. Colligan mentions that he is owed $53,000 by Sitzmann, Jones states that Mr. Sitzmann owes him $100,000.  Id. at 8.  In apparent reference to future drug transactions, Mr. Jones says:  "I didn't know you were coming [to Florida] till yesterday.  Everybody promises maybe they're going to do stuff and haven't been doing stuff.  I'd asked you to come a month ago."  After Mr. Colligan responds, "I know, but Greg said he was going to take care of it," Mr. Jones replies:  "He didn't take care of nothing."  Id. at 8.  Later, Mr. Colligan relates:  "When I talked to Greg and I told him that I'd talked to you, you had some work for him . . . he says it's too cheap.  I said . . . 'you know, George asked if I could help him out.'  He said, 'I'll take care of that.'  OK, that's why I didn't."  Mr. Jones responds:  "Well he was going to . . . ."  Id. at 18.  With respect to the drug deal that Jones and Colligan are planning in early March of 2004, Mr. Jones explains that of the "fifteen hundred" he expects to receive, he will keep "750" for himself and give "750 to Greg," explaining that "this is for his people that I'm doing business with."  Id. at 13.[3]

---

[3]     Agent Buss testified that this meant $1,500 per kilogram.  See Trial Tr. (4/30/12) at 11.

When Mr. Sitzmann was arrested in France in February 2004, the first person that he notified of his arrest by telephone was Mr. Jones.  Trial Tr. (4/18/12) at 56-62; id. (4/30/12) at 24.  After Jones was arrested following the sting operation facilitated by Colligan, investigators executing a search warrant for his home discovered property there belonging to Sitzmann and related to drug-smuggling, including "numerous boxes of bank records, corporate records," "information dealing with the purchase and sale of airplanes," "packing material, heat-sealing equipment," and "professional grade leather bags that had false compartments in the bottom," of the type that Mr. Sitzmann had previously described using for drug smuggling to Mr. Colligan and in which he was hiding 7 kilograms of cocaine when he was arrested in France in February 2004.  Hr'g Tr. (8/16/11) at 28-30.  When Mr. Colligan delivered the fake cocaine to Mr. Jones in Florida in late March 2004, the latter said he was "going to put this in a bag.  Going to put it in one of Greg's bags," Gov't Trial Ex. 40, Tape G, at 4, and when Mr. Jones' home was searched, one of the kilograms was discovered in the false compartment of one of those bags.  Trial Tr. (4/30/12) at 43-46.

The government's evidence was sufficient to show, by a preponderance of the evidence, that when George Jones wired money to Terrence Colligan in Washington, D.C., he acted in furtherance of the same conspiracy with which the grand jury charged Mr. Sitzmann. Specifically, the evidence indicates that Jones anticipated obtaining cocaine from Sitzmann for resale; that when Jones did not receive it he arranged to receive a substitute batch of cocaine from Colligan, whom he believed to be a fellow Sitzmann conspirator; that the cocaine was "for his [Sitzmann's] people that I'm doing business with"; and that Jones planned to share half of the proceeds of the sale with Sitzmann, just as he had done after previous drug transactions.

In these circumstances, it does not matter whether Mr. Colligan was a government informant.  Nor does it matter whether Mr. Sitzmann knew about or participated in the wire transfer, so long as Sitzmann previously reached a conspiratorial agreement with Mr. Jones — "'the combination of minds in an unlawful purpose,'" Smith v. United States, 133 S. Ct. 714, 719 (2013) (quoting United States v. Hirsch, 100 U.S. 33, 34 (1879)) — and never affirmatively withdrew from that agreement.  "Conspiracy is an ongoing offense that lasts, absent one's affirmative withdrawal from the enterprise, as long as any co-conspirator continues to further common ends[.]"  United States v. Childress, 58 F.3d 693, 733 (D.C. Cir. 1995).  Once the government establishes the existence of a conspiracy, the burden of establishing withdrawal from that conspiracy rests on the defendant.  Smith v. United States, 133 S. Ct. at 719.  Mr. Sitzmann raised a defense of withdrawal at trial, which the jury rejected.  Mr. Sitzmann thus was "responsible for the acts of his co-conspirators in pursuit of their common plot."  Id. (citing Pinkerton v. United States, 328 U.S. 640, 646 (1946)).  So long as Mr. Jones made the wire transfer in furtherance of his conspiracy with Mr. Sitzmann to traffic in cocaine for profit, venue lies in the District of Columbia.  The government demonstrated this to be the case by a preponderance of the evidence.

### B.  "Manufactured Venue"

Mr. Sitzmann next argues that he must be acquitted because the government violated his constitutional rights by manufacturing venue in the District of Columbia through the ruse of the wire transfer.  He made the same argument, which is based on dicta from United States v. Spriggs, 102 F.3d 1245, 1250-51 (D.C. Cir. 1997), in a pretrial motion that the Court denied.  See infra at 23-24 & n.7.  In reviving the argument, he cites no new facts or supporting legal authority.  See Mot. at 20-22; Defendant Sitzmann's Reply to Government's Opposition to

Motion for Judgment of Acquittal and Motion for New Trial ("Reply") at 4-5.  The Court rejects

the argument for the same reasons that it explained at length in its ruling from the Bench on

September 8, 2011.  See Hr'g Tr. (9/8/11) at 36-41.

### C.  Statute of Limitations

In a prosecution for conspiracy under 21 U.S.C. § 846, the government must

prove that the conspiracy continued into the five-year statute of limitations period.  United States

v. Butler, 792 F.2d 1528, 1531-32 (11th Cir. 1986) (citing 18 U.S.C. § 3282); accord United

States v. Lokey, 945 F.2d 825, 832 (5th Cir. 1991).  Because a conviction under Section 846

does not require proof of any overt act in furtherance of the conspiracy, United States v. Shabani,

513 U.S. 10, 11 (1994), the government need not prove that an overt act occurred within the

limitations period — merely that the conspiracy still existed during that period.  See United

States v. Seher, 562 F.3d 1344, 1364 (11th Cir. 2009) ("The government satisfies the

requirements of the statute of limitations for a non-overt act conspiracy if it alleges and proves

that the conspiracy continued into the limitations period.") (citation omitted); United States v.

Wilkins, 354 F. App'x 748, 756 n.10 (4th Cir. 2009) ("Since no overt acts are required to sustain

a conviction for a drug conspiracy under 21 U.S.C. § 846[,] the dispositive consideration for

Wilkins's limitations claim is whether he withdrew from the conspiracy or the conspiracy ended

outside the five-year limitations period.") (internal citation omitted); United States v. Butler, 792

F.2d at 1532-33 ("[O]n a non-overt conspiracy charge, the indictment satisfies the requirements

of the statute of limitations if the government alleges and proves . . . that the conspiracy

continued into the limitations period."); cf. United States v. Hitt, 249 F.3d 1010, 1015 (D.C. Cir.

2001) (stating that under general conspiracy statute, 18 U.S.C. § 371, which requires proof of an

overt act in furtherance of conspiracy, at least one overt act must occur during limitations period).

"[A] conspiracy is deemed to continue as long as its purposes have neither been abandoned nor accomplished, and no affirmative showing has been made that it has terminated." United States v. Seher, 562 F.3d at 1364 (citation omitted); accord United States v. Magleby, 420 F.3d 1136, 1145 (10th Cir. 2005) ("[F]or statute-of-limitations purposes, a non-overt-act conspiracy is not committed simply on the date the agreement is made but is deemed to continue as long as its purposes have neither been abandoned nor accomplished, and no affirmative showing has been made that it has terminated.") (internal quotation marks omitted).

The indictment in this case was returned on August 7, 2008, and the statute of limitations therefore reaches back to August 7, 2003.  Mr. Sitzmann contends that he is entitled to judgment of acquittal because the government failed to present any evidence that the conspiracy with which he was charged continued after that date.  He is wrong.

To help explain the nature of Sitzmann's argument, it is well to remember that Mr. Sitzmann's primary defense at trial was that he ceased all drug-trafficking activity within the United States after meeting with Florida prosecutors in the year 2000, after which he smuggled drugs from South America directly to Europe, without transporting them through or distributing them in the United States, or agreeing to do so.  See Notice of Filing (June 4, 2012) [Dkt. No. 180], Tab. DD, at 3 (Theory of Defense).  A conspiracy to smuggle drugs from one nation to another nation, without any intent to either possess the drugs in the United States or to distribute them in the United States, would not violate 21 U.S.C. § 846.  See United States v. Benbow, 539 F.3d 1327, 1330-34 (11th Cir. 2008); cf. United States v. Holler, 411 F.3d 1061, 1064-65 (9th Cir. 2005).  In essence, Mr. Sitzmann argues that he withdrew from his previous conspiracy —

which involved contact with the United States — before the statute of limitations began to run, and that the conspiracy he engaged in afterward did not involve the United States or violate federal law.  See, e.g., Trial Tr. (5/16/12 p.m.) at 16-19 (excerpt of defense closing arguments).

Although not required to do so, the government produced evidence at trial of at least three overt acts committed within the United States in furtherance of the charged conspiracy during the limitations period — one by Mr. Sitzmann, and two by a co-conspirator.  It also provided additional evidence that the conspiracy continued into the limitations period.

Because the statute of limitations began to run on August 7, 2003 and Mr. Sitzmann was arrested in France in February 2004 — limiting the range of his own activities thereafter — he had a relatively small window in which to commit overt acts in furtherance of the conspiracy within the United States.  Making the government's case much easier, however, Mr. Sitzmann admitted to U.S. law enforcement officers during a 2008 debriefing in France that he personally smuggled cocaine through the United States on his way to Europe from Colombia at least once between December 2003 and February 2004.  See Trial Tr. (5/10/12) at 16-24, 29-30, 41-42.[4]

The government also furnished evidence of two overt acts performed in furtherance of the conspiracy during the limitations period by one of Mr. Sitzmann's co-conspirators:  the March 2004 wire transfer from George Jones to informant Terrence Colligan, and Jones' later receipt of sham cocaine from Colligan.  As described above, Mr. Jones made the

---

[4]	This admission came into evidence as a result of the defense theory that Mr. Sitzmann pursued at trial.  He has argued throughout these proceedings that he was granted immunity by federal prosecutors in Florida in the year 2000, after which he committed no offenses within the United States.  His pursuit of this immunity defense at trial — which included calling to the stand one of his former attorneys to testify about meetings held with prosecutors in early 2000 — opened the door to permit the government to introduce contrary assertions made by Mr. Sitzmann during his 2008 debriefing in France.  See Trial Tr. (5/10/12) at 26-29.

wire transfer to help Colligan — whom he believed to be a fellow co-conspirator of Sitzmann — deliver 16 kilograms of cocaine to him, the profits from which he planned to share with Sitzmann.  See supra at 5-9.

Apart from the wire transfer itself and the cocaine receipt, Mr. Jones' recorded comments to Mr. Colligan in March 2004 and his participation in the cocaine transaction demonstrate that Jones and Sitzmann were still in a conspiratorial relationship in March 2004.  In a conversation between Jones and Colligan two weeks before the wire transfer, in which the men planned a cocaine transaction that ultimately did not come to fruition, Mr. Jones explained that the cocaine he would be receiving was for Mr. Sitzmann's "people," whom Jones was "doing business with."  Gov't Trial Ex. 40, Tape B2, at 13.  Jones further explained that of the $1,500 he expected to earn per kilogram, he would keep $750 for himself and give $750 to Mr. Sitzmann, id., just as, for many years, he had shared half of his drug earnings with Sitzmann and vice versa. Id. at 19.  When Mr. Colligan eventually provided Jones with 16 kilograms of fake cocaine, Jones said that he was "[g]oing to put it in one of Greg's bags," Gov't Trial Ex. 40, Tape G, at 4, and part of the cocaine later was found hidden in one of the false-compartment bags that, the evidence showed, Mr. Sitzmann gave to the individuals in his drug-smuggling network.  Trial Tr. (4/30/12) at 43-46.

This evidence demonstrates that while Mr. Sitzmann was in a French jail in February 2004, his conspiratorial agreement with Mr. Jones to make money from cocaine smuggling was still being carried on by Mr. Jones.  It further demonstrates that this conspiratorial agreement was not limited to drug smuggling that occurred entirely outside the United States.  And, as noted earlier, "[c]onspiracy is an ongoing offense that lasts, absent one's

affirmative withdrawal from the enterprise, as long as any co-conspirator continues to further common ends."  United States v. Childress, 58 F.3d at 733.

There is still more evidence that shows that Mr. Sitzmann's conspiracy continued past August 7, 2003.  One of his other co-conspirators, Gary Paulson, testified that in January 2004 Mr. Sitzmann proposed resuming the operations they had conducted in the late 1990s, which involved smuggling cocaine by truck from Mexico through the United States and into Canada, where it was purchased and distributed by members of the Canadian Hell's Angels.  See infra at 32; Trial Tr. (4/25/12 a.m.) at 22-24.  At the time, Mr. Paulson testified, he was helping Sitzmann to sell a Stallion kit plane that had been purchased (for drug smuggling) with proceeds from the previous Canadian operations, and he was aware that Mr. Sitzmann was in Europe carrying on drug smuggling there.  Trial Tr. (4/24/12 p.m.) at 95-101; id. (4/25/12 a.m.) at 22-24.[5]  Although Mr. Paulson did not agree to resume the smuggling to Canada, Sitzmann's offer is further evidence that his conspiracy was ongoing at the time of his arrest in February 2004.

The government cites other evidence that the conspiracy continued into the statute of limitations period, but the foregoing is sufficient.  As the government persuasively explains, see Government's Opposition to Defendant's Motion for Judgment of Acquittal or for a New Trial ("Opp.") at 33-41, virtually all of Mr. Sitzmann's activities, including those that occurred during the limitations period, involved the same core group of people and the same goal — to profit by the smuggling of cocaine from Mexico and South America into the United States, Canada, and Europe.  Although Sitzmann may have shifted his emphasis toward distribution and

---

[5]     Mr. Paulson sold the Stallion airplane in April 2004, sending the proceeds to Mr. Sitzmann's girlfriend and alleged co-conspirator, Maritza Fontecha.  Trial Tr. (4/24/12 p.m.) at 95-104; id. (4/25/12 a.m.) at 12-23; see Government's Opposition to Defendant's Motion for Judgment of Acquittal or for a New Trial ("Opp.") at 40-41 (describing supporting documentary evidence).

sales in Europe during the later years of the conspiracy, and may have become more circumspect by reducing his conduct within the United States to avoid the harsher drug laws here, this shift in tactics does not change the fact that Sitzmann and his associates "share[d] a common goal": "the possession and distribution of narcotics for profit." United States v. Tarantino, 846 F.2d 1384, 1393 (D.C. Cir. 1988). Nor does it diminish "the overlap of participants in the various operations" undertaken in pursuit of this goal. Id. "[A] single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." United States v. Payne, 591 F.3d 46, 61 (2d Cir. 2010) (citation omitted). "Nor do . . . shifting emphases in the locale of operations necessarily convert a single conspiracy into multiple conspiracies." United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990). "It is often possible, especially with drug conspiracies, to divide a single conspiracy into sub-agreements," but this "does not . . . mean that more than one conspiracy exists." United States v. Ghazaleh, 58 F.3d 240, 245 (6th Cir. 1995). "The key is to determine whether the different sub-groups are acting in furtherance of one overarching plan." Id.

Viewing the evidence in the light most favorable to the government, United States v. Kayode, 254 F.3d at 212, and according the government the benefit of all legitimate inferences, United States v. Weisz, 718 F.2d at 437, the Court finds that the government's evidence showed that the conspiracy that existed during the statute of limitations period in this case was the same one that had existed all along.

### D.  Multiple Conspiracies

Mr. Sitzmann's motion includes a section with the heading:  "Because the Evidence at Trial Established Multiple Conspiracies, Acquittal is Required Where No

16

Conspiracy Occurred in the District of Columbia."  Mot. at 25.  This section consists of a single

sentence:  "Once the grand jury returns an indictment, the prosecutor is bound by the parameters

of that indictment."  Id.  The government says that it "cannot discern what argument the defense

is attempting to make here," Opp. at 45, and neither can the Court.  The only argument that Mr.

Sitzmann might have regarding multiple conspiracies that is discernible to the Court falls within

Mr. Sitzmann's combined statute-of-limitations and withdrawal-from-the-conspiracy argument,

just discussed.  See supra at 12-13.

> The indictment in this case provided as follows:
>
> From at least the 1990s, through at least 2004, the exact dates
> being unknown to the Grand Jury, within the United States,
> Mexico, Canada, Colombia, the Bahamas, Spain, France, Italy, and
> elsewhere, Gregory Joel Sitzmann did knowingly and willfully
> combine, conspire, confederate and agree together and with other
> persons both known and unknown to the Grand Jury, to
> unlawfully, knowingly and intentionally distribute and possess
> with intent to distribute a mixture and substance containing a
> detectable amount of cocaine . . . .

Indictment at 1 (Aug. 7, 2008).  The evidence presented at trial was consistent with this

description.  Because Mr. Sitzmann provides no further explanation in his reply brief of this

cryptic section of his motion, the Court will not further guess at its meaning.

## III.  MOTION FOR A NEW TRIAL

### A.  *Failure to Submit the Question of Venue to the Jury*

Mr. Sitzmann argues that he was wrongly denied the right to have the jury decide

whether venue was proper in the District of Columbia.  The Court rejected Mr. Sitzmann's

request for a jury instruction on venue, applying the standards for such a request found in United

States v. Haire, 371 F.3d at 838-40, and United States v. Nwoye, 663 F.3d 460, 466 (D.C. Cir.

2011).  Mr. Sitzmann contends that the failure to have the jury decide the venue question violated his constitutional and statutory rights, requiring a new trial.

Although "strictly speaking" venue "'is an element of every offense,'" it nevertheless "'does not automatically present a question for the jury.'"  United States v. Haire, 371 F.3d at 839 (quoting United States v. Perez, 280 F.3d 318, 329-30 (3d Cir. 2002)).  In fact, "[i]t is well established that a defendant can waive his venue rights altogether 'just by his failure to lodge an objection prior to trial.'"  United States v. Borda, 952 F. Supp. 2d 43, 46 (D.D.C. 2013) (quoting United States v. Burroughs, 161 F. App'x 13, 14 (D.C. Cir. 2005)).  "It has long been settled in this circuit and elsewhere . . . that a defendant may waive his right to proper venue."  United States v. Wilson, 26 F.3d 142, 151 (D.C. Cir. 1994) (citing Jones v. Gasch, 404 F.2d 1231, 1235 (D.C. Cir. 1967)); see, e.g., United States v. Gaviria, 116 F.3d 1498, 1517 & n.22 (D.C. Cir. 1997).  "Venue is a jury question only if [1] 'the defendant objects to venue prior to or at the close of the prosecution's case-in-chief,' [2] 'there is a genuine issue of material fact with regard to proper venue,' and [3] 'the defendant timely requests a jury instruction.'"  United States v. Nwoye, 663 F.3d at 466 (quoting United States v. Haire, 371 F.3d at 840).

Mr. Sitzmann timely requested a jury instruction on venue.  See Notice of Filing, Tab J.[6]  After the government objected to this proposed instruction, the matter was discussed during the charge conference on May 14, 2012.  See Trial Tr. (5/14/12) at 52-61.  The Court decided the next day that, in its view, Mr. Sitzmann also had satisfied Nwoye's first requirement because he "properly objected to venue pretrial, during trial, and prior to the close of the government's case-in-chief."  Notice of Filing, Tab R.  After receiving additional arguments

---

[6]    After trial, at the Court's direction, the parties compiled and filed on the docket their email exchanges with the Court between May 1 and May 15, 2012, regarding proposed jury instructions.

from counsel regarding <u>Nwoye</u>'s second requirement, <u>see id</u>., Tab X, the Court ruled that this requirement was not met, because there was "no genuine issue of material fact with regard to proper venue." <u>Id</u>., Tab LL.  Thus, a jury instruction on venue was "not warranted in this case." <u>Id</u>.

Mr. Sitzmann maintains that all three prerequisites for a jury instruction on venue were satisfied.  There is no dispute that he timely requested such an instruction; thus, the third requirement of <u>Nwoye</u> was met.  <u>United States v. Nwoye</u>, 663 F.3d at 466.  The government disputes, however, whether "there [was] a genuine issue of material fact with regard to proper venue," and it further disagrees with the Court's earlier determination that Sitzmann "object[ed] to venue prior to or at the close of the prosecution's case-in-chief."  <u>United States v. Nwoye</u>, 663 F.3d at 466.  The Court addresses these two issues in turn.

1.  Genuine Issue of Material Fact with Regard to Proper Venue

Even if a defendant properly objects to venue and timely requests a jury instruction on the issue, no instruction is required and venue does not become an issue for the jury unless "there is a genuine issue of material fact with regard to proper venue."  <u>United States v. Nwoye</u>, 663 F.3d at 466 (quoting <u>United States v. Haire</u>, 371 F.3d at 840); <u>see</u> <u>United States v. Fahnbulleh</u>, 752 F.3d at 477.  Finding no such genuine issue in this case, the Court denied Mr. Sitzmann's request for a jury instruction on venue.  <u>See</u> Notice of Filing, Tab R; <u>id</u>., Tab LL. Mr. Sitzmann contests that determination, arguing that the jury should have been permitted to decide whether Mr. Jones intended to further a conspiracy with Mr. Sitzmann by wiring money to Mr. Colligan in Washington, D.C., or whether that act related to an entirely separate drug smuggling agreement with no connection to Mr. Sitzmann.  But a review of the record indicates

that this question was never put in issue by Mr. Sitzmann, either at trial or before, through counsel, or *pro se*.

The courts of appeals differ on "[t]he precise issue of when venue is 'in issue' so as to raise a fact question for the jury." United States v. Perez, 280 F.3d at 333. "The more narrow view," followed by the Third, Fifth, and Seventh Circuits, "holds that venue is not in issue unless it is actually disputed at trial." Id. (citing United States v. Winship, 724 F.2d 1116, 1125-26 (5th Cir. 1984), and United States v. Massa, 686 F.2d 526, 529-31 (7th Cir. 1982)); see id. at 334 (adopting this view). At the other extreme, "the Tenth Circuit holds that 'failure to instruct [the jury] on venue, when requested, is reversible error unless it is beyond a reasonable doubt that the jury's guilty verdict on the charged offense necessarily incorporates a finding of proper venue.'" Id. at 333 (quoting United States v. Miller, 111 F.3d 747, 751 (10th Cir. 1997)). "Straddling these opposing positions are the Fourth and Eighth Circuits," which have expressed the same view as the Tenth Circuit, "but on the other hand have found harmless the refusal by the trial court to instruct on venue because evidence that criminal acts occurred in the applicable districts was substantial and uncontroverted." Id. (citing United States v. Martinez, 901 F.2d 374, 376-77 (4th Cir. 1990), and United States v. Moeckly, 769 F.2d 453, 462 (8th Cir. 1985)).

The Court is persuaded that the narrower position of the Third, Fifth, and Seventh Circuits is correct and is most consistent with this circuit's case law. "Venue cannot be in issue unless the parties actually dispute it." United States v. Perez, 280 F.3d at 334. That conclusion makes particular sense because, as noted, "[i]t has long been settled in [the D.C. Circuit] and elsewhere . . . that a defendant may waive his right to proper venue." United States v. Wilson, 26 F.3d at 151 (citing Jones v. Gasch, 404 F.2d at 1235); see, e.g., United States v. Gaviria, 116 F.3d at 1517 & n.22. A further reason to hew to this narrower position is that it was integral to

the Third Circuit's formulation of the three-part test for when venue is a jury question — and that test was later adopted by our own circuit. See United States v. Haire, 371 F.3d at 840 ("We cannot improve upon [the Third] Circuit's conclusion that venue becomes a jury question and the trial court must specifically instruct the jury on venue, in cases where there is no facially-obvious defect in the allegations of venue, when the following three conditions are met . . . .").

Mr. Sitzmann's pretrial motions never disputed that the Jones-Colligan wire transfer established venue in Washington, D.C.  But he did raise two issues in pretrial motions that related to venue.  First, he argued unsuccessfully for dismissal of the case under a theory of so-called "manufactured venue" or "venue entrapment," the premise of which was that the government established venue through improper means that violated Mr. Sitzmann's constitutional rights.  Second, Mr. Sitzmann moved unsuccessfully for a transfer of venue to the United States District Court for the Southern District of Florida.  Because these matters resurfaced during trial and during the arguments made surrounding a jury instruction on venue, it is necessary to delve into some of the complicated history of the pretrial motions in this case, in order to show that, notwithstanding these two motions, venue was never actually put in issue before or during trial.

Mr. Sitzmann's trial was preceded by nearly four years of pretrial motions activity, during which Sitzmann filed numerous and often interrelated motions to dismiss the indictment.  These pretrial proceedings were delayed in part because Mr. Sitzmann repeatedly developed conflicts with his attorneys that led to their withdrawal and replacement, and because of Sitzmann's vacillation between requesting to proceed *pro se* or through counsel.  See United States v. Sitzmann, 826 F. Supp. 2d 73 (D.D.C. 2011).  In April 2010, acting through his then-attorney, Richard Klugh, Mr. Sitzmann filed two motions to dismiss the case:  one based on

alleged violation of the statute of limitations and constructive amendment of the indictment, and the other based on alleged due process violations, jurisdictional issues, and interference with the defendant's ability to timely respond to the charges.  See Dkt. Nos. 62, 64.  Neither motion mentioned venue.  Oral argument was held on the motions in July 2010, during which Mr. Klugh mentioned, for the first time, the possibility of a venue issue, though without providing any sustained argument about the matter.  See Hr'g Tr. (7/12/10) at 44, 47, 54, 119.  It was agreed at this hearing that Mr. Klugh would file a supplemental memorandum expanding on certain issues raised in the two pending motions, and he did so in September 2010.  See Dkt. No. 88.

One paragraph of this September 2010 supplemental memorandum, under the heading "Jurisdictional/venue issues," advanced an argument regarding so-called "manufactured venue," which the memorandum described as a doctrine "premised on luring a defendant to a distant district for a tactical advantage," resulting in "a constitutional violation."  Dkt. No. 88 at 8 (citing United States v. Spriggs, 102 F.3d 1245 (D.C. Cir. 1996)).  This passage argued that the government had engaged in "manipulation of venue" through its orchestration of the wire transfer from George Jones to Terrence Colligan.  Id. at 8-9; see supra at 10-11.  The memorandum did not argue that venue was lacking in the District of Columbia; the closest it came to doing so was expressing possible doubt about the matter in an aside.  See Dkt. No. 88 at 8-9 ("When combined with the preindictment delay, the interference with representation and assistance of an investigator, and the attempt to merge conduct not in violation of United States law . . . with time-barred conduct involving the United States, the manipulation of venue — to the extent the Court deems such an artificial premise to be sufficient to maintain venue in this district — compels dismissal.").

Mr. Klugh subsequently withdrew from the case in early 2011 after conflicts developed between him and Mr. Sitzmann.  See United States v. Sitzmann, 826 F. Supp. 2d at 79-80.  New counsel, Thomas Abbenante, was appointed in his place.  Id.  Mr. Abbenante filed a motion to transfer venue to the Southern District of Florida, pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure.  See Dkt. No. 112.  This motion did not argue that venue was lacking in the District of Columbia, but requested a transfer under the standards articulated in Platt v. Minnesota Min. & Mfg. Co., 376 U.S. 240 (1964).  In August 2011, the Court heard argument on this motion to transfer venue.  The two motions filed by Mr. Klugh were still pending at the time, so Mr. Abbenante also called ICE Agent William Buss for testimony regarding "whether or not there was some improper government action with respect to the establishment of venue here."  Hr'g Tr. (8/16/11) at 11.  (Mr. Klugh had planned to call this witness before his withdrawal as counsel.)  Agent Buss testified about the wire transfer ruse, and, at the close of the hearing, Mr. Abbenante asked the Court to consider this testimony in support of Mr. Klugh's previously briefed argument on "manufactured venue," because the testimony revealed the manner in which law enforcement "devised a way in which they could get jurisdiction here."  Id. at 106-07.

On the day of this hearing, Mr. Abbenante also presented to the Court, and incorporated by reference into his arguments, a *pro se* "supplemental motion" written by Mr. Sitzmann in support of the motion to transfer venue.  See Dkt. No. 120 ("Supplemental Motion by Pro Se Defendant for Previous[ly] Filed Motion of Counsel Requesting Change of Venue").  In a heading in this supplemental filing, Mr. Sitzmann asked the Court to "dismiss the pending charge for lack of Venue and or because of Due Process Violations or in the alternative to transfer Venue to the Southern District of Florida pursuant to Rule 21(b) of the Federal Rules of

Criminal Procedure." Id. at 1.  Although this filing asked the Court to "dismiss" the case "for

lack of Venue," the filing did not in any way discuss lack of venue, or even manufactured venue.

Instead, the filing expounded on several of the factors relevant to a transfer of venue under Platt

v. Minnesota Min. & Mfg. Co.  See id. at 1-3.  In other words, it was — as titled — a

supplemental motion "requesting change of venue."  Id. at 1.

        In a lengthy bench ruling delivered the next month, the Court denied several of

Mr. Sitzmann's pending motions, including his motion to transfer venue and his jurisdictional

motion that incorporated arguments about "manufactured venue."  Hr'g Tr. (9/8/11) at 36.[7]  The

Court determined that the concept of venue manipulation is not recognized in this circuit "or

perhaps anywhere," and it explained why the facts of this case did not even resemble the

hypothetical discussion of such a concept in United States v. Spriggs.  Id. at 38-41.  The Court

then explained why the Platt factors did not counsel in favor of transferring venue.  Id. at 41-45.

In an Order dated September 15, 2011, memorializing these bench rulings, the Court denied Mr.

Sitzmann's motion to transfer venue and his motion incorporating his manufactured venue

argument.  See Order (Sept. 15, 2011).[8]

        At trial, the issue of venue came up only once, during the cross-examination of

ICE Agent William Buss.  During the cross-examination of Agent Buss, after eliciting answers

about the orchestration of the wire transfer from George Jones to Terrence Colligan, Mr.

---

[7]    See Hr'g Tr. (9/8/11) at 36 ("The argument is that this was manufactured venue; that he was lured back to the District only after the Florida authorities declined and the United States Attorney's Office, working with agents, devised a way to get him here and to get jurisdiction here; and that that is illegitimate, referred to as manufactured venue.  And in addition, that — or as a separate argument for changing venue, that venue properly belongs in Florida because the witnesses are there and various of the other factors.").

[8]    Because the Court had rejected Mr. Sitzmann's manufactured venue argument, it never addressed the government's argument that, apart from the Jones-Colligan wire transfer, venue existed independently under 18 U.S.C. § 3238.  See Minute Order (Sept. 15, 2011); Hr'g Tr. (9/8/11) at 61-66.

Abbenante began to ask a question about the Florida prosecutors' lack of interest in pursuing Mr. Jones.  See Trial Tr. (4/30/12) at 83.  The government objected on relevance grounds, and a sidebar discussion ensued.  Explaining his purpose in asking the question, Mr. Abbenante referenced Agent Buss' testimony during the August 2011 motions hearing about the wire transfer and the previously raised argument that "this has just been manufactured to get this case up to D.C."  Id. at 83.  The Court stated: "If you're trying to show that there's — that the jurisdiction or venue of the case was manufactured, I think I've already dealt with that. . . . That's not a question for the jury.  That's a legal question."  Mr. Abbenante responded: "I understand."  Id. at 84.  He was permitted to elicit from Agent Buss that one reason the government instigated the wire transfer to the District of Columbia was because "the Florida people weren't interested in the case" and "[b]y wiring money up here, it gave us venue to make the arrest in Washington, D.C."  Id. at 87.

Later that day, as a sidebar discussion of another topic was ending, the government stated:  "Oh, Your Honor, Mr. Abbenante brought up the issue of venue.  We'd request an instruction that you've already determined that venue is appropriate in [this] case."  Trial Tr. (4/30/12) at 113.  In response to a proposed instruction, Mr. Abbenante stated that he did not have any problem with an instruction that stated simply that "venue is not a question of fact, it's a legal issue that's to be determined by the Court."  Id. at 114.  During an ensuing recess, government counsel and defense counsel discussed such an instruction between themselves, and upon returning to court, government counsel reported that they had agreed on the following instruction:  "During Agent Buss' testimony the subject of venue was discussed. Venue is a legal question about where a case can be filed.  I have already decided that venue is appropriate in this Court.  It is not a question for the jury to decide."  Id. at 121-22.  When asked

by the Court, "Is that all right?", Mr. Abbenante responded, "Yes," and the instruction was read

to the jury upon its return.  Id. at 122-23.  The topic of venue was not raised again during trial.

      After the evidence was concluded and both sides had finally rested, Mr.

Abbenante included with his proposed jury instructions an instruction on venue, which read:  "In

addition to the other elements of the offense, the government has the burden of proving that

some part of the offense occurred in the District of Columbia.  If you find that there was a

conspiracy, but it was not in or did not involve the District of Columbia, then you must acquit the

defendant, notwithstanding any other issues in the case."  Notice of Filing, Tab J, at 2.  Applying

the Haire/Nwoye test, the Court declined to give this instruction, as described above.  See supra

at 18-19.

      Mr. Sitzmann now argues that while he does not dispute the basic facts

surrounding the Jones-Colligan wire transfer, there is a question of fact about whether Mr. Jones

made the wire transfer in furtherance of the same conspiracy with which Mr. Sitzmann was

charged.  This belated argument, however, was never presented until after the close of all the

evidence and both sides had rested.[9]  Mr. Sitzmann's contention that his trial counsel "attempted

---

[9]    The absence of any attempt to put this factual matter in issue before or during trial
is further illustrated by counsel's arguments during the charge conference.  In seeking to explain
how the second prong of the Haire/Nwoye test was met, the only thing cited to show that the
issue of venue had been contested was the pretrial argument about manufactured venue and the
question of whether Mr. Colligan was actually in the District of Columbia when he made the
telephone calls to Mr. Jones requesting the money, as he claimed in the calls.  Trial Tr. (5/14/12)
at 56-57, 61.  When the Court later offered the parties the chance to make supplemental written
arguments on the matter, Mr. Sitzmann's counsel wrote only:  "It is my position that the venue
instruction that I requested is appropriate and I would still request that it be given.  There is no
dispute that the money was wired to DC but there is a dispute as [to] the location of Colligan
when the calls were made to Jones requesting that the monies be sent."  Notice of Filing, Tab X.
It was not until the next morning — the day of closing arguments and jury instructions — that
Mr. Sitzmann's counsel first raised an argument akin to the one now being presented:  that a
venue instruction was required because the jury should determine whether Mr. Jones was still in
a conspiracy with Mr. Sitzmann at the time of the wire transfer.  Trial Tr. (5/16/12 a.m.) at 5-13.

to explore the issue of venue" during the cross examination of Agent Buss, see Reply at 5, is not persuasive.  The aborted line of questioning to which he alludes, to the extent that it implicated venue, was described to the Court by Mr. Sitzmann's counsel as being related to the pretrial argument about venue "entrapment" or manipulation, not about whether the wire transfer was legally sufficient to establish venue.  See Trial Tr. (4/30/12) at 82-83.  Counsel's comments at the Bench, and his ensuing questions to Agent Buss, indicate that entirely apart from venue, the question may have been intended to test Agent Buss' credibility by probing for any divergence between his trial testimony regarding the purpose of the wire transfer ruse and his testimony in the August 2011 hearing on the same subject.  See id. at 84-88.  It also may have been intended to score points by bringing to the jury's attention the lack of interest the Florida authorities had in prosecuting Mr. Jones or Mr. Sitzmann.  See id.

Whatever the intended purpose or purposes of the question, at no point during his examination of Agent Buss did Mr. Sitzmann's counsel suggest that he was attempting to demonstrate the absence of venue in the District of Columbia by raising factual questions about whether Mr. Jones made the wire transfer in furtherance of the conspiracy with Mr. Sitzmann. To the contrary, he agreed that he was not attempting to challenge venue, and he consented that same day to a jury instruction telling the jurors that venue was not a matter for them to consider. See supra at 25.

In sum, the factual question that Mr. Sitzmann now claims the jury should have decided — whether Mr. Jones intended to further a conspiracy with Mr. Sitzmann by wiring money to Mr. Colligan in Washington, D.C., or whether that act related to an entirely separate drug smuggling agreement with no connection to Mr. Sitzmann — was never put in issue by Mr. Sitzmann, either at trial or before, through counsel, or pro se.

2.   Objection to Venue

The foregoing discussion explains why Mr. Sitzmann has not met the second

prong of the <u>Haire</u>/<u>Nwoye</u> test.  Upon reviewing the record, however, the Court believes that it

was wrong when it agreed — at the time of jury instructions — that Mr. Sitzmann had satisfied

the *first* prong:  that "'the defendant objects to venue prior to or at the close of the prosecution's

case-in-chief.'"  <u>United States v. Nwoye</u>, 663 F.3d at 466 (quoting <u>United States v. Haire</u>, 371

F.3d at 840); <u>see</u> Notice of Filing, Tab R; <u>id.</u>, Tab LL.  Mr. Sitzmann's failure to satisfy this first

prong provides an additional reason why Mr. Sitzmann was not entitled to have the question of

venue submitted to the jury.

Although our circuit has not explained exactly what it means for a defendant to

have "object[ed] to venue," <u>United States v. Nwoye</u>, 663 F.3d at 466, the Third Circuit spoke

directly to that issue in <u>Perez</u>:  "A defendant may object to venue by raising its absence in a pre-

trial motion, challenging during the Government's case its evidence as to venue, or making a

motion for acquittal at the close of the Government's case that specifically deals with venue."

<u>United States v. Perez</u>, 280 F.3d at 334-35.  Mr. Sitzmann did none of these things.

Far from raising the absence of venue in a pre-trial motion, Mr. Sitzmann's

pretrial filings presupposed that venue was established in Washington, D.C. through the Jones-

Colligan wire transfer.  Those filings simply argued that in bringing about the act that established

venue, the government violated Mr. Sitzmann's constitutional rights through a form of

entrapment.  He further moved for a transfer of venue under Rule 21(b) of the Federal Rules of

Criminal Procedure, further illustrating his understanding that venue had been established here.

<u>See</u> <u>supra</u> at 23-24.

Mr. Sitzmann did not object to venue during trial, either explicitly or by "challenging during the Government's case its evidence as to venue." United States v. Perez, 280 F.3d at 334.  As described above, he attempted to pursue a line of questioning related to his earlier "manufactured venue" argument, but after being reminded that the issue had been decided, he asked no further questions and introduced no evidence implicating the issue of venue for the remainder of the trial.  See supra at 26-27.  Mr. Sitzmann thus did not object to venue "prior to . . . the close of the prosecution's case-in-chief."  United States v. Nwoye, 663 F.3d at 466.  "Objecting to venue at the jury instruction phase, without more, is not sufficient," United States v. Perez, 318 F.3d at 335, because such belated objection does not give the government an opportunity to offer all the evidence of venue available to it after the question of venue has been put at issue.  Cf. id. at 335 n.13, 336.

Nor did Mr. Sitzmann object to venue "at the close of the prosecution's case-in-chief," through a motion for judgment of acquittal based on venue.  United States v. Nwoye, 663 F.3d at 466.  Although his counsel made a motion for judgment of acquittal at that time, and although counsel was careful to ask the Court to consider all of the pretrial motions that had been filed in the case, those pretrial motions did not involve any objections to venue, as explained above.  See supra at 21-24.

Thus, although Mr. Sitzmann raised issues before and during trial that related to venue, a careful examination of the record shows that he never disputed that venue was established in Washington, D.C. through the Jones-Colligan wire transfer.  Thus, he never "objected to venue," within the meaning of the first prong of the Haire/Nwoye test.

### B.  Improper Admission of Evidence

Mr. Sitzmann next contends that he was unfairly prejudiced "not only by massive amounts of irrelevant evidence, but also by highly prejudicial other crimes evidence."  Mot. at 29.  The Court is not persuaded.

Before trial, and upon motion by the government, the Court ruled that certain intrinsic and other crimes evidence was admissible at trial.  See United States v. Sitzmann, 856 F. Supp. 2d 55 (D.D.C. 2012).  Specifically, the Court admitted — both as intrinsic evidence and as admissible other crimes evidence under Rule 404(b) of the Federal Rules of Evidence — discussions that Mr. Sitzmann had with "his soon-to-be co-conspirators" Gary Paulson, John Sager, and Jerry Harvey while they were incarcerated together at the Miami Correctional Center ("MCC") in the late 1980s.  The Court found these conversations to be "relevant to proving the inception of the very conspiracy that the grand jury has charged."  Id. at 60.

Under Rule 404(b), the Court admitted evidence of Mr. Sitzmann's "participation in a high-volume international drug smuggling operation involving the transportation of cocaine from Colombia to the United States via the Bahamas in late 1986 and early 1987" (which led to his incarceration at MCC).  United States v. Sitzmann, 856 F. Supp. 2d at 63.  The Court also admitted evidence of the circumstances leading up to Mr. Sitzmann's 1985 Bahamian drug conviction, which included "the use of airplanes to smuggle large amounts of cocaine."  Id. at 65.  Evidence of these previous drug-smuggling activities, the Court held, was relevant for several reasons.  In particular, the evidence was "probative of [Mr. Sitzmann's] opportunity to participate in the instant offense" because, according to the government, "it was the defendant's substantial prior experience with international drug trafficking that gave him the opportunity to establish relationships [at MCC] with Paulson and Sager, and to reconnect with Harvey, which

led to the development of the conspiracy charged in this case." Id. at 63.  The evidence also was probative of Mr. Sitzmann's "ability to traffic in large quantities of illegal drugs," and, "in particular, of his familiarity with the use of private airplanes to transport large quantities of drugs across continents." Id. at 64.  Finally, "with respect to the approximately seven kilograms of cocaine that were seized from the defendant's bags upon his arrest by French law enforcement in 2004," the Court held that Mr. Sitzmann's "past involvement in a cocaine smuggling operation [was] probative of his intent to possess cocaine with the intent to distribute it as a part of the charged conspiracy," as well as of his "knowledge that he was in fact carrying cocaine (and not euros, as he allegedly claimed at least once to the French authorities)." Id.

      Mr. Sitzmann now argues that the Court erroneously admitted this evidence based on government misrepresentations about its relationship to the charged conspiracy.  The trial evidence, he says, showed that Mr. Harvey and Mr. Sager were never co-conspirators of Mr. Sitzmann, and that Mr. Paulson did not become a co-conspirator until the late 1990s.  Thus, the evidence showed that no conspiracy of any kind originated at MCC in the late 1980s.  Mr. Sitzmann had no need to establish credibility or trust with these three men, he argues, because two of them never became co-conspirators, and the third (Mr. Paulson) did not do so until Mr. Sitzmann proved his *bona fides* through a successful marijuana deal in 1997.  Furthermore, according to Mr. Sitzmann, none of these men even knew why he was incarcerated at MCC, undermining the entire notion that his prior drug smuggling activity helped him to form a conspiratorial relationship with them.

      Mr. Sitzmann's protestations notwithstanding, the evidence admitted by the Court showed exactly what the government represented it would.  Mr. Paulson, for instance, testified that he met Sitzmann at MCC, where he learned that Sitzmann was prosecuted for a conspiracy

case involving a Cessna airplane that crashed on the beach in Colombia during a drug-smuggling trip. Trial Tr. (4/24/12 p.m.) at 17-19. Paulson became friends with Sitzmann at MCC, and the men discussed carrying out an operation to smuggle cocaine into Canada after Mr. Sitzmann's release. In these discussions, Sitzmann explained that he had a source of cocaine available to him, and that he could move the cocaine into Canada, while Paulson described his connections in Canada, through his brother-in-law Robert Campeau, that could facilitate sales. After Sitzmann was released from MCC, he met with Mr. Campeau in Canada. Mr. Paulson and Mr. Sitzmann later cooperated on a marijuana deal in 1997, after which they participated in a series of operations in which over 200 kilograms of cocaine were transported by truck from Mexico, through the United States, and into the Toronto area — hidden in the modified gas tanks of Chevrolet Suburban trucks — where the cocaine was distributed by members of the Canadian Hell's Angels who were connected with Mr. Paulson. Id. at 19-52.

In short, Mr. Paulson befriended Sitzmann at MCC, learned about his cocaine-smuggling history, and had discussions with him in contemplation of a specific Mexico–United States–Canada cocaine smuggling operation that was later carried out once the men were released. Mr. Sitzmann's conversations at MCC with Paulson, therefore, were the genesis of a major facet of the charged conspiracy, and the circumstances underlying his drug convictions in Florida and the Bahamas (which showed his drug-smuggling experience) facilitated his ability to participate in that facet of the conspiracy. The evidence was properly admitted on these bases alone, even apart from the probative value of the evidence in showing Mr. Sitzmann's ability to traffic in large quantities of illegal drugs, and in showing his intent and absence of mistake regarding the seven kilograms of cocaine found on his person in France. See United States v.

Sitzmann, 856 F. Supp. 2d at 64.[10]   Moreover, highlighting the lack of misrepresentation by the government, Paulson's trial testimony about his conversations with Sitzmann at MCC was consistent with his testimony before the grand jury, which formed the basis for the government's motion to admit intrinsic and Rule 404(b) evidence.  See Opp., Att. 10; Opp. at 63-64.

        Also contrary to Mr. Sitzmann's arguments, the evidence showed that Mr. Harvey was one of his co-conspirators, making the connection they developed at MCC relevant to the charged conspiracy.  Mr. Harvey, who testified about his knowledge of money laundering, explained that during the second half of the 1990s he held money for Sitzmann on ten different occasions — sometimes as much as $150,000 — and that at Mr. Sitzmann's request he would return this money to him or to his "drivers."  Trial Tr. (4/19/12 p.m.) at 29-30, 40-41.  Harvey also testified about how he advised Sitzmann on the selection of a Piper Navajo Panther airplane, which Mr. Sitzmann said he intended to purchase for use in transporting cocaine between Colombia and Nicaragua.  Harvey testified that because the airplane could not be bought with cash, Sitzmann gave Harvey $500,000 in cash, and Harvey then purchased the airplane with money from his own bank account via wire transfer.  Id. at 32-40.  During the 1990s, Mr. Sitzmann frequently asked Mr. Harvey's advice about the capabilities of various airplanes — "always" in the context of drug smuggling.  Trial Tr. (4/19/12 a.m.) at 113-15.  Mr. Harvey also said he accompanied Sitzmann to a machine shop to pick up one of the Chevrolet Suburban trucks that Sitzmann had modified at the shop in order to hide drugs in the gas tank (for use in the Canadian drug smuggling operation he was conducting with Mr. Paulson).  Id. at 123-25.

        As for Mr. Sager, he testified that he met Mr. Sitzmann at MCC, learned that he was there on a drug importation charge, and developed a trusting relationship with him.  Trial Tr.

---

[10]    Mr. Sitzmann argues that his possession of cocaine in France (for which he was arrested) was itself Rule 404(b) evidence, but it was alleged to be an overt act in furtherance of the charged conspiracy.

(4/23/12 p.m.) at 38-39, 43, 46.  The two men had extensive discussions about the use of airplanes in drug smuggling, during which, for instance, Mr. Sager shared his knowledge of what could be achieved with Piper Navajo airplanes.  According to Sager, the men also had conversations about the potential benefits of smuggling drugs for sale in Europe and Canada.  In the mid-1990s, after both men were released, a Velocity airplane that Mr. Sager outfitted to enhance its drug-smuggling capabilities was seized by the authorities after it crashed during an aborted drug smuggling operation.  The airplane was subsequently put on public auction, and Mr. Sitzmann consulted Mr. Sager about its capabilities.  Sager testified that the men discussed, among other things, the plane's suitability for flying cocaine from Colombia to Canada, and Mr. Sitzmann ultimately purchased the airplane in the auction.  Id. at 33-34, 52-65.[11]  Later, in 1998, when Mr. Sager was looking for a drug-smuggling project, he testified, the two men discussed using a Navajo Panther to smuggle cocaine from Colombia to Canada, with Sager piloting the airplane and Sitzmann supplying the market in Canada; that plan never came to fruition.  Id. at 65-76.  While the question of whether Sager truly was a co-conspirator of Mr. Sitzmann is perhaps more murky than with respect to Paulson and Harvey, it is clear that Sitzmann's conversations with Sager at MCC and the relationship of friendship, trust, and professional affinity that they developed there — a direct result of Mr. Sitzmann's prior experience as a drug smuggler — contributed to Sitzmann's ability to participate in the charged conspiracy.

---

[11]     Mr. Harvey testified that Mr. Sitzmann also consulted him about the Velocity airplane, and that Mr. Harvey went to the auction with Sitzmann and inspected the airplane with him before Sitzmann purchased it.  Trial Tr. (4/19/12 p.m.) at 9-12.  Harvey also testified that Mr. Sitzmann later told him that the airplane had been stolen and was in Colombia, and that Sitzmann asked Harvey "to contact somebody in Colombia and get the airplane back for him." Mr. Harvey "put him in touch with somebody there that would get it for him," although, Harvey testified, Sitzmann later admitted that the plane was not stolen and that Mr. Sitzmann had instead been "essentially leasing the plane for smuggling" to "some smugglers in Mexico."  Id. at 15-16.

Therefore, the intrinsic and other crimes evidence that the government offered was properly admitted in evidence.

Apart from this evidence, Mr. Sitzmann also contends that the government improperly introduced extrinsic evidence of additional crimes without providing prior notice to the defense or to the Court.  These accusations are unfounded.  The Court admitted evidence of Mr. Sitzmann's large-scale smuggling operations through the Bahamas in the mid-1980s, about which Mr. Sitzmann told Mr. Harvey at the time, after first hearing Mr. Harvey's testimony outside the presence of the jury.  See Trial Tr. (4/19/12 a.m.) at 4-27; United States v. Sitzmann, 856 F. Supp. 2d at 63 n.3.  Mr. Harvey's spontaneously offered statement that Mr. Sitzmann bribed Bahamian officials in order to facilitate this scheme was not solicited by the government or objected to by the defense.  See Trial Tr. (4/19/12 a.m.) at 111.  Mr. Harvey's testimony about having laundered money for Mr. Sitzmann was not extrinsic evidence, but rather described overt acts performed directly in furtherance of Sitzmann's drug smuggling conspiracy, as explained by Harvey himself.  Trial Tr. (4/19/12 p.m.) at 29-41; cf. United States v. Tarantino, 846 F.2d at 1396 ("The laundering of funds was a *part* of the plan to distribute cocaine; the conspirators . . . well knew that the cocaine money had to be 'cleaned up' to be useful to them.") (emphasis in original).  So, too, with Mr. Sitzmann's possession of cocaine in France and his efforts to obtain a false driver's license in Florida, see Trial Tr. (4/19/12 a.m.) at 121; id. (4/24/12 p.m.) at 54 — ample advance notice of which was provided by the government.  See Opp., Att. 9; Hr'g Tr. (2/1/12) at 54.

Finally, Mr. Sitzmann contends that he was unfairly prejudiced by the sheer mass of other crimes evidence having marginal if any relevance to the charged conspiracy, much of which had the effect of "repeatedly informing the jury of prior criminal convictions and criminal

activities." Mot. at 29.  He maintains that the government attempted to "exaggerate this case into something much, much larger than the facts justified," id. at 30, by introducing a plethora of tangential matters that "confused the issues, wasted time, and had the clear potential to mislead the jury," id., with the goal of making Mr. Sitzmann appear "a habitual criminal and a person of bad character."  Id.  Largely for the reasons explained by the government, however, see Opp. at 70-74, the Court does not agree that this evidence was irrelevant or that it so unfairly prejudiced Mr. Sitzmann as to justify a new trial.

### C.  Miscellaneous and Cumulative Error

Finally, Mr. Sitzmann alleges four additional improprieties committed by the government before and during trial that, he argues, separately and cumulatively deprived him of a fair trial.

### 1.  Grand Jury Abuse and Constructive Amendment of the Indictment

In pretrial motions, Mr. Sitzmann moved for dismissal of this case based on asserted constructive amendments of the indictment.  See Dkt. No. 62.  He argued that the government constructively amended the indictment by adding new allegations to its second amended bill of particulars involving conduct during the five-year statute of limitations period. See id. at 4-6.  The Court rejected this argument, finding, among other things, that "there isn't any significant divergence between the indictment and the various iterations of the bill of particulars to support a theory of constructive amendment," and that the bills of particulars did not add additional charges or expand the time period covered.  Hr'g Tr. (9/8/11) at 15; see id. at 9-15.

36

Mr. Sitzmann now claims that "[w]hat the government failed to inform the Court" at the time Sitzmann raised his constructive amendment argument "was that it had been improperly presenting witnesses to various grand juries after the indictment was returned for the purpose of collecting additional evidence on the already indicted § 846 conspiracy charge."  Mot. at 51.  He contends that the government hastily returned the indictment in this case in early August 2008, in anticipation of Mr. Sitzmann's imminent arrival from France, and that, post-indictment, the government "subpoenaed various witnesses, including Gary Paulson, Brian Hill, Bill Long, and Michael Fields and presented their testimonies to three different grand juries," with the sole purpose of "getting new trial evidence against Gregory Sitzmann on the already indicted case."  Id. at 51-52; see also Reply at 8-9.  "Had the government told the Court and defense counsel that it was still putting witnesses in the Grand Jury," Sitzmann maintains, "appropriate sanctions, including dismissal of the indictment, could have been presented to the Court prior to trial."  Mot. at 52.

As the Court already has ruled, there was no constructive amendment of the indictment in this case.  See Hr'g Tr. (9/8/11) at 9-15.  A constructive amendment of an indictment occurs when "the evidence presented at trial and the instructions given to the jury so modif[y] the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment."  United States v. Sayan, 968 F.2d 55, 59 (D.C. Cir. 1992).  Constructive amendments are impermissible because the Fifth Amendment gives a criminal defendant the right to be tried only on the charges of which he is apprised in the indictment.  Id.; see United States v. Rigas, 490 F.3d 208, 225-26 (2d Cir. 2007).  But where "'a generally framed indictment encompasses the specific legal theory or evidence used at trial,' there is no constructive amendment."  United States v. Rigas, 490 F.3d at 228 (quoting United

States v. Milstein, 401 F.3d 53, 65 (2d Cir. 2005)).  Therefore, "'an indictment drawn in more general terms may support a conviction on alternate bases, even though an indictment with specific charging terms will not.'"  Id. (quoting United States v. Zingaro, 858 F.2d 94, 99 (2d Cir. 1988)).

       The "two constitutional requirements for an indictment" are "'first, [that it] contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, [that it] enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'"  United States v. Resendiz-Ponce, 549 U.S. 102, 108 (2007) (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)).  "The issue in determining whether an indictment has been constructively amended, then, is whether the deviation between the facts alleged in the indictment and the proof adduced at trial undercuts these constitutional requirements."  United States v. Rigas, 490 F.3d at 228.  "The defendant is deprived of his right to have all charges screened by the grand jury only if the deviation in proof . . . from the specifics of the indictment affects an essential element of the offense charged."  United States v. Lemire, 720 F.2d 1327, 1345 (D.C. Cir. 1983).

       The indictment in this case stated that, "[f]rom at least the 1990s, through at least 2004 . . . within the United States, Mexico, Canada, Colombia, the Bahamas, Spain, France, Italy, and elsewhere," Mr. Sitzmann "did knowingly and willfully combine, conspire, confederate and agree together and with other persons . . . to unlawfully, knowingly and intentionally distribute and possess with intent to distribute a mixture and substance containing a detectable amount of cocaine."  Indictment at 1 (Aug. 7, 2008).  Mr. Sitzmann does not argue that the proof offered at trial or the instructions given to the jury diverged from the allegations in the indictment as explicated by bills of particulars.  Indeed, the Court already has concluded that

the bills of particulars did not expand the legal theory on which Sitzmann was tried, but rather served to provide notice and a great amount of detail (well beyond what the Controlled Substances Act requires) concerning the evidence the government would present at trial.  See Hr'g Tr. (9/8/11) at 10-12.  Mr. Sitzmann's argument, it seems, now rests entirely on his allegation that the government improperly presented a number of his co-conspirators to the grand jury after the grand jury had returned its indictment against him, for the sole purpose of gathering additional evidence, and that this conduct was an abuse of the grand jury process.

As Sitzmann correctly points out, the government may not use the grand jury for "the sole purpose of pretrial discovery in cases in which an indictment has already been returned," United States v. Star, 470 F.2d 1214, 1217 (9th Cir. 1972), because it is improper for a prosecutor to use the grand jury for trial preparation.  Mot. at 50.  On the other hand, as Sitzmann concedes, Reply at 8, the government may continue to use the grand jury process if there is an ongoing investigation that could possibly lead to further charges against the defendant or against other uncharged individuals.  And, as discussed below, it is established that any evidence obtained in such an ongoing, post-indictment grand jury process may be used in the pending prosecution so long as there was a legitimate purpose behind the continuing use of the grand jury.

The defendant bears the burden of establishing that the government abused the grand jury system.  United States v. Flemmi, 245 F.3d 24, 28 (1st Cir. 2001); In re Grand Jury 95-1, 59 F. Supp. 2d 1, 16 (D.D.C. 1996).  A defendant can meet this burden by showing that the government engaged in misconduct, such as by using the grand jury for "the primary purpose of strengthening the Government's case on a pending indictment or as a substitute for discovery." United States v. Gibbons, 607 F.2d 1320, 1328 (10th Cir. 1979).  But it is not improper for the

government to continue to employ the grand jury after an indictment has been returned, so long as strengthening the government's case or preparing for trial is not the prosecutor's "sole or dominant" purpose.  In re Grand Jury 95-1, 59 F. Supp. 2d at 15-16, see also United States v. US Infrastructure, Inc., 576 F.3d 1195, 1214 (11th Cir. 2009) (grand jury cannot be used solely or primarily to "gather evidence against an indicted defendant, [but] it can be used to investigate whether a defendant committed crimes not covered in the indictment"); United States v. Leung, 40 F.3d 577, 581 (2d Cir. 1994) (improper to use grand jury for "sole or dominant purpose of preparing for trial under a pending indictment"); United States v. Ruppel, 666 F.2d 261, 267-68 (5th Cir. 1982) (no grand jury abuse where government's post-indictment investigation related to individuals "not yet named in any indictment"); In re Grand Jury Proceedings, 632 F.2d 1033, 1041 (3d Cir. 1980) (grand jury subpoena enforceable where defendant "ha[d] not made any factual showing that the grand jury's sole or dominant purpose for seeking enforcement . . . [was] to continue, unlawfully, to investigate him subsequent to his indictment").

Furthermore, where the purpose of the grand jury process is directed to other offenses or other individuals, "any collateral fruits from bona fide inquiries may be utilized by the government."  United States v. Sellaro, 514 F.2d 114, 121-22 (8th Cir. 1973); see also United States v. Flemmi, 245 F.3d at 28 ("[E]vidence obtained pursuant to [an ongoing grand jury] investigation may be offered at the trial on the initial charges.") (quoting United States v. Leung, 40 F.3d at 581); United States v. Alred, 144 F.3d 1405, 1413 (11th Cir. 1998) (while government may not use grand jury for purpose of discovery or trial preparation, it may continue investigation for legitimate reason even if it thereby obtains information relevant to a pending prosecution as an "incidental benefit"); In re Grand Jury Proceedings, 814 F.2d 61, 70 (1st Cir. 1987) ("The prosecutor at a trial . . . may use evidence incidentally gained from a grand jury

40

primarily investigating other crimes."); United States v. Gibbons, 607 F.2d at 1328 (proceeding not improper just because government may derive incidental benefit from the post-indictment investigation).  In sum, it is not improper for the government to continue to use the grand jury, post-indictment, when investigating other offenses committed by the defendant that are not covered in the indictment or when investigating unindicted potential targets.

Mr. Sitzmann concedes that the government may use the grand jury to investigate after an indictment is returned so long as the investigation relates to a possible superseding indictment of additional defendants or additional crimes by an indicted defendant.  Reply at 8. He argues, however, that the government has not identified "a single additional target" or "a single additional charge," and therefore has not demonstrated that the post-indictment grand jury appearances were proper.  Id.  But the government does in fact list numerous reasons for its continued use of the grand jury — including adding possible money-laundering charges against Sitzmann, and identifying and investigating the cocaine suppliers and markets involved in Sitzmann's large enterprise.  See Opp. at 23-27; id. at 25 (the defense "has known that Sitzmann was not the final target of this investigation"); id. at 26 ("the purpose was to continue the investigation against Sitzmann's suppliers, re-distributors, money launderers and assets").  The government also explains that "once it appeared unlikely that new charges and targets could be indicted within the statute of limitations, [it] stopped presenting new testimony to the grand jury."  Id. at 27.  Mr. Sitzmann responds that the grand jury transcripts of the witnesses who were called post-indictment show that the only goal of securing their testimony was to gather historical information on him — because these witnesses had not seen Mr. Sitzmann for many years and were "not questioned . . . about any new possible targets for an indictment."  Reply at 8.  The Court is not persuaded by that bare and conclusory assertion.  Because the government

41

has provided legitimate reasons for its post-indictment appearances before the grand jury as

recognized by the case law, and as Sitzmann has not met his burden of establishing that the grand

jury process was abused, the Court rejects his grand jury abuse argument.[12]

### 2.   Improper Vouching for Witness Credibility and Bolstering

Mr. Sitzmann next contends that, throughout the trial, the government improperly

vouched for the credibility of its witnesses and attempted to bolster their testimony.  See Mot. at

42-49 (providing excerpts of allegedly objectionable colloquies).  All the record shows, however,

is that the government questioned its witnesses about whether they understood their legal

obligation to tell the truth, what they understood to be the possible consequences if they lied on

the stand, whether the prosecutors or anyone else had told them what to say, and what the

prosecutors had instructed them about their testimony.  See id.  The government did not present

itself as "the guarantor of its witness[es]' honesty" or suggest "its ability to determine and police

their honesty."  Id. at 48.  Its questions did not "'convey the impression that evidence not

presented to the jury, but known to the prosecutor, supports the charges against the defendant,'

thereby jeopardizing 'the defendant's right to be tried solely on the basis of the evidence

presented to the jury.'"  United States v. Wilson, 605 F.3d 985, 1021 (D.C. Cir. 2010) (quoting

United States v. Brown, 508 F.3d 1066, 1075 (D.C. Cir. 2007)).  The questions the prosecutors

---

[12]      Mr. Sitzmann also requests that the government produce to him all the evidence
presented to the grand jury prior to the August 7, 2008 return of the indictment, "in order to have
the facts necessary to resolve this motion."  Mot. at 52.  Rule 6(e)(3)(E)(ii) of the Federal Rules
of Criminal Procedure provides that "[t]he court may authorize disclosure — at a time, in a
manner, and subject to any other conditions that it directs — of a grand-jury matter . . . at the
request of a defendant who shows that a ground may exist to dismiss the indictment because of a
matter that occurred before the grand jury."  Most courts have held that, to satisfy the
requirements of this Rule, a defendant must present a "particularized need" for the grand jury
material.  United States v. Naegele, 474 F. Supp. 2d 9, 10 (D.D.C. 2007) (citing cases).  Such
cases are "exceedingly rare," and it is settled that "conclusory or speculative allegations of
misconduct do not meet the particularized need standard; a factual basis is required."  Id.  Mr.
Sitzmann has offered no such basis.

asked did not imply that the government would have known that the witnesses were lying, nor did they "express the prosecutor's personal opinion about [the witnesses'] credibility." Id. at 1023.

        With respect to the questioning of Mr. Sitzmann's alleged co-conspirators — the witnesses about whom he is most concerned — Sitzmann put their truthfulness at issue from the beginning of the trial.  His counsel devoted much of his opening statement to attacking their honesty, character, and motives — in some cases highlighting their immunity agreements with the government to imply a *quid pro quo* arrangement for their testimony.  See Trial Tr. (4/17/12) at 70-78.[13]  Given that much of Mr. Sitzmann's defense centered around tearing down the truthfulness of these witnesses, it was entirely appropriate for the government to ask the simple questions that it did, which did not cross the line into vouching or bolstering.  Furthermore, Sitzmann can show no prejudice to him from the questions asked, as the Court instructed the jurors that "[y]ou alone decide the credibility or believability of the witnesses," that "you alone are to determine whether to believe any witness and the extent to which any witness should be believed," and that the testimony of witnesses who claimed to be accomplices of Mr. Sitzmann "should be considered with caution" and "you should give the testimony of such witnesses as much weight as in your judgment it deserves."  Notice of Filing, Tab GG, at 165, 170-71 (instructions 2.102, 2.200, and 2.202); see United States v. Miller, 738 F.3d 361, 372-73 (D.C. Cir. 2013).

---

[13]    See, e.g., Trial Tr. (4/17/12) at 74 ("I am certain that when you listen to the testimony of Mr. Harvey and Mr. Sager . . . you're going to realize and it's going to come to light that these individuals, just because they get up here and . . . they swear to tell the truth and nothing but the truth, you're going to realize that when you look at what they've done in the past — and the evidence is going to come out — that they don't have any respect for this process. They want — they are looking for something out of this.  They don't like Mr. Sitzmann.").

3.  Reliance on Recorded Statements in Violation of Confrontation Rights

Mr. Sitzmann argues that the government treated the recorded statements of George Jones and Terrence Colligan, see supra at 5-9, "as testimonial evidence for the truth of the matters asserted in violation of the Sixth Amendment's Confrontation Clause."  Mot. at 52.

Terrence Colligan was a government informant at the time of the recordings, as the jury was made well aware — he was the one who recorded the conversations at the behest of federal agents.  His words obviously had to be played for the jury in order for co-conspirator George Jones' responses to make any sense.  Both Colligan and Jones were deceased at the time of trial.  Colligan's statements were not relied upon by the government for the truth of the matters asserted therein; the calls were admitted for what Mr. Jones had to say, not for what Mr. Colligan had to say.  Because there was sufficient evidence that Mr. Jones was a co-conspirator of Mr. Sitzmann at the time of the recordings, and because his statements were made in furtherance of the conspiracy, the statements were properly admitted.

A statement is not hearsay if it is "offered against an opposing party" and "was made by the party's coconspirator during and in furtherance of the conspiracy."  FED. R. EVID. 801(d)(2)(E).  "In order to rule that a statement is admissible under Rule 801(d)(2)(E), a 'district court must find by a preponderance of the evidence that a conspiracy existed and that the defendant and declarant were members of that conspiracy.'"  United States v. Loza, 763 F. Supp. 2d 108, 111-12 (D.D.C. 2011) (quoting United States v. Brockenborrugh, 575 F.3d 726, 735 (D.C. Cir. 2009)).  The court must also find that the statement in question was "made in furtherance of the common goal" of the conspiracy.  United States v. Gewin, 471 F.3d 197, 201 (D.C. Cir. 2006) (citation and internal quotation marks omitted).  Any finding by the court that the requirements of Rule 801(d)(2)(E) are met must be based at least in part "on some

independent evidence of the conspiracy" — that is, on evidence other than the statements whose admissibility is in question.  Id.

When the government moved to admit the conversations into evidence and Mr. Sitzmann's counsel raised questions about their admissibility, the Court ruled after a sidebar discussion that it would provisionally admit the statements and allow the recordings to be played, but that the Court would strike them afterward upon objection by the defense if the Court concluded that any of them were not in furtherance of the conspiracy.  Trial Tr. (4/30/12) at 17-20.  No objection ensued after the calls were played, probably because their admissibility as non-hearsay statements of a co-conspirator was so clear.

Overwhelming evidence was presented at trial that Mr. Jones long served as Mr. Sitzmann's co-conspirator, and this point has not even been contested by Sitzmann.  The evidence further showed, at least by a preponderance of the evidence, that Mr. Jones was still a co-conspirator in March 2004 at the time of these recordings.  See supra at 5-9, 11-14.  Evidence of that continuing relationship was not limited to Jones' comments in the recordings themselves, but included his consummation of the 16-kilogram cocaine transaction with Mr. Colligan, his retention of Sitzmann's drug-smuggling paraphernalia in his home, his placing of fake cocaine that he received from Colligan in one of Sitzmann's false-bottomed leather bags, the fact that Jones was the first person Sitzmann telephoned upon his February 2004 arrest in France, and the fact that in January 2004 Sitzmann suggested to another co-conspirator, Mr. Paulson, that they revive their Canadian smuggling operation from the late 1990s, in which Jones played an integral part.

Moreover, Mr. Jones' statements were made in furtherance of the charged conspiracy.  It is true that some of the exchanges on the recordings might be characterized as

"casual comments to [someone] inside the conspiracy" or "mere narratives of past successes and failure."  United States v. Tarantino, 846 F.2d at 1412.  But the government established by copious independent evidence that Mr. Sitzmann and Mr. Jones were longtime co-conspirators, and the statements on the recordings confirming that relationship had little, if any, damaging effect on Sitzmann's defense.

What was truly damaging — and what the government focused on in the recordings — was the evidence that Mr. Jones and Mr. Sitzmann were still in a conspiratorial relationship at the time the recordings were made.  And the statements by Jones with a bearing on that matter "can reasonably be interpreted as encouraging [Colligan] to advance the conspiracy."  United States v. Tarantino, 846 F.2d at 1412.  In the recorded statements, Jones tells Colligan that he has "no other way to make a living," other than through drug trafficking, Gov't Trial Ex. 40, Tape B2, at 14; complains that Sitzmann has lately been remiss in providing Jones with promised opportunities for drug transactions, id. at 18-19; and accuses Colligan of the same.  Id. at 8 ("I didn't know you were coming till yesterday.  Everybody promises maybe they're going to do stuff and haven't been doing stuff.  I'd asked you to come a month ago.").  Elsewhere in the recordings, Jones explains that despite his frustration with Mr. Sitzmann, he plans to split with him the proceeds of the drug transaction that Jones and Colligan are planning.  Id. at 13 ("I'm giving the money to Maritza to give to [Mr. Sitzmann's] lawyers. . . .  [H]e owes me money, but he's my brother. . . .  He's trying to make a living, trying to make a life for that little girl down there.").  These comments can easily be regarded as "essentially an invitation to participate in a further stage of the conspiracy."  United States v. Tarantino, 846 F.2d at 1412.

Jones' statements, therefore, were properly admitted under Rule 801(d)(2)(E).  And the admission of co-conspirator statements under Rule 801(d)(2)(E) does not violate the

Confrontation Clause.  Giles v. California, 554 U.S. 353, 374 n.6 (2008) (citing Bourjaily v. United States, 483 U.S. 171 (1987)).

    4.  Improper Attempt to Use Guilty Plea of Co-Conspirator as Substantive Evidence of Guilt

        Finally, Mr. Sitzmann maintains that the government improperly used Mr. Jones' guilty plea — which stemmed from the cocaine sting operation described earlier in this Opinion — as substantive evidence of Mr. Sitzmann's guilt.  After introducing evidence regarding the sting operation, the recorded conversations of Mr. Colligan and Mr. Jones, and the subsequent arrest of Mr. Jones and search of his home, the government engaged in the following colloquy with ICE Agent Buss:

> Q:  And was there a case in Washington, D.C. against him [Mr. Jones] for conspiracy?
>
> A:  Yes.  I had originally obtained an arrest warrant on a criminal complaint.
>
> Q:  And did Mr. Jones plead guilty?
>
> A:  He pled guilty.
>
> Q:  What did he plea?
>
> A:  And signed a plea agreement.
>
> Q:  Okay.  And did he plead guilty to conspiracy to distribute and possess with the intent to distribute at least 5 kilograms of cocaine?
>
> A:  That's correct.
>
> Q:  And did he end up cooperating with the government?
>
> A:  He did.
>
> Q:  And what happened to Mr. Jones?  Is he alive today?
>
> A:  He passed away.

Q.  Okay.  Do you recall roughly how long ago, if you know?

A.  I believe 2008.  It was after I retired.

Q.  Okay.  And Mr. — I may have asked you this earlier.  Mr.
Colligan, is he still with us?

A.  He also passed away, 2009.

Hr'g Tr. (4/30/12) at 47-48.  The government made no further reference to Mr. Jones' guilty

plea, either during the course of further testimony or in closing arguments.

While this exchange, as the government argues, may have helped "complete the

time line on George Jones, from the 16-kilogram reversal to his death," Opp. at 91, the fact that

Mr. Jones signed a plea agreement was not necessary for that purpose, nor was identifying the

specific charge to which he pled.  Yet it is hard to see how Mr. Sitzmann was prejudiced by this

brief colloquy.  The fact that Mr. Jones received 16 kilograms of cocaine from Mr. Colligan in a

sting operation was uncontested, and the government introduced evidence of the cocaine, drug

smuggling paraphernalia, and drug-smuggling vehicle discovered at his home.  See, e.g., Trial

Tr. (5/1/12) at 106-27.  Given the evidence already before the jury that Mr. Jones attempted to

obtain cocaine in March 2004 with the intent to distribute it, and given the fact that the

government did not mention Jones' guilty plea again or attempt to connect his plea (as opposed

to the conduct preceding it) with Mr. Sitzmann's guilt, and further given the fact that the

government "referenced the plea agreement[] in the context of a larger discussion about the

evidence of a conspiracy generally," United States v. Brown, 508 F.3d at 1073, the Court does

not see how Mr. Sitzmann was "disadvantaged in any significant way" by this exchange or by

the lack of a limiting instruction.  United States v. Tarantino, 846 F.2d at 1405.

IV.  CONCLUSION

For the foregoing reasons, the Court will deny Mr. Sitzmann's motion for judgment of acquittal or, in the alternative, for a new trial under Rules 29 and 33 of the Federal Rules of Criminal Procedure.  Accordingly, it is hereby

ORDERED that the defendant's motion for judgment of acquittal or, in the alternative, for a new trial under Rules 29 and 33 of the Federal Rules of Criminal Procedure [Dkt. No. 216] is DENIED.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
DATE:  November 18, 2014          United States District Judge