# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 08-242 (PLF)** |
| | ) | |
| **GREGORY JOEL SITZMANN,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, hereby respectfully submits this memorandum in aid of sentencing. As discussed below, the government recommends that the Court sentence the defendant to life imprisonment, a guideline compliant sentence as reflected in the Presentence Investigation Report, ESF Document 273 ("PSR"). To assist the Court in fashioning an appropriate sentence, the government relies on the following points and authorities and any other points and authorities which may be cited at a hearing on this matter.

## INTRODUCTION

As set forth in more detail below, defendant Sitzmann's base offense level is 38 based upon Sitzmann's relevant conduct involving over 1,800 kilograms of cocaine. United States Sentencing Guidelines ("U.S.S.G.") § 2D1.1(a)(5), (c)(1). The government also believes that the following upward adjustments to the defendant's guidelines range are applicable: (1) a four-level upward adjustment pursuant to U.S.S.G. § 3B1.1(a) (Aggravating Role) as an organizer or leader; (2) a two-level increase pursuant to U.S.S.G. § 2D1.1(b)(2) (Use of an Aircraft) based upon Sitzmann's use of noncommercial aircraft to import or export narcotics; and (3) a two-level

increase pursuant to U.S.S.G. § 3C1.1 for obstruction of justice based upon Sitzmann's attempt to derail and impede the investigation and prosecution of Billy Long and James Fields related to the criminal acts for which they were arrested in Bogotá, Colombia in 2002. These criminal acts were designed and orchestrated by Sitzmann and were part of the conspiracy at issue in the instant case. Accordingly, the government submits that defendant Sitzmann's total offense level is at 46 and he falls within Criminal History Category III, resulting in a guidelines range of life imprisonment.

The government also requests that the Court take into account certain factors that have not been considered in determining defendant's guidelines range: (1) Sitzmann's two foreign drug trafficking convictions (Bahamas in 1985 and France in 2004) that were not used to calculate Sitzmann's criminal history category; and if the government applies the version of the Guidelines in place of the timing of the offense, (2) the sentencing enhancements that are contained in the present version of the Guidelines that were not contained in the version of the Guidelines in existence at the time of the offense, which the Court can properly consider in fashioning a sentence.

## **FACTUAL BACKGROUND**

1.      Although the Court is well versed in the facts of this case following a six-week trial and extensive briefing, the government submits the following abbreviated factual statement to assist the Court in determining an appropriate sentence.[1]

2.      As discussed more fully below, defendant Gregory Joel Sitzmann was a career wholesale cocaine trafficker who functioned at the highest levels. From approximately 1990 through approximately 2004, he was the leader and organizer of a drug organization that

---

[1] The government is providing citations to the record to substantiate the accuracy of its factual statements and conclusions. The government would not object if the Court were to rely upon these facts to supplement or substitute those contained in the PSR.

operated both domestically and internationally, including in such foreign countries as Colombia, Canada, Mexico, Spain, France, Italy and Panama.  The evidence presented at trial established that defendant was highly sophisticated in shipping vast quantities of cocaine, usually in amounts in the hundreds of kilograms.  Sitzmann used and conspired to use numerous individuals and artifices to transport these large shipments of cocaine.  Sitzmann's co-conspirators included the following individuals: George Jones, James Fields, Billy Long, Gary Paulson, Robert Campeau, Robert Barnaby, Jerry Harvey, Alex Mesa, John Sager, Maritza Fontecha, and members of the Canadian Hell's Angels, namely Normand Theoret.  Sitzmann also utilized private airplanes with special modifications designed for smuggling hundreds of kilograms of cocaine over long distances, as well as false identifications and vehicles and leather travel bags with secret compartments designed for the smuggling of cocaine and drug proceeds.  He also employed expert money launderers and sophisticated money laundering techniques in an attempt to conceal and cleanse millions of dollars in drug proceeds.

3.     The conspiracy began while Sitzmann was incarcerated in Florida at the Miami Correctional Center ("MCC Miami") from the late 1980s until 1990 on federal cocaine trafficking charges.  In that case, Sitzmann conspired to smuggle at least 340 kilograms of cocaine out of Colombia and into the United States by private aircraft.  Sitzmann was convicted and sentenced on May 9, 1990, in the United States District Court for the Southern District of Florida for Conspiracy to Import at Least Five Kilograms of Cocaine.  PSR ¶ 86; Government Trial Exhibits ("Gov. Tr. Ex.") 240, 241, 1040, 1041 at ¶ 8.  While incarcerated at MCC Miami, Sitzmann met and/or became reacquainted with a number of inmates that became his co-conspirators in the instant case, including Gary Paulson, Jerry Harvey, and John Sager.  Rine,

4/19/12, a.m. at 31-37; Gov. Tr. Ex. 230; Paulson, 4/24/12, p.m. at 22-26; Sager, 4/23/12, p.m. at 40-43; Harvey, 4/19/12, a.m. at 115.[2]

4.      While incarcerated in Miami, Sitzmann and Paulson agreed to traffic in cocaine together.  Sitzmann told Paulson that he already had a cocaine supplier, and Paulson responded that he already had people to whom they could supply the cocaine, in particular the Canadian Hell's Angels.  While Sitzmann was at MCC Miami, he asked Paulson to connect Sitzmann with the people in Canada after Sitzmann was released, to which Paulson agreed.  This was the start of the conspiracy.  Accordingly, following Sitzmann's release and as was agreed, Paulson gave Sitzmann the contact information for Robert Campeau, Paulson's brother-in-law who lived in Canada.  Opinion and Order dated 11/18/14, ECF Document # 253, at 31-33; Paulson, 4/24/12, p.m. at 22-29; see also Campeau, 4/25/12, p.m. at 13-14.

5.      Also while in prison at MCC Miami, Sitzmann discussed using private aircrafts to smuggle cocaine with John Sager, his cellmate.  Sager was a drug smuggling pilot who conferred with Sitzmann about the capabilities of various airplanes, namely the Piper Navajo, and kit planes, like the Velocity.   Both men were interested in drug-smuggling airplanes.   Sager, 4/23/12, p.m., at 40-43, 50.  It was during their incarceration at MCC Miami that Sitzmann and Sager talked about sources of cocaine supply and markets to deliver cocaine, all a prelude to, and preparation for, Sitzmann's drug trafficking enterprise at issue in the conspiracy here.  They also discussed international drug trafficking, including to Canada and Europe, because cocaine commands higher prices at those locations and drug trafficking laws are more lenient and less "draconian" there.  Sager, 4/23/12, p.m. at 52-53.

---

[2] For consistency purposes, the United States will cite to the trial transcripts in the same manner that both the defense and the government utilized in the briefs related to defendant's motion for acquittal or for new trial.  The citation will generally include the name of the testifying witness, the date of the testimony, whether it was a morning or afternoon session, and the relevant page numbers from the transcript.

6.       Sitzmann was released from MCC Miami on July 18, 1990, and was on parole until March 9, 1992.  PSR ¶ 86.  Approximately a year and half after his release from MCC Miami, Sitzmann was returned to the Bahamas to complete a criminal sentence that had not been served due to Sitzmann's escape from prison.  That sentence was related to a 1985 conviction for smuggling 163 kilograms of cocaine by a private airplane from Colombia to the Bahamas with the intent to bring the cocaine into the United States.  PSR ¶ 85; Rine, 4/19/12, a.m., at 36-37; Harvey, 4/19/12, a.m. at 15-19; Gov. Tr. Exs.. 270, 271, 272, 1040, 1041 at ¶ 7, 9.  As explained by co-conspirator Jerry Harvey, who funded Sitzmann's escape, Sitzmann regularly conducted operations in which hundreds of kilograms of cocaine were smuggled by private airplane from Colombia into the Bahamas, which he then smuggled into the United States by boat.  Harvey, 4/19/12, a.m., at 15-19, 111-113.  After his release from the Bahamian prison in January 1994 (Gov. Tr. Ex. 1041 ¶ ¶ 7, 9), Sitzmann continued with the instant conspiracy and his career as a cocaine trafficker.

7.       Just days after being released from the Bahamian prison, Sitzmann attempted to obtain a false identification from the Florida Department of Motor Vehicles.  On January 28, 1994, he was arrested for and later convicted in a Florida state court of attempting to procure a false identification from the Florida Department of Motor Vehicles by using a fraudulent social security card and birth certificate.  PSR ¶ 87; Aldridge, 4/23/12, a.m., at 9-15; Berrios-Lopez, 4/23/12, a.m., at 17-25; Gov. Tr. Exs. 250, 251, 252, 253, 256, 1040, 1041 at ¶ 10.  Fake identifications are tools of the drug trade, particularly for traffickers like Sitzmann who have criminal histories attempting international travel.  Sitzmann, along with Paulson, acquired fake identifications to be able to cross foreign borders including that of Canada.  Additionally,

Sitzmann acquired fake foreign identifications for that purpose.  Paulson, 4/24/12, p.m., 54-57; Harvey, 4/19/12, a.m., at 120; Stacy, 5/2/12, 163-165.

8.      In approximately 1994, Sitzmann secured an introduction to the Canadian Hell's Angels, particularly Normand Theoret, through Paulson, as they had agreed while incarcerated in MCC Miami.   By 1994-1995, Sitzmann was smuggling cocaine from the United States into Canada to supply the Hell's Angels.  He would then smuggle the drug proceeds from Canada through the United States and into Mexico.  Paulson, 4/24/12, p.m., at 22-29; Harvey, 4/19/12, a.m., at 117-120; see also Campeau, 4/25/12, p.m., at 13-15.

9.      In 1995 or 1996, Sitzmann was transporting cocaine in two Suburbans from Houston to Vancouver, Canada.  According to Sitzmann, each Suburban carried 40 kilograms of cocaine during that operation.  Armbruster, 5/10/12, p.m., at 72-74.

10.     Sitzmann also reconnected with some of his former fellow inmates as they were released from prison and he recruited them into his operation.  In 1995, just a short period after his release by the Bahamian authorities in 1994, Sitzmann consulted with both Jerry Harvey and John Sager about purchasing a Velocity airplane that had been seized by Florida law enforcement from Sager because of its use in drug trafficking.  In 1995, Sitzmann purchased the plane from the sheriff's auction.  That plane was capable of carrying 150 kilograms of cocaine. Sitzmann eventually leased the Velocity to drug smugglers in Mexico who paid him $150,000 to use the plane for two drug smuggling trips.   After the second trip, the smugglers acquired ownership of the Velocity.  Harvey, 4/19/12, p.m., at 9-13, 16; Gov. Tr. Exs.. 430-431.

11.     Sitzmann sought to use airplanes to smuggle cocaine throughout the 1990s.  In 1996, Sitzmann and Gary Paulson, who was released from prison in 1996, agreed to import 500 kilograms of cocaine from Colombia, up through the oil rigs in the Gulf of Mexico and into the

United States using a Piper Navajo Panther equipped with auxiliary fuel tanks. They attempted to employ Brian Hill as the pilot for this operation, offering him $250,000 for that trip. After considering the offer for a few days, Hill declined the offer. In 1997, Sitzmann and Paulson approached Hill to smuggle another 500 kilograms of cocaine, this time using a turbo propeller airplane to fly from the Bahamas to Colombia to pick up the cocaine and then fly around the Dominican Republic and Burmuda into Canada, with an airdrop into a river. They offered Hill $250,000 for this trip, which he declined. However, within a few days Sitzmann hired Hill to drive a utility truck from Florida to Texas. Secreted in the truck in a secret compartment created at Robert Barnaby's machine shop was $1.5 million in cash. Hill drove the truck and money to Texas. Both the truck and money were destined for Mexico. Hill, 4/25/12, p.m., at 108-132; Paulson, 4/24/12, p.m., 26, 32-95; Barnaby, 4/23/12, a.m. 104-107.

12.     In approximately 1998, Sitzmann and Sager agreed to smuggle cocaine from Colombia, through the United States and into Canada. After several meetings, they agreed that Sager would pilot a Piper Navajo Panther capable of carrying 250 kilograms of cocaine, pick up the cocaine in Colombia, and fly it through the United States and into Canada. This plan ultimately did not come to fruition with Sager, however. Sitzmann abandoned Sager after Sitzmann came to believe that Sager either had become a government informant or had been followed to one of their meetings by law enforcement officers. Sager, 4/23/12, p.m., 70-71, 75-76. Nevertheless, as more fully discussed below, Sitzmann acquired a Piper Navajo Panther in 1999, and modified it and utilized it for long-range drug smuggling. Harvey, 4/19/12, p.m., at 32-40; Gov. Tr. Exs.. 440-444, 446, 448, 759; Sanders, 4/27/12, a.m., 10-22; see also Rine, 4/27/12, a.m., 24-43. On September 21, 2000, while Sitzmann owned the plane, a drug dog

alerted on the airplane for narcotics.  Rine, 5/10/12, a.m., 53-55; Gov. Tr. Ex. 1030.  Sitzmann

sold the plane weeks later, not unpredictably.  Sanders, 4/27/12, a.m., 6-11; Gov. Tr. Ex. 445.

      13.     In 1998, Sitzmann and Paulson together began to smuggle large quantities of

cocaine through the United States and into Canada to supply the Hell's Angels.  Sitzmann's plan

was to move cocaine through the United States and into Canada by smuggling kilograms of

cocaine in the gas tanks of large vehicles.  Sitzmann again employed the services of Robert

Barnaby to modify the gas tanks of three GMC Suburbans such that a large number of kilograms

of cocaine could be fitted into the tanks and transported through the United States and across the

border into Canada.  In Canada, Sitzmann rented at least three chalets in the town of St. Sauveur,

at least one of those chalets was used to store the cocaine and to dry and repackage any cocaine

that had been contaminated by gasoline.  Sitzmann also utilized a storage facility in Canada to

store a large 17-18 cubic foot freezer packed with kilograms of cocaine.  Sitzmann and Paulson

employed Robert Campeau to guard the homes and assist in drying any fuel-soaked kilograms of

cocaine.  Campeau was terminated when he began using some of the cocaine.  Sitzmann also

employed George Jones and James Fields as drivers in this operation to smuggle the cocaine into

Canada and to smuggle millions of dollars in drug proceeds back into the United States.

Sitzmann admitted that "everyone who worked for me transported money by car except me.  I

did it on a commercial plane."  Sitzmann also stated that his 1995 Suburban was used to

transport narcotics proceeds more than once.  Sitzmann smuggled at least 330 kilograms of

cocaine from the United States into Canada as part of this operation with Paulson.[3]  The cocaine

ultimately was sold to the Canadian Hell's Angels via Normand Theoret, Paulson's contact.

Sitzmann admitted to the operation with bikers in Montreal.  Opinion and Order dated 11/18/14,

---

[3] This quantity of cocaine does not include the cocaine Sitzmann was smuggling into Canada before Paulson was
released from prison in 1996.

ECF Document # 253, at 31-33; Paulson, 4/24/15, p.m., at 32-76; Campeau, 4/25/12, p.m., at 15-68; Harvey, 4/19/12, a.m., at 116-119; Armbruster, 5/10/12, p.m., at 72-74; Gov. Tr. Ex. 744.

14.     Defendant's travels and drug smuggling to Canada are extensively corroborated by independent witnesses and evidence.  George Jones admitted to Terry Colligan, a government informant who had infiltrated Sitzmann's organization and secretly worn a wire, that he and Sitzmann smuggled cocaine to bikers in Canada, that cocaine would be secreted in the altered gas tank of his truck, and that gasoline got in some of the cocaine.  Gov. Tr. Ex. 40, Tape B2, Clips 8, 14 (Transcript: Gov. Tr. Ex. 40b2 at 16-17, 23).

15.     Moreover, the parties stipulated that on October 18, 1998, George Jones left Windsor, Canada and entered Detroit, Michigan while driving one of the GMC Suburbans. While passing through U.S. customs, Jones was found by officers to be in possession of a small bag of marijuana, which he admitted was his.  He was issued a violation notice, given a court date, and released to go on his way with his GMC Suburban.  Gov. Tr. Ex. 1043; Paulson, 4/24/12, at 69-76.  A few days later, on October 23, 1998, Sitzmann faxed documents from the library in St. Sauveur, Canada (the town where Sitzmann rented the chalets and stored the cocaine) to the Iowa Department of Motor Vehicles.   In those documents, Sitzmann was attempting to transfer title to that Suburban from George Jones to a corporation in which Sitzmann was President, an apparent attempt by Sitzmann to distance Jones and his drug arrest from the vehicle Sitzmann needed for his cocaine smuggling operation in Canada.     Rine, 4/25/12, a.m., at 75-81; Gov. Tr. Ex. 342.  This Suburban was eventually recovered during the execution of a search warrant at George Jones' home in Tavernier, Florida on March 26, 2004. The Suburban was found to have several secret compartments, including a secret compartment in

a modified gas tank.  Chong, 5/1/12, a.m., 136-140; Buss, 4/30/12, p.m., 31-32; Stacey, 5/2/12, 146-147, 154-163; Gov. Tr. Ex. 774.

16.     Additionally, on December 13, 1998, defendant arrived at the Detroit Ambassador Bridge from Canada attempting to enter the United States.  Defendant stated to U.S. Customs inspectors that he possessed approximately $800, that he resided in Iowa, that he was in Cleveland for four days, that he was returning from a visit of just a couple of hours to the Windsor Casino in Canada and that he was on his way to the airport to return to Iowa.  Contrary to his statements, defendant had approximately $3,000 in cash and two ticket stubs in his name to and from Mexico.  One ticket was purchased in cash on the same day of travel, December 9, 1998, originating in Puerto Vallarta, Mexico to Guadalajara, Mexico and returning to Puerto Vallarta on December 10, 1998.  The second ticket was purchased in cash on the same day of travel, December 10, 1998, originating in Laredo, Texas to Dallas and then on to Detroit, with a return to Laredo on December 15, 1998.  Sitzmann was also carrying a business card that reflected his name and an address in Mexico (not Iowa), a birth certificate in the name of Nicholas Sitzmann, and two airline tickets in the name of Gary Giester that were purchased in cash on the same day of travel.  One showed travel from New York to Montreal on November 19, 1998, and the other showed travel from Dallas to Chicago to Montreal on November 27, 1998, and a return to Dallas, through Chicago, on December 1, 1998.  Wynns, 4/23/12, a.m., at 54-66.

17.     Sitzmann's use of vehicles with secret compartments was not limited to GMC Suburbans or to the 1998-1999 time period.  On December 15, 1997, Sitzmann attempted to cross into the United States, to Loredo, Texas from Mexico with a 1993 Dodge Intreped with Nevada tag 119HDY.  A dog trained to detect drugs and money alerted law enforcement to the

trunk area of the vehicle.  Consequently, a thorough search of the vehicle was conducted and at least two secret compartments were found, one in the dash, running from the passenger side airbag to the driver's side, and one in the side of the trunk behind the trunk liner.  The secret compartments were completely clean of any dust, suggesting their recent use.  A month earlier, on November 18, 1997, the same Intrepid with the same tag number entered the United States from Canada at the Port of Champlain in New York.  The vehicle was registered in the name of co-conspirator James Field, and it had been given to Fields by Sitzmann.  Villarreal, 4/23/12, a.m., at 35-47; Gov. Tr. Exs.. 330, 332; Rhonda Fields, 4/27/12, p.m., at 28.

18.    Through the 1990s and into the 2000s, Sitzmann was involved in drug smuggling with James Fields, a very close friend of Sitzmann's since at least the 1970s.  Michael Fields, 4/27/12, p.m., at 44-52; Rhonda Fields, 4/27/12 p.m. at 9, 19-24.  Sitzmann even made James Fields an authorized user on Sitzmann's credit card in 1999.  Gov. Tr. Ex. 584.

19.    Sitzmann's drug trafficking enterprise continued to involve airplanes.  In 1999 Jerry Harvey provided money laundering services to Sitzmann for purposes of laundering $500,000 in cash through a Swiss bank account and Sitzmann's Panamanian bank account to facilitate Sitzmann's purchase of a Piper Navajo Panther aircraft.  Harvey, 4/19/12, p.m., 32-40; Paulson, 4/24/12, p.m., at 77-89; Sager, 4/23/12, p.m., 70-71, 75-76; Gov. Tr. Exs., 44, 44A, Clip 2; Gov. Tr. Exs. 440-444, 446, 448, 759.  As discussed above, this acquisition came on the heels of Sitzmann's attempt to have John Sager fly a Piper Navajo Panther laden with 250 kilograms of cocaine from Colombia, through the United States and into Canada.  Sitzmann had outfitted the plane specifically for drug smuggling.  The plane was modified with piping for extended fuel bladders to augment the aircraft's range and enable it for long-distance drug smuggling trips. Sanders, 4/27/12, a.m., 10-22.  On September 21, 2000, a law enforcement drug dog alerted on

the airplane for illegal narcotics, further evidence that Sitzmann used this private plane for drug smuggling purposes.  Rine, 5/10/12, a.m., 53-55; Gov. Tr. Ex. 1030.  Just a matter of weeks after the drug dog alerted on the plane, Sitzmann sold the plane.  Sanders, 4/27/12, a.m., 6-11.

20.  Sitzmann's illicit drug operation was not limited to trafficking cocaine from the United States to Canada.  Between 1996 and 1998, as Sitzmann admitted during his debriefings in France, he imported multiple shipments of 10-20 kilograms of cocaine into New York, selling it to "a Dominican" by the name of Ramone.  Opinion and Order dated 11/18/14, ECF Document # 253, at 13; Armbruster, 5/10/12, p.m., 16-24, 29-30, 41-42, 47-48.

21.  Additionally, in the late 1990s or early 2000s, Sitzmann and George Jones agreed to purchase cocaine from "Mexicans" in Chicago.  Their attempt to acquire 20 kilograms of cocaine, however, failed when they met with the Mexican traffickers in Chicago, who wanted Sitzmann and Jones to acquire a minimum of 500 kilograms of cocaine.  Gov. Tr. Ex. 40, Tape B2, Clip 13 (Transcript:  Gov. Tr. Ex. 40b2 at 21).

22.  Sitzmann also continued to operate in the United States.  Agent William Buss testified that Sitzmann used George Jones' home in Florida in late 2000 to "shine up" 16 kilograms of cocaine to make them appear purer.  Buss, 4/30/12, a.m., at 57-62, 107, 109.  Jones and Colligan were present.  Jones acknowledged the shining up of the cocaine at his Florida home and complained that Sitzmann had not paid him for it.  Gov. Tr. Ex. 40, Tape B2, Clip 7 (Transcript:  Gov. Tr. Ex. 40b2 at 13).  Separately, Sitzmann admitted to the government in a letter that he had Colligan "cut" two kilograms of cocaine for Sitzmann at Jones' home in Florida in 2002 while both Jones and Sitzmann were present.  Gov. Tr. Ex. 1025.

23.  Sitzmann also utilized his co-conspirators, particularly Fields and Long, to smuggle multiple kilograms of cocaine from Colombia to Europe.  According to recorded co-

conspirator statements of George Jones, Sitzmann made a lot more money from cocaine in Europe. James Fields was a long-time associate of Sitzmann and one of his primary drug mules. Billy Long was also a long-time acquaintance, and was recruited by Sitzmann in 2001 to smuggle cocaine from Colombia to Europe. Long successfully smuggled cocaine into Spain for Sitzmann on at least two occasions: a delivery of approximately two kilograms of cocaine to Barcelona, Spain that had been soaked and hardened into tablecloths and then placed in Long's luggage; and a delivery of four kilograms of cocaine to Madrid, Spain that had been secreted in the secret compartments of leather bags that had been supplied by Sitzmann. Fields was involved with Long in those transactions. Sitzmann admitted that he supplied Fields and Long, along with all members of "my organization" with leather bags containing secret compartments to use in his drug smuggling operation. Long, 5/1/12, 14-66; Armbruster, 5/10/12, p.m., at 42-44, 47-48, 70-71; Michael Fields, 4/27/12 p.m. at 52-55; Rhonda Fields, 4/27/12 p.m. at 22-26; Rine, 5/2/12, a.m., at 11-50, 53-57; Gov. Tr. Ex. 40, Tape B2, Clips 2,3 (Transcript: Gov. Tr. Ex. 40b2 at 3-4, 7).

24.     Fields and Long made multiple trips smuggling Sitzmann's cocaine between South America and Europe. These trips were financed by Sitzmann, who bought the plane tickets and paid Fields and Long for their efforts. Long, 5/1/12, at 14-66; Michael Fields, 4/27/12 at 51-52; Rine, 5/2/12, a.m., at 11-50, 55-57; Gov. Tr. Ex. 548. Fields and Long ultimately were arrested at the Bogotá airport in March 2002 while attempting to smuggle approximately eight kilograms of cocaine out of the country and into Europe. The cocaine was discovered in the secret compartments of leather bags supplied by Sitzmann. George Jones had also traveled to Colombia as part of the conspiracy and it was planned that he too would carry cocaine for Sitzmann alongside Fields and Jones during that doomed trip. Jones decided, with

Sitzmann's agreement, not to participate at the last moment.  After they were arrested, Fields and Long were questioned by American DEA Agents who asked Fields and Long to cooperate with them.  They declined.  Gov. Tr. Ex. 1042; Long, 5/1/12, 14-66; Gov. Tr. Ex. 40, Tape B2, Clips 7, 14 (Transcript:  Gov. Tr. Ex. 40b2 at 12, 22); Opinion and Order dated 11/18/14, ECF Document # 253, at 7.

25.     After the arrests of Fields and Long, Sitzmann and his Colombian girlfriend, Maritza Fontecha, coached Fields and Long to falsely testify to Colombian authorities for the purpose of deceitfully exonerating Long, obtaining a brief sentence for the elderly Fields and hiding the true leader of the operation, Sitzmann.  The story, which was fabricated by Sitzmann and Fontecha and reduced to the form of a written statement by Fields, falsely claimed that the cocaine Fields and Long possessed came from a fictitious supplier, Raul (not Sitzmann), that Fields was coerced into smuggling the cocaine and that Long did not know that he was carrying cocaine.  Further, Fontecha prepared and sent to Long in prison an outline of the lies Long was to provide to the authorities, including that he was instructed by Fields (not Sitzmann) to carry the bags with the hidden cocaine.  Fontecha also sent a letter to Long that Sitzmann was paying for everything, including for lawyers, and that he was paying all the people that needed to be paid.  This letter further stated that Long had to rehearse the lies with Fields to make sure they both told the same lies to the authorities.  Sitzmann also instructed Fields and Long not to talk to the United States authorities.   Despite all the lies, Fields and Long were both convicted by a Colombian court and imprisoned.  Long, 5/1/12, 73-93; Gov. Tr. Exs.. 1011, 1012, 1013.  Fields died in a Colombian prison, and Sitzmann made the funeral arrangements in Colombia with Maritza Fontecha.  Rhonda Fields, 4/27/12 p.m. at 29-36.  Billy Long completed his Colombian prison sentence in March 2007 and returned to the United States.  Long, 5/1/12, at 9.

26.     Even with the arrests of Fields and Long, Sitzmann's drug enterprise continued. In January 2004, Sitzmann proposed to co-conspirator Gary Paulson that they resume the operations they had conducted in the 1990s of smuggling cocaine by truck from Mexico through the United States and into Canada to be redistributed to the Canadian Hell's Angels.  Opinion and Order dated 11/18/14, ECF Document # 253, at 15; Paulson, 4/25/12, a.m., at 22-24.   At the time, Paulson was helping Sitzmann sell one of his Stallion kit planes that Sitzmann had purchased for drug smuggling purposes with the proceeds from the previous Canadian operations.  Paulson was aware at that time that Sitzmann was carrying on drug smuggling operations in Europe.  Opinion and Order dated 11/18/14, ECF Document # 253, at 15; Paulson, 4/24/12, p.m. at 95-101; Paulson, 4/25/12, a.m. at 22-24.

27.     Sitzmann also continued to smuggle cocaine to Europe despite the arrests of Fields and Long.  Between December 15, 2003 and February 18, 2004, Sitzmann made several trips carrying cocaine from Colombia to Europe, at least one of which he traveled through the United States.  Armbruster, 5/10/12, p.m., at 29-30.

28.     In February 2004, Sitzmann flew to Spain and rented a car with the intent of driving to Italy with approximately eight kilograms of cocaine in his possession.  He drove through France and was stopped by French authorities near Nice attempting to cross into Italy, the final destination for the cocaine.  Sitzmann drove along a highway known to French authorities to be popular for drug traffickers.  Sitzmann's only luggage upon being stopped was a leather bag with a hidden compartment, which contained another leather bag with a hidden compartment.  French law enforcement officers found approximately eight kilograms of cocaine inside the hidden compartments.  Sitzmann was arrested by French authorities and was later convicted of drug trafficking by a French court.  Opinion and Order dated 11/18/14, ECF

Document # 253, at 7, 9; Armbruster, 5/10/12, p.m., at 42; Gov. Tr. Ex. 40, Tape B2, Clips 2, 3, 7 (Transcript: Gov. Tr. Ex. 40b2 at 3-4, 6, 12); Gov. Tr. Exs.. 180, 181, 182; Courreges, 4/17/12, p.m., at 11-31; Dorcet, 4/18/12, at 65-68.

29.     The cocaine seized from Sitzmann in France was analyzed by a chemist at the DEA Laboratory and determined that the cocaine was over 93 percent pure.  Sitzmann admitted that he believed that the cocaine was at least 90 percent pure.  Gov. Tr. Exs. 782, 1040: Armbruster, 5/10/12, p.m., at 42.

30.     Sitzmann had asked George Jones to accompany him on this trip to Europe and smuggle cocaine, but again Jones instinctively decided not to participate in that transaction. Gov. Tr. Ex. 40, Tape B2, Clip. 7 (Transcript:  Gov. Tr. Ex. 40b2 at 12).

31.     Shortly after Sitzmann was arrested in France, Jones attempted to acquire 16 to 20 kilograms of cocaine from Terrence Colligan, the undercover government informant who had infiltrated Sitzmann's drug smuggling operation.  Sitzmann had a longstanding and ongoing conspiratorial relationship with Jones, and this transaction was in furtherance of the conspiracy. Jones had discussed the acquisition of 20 kilograms of cocaine with Sitzmann and had anticipated acquiring the cocaine directly from Sitzmann prior to Sitzmann being arrested in France.  When Jones did not receive it from Sitzmann, he arranged to receive a substitute batch of 16-20 kilograms of cocaine from Colligan.  Jones intended to sell the cocaine to customers of Sitzmann and split the profits with Sitzmann.   Opinion and Order dated 11/18/14, ECF Document # 253, at 7-9, 14-15.   Following Jones' acquisition of 16 kilograms of cocaine from Colligan, Jones was arrested, and his home in Tavernier, Florida was searched.   Recovered during the search were the 16 kilograms of cocaine, the GMC Suburban with the modified gas tank used for smuggling cocaine and drug proceeds, and substantial drug trafficking property

belonging to Sitzmann, including "numerous boxes of bank records, corporate records, information dealing with the purchase and sale of airplanes, packing material, heat-sealing equipment, and professional grade leather bags that had false compartments in the bottom, of the type that Mr. Sitzmann had previously described using for drug smuggling to Mr. Colligan and in which he was hiding 7 kilograms of cocaine when he was arrested in France in February 2004." Opinion and Order dated 11/18/14, ECF Document # 253, at 7-9. The leather bags recovered in Jones' home were virtually identical to those that Sitzmann gave to Paulson, Harvey, Fields and Long. Sitzmann stated that he had 15 or 20 leather bags with secret compartments made in Colombia for his organization and that everyone in his organization had a bag that became their own. He also admitted that his personal property, including his files, leather bags and clothes, was at Jones' house. He stated that the packaging machine was used to seal his drugs, but that he also used a hot iron to seal his packages. See e.g., Paulson, 4/25/12 p.m. at 59; Harvey, 4/19/12 p.m. at 45-49; Armbruster, 5/10/12, p.m., at 42-43; Rine, 5/2/12, a.m., 53-55; Gov. Tr. Exs.. 260, 360, 732-738.

## PROCEDURAL BACKGROUND

32.     Defendant Sitzmann was indicted on August 7, 2008, by a federal grand jury for Conspiracy to Distribute and Possess with Intent to Distribute Five Kilograms or More of Cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), and 846. At the time of the indictment, Sitzmann was still incarcerated in France. He was deported by French authorities the following day and was arrested by United States law enforcement officials at Washington Dulles International Airport. A six-week jury trial was held in April and May 2012. On May 21, 2012, a federal jury found Sitzmann guilty of the single conspiracy charge contained in the indictment. Eight months after the guilty verdict, Sitzmann filed a motion for acquittal or a new trial. After

extensive briefing, the Court denied this motion in an Opinion and Order dated November 18,

2014.  Sitzmann's sentencing was scheduled for July 30, 2015, but is expected to be rescheduled

for some time in August 2015.

## SENTENCING CALCULATION

### I.     STATUTORY MINIMUMS AND MAXIMUMS

33.     The penalty for conspiring to commit a narcotics offense, in violation of 21

U.S.C. § 846, is the same as that prescribed for the substantive offense, "the commission of

which was the object of the . . . conspiracy."   In this case, the penalty is the same as for a

violation of 21 U.S.C. § 841(a)(1), as set forth in 21 U.S.C. § 841(b)(1)(A)(ii), distribution or

possession with intent to distribute cocaine by a person with a prior conviction for a felony drug

offense that has become final.   On February 28, 2011, the government filed a Notice of

Additional Penalties pursuant to 21 U.S.C. § 851 and provided notice therein of defendant's prior

federal drug trafficking conviction.

34.     The statutory mandatory minimum penalty after a prior conviction for a felony

drug offense has become final, is a sentence of not less than 20 years imprisonment, and the

maximum penalty is life imprisonment.   21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), and 846.

Additionally, 21 U.S.C. § 841(a)(1) provides for a fine of not more than $8 million for an

individual with a prior felony drug conviction.[4]

### II.     GOVERNMENT'S SENTENCING GUIDELINES CALCULATION

35.     The government notes that the current United States Sentencing Guidelines

Manual incorporates guideline amendments effective as of November 1, 2014.  The government

acknowledges that it is a violation of the Ex Post Facto Clause of the United States Constitution

---

[4]The maximum fine of $8 million is provided for in the version of 21 U.S.C. § 841 in effect from
November 2, 2002, to March 8, 2006, which includes the offense of conviction.

to sentence a defendant under Guidelines promulgated after the commission of the defendant's criminal acts when the new version of the Guidelines provides a higher applicable sentencing range than the version in place at the time of the offense. Peugh v. United States, 569 U.S. ___, 133 S. Ct. 2072 (2013). If the new version of the Guidelines would violate the Ex Post Facto Clause, "[d]istrict courts must begin their sentencing analysis with the Guidelines in effect at the time of the offense and use them to calculate the sentencing range correctly . . . . The newer Guidelines, meanwhile, will have the status of one of many reasons a district court might give for deviating from the older Guidelines." Peugh, 133 S. Ct. at 2087 (emphasis in original); see also U.S.S.G. §1.B1.11. The PSR utilizes the Guidelines in effect on the date the offense of conviction was committed. PSR ¶ 74. The government has done the same. However, the government is confident that under the Guidelines and amendments effective November 1, 2003,[5] Sitzmann's applicable sentencing range is identical to the sentencing range provided under the Guidelines and amendments effective November 1, 2014.[6] Both produce a recommended sentence of life imprisonment.

## A. Base Offense Level and Cocaine Quantities

36.    The Guidelines in effect at the time of sentencing attribute a base offense level of 38 to an offense involving at least 450 kilograms of cocaine. U.S.S.G. § 2D1.1(a)(5), (c)(1). Under the Guidelines and amendments effective November 1, 2003, those in effect during the conspiracy, a base offense level of 38 is prescribed for a conspiracy to distribute 150 kilograms or more of cocaine, significantly less than the Guidelines in effect at sentencing. PSR ¶ 75. Even under the newer Guidelines, which require the government to show a much higher quantity

---

[5]The Guidelines and amendments effective November 1, 2003, were the Guidelines and amendments in effect at the time the conspiracy concluded in 2004.
[6]The Guidelines and amendments effective November 1, 2014, are the Guidelines and amendments in effect at the time of sentencing in 2015.

of cocaine to arrive at a base offense level of 38, the government can show that the conspiracy involved a quantity of cocaine well in excess of 450 kilograms, resulting in a base offense level of 38.  The government concurs with the PSR that the base offense level is 38. PSR ¶ 75.

37.     "Under the Sentencing Guidelines, the district court determines a defendant's base offense level—and, ultimately, his guideline range—by delineating his 'relevant conduct.'" United States v. Wyche, 741 F.3d 1284, 1292 (D.C. Cir. 2014), quoting United States v. Thomas, 114 F.3d 228, 254 (D.C.Cir.1997), and U.S.S.G. § 1B1.3 (internal quotations omitted).  "In a drug conspiracy, the amount of drugs attributable to any one codefendant as 'relevant conduct' for guidelines purposes is limited to the reasonably foreseeable transactions in furtherance of that codefendant's 'jointly undertaken criminal activity.'" Wyche, 741 F.3d at 1292, quoting United States v. Easter, 553 F.3d 519, 523 (7th Cir.2009), and U.S.S.G. § 1B1.3(a)(1)(B) (some internal quotations omitted); see also Thomas, 114 F.3d at 254–55.  "A court may rely 'on evidence of a defendant's relationship to and involvement with the conspiracy in order to draw permissible inferences regarding' the scope of his agreement to the conspiratorial conduct 'and the foreseeability of his co-conspirators' conduct.'"  Wyche, 741 F.3d at 1292, quoting Thomas, 114 F.3d at 260.  "If the defendant plays a managerial role in a drug conspiracy, coordinates drug distribution with other managers of the conspiracy and shares in the conspiracy's profits, he may be held responsible for the entire drug quantity attributable to the conspiracy during the time he was a participant."  Wyche, 741 F.3d at 1292-93; see Thomas, 114 F.3d at 260; see also United States v. Law, 528 F.3d 888, 906 (D.C. Cir. 2008) ("a single violation of the conspiracy statute encompasses all of the crimes reasonably foreseeable within that conspiracy") (internal quotations omitted).

38.     The applicable burden of proof at sentencing for a determination of "relevant conduct" is simply a preponderance of the evidence.  United States v. Stover, 329 F.3d 859, 871 (D.C. Cir. 2003); United States v. Jackson, 161 F.3d 25 (D.C. Cir. 1998) ("preponderance of the evidence standard govern[s] . . . relevant conduct" at sentencing)

39.     The evidence submitted at trial establishes that Sitzmann's conspiracy involved over 1,800 kilograms of cocaine.  As discussed above more fully, the total quantity of cocaine has been calculated based on the following quantities:

i.      At least 80 kilograms of cocaine in 1995 or 1996, when Sitzmann's transported at least this amount in two Suburbans from Houston to Vancouver, Canada. Each Suburban would carry 40 kilograms of cocaine during that operation.  Because the government does not know the total number of trips made, the government assumes herein only one.  Armbruster, 5/10/12, p.m., at 72-74.

ii.     At least 500 kilograms of cocaine in 1996, when Sitzmann and Gary Paulson agreed to import at least this amount into the United States from Colombia, flying over the Gulf of Mexico.  They approached Brian Hill to be the pilot for this operation.  Hill decided to not to participate in this operation.  Hill, 4/25/12, p.m., at 108-121.  Drug quantity for Guidelines purposes includes amounts that were attempted to or conspired to be distributed, whether or not actually consummated.  U.S.S.G. § 2D1.1, Application Note 12; see also United States v. Layeni, 90 F.3d 514, 522-24 (D.C. Cir. 1996); United States v. Podlog, 35 F.3d 699, 707 (2nd Cir. 1994)

iii.    At least 500 kilograms of cocaine in 1997, when Sitzmann and Gary Paulson agreed to smuggle at least this amount from Colombia to Canada to be airdropped into a river.  They again approached Brian Hill to be the pilot for this operation.  Hill rejected the offer.  Hill, 4/25/12, p.m., at 108-121.

iv.     At least 37.5 kilograms of cocaine, in the form of $1.5 million in drug proceeds, in 1997 when Brian Hill, in lieu of piloting an airplane filled with cocaine, took a job from Sitzmann in 1997 that involved driving a utility truck from Florida to Texas. The truck contained $1.5 million in drug proceeds secreted in a hidden compartment. Using a high estimated price of cocaine ($40,000 per kilogram) to arrive at a conservative estimate of the amount of cocaine that would have been exchanged for $1.5 million, the government has determined that this amount of cash represents at least 37.5 kilograms of cocaine.  Hill, 4/25/12, p.m., at 121-132.

v.      At least 330 kilograms of cocaine, in approximately 1998 and 1999, when Sitzmann shipped no less than this amount through the United States and into Montreal,

Canada by means of secreting the cocaine in the gas tanks of GMC Suburbans.  The cocaine was ultimately delivered to the Hell's Angels and Normand Theoret.  Gary Paulson testified that the first shipment, the transportation of which he was directly involved in as a driver of one of the Suburbans, was a total of ninety (90) kilograms.  He testified that there was a later shipment of 120 kilograms, and that the second shipment was of a larger quantity of cocaine than the first because the conspirators realized more could be held in the modified gas tanks.  Paulson also testified that he learned from co-conspirator Theoret that there was a third shipment, also of 120 kilograms.  Paulson, 4/24/12/, p.m., at 47, 62, 66-68, 70, 74-75; see also Opinion and Order dated 11/18/14, ECF Document # 253, at 31-33.  Robert Campeau, Paulson's brother-in-law, testified that he personally observed portions of the shipments that had been soaked in fuel and were being dried out in chalets rented by Sitzmann.  He also observed a freezer in a rented storage unit full of kilograms of cocaine.  Campeau, 4/25/12, p.m., at 26.  This 330 figure does not include the cocaine that Sitzmann smuggled from the United States into Montreal, Canada starting in 1994-1995, prior to Paulson's direct involvement in the operation.  Paulson, 4/24/12, p.m., at 22-29; Harvey, 4/19/12, a.m., at 117-120; see also Campeau, 4/25/12, p.m., at 13-15.

vi.     At least 250 kilograms of cocaine. in approximately 1998, when after several meetings, Sitzmann reached an agreement with John Sager to fly at least this amount by use of a Piper Navajo Panther airplane from Colombia to Canada, through the airspace of the United States.  This plan ultimately did not come to fruition with Sager, however, as Sitzmann came under the belief that Sager was either being followed by or cooperating with law enforcement.  Consequently, Sitzmann cut all ties with Sager.  Sager, 4/23/12, p.m., 70-71, 75-76.  Nevertheless, as previously discussed above, in 1999 Sitzmann acquired a Piper Navajo Panther and modified it for long range drug smuggling.  While Sitzmann owned the plane, a law enforcement drug dog alerted on the plane the presence of narcotics, and within weeks of that hit, Sitzmann sold the plane.  Harvey, 4/19/12, p.m., at 32-40; Sanders, 4/27/12, a.m., 10-22; Rine, 4/27/12, a.m., 24-43; Gov. Tr. Exs.. 440-446, 448, 759, 1030.

vii.     Sixteen kilograms of cocaine in late 2000, when Colligan, a confidential informant who ostensibly became a co-conspirator of Sitzmann's and Jones', helped Sitzmann and Jones "shine-up" (cleanse) this amount at Jones' home in Tavernier, Florida.  Buss, 4/30/12 a.m. at 54-62, 107.  Jones acknowledged the shining up of the cocaine at his Florida home and complained that Sitzmann had not paid him for it.  Gov. Tr. Ex. 40, Tape B2, Clip 7 (Transcript: Gov. Tr. Ex. 40b2 at 13).  Separately, Sitzmann admitted to the government that he had Colligan "cut" two kilograms of cocaine for Sitzmann at Jones' home in Florida in 2002.  Gov. Tr. Ex. 1025.

viii.     Approximately 1.8 kilograms of cocaine, between 2001 and 2002, when Billy Long was recruited by Sitzmann to smuggle cocaine on several occasions  On one occasion, Sitzmann supplied Long with tablecloths soaked with cocaine, which he transported from Colombia to Barcelona, Spain.  He testified that the cocaine-soaked tablecloths weighed approximately four pounds.  Long, 5/1/12, a.m., at 28.  Four pounds is equivalent to approximately 1.8 kilograms.

ix.     Approximately four kilograms of cocaine in March 2002, when Billy Long transported this amount from Bogotá to Madrid for Sitzmann.  Long, 5/1/12, a.m., at 39, 41, 50.

x.     Approximately eight kilograms of cocaine in May 2002, when James Fields and Billy Long were arrested at the international airport in Bogotá, Colombia as they attempted to board a flight to Madrid, an operation put together by Sitzmann.  Fields and Long were in possession of approximately eight kilograms of Sitzmann's cocaine.  The parties stipulated to this event and Billy Long gave testimony regarding his involvement with Sitzmann.  Long, 5/1/12, a.m., at 63; Fields, 4/27/12, p.m. at 6; Gov. Tr. Ex. 1042, Second Supplemental Stipulation of the Parties.

xi.     At least 20 kilograms of cocaine, when Sitzmann and Jones agreed to acquire no less than this amount from "Mexicans" in Chicago.  Sitzmann and Jones traveled to Chicago to consummate this deal; however, the deal fell through when the sellers were unwilling to sell any quantity other than 500 kilograms.  Gov. Tr. Ex. 40, Tape B2, Clip 13 (Transcript: Gov. Tr. Ex. 40b2 at 21).

xii.     At least 30 to 60 kilograms of cocaine between 1996 and 1998, when Sitzmann imported no less than three shipments of at least 10 to 20 kilograms of cocaine into New York, totaling at least this amount.  The amounts were delivered to an individual known only as Ramone and described only as "a Dominican."  Opinion and Order dated 11/18/14, ECF Document # 253, at 13; Armbruster, 5/10/12, p.m., 16-24, 29-30, 41-42, 47-48.

xiii.     At least seven kilograms of 93 percent pure cocaine in 2004, when Sitzmann was found in possession by French law enforcement authorities as he attempted to cross the French border into Italy.  This was attested to in the testimony of Daniel Courreges, Serge Giraudo, and Philippe Dorcet, as well as through a stipulation of the parties and Sitzmann's admission during his debriefing in France.  Opinion and Order dated 11/18/14, ECF Document # 253, at 7, 9;  4/18/12, at 11-38, 40, 56, 65-68, 124, 126; Armbruster, 5/10/12, p.m., at 42; Gov. Tr. Ex. 40, Tape B2, Clips 2, 3, 7 (Transcript: Gov. Tr. Ex. 40b2 at 3-4, 6, 12); Gov. Tr. Exs.. 180, 181, 182.

xiv.     Sixteen kilograms of cocaine in March 2004, when shortly after Sitzmann was arrested in France, George Jones attempted to acquire this amount from Colligan.  Sitzmann had a longstanding and ongoing conspiratorial relationship with Jones and this transaction was in furtherance of the conspiracy.  Jones had discussed the acquisition of 20 kilograms of cocaine with Sitzmann and had anticipated acquiring the cocaine directly from Sitzmann prior to Sitzmann being arrested in France.  When Jones did not receive it from Sitzmann, he arranged to receive a substitute batch of 16-20 kilograms of cocaine from Colligan.  Jones received 16 kilograms of cocaine from Colligan.  Jones intended to sell the cocaine to customers of Sitzmann and split the profits with Sitzmann.  Opinion and Order dated 11/18/14, ECF Document # 253, at 7-9, 14-15; Buss, 4/30/12, a.m. at 9,

11, 43-44, 48, 59.  Accordingly, 16 kilograms of cocaine have been added to defendant's drug quantity.

40.     The United States has been conservative in estimating the quantities of cocaine involved in Sitzmann's conspiracy.  For example, if the evidence reflected that the number of smuggling trips Sitzmann was involved in and the number of kilograms per trip or operation were within a range, the government has assumed the low end of the range for both matters.  Additionally, the government calculated the drug quantities by looking only at the number of kilograms with which Sitzmann and his crew members were directly involved or about which they conspired.   The government has not multiplied the number of kilograms involved in Sitzmann's conspiracy by the number of kilograms each kilogram could have been diluted or "cut" before reaching the streets for final distribution.  The total relevant conduct could have been many times greater than what has been calculated here.  See Stover, 329 F.3d at 870-73 (heroin quantity for relevant conduct purposes was determined by multiplying the number of high purity kilograms by the number of kilograms that could be generated by diluting the heroin for street sale).  Moreover, the government has not considered in its calculation additional trips to Canada, Europe and the United States where an indefinite quantity of cocaine was involved.  The government could have estimated the quantity of cocaine involved in those trips by extrapolating the quantity from similar trips and events where kilograms of cocaine were involved.   See United States v. Badru, 97 F.3d 1471, 1476-77 (D.C. Cir. 1996) (court can reasonably rely on modus operandi to estimate drug quantities in situations where no drugs are recovered).  However, notwithstanding the government's conservative calculations, the amounts tallied by the government total at least 1,801.3 kilograms of cocaine, far in excess of the 150 kilograms or 450 kilograms necessary to reach a base offense level of 38.

B.  Four-level Adjustment as Leader and Organizer (U.S.S.G. § 3B1.1)

41.     The Guidelines prescribe for an increase to the base offense level by four levels if, "[b]ased on the defendant's role in the offense . . . the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a).   The United States concurs with the PSR that an increase of four levels is appropriate. PSR at ¶ 78.

42.     The evidence at trial established that Sitzmann was the organizer and leader in the conspiracy.   Sitzmann controlled both the supply of cocaine and the drug proceeds throughout the period of the conspiracy.   Numerous witnesses testified to Sitzmann's leadership role in the conspiracy.   Gary Paulson testified about how he met Sitzmann while incarcerated in a federal facility in Miami and that Sitzmann had a supplier of cocaine and was interested in using Paulson's contacts in Canada to smuggle and redistribute cocaine there.   Paulson also testified that Sitzmann employed numerous individuals in the conspiracy and provided them with special leather bags he had made in Colombia for smuggling drugs and drug money.   Sitzmann similarly admitted during his debriefing in France that he had 15 or 20 leather bags with secret compartments made in Colombia for his organization and that he gave everyone in his organization a bag of their own.   Sitzmann also employed Jerry Harvey as a money launderer and provided him with a leather bag.  Paulson, 4/24/12, p.m., at 17, 19, 23-32, 48-49, 58-62, 70, 74-75; Opinion and Order dated 11/18/14, ECF Document # 253, at 33; Armbruster, 5/10/12, p.m., at 42-43; Harvey, 4/19/12, p.m. at 30-43; Rine, 4/27/12 a.m. at 28-43; Gov. Tr. Exs.. 440-444, 446, 448, 759.  Robert Campeau testified that he was hired by Sitzmann to guard cocaine stored at chalets in Canada and was instructed by Sitzmann on how to dry cocaine that had been soaked in fuel.   Campeau also identified George Jones as a driver of a Suburban in Canada. Campeau, 4/25/12, p.m., at 26-29, 37-39.   Brian Hill testified that Sitzmann approached him

about piloting an aircraft to smuggle cocaine from Colombia into the United States.  Hill testified that Sitzmann and Paulson were partners but that Sitzmann was the financier of the operation. Hill, 4/25/12, p.m., at 111-13.  Robert Barnaby, who modified gas tanks in the GMC Suburbans to facilitate smuggling of cocaine and cash, testified that Sitzmann paid for the modifications and was the "brains" of the operation.  Barnaby, 4/23/12, a.m., at 90, 120.  Billy Long testified about how he was recruited and hired by Sitzmann to smuggle cocaine with James Fields from Colombia to Europe in 2001 and 2002, and testified to the fact that Sitzmann arranged travel and purchased plane tickets for him.  Long also testified about how George Jones was with Sitzmann while Sitzmann and Long were getting ready for one of the smuggling trips from Colombia to Europe.  Long, 5/1/12, a.m. at 21-22.  Sitzmann admitted that he gave Long and Fields leather bags with secret compartments and maintained several of those bags at Jones' home. Armbruster, 5/10/12, p.m., at 42-43. Agent Jared Rine testified that Sitzmann purchased plane tickets for both Billy Long and James Fields, for travel between the United States, Mexico, Colombia, and Europe.  Rine, 5/1/12, a.m., at 38-39, 43-45.  Agent John Armbruster testified that Sitzmann described the conspiracy to federal officials as "my organization" during a meeting with federal officials while Sitzmann was incarcerated in France.  Armbruster, 5/10/12, p.m., 42-43, 47-48.  George Jones' taped conversation with Mr. Colligan further evidences Sitzmann's role.  See Gov. Tr. Ex. 40, Tape B2, generally (Transcript: Gov. Tr. Ex. 40b2).  The evidence overwhelmingly demonstrates that Sitzmann was the organizer and leader of a criminal conspiracy to traffic in huge quantities of cocaine.  He recruited numerous participants, controlled both the cocaine supply and the drug proceeds for the organization, financed and provided the artifices for his smuggling network, and directed his numerous co-conspirators in furtherance of the conspiracy.

43.     The evidence admitted at trial also clearly demonstrates that the criminal activity for which Sitzmann was convicted involved well over five participants.  Jerry Harvey testified that Gary Paulson and John Sager were part of Sitzmann's organization.  Harvey, 4/19/12, at 4-9.  Gary Paulson testified that Sitzmann made deals and sold cocaine to Normand Theoret and the Canadian Hell's Angels, that Paulson, George Jones, James Fields, Jerry Harvey, Robert Barnaby, and Robert Campeau were part of the organization, many of whom received Sitzmann's trademark leather bags with false bottoms and hidden compartments.  Paulson, 4/24/12, p.m., at 17, 19, 23-32, 48-49, 58-62, 70, 74-75.  Robert Barnaby testified that he was hired by Sitzmann to modify gas tanks for smuggling purposes.  Barnaby, 4/23/12 a.m., at 90, 120.  Robert Campeau testified that he was hired to guard cocaine and dry out fuel-soaked cocaine in Canada.  Campeau, 4/25/12, p.m. at 26-29.  Billy Long testified that he was hired by Sitzmann in 2001 to smuggle cocaine, and that Sitzmann bought airplane tickets for him.  Long, 5/1/12 at 21-22.  Agent Jared Rine also testified that Sitzmann bought airplane tickets for Fields as well as Long.  5/2/12, a.m., at 38-39, 43-45.  The testimonies of Sitzmann's co-conspirators established that his organization had no less than nine participants: (1) Gary Paulson, (2) John Sager, (3) Normand Theoret, (4) George Jones, (5) James Fields, (6) Jerry Harvey, (7) Robert Barnaby, (8) Robert Campeau, and (9) Billy Long.  The record further establishes that Sitzmann acquired cocaine in Colombia from, and redistributed the cocaine to, an indeterminate number of unindicted co-conspirators.

44.     Defendant's leadership role in the conspiracy is also evidenced by the extremely high purity of the cocaine that he distributed.  There should be no doubt from the overall record that Sitzmann operated at the highest levels of the cocaine trade, acquiring his cocaine directly from the drug cartels in Colombia.  The cocaine that was seized from the defendant during the

conspiracy was over 93 percent pure, and Sitzmann admitted that he believed that the cocaine was at least 90 percent pure. Gov. Tr. Exs. 782, 1040: Armbruster, 5/10/12, p.m., at 42. In this regard, the Sentencing Guidelines that were in effect during the offense conduct provide that "[t]rafficking in controlled substances . . . of unusually high purity may warrant an upward departure . . .. The purity of the controlled substance . . . may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution. Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." U.S.S.G. (2003) § 2D1.1, Application Note 9; see also U.S.S.G. (2014) §2D1.1, Application Note 27(c). Accordingly, the high purity of the cocaine is further proof of the fact that Sitzmann was the organizer and leader of a conspiracy to traffic in enormous amounts of extremely pure cocaine that involved more than five participants. Hence, an increase in the offense level by at four levels, if not more, is appropriate.

### C. Two-level Increase For Use of an Aircraft (U.S.S.G. § 2D1.1(b)(2))

45.    The Sentencing Guidelines provide for an increase by two levels if "the defendant unlawfully imported or exported a controlled substance under circumstances in which (A) an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance." U.S.S.G. § 2D1.1(b)(2). The United States concurs with the PSR that an increase of two levels is appropriate. PSR at ¶ 76. Sitzmann's use of an aircraft to smuggle cocaine into and/or out of the United States was established through the testimony of multiple witnesses at trial.

46.     To begin with, Sitzmann had a keen interest in airplanes that was always in the context of drug smuggling.  Opinion and Order dated 11/18/14, ECF Document # 253, at 33. Jerry Harvey testified that Sitzmann purchased airplanes and modified them to improve their capability for smuggling cocaine.  Harvey, 4/19/12, at 18, 20-21, 34-35, 113-115.  John Sager testified that he and Sitzmann discussed using airplanes to smuggle narcotics while they were incarcerated in Miami.  Both Harvey and Sager testified that Sitzmann purchased a Velocity airplane in 1995 that Sager had owned for purposes of smuggling cocaine from Colombia, through the United States and into Canada.  Before purchasing the Velocity, Sitzmann inquired about the drug smuggling capabilities of the plane.  Sitzmann eventually leased the Velocity to Mexican drug traffickers who used it for drug smuggling.  Harvey, 4/19/12, p.m., at 9-13, 16; Gov. Tr. Exs.. 430-431; Sager, 4/23/12, p.m., at 25-28, 42-43, 56-60, 64-76.

47.     More importantly, in 1998 Sager and Sitzmann planned to acquire a Piper Navajo Panther aircraft for purposes of smuggling cocaine from Colombia, into the United States and Canada.  Sager would be the pilot in that cocaine smuggling operation.  Sager, 4/23/12, p.m., at 66-76.  Although Sager ultimately did not participate in this operation, Sitzmann purchased a Piper Navajo Panther airplane in 1999 with the assistance of expert money launderer Jerry Harvey.  The plane was outfitted, without any FAA certifications, with piping and other modifications to connect auxiliary fuel tanks to be used for long range drug smuggling, Sitzmann's career occupation.  Harvey, 4/19/12, p.m., at 32-40; Gov. Tr. Exs.. 440-444, 446, 448, 759; Sanders, 4/27/12, a.m., 10-22; see also Rine, 4/27/12, a.m., 24-43.     Then, on September 21, 2000, a law enforcement drug dog alerted on the airplane for illegal narcotics. Rine, 5/10/12, a.m., 53-55; Gov. Tr. Ex. 1030.  Sitzmann sold the plane just weeks later. Sanders, 4/27/12, a.m., 6-11; Gov. Tr. Ex. 445.     Accordingly, there is more than sufficient

evidence from which to conclude that Sitzmann used one or more of his private airplanes to carry cocaine from Colombia, his source country, into the United States and then to Canada.

> ### D.   Two-level Increase for Obstruction of Justice (U.S.S.G. § 3C1.1)

48.     The United States believes that an adjustment for obstruction of justice should be made in this case.  An increase in the offense level by two levels is warranted when "(A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense."  U.S.S.G. § 3C1.1.[7]  When a defendant obstructs justice in a foreign jurisdiction, such conduct is grounds for an enhancement under the Sentencing Guidelines when the attempt to frustrate a foreign investigation or prosecution could reasonably be expected to have an effect on an investigation or prosecution in the United States that is closely related to the foreign investigation or prosecution.  United States v. Teyer, 322 F.Supp.2d 359, 366-67 (S.D.N.Y. 2004).

49.     The first element—willfully attempted to obstruct or impede the investigation of the instant offense of conviction—is satisfied.  Sitzmann wanted to impede the Colombian investigation and any American investigation into his drug-smuggling ring by having James Fields take the blame for the cocaine seized from him and Long.  His plan was to have Fields falsely claim that the cocaine came from a fictitious supplier named Raul, thus ending or derailing the investigation and proceedings.  Billy Long testified at trial that following the 2002 arrests of Long and Fields at the Bogotá airport, Fields and Long were questioned by three agents from the United States DEA, who also attempted to have Fields and Long cooperate with

---

[7]The text of the Guideline quoted here is from the November 1, 2003, version of the Guidelines.

them.  Long testified that following the arrests in Bogotá, Sitzmann and his girlfriend, co-conspirator Maritza Fontecha, formulated a plan to have Fields falsely claim that Fields was coerced into smuggling the cocaine by a fictitious Raul and that Long was unaware of the four kilograms of cocaine in the secret compartments of his bags.  Long would also lie to Colombian authorities and a Colombian court by testifying that Fields (not Sitzmann) gave him the leather bags containing the hidden cocaine and that Long was not aware of the cocaine.  Fontecha even provided an outline containing the lies Long was to offer to the authorities, including instructions on practicing the lies with Fields.  The plan, which was attempted but proved unsuccessful, involved  Fields taking the blame for the cocaine smuggling, Long being acquitted and released, and Fields receiving a reduced sentence on account of his advanced age.  Sitzmann also instructed Long not to speak with any United States officials in Bogotá.  Long, 5/1/12, at 66, 73-75, 79-82, 84-93.  Gov. Tr. Exs. 1011-1013.  The Colombian prosecution of Fields and Long is an investigation of the instant offense of conviction.  Their arrest, prosecution and conviction were the result of their participation in Sitzmann's conspiracy for which Sitzmann was later indicted and convicted in this case.[8]

50.     The second element of U.S.S.G. § 3C1.1—that the obstructive conduct be related to the defendant's offense of conviction and any relevant conduct or a closely related offense—is satisfied because Long's and Fields's offense in Colombia was part and parcel of Sitzmann's conspiracy offense for which he was convicted here.  Sitzmann could reasonably expect that by

---

[8] It is noted that the United States began the instant investigation into Sitzmann's drug-smuggling organization in 2000, thus placing his obstructive conduct in Colombia "during the course of the investigation."  Buss, 4/30/12, a.m. at 54-55.  Moreover, both the DEA and the Colombian authorities were involved in investigating the circumstances surrounding the 2002 arrests of Fields and Long in Bogotá.  Although defendant need not have been aware of the instant investigation to be liable for the obstruction of justice sentencing enhancement., see Teyer, 322 F. Supp. 2d at 367; U.S.S.G. § 3C1.1, it is clear that he did know about the related Colombian investigation concerning the events leading to the arrests of Fields and Long, which were a part of the conspiracy for which Sitzmann was indicted, tried and convicted.

impeding the Colombian and American investigations into his co-conspirators criminal activity,

he could impede any resulting investigation by the United States into Sitzmann's operation.

Sitzmann was fearful of his own prosecution as evidenced by the fact that after Fields and Long

were arrested and interviewed by DEA agents and then interviewed by U.S. Embassy

representatives, Sitzmann instructed Long not to speak to United States authorities.   An increase

of the offense level by two points is appropriate here.

51.     Accordingly, the government has calculated defendant's total offense level to be

46.  As reflected in the PSR, where the total offense level is calculated to be in excess of 43, the

offense level will be treated as a level 43.  PSR at ¶  83

E.     Calculation of Sitzmann's Criminal History Category

52.     Sitzmann has two prior criminal convictions in the United States.  In 1990, he was

sentenced to five years in prison in the United States District Court for the Southern District of

Florida for conspiracy to import at least five kilograms of cocaine.  Gov. Tr.  Exs. 240, 241, 1041

(First Supplemental Stipulation of the Parties).  There are three criminal history points associated

with this offense under U.S.S.G. § 4A1.1(a).  PSR at ¶ 86.

53.     In 1994, Sitzmann was convicted in Broward County, Florida of unlawfully using

a false or fictitious name in an application for a driver's license or identification card by

presenting an invalid birth certificate as a form of identification in his application for a Florida

identification card.  Gov. Tr. Exs. 251, 252, 1041.  He served two days in jail and was ordered to

pay a $1,000 fine.  Id.  There is one criminal history point associated with this offense under

U.S.S.G. § 4A1.1(c).  PSR at ¶ 87.

54.     As acknowledged in the PSR, two additional criminal history points would be

appropriate if Sitzmann was under any criminal justice sentence while involved in the instant

offense.  PSR at ¶  88, fn 2.  Pursuant to U.S.S.G. § 4A1.1(d), two criminal history points should

be added because defendant's conspiracy was in place and underway while he was "under any

criminal justice sentence, including . . . parole, . . . [and] imprisonment."

55.     Sitzmann was sentenced on May 9, 1990, in the United States District Court for

the Southern District of Florida for Conspiracy to Import at Least Five Kilograms of Cocaine.

Sitzmann was released from MCC Miami on July 18, 1990, and his parole expired on March 9,

1992.  PSR ¶  86.  The evidence at trial established that while incarcerated in MCC Miami,

Sitzmann's cocaine trafficking conspiracy began.  There, at MCC Miami, Sitzmann had made the

agreement with Paulson to smuggle cocaine from Sitzmann's supplier into Canada, after his

release in 1990.  Opinion and Order dated 11/18/14, ECF Document # 253, at 31-33; Paulson,

4/24/12 p.m. at 22-26.

56.     The evidence at trial established that the conspiracy started while Sitzmann and

Paulson were incarcerated at MCC Miami, and it was in existence while Sitzmann was under a

criminal justice sentence following his conviction in Miami in 1990.  The existence of the

conspiracy while Sitzmann was under a criminal justice sentence between 1990 and 1992 is

further established by the evidence that after Sitzmann was released from prison, Paulson

followed through with their agreement to make arrangements for Sitzmann to meet Paulson's

Canadian drug contacts in Canada, which he did in approximately 1994.  Opinion and Order

dated 11/18/14, ECF Document # 253, at 31-33; Paulson, 4/24/12, p.m. at 22-29; see also

Campeau, 4/25/12 p.m. at 13-15.  Additionally, between 1994 and 1995, Sitzmann was

smuggling cocaine from the United States into Canada to supply the Hell's Angels, and he

smuggled the drug proceeds from Canada through the United States and into Mexico.  Harvey,

4/19/12, a.m., at 117-120.  Similarly, the fact that Sitzmann and Paulson smuggled hundreds of

kilograms of cocaine together from the United States to the Canadian Hell's Angels and Normand Theoret in the late 1990s is further evidence that a conspiratorial agreement existed between Sitzmann, Paulson and others starting at the time that Sitzmann and Paulson were incarcerated at MCC Miami in 1990 and that it continued well after Sitzmann's parole expired. Paulson, 4/24/12, p.m., at 31-68. Thus, there is no question that the conspiratorial agreement between Sitzmann and Paulson started at MCC Miami prior to Sitzmann's 1990 release and continued thereafter. During this period, Sitzmann was serving his sentence for his federal drug trafficking conviction in Florida and was on parole until March 1992. Sitzmann's admission that he had the source of cocaine supply is also evidence that Sitzmann was already in a conspiratorial relationship to traffic in cocaine with unknown suppliers of cocaine. See Rogers v. United States, 340 U.S. 367, 375 (1951) (one person may be convicted of conspiracy with persons whose names are unknown); United States v. Obialo, 23 F.3d 69, 72 (3d Cir. 1994); United States v. Goodwin, 492 F.2d 1141 (5th Cir. 1974) (an individual can be convicted of conspiracy with "unknown person").

57.     Accordingly, the government calculates Sitzmann's total criminal history points to be six and his criminal history category to be III.

### III.     ADDITIONAL FACTORS TO CONSIDER IN DETERMINING A SENTENCE

58.     The United States Code imposes a maximum sentence of life imprisonment for the charged offense. See 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii); 846. The United States submits the following additional information to consider in determining a sentence in this case, which provides additional grounds for imposing a life sentence.

A.     Criminal History Category Unrepresentative of Defendant's Actual Criminal History

59.     In fashioning a sentence in this case, the Court should consider that there is
"reliable information indicat[ing] that the defendant's criminal history category substantially
underrepresents the seriousness of the defendant's criminal history or the likelihood that the
defendant will commit other crimes."  U.S.S.G. § 4A1.3(a)(1).  "Reliable information" includes
information concerning "[p]rior sentence(s) not used in computing the criminal history category
(e.g., sentences for foreign and tribal offenses)."  U.S.S.G. § 4A1.3(a)(2)(A).

60.     There are two foreign convictions and sentences on the record that were not used
in calculating Sitzmann's criminal history category.  The first is his conviction in 1985 in the
Bahamas for possession of dangerous drugs and possession of dangerous drugs with intent to
supply in connection with an arrest at an airstrip while in possession of 163 kilograms of
cocaine.  Sitzmann, under the alias Anthony Joseph Martin, was sentenced to four years in prison
on each count, to run concurrently.  Gov. Tr. Exs.. 270, 271, 272, 1040, 1041; PSR at ¶ 85.
Sitzmann served about sixteen months in prison in the Bahamas before he escaped on or about
August 31, 1986.  Id.  He was returned to the Bahamas in April 1992, completed his sentence,
and was released and returned to the United States in January 1994.  Id.

61.     The second foreign conviction and sentence is the French conviction following
Sitzmann's arrest in February 2004 near Nice, France for possession of over seven kilograms of
cocaine.  In October 2004, he was sentenced to five years in prison.  Gov. Tr. Ex. 180; Gov. Tr.
Ex. 182.  He was deported from France on August 8, 2008, following his indictment in the
United States.

62.     Therefore, Sitzmann's substantial record of conviction in foreign jurisdictions that
were not considered in determining his Sentencing Guidelines range should be considered in
fashioning a sentence in this case.

B.  <u>Consideration of Enhancements Available in the Sentencing Guidelines in Effect at the Time of Sentencing</u>

63.  The Supreme Court in <u>Peugh</u> indicated that sentencing enhancements contained in the Guidelines at the time of sentencing, but not in the Guidelines at the time of the offense, may be considered as "reasons a district court might give for <u>deviating</u> from the older Guidelines." <u>Peugh</u>, 133 S. Ct. at 2087 (emphasis in original).  The following enhancements are those the government finds relevant to the instant case, but are only contained in the Guidelines at the time of sentencing and not in the Guidelines in effect at the time of the offense.  The government respectfully requests that the Court consider these factors and enhancements in fashioning a sentence.

i.  *Credible Threat to Use Violence (U.S.S.G. § 2D1.1(b)(2))*

64.  The Sentencing Guidelines provide for an increase of two levels "[i]f the defendant . . . made a credible threat to use violence."  U.S.S.G. § 2D1.1(b)(2).  In the course of the conspiracy, Sitzmann made death threats to a government cooperator and informant, Terrence Colligan, if Colligan ever betrayed Sitzmann's organization.  First Amended Bill of Particulars ¶ 134.  Specifically, upon Colligan's induction into Sitzmann's drug trafficking conspiracy, Sitzmann informed Colligan that if he ever betrayed him, Colligan's family members and pets would be killed before his eyes, and then Colligan himself would be killed.  <u>Id.</u>

ii.  *Maintening Premises for Manufacturing or Distributing Narcotics (U.S.S.G. § 2D1.1(b)(12))*

65.  An increase of two levels is provided for when "the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance."  U.S.S.G. § 2D1.1(b)(12).  Gary Paulson and Robert Campeau both testified that Sitzmann maintained chalets in Canada that were used to "dry out" and otherwise store large quantities of cocaine that

36

were transported from the United States and ultimately distributed to the Canadian Hell's Angels.  Paulson, 4/24/12, p.m., at 44-46; Campeau, 4/25/12, p.m. at 26-30.  Additionally, Agent William Buss testified that Sitzmann used George Jones' home in Florida in late 2000 to "shine up" 16 kilograms of cocaine to make them appear purer.  Buss, 4/30/12, a.m., at 57-62, 107, 109.  Jones acknowledged the shining up of the cocaine at his Florida home.  Gov. Tr. Ex. 40, Tape B2, Clip 7 (Transcript: Gov. Tr. Ex. 40b2 at 13).    Separately, Sitzmann admitted to the government in a letter that he had Colligan "cut" two kilograms of cocaine for Sitzmann at Jones' home in Florida in 2002.  Gov. Tr. Ex. 1025.  Sitzmann also utilized Jones' home to store a vast array of drug trafficking paraphernalia.   Opinion and Order dated 11/18/14, ECF Document # 253, at 7-9.  Lastly, Billy Long testified that Sitzmann maintained an apartment in Bogotá, Colombia where cocaine was received and sealed in plastic.  Long, 5/1/12, at 37, 39.

66.     Case law and the Sentencing Guidelines commentary indicate that U.S.S.G. § 2D1.1 is applicable upon consideration of (1) whether the defendant held a possessory interest in the premises (owned or rented the premises) and (2) the extent to which the defendant controlled access to, or activities at, the premises; also to be analyzed is whether the defendant's primary or principal use of the premises was for the manufacture or distribution of narcotics, with consideration given to the frequency of use of the premises for lawful and unlawful purposes.  Comment to U.S.S.G. § 2D1.1, n.17; United States v. Flores-Olague, 717 F.3d 526. 533 (7th Cir. 2013); United States v. Miller, 698 F.3d 699 (8th Cir. 2012).

67.     As to the Canadian chalets and the Colombian apartment, Sitzmann rented these premises and thus had a possessory interest in both.   The record shows that he rented the Canadian homes exclusively for his cocaine smuggling enterprise.  Robert Campeau testified that Sitzmann would live in hotels, not the chalets.  Campeau, 4/25/12/, p.m., at 30.  With regard to

control of access to and activities on the premises at the Canadian chalets, Sitzmann had such control over the premises, as demonstrated by his direction and participation in the drying of cocaine at the chalets and by his hiring of Robert Campeau to guard and dry out the cocaine that was stored there.   There is no evidence Sitzmann or anyone ever lived in the Canadian chalets except as it related to drug trafficking.   Campeau was hired to guard the chalets, indicating they were not rented as a typical residence.   The only evidence concerning the purpose for the rental and use of these chalets was to facilitate the distribution of cocaine to the Canadian Hell's Angels.   The primary purpose test is also satisfied with respect to Sitzmann's Colombian apartment.   The fact that cocaine was delivered to the apartment and sealed in plastic bags there to be transported by his mules indicates his control of the apartment and the narcotics-related activity that occurred there.   All of the evidence on the record indicates that Sitzmann lived in Colombia to be close to his source of cocaine supply and to further his career as an international cocaine trafficker.   His use of the apartment to prepare cocaine for shipment to Europe indicates that the apartment's use in drug trafficking was the primary purpose for maintaining that apartment.

68.     As to George Jones's home in Florida, it too was under the defendant's control in part because Sitzmann occasionally lived there with his trusted co-conspirator.   This apartment was used primarily for purposes of furthering the conspiracy.   While Jones did use it as a residence, it was also used continuously to store artifices of the conspiracy utilized and/or belonging to Sitzmann, including a GMC Suburban with a modified gas tank that could facilitate the smuggling of narcotics and cash, sealing equipment, plastic heat seal bags, metallic foil type bags to wrap kilograms of cocaine, airplane records and bags with false bottoms and hidden compartments.   This was yet another premise maintained by the defendant as part of the

conspiracy, and along with the Canadian chalets and Colombian apartment, should be considered in determining the defendant's sentence.

> iii. *Further Enhancement When There Is an Adjustment Under U.S.S.G. §*
> *3B1.1 for an Aggravating Role in the Offense (U.S.S.G. § 2D1.1(b)(15))*

69.     If the defendant qualifies for an adjustment under U.S.S.G. § 3B1.1 as a leader or organizer, as discussed above, and "(C) the defendant was directly involved in the importation of a controlled substance; (D) the defendant . . . otherwise obstructed justice in connection with the investigation or prosecution of the offense; [or] (E) the defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood," then an increase by two levels is merited.  Sitzmann satisfies all of these qualifications.

70.     The evidence established that Sitzmann was involved in the importation of cocaine.  For example, Agent John Armbruster testified that Sitzmann stated to federal officials that he and his organization imported cocaine into the New York City area between 1996 and 1998.  Armbruster, 5/10/12, p.m., at 47-48.  Gary Paulson established that with respect to the cocaine being trucked to the Canadian Hell's Angels in the gas tanks of the GMC Suburbans, Sitzmann had the cocaine coming out of Mexico, up through the United States and into the Toronto area.  Paulson, 4/24/12, p.m. at 33.   Additionally, between 1996 and1997, Sitzmann and Gary Paulson agreed to import 500 kilograms of cocaine into the United States from Colombia by airplane and tried to employ Brian Hill as the pilot for this operation.  Hill, 4/25/12, p.m., at 121-132.  Moreover, Sager testified that in approximately 1998, he agreed with Sitzmann to fly cocaine from Colombia, through the United States and into Canada with a Piper Navajo Panther. After abandoning Sager from this operation, Sitzmann acquired a Piper Navajo Panther in 1999, and modified it to use it for long range drug smuggling until he sold the plane after a drug dog hit on the plane for narcotics.  Sager, 4/23/12, p.m., 70-71, 75-76.  Harvey, 4/19/12, p.m., at 32-40;

Sanders, 4/27/12, a.m., 6-22; Rine, 4/27/12, a.m., 24-43; Rine, 5/10/12, a.m., 53-55; Tr. Gov. Tr.

Exs.. 440-446, 448, 759, 1030.   There is ample evidence proving that Sitzmann was directly

involved in the importation of cocaine into the United States.

71.     With respect to obstruction of justice, the government will not repeat all the facts

here.   It suffices to say that the evidence established that Sitzmann and his girlfriend, Maritza

Fontecha, obstructed justice in connection with the investigation or prosecution of the conspiracy

that was ultimately charged in the instant case.

72.     Finally, the conspiracy for which Sitzmann was convicted was very clearly part of

a pattern of criminal conduct engaged in as a livelihood.   The evidence unquestionably

establishes that the conspiracy lasted for fourteen years and was part of a larger pattern of

criminal conduct that constituted Sitzmann's livelihood.   Prior to the start of the conspiracy in

the instant case, Sitzmann had other convictions for high-volume cocaine trafficking over an

extended period of time.   Sitzmann's prior high-level drug trafficking, as well as the extensive

and lucrative nature of the very conspiracy for which he was convicted here, demonstrate that his

conduct in the offense of conviction was part of a pattern of criminal conduct engaged in as a

livelihood.

## SENTENCING RECOMMENDATION

73.     The government requests that the defendant be sentenced to a term of life

imprisonment, the recommended sentence under the Guidelines and maximum sentence allowed

by law.   Additionally, the government requests that the defendant be fined in the amount of

$8,000,000.   As discussed below, the government makes this recommendation after considering

the sentencing factors enumerated in 18 U.S.C. § 3553(a), the Sentencing Guidelines and

policies promulgated by the United States Sentencing Commission, as well as defendant's

criminal history and the nature and circumstances of the defendant's criminal actions in this case.

### I.    INCARCERATION

74.    "[A] district court should begin all sentencing proceedings by correctly

calculating the applicable Guidelines range." United States v. Gall, 552 U.S. 38, 49 (2007).  The

Guidelines are "the product of careful study based on extensive empirical evidence derived from

the review of thousands of individual sentencing decisions" and are the "starting point and the

initial benchmark." Id. at 49-50.  The district court should next consider all of the applicable

factors set forth in 18 U.S.C. § 3553(a).  Gall, 552 U.S. at 49.  Indeed, the Guidelines themselves

are designed to calculate sentences in a way that implements the considerations relevant to

sentencing as articulated in § 3553(a).  United States v. Rita, 551 U.S. 338, 351 (2007).

75.    It is well settled that the government's usual burden to prove facts in support of an

upward adjustment or variance outside the Guidelines range, including evidence of acquitted

conduct, is by the preponderance of evidence standard.  United States v. Dorcely, 454 F.3d 366,

371-72 (D.C. Cir. 2006); United States v. Dozier, 162 F.3d 120, 123 (D.C. Cir. 1998)

(enhancement required only proof by a preponderance of evidence).  A sentence by the district

court is reviewed under a "'deferential abuse-of-discretion standard'" whether the sentence is

"'inside, just outside, or significantly outside the Guidelines range.'"  United States v. Opio

Moore, No. 10-4456, 2012 WL 2402567 *5 (4th Cir. June 27, 2012) (quoting, Gall, 552 U.S. at

41).  This standard calls for the Court of Appeals to "'give [ ] due deference to the District

Court's reasoned and reasonable decision that the § 3553(a) factors, on the whole, justified the

sentence.'"  Id. (quoting, Gall, 552 U.S. at 59-60).  In determining whether the district court

abused its discretion in imposing an upward variance, appellate courts will consider "'whether

the sentencing court acted reasonably both with respect to its decision to impose such a sentence and with respect to the extent of the divergence from the sentencing range.'"   Id. (quoting, United States v. Hernandez-Villanueza, 473 F.3d 118, 123 (4th Cir. 2007)).

76.     The § 3553(a) factors include  (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the Sentencing Guidelines and related Sentencing Commission policy statements; and (4) the need to avoid unwarranted sentence disparities.

77.     The government submits the aforementioned upward adjustments, which have been adequately proven against defendant Sitzmann through the evidence presented at trial and any supplementary materials noted herein or to be presented at the sentencing hearing. Accordingly, the government submits that based upon these upward adjustments, the defendant's adjusted offense level should be 46 and that the defendant be sentenced in accordance with the applicable Guidelines range, which is life imprisonment.[9]

78.     The government's recommendation also takes into account the factors set forth in § 3553(a).   The nature and circumstances of the defendant's involvement in the charged conspiracy were serious and substantial.  The defendant's actions directed the distribution of vast quantities of cocaine to numerous places around the world, and his activities of leading this conspiracy lasted for fourteen years.  He organized and directed this enterprise, and he recruited many co-conspirators into his organization.  Defendant Sitzmann made large profits from the

---

[9] We again acknowledge that in instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43.  See PSR ¶ 83.

distribution of cocaine to the various countries, including the United States, all at the expense of the people, families, neighborhoods and communities of those countries that have been ravished and crippled by drugs, drug trafficking and the violence associated with it.  As the Court is aware, cocaine is a highly addictive and dangerous drug, one that destroys or debilitates its users, their families and their surrounding communities.  When considering the amounts of cocaine that the defendant is responsible for and his leadership role in his narcotics trafficking organization, much of this destruction can be laid at his feet.

79.     A life sentence will have a powerful deterrent effect on other large-scale traffickers who similarly cause widespread and extensive harm to communities.  The sentence will send a clear message that the long arm of the law will reach beyond the low-level street redistributors of their cocaine and grip the high-level, large-scale supplier.

80.     The government has also taken into account the defendant's substantial criminal history of large-scale drug trafficking as well as the particular need to deter the defendant.  The defendant is a career drug trafficker with trafficking convictions in the United States, France and the Bahamas that span 30 years.  Despite all of these convictions and resulting prison sentences, Sitzmann has not been deterred from continuing with his illegal profession.  A life sentence is the only way to preclude the defendant from re-entering this lucrative but illegal trade.  There should be no doubt that if the defendant was ever released from prison, he would re-enter the high-level drug trade, as he did following his escape from the Bahamian prison, his release from the Bahamian prison following the completion of his sentence, and following the completion of his federal sentence in Miami.  His prior convictions and incarcerations have failed to deter the defendant from continuing with his drug trafficking profession.  Moreover, his convictions and incarcerations have failed to cut his links to huge supplies of cocaine.  To the contrary, despite

Sitzmann's Bahamian arrest, conviction, incarceration and escape, Sitzmann put together an operation to smuggle 340 kilograms of cocaine from Colombia into the Bahamas and then into the United States, for which he was convicted in the Southern District of Florida.  His plan to return to the Bahamas even while on escape status there reflects his arrogance and his lack of remorse and respect for the criminal justice system.  Likewise, even while in prison in Miami, he was confident of his cocaine supply to satisfy the needs of his Canadian operation at issue here.  In this regard, it must not be forgotten that the defendant has used prison as an opportunity to network with other members of the illegal drug trade.  When he was released from MCC Miami, he utilized his connections made in prison to form a core aspect of the conspiracy for which he was convicted in the instant case.

81.     The defendant has not only failed to show any remorse with respect to his prior convictions, he has shown no remorse for his criminal behavior in the instant case, another strong indication that he will continue drug trafficking if he is released.  He has instead spent an immense amount of energy to obfuscate and delay this case, including by manipulating his right to counsel and right to self-representation.   See Minute Entry dated August 16, 2011; Court's Opinion and Order dated November 28, 2011, Document Nos. 138, 139.  When these tactics were put to an end by the Court, Sitzmann sought to disrupt critical stages of the case, including when he filed a baseless motion to disqualify his attorney because his attorney had flown the cremated ashes of a friend to Italy.   See Document Nos. 130, 135, 136, 137.  Defendant also filed a federal civil action in this Court against his trial lawyer, Thomas Abbenante, and the prosecutor just a few weeks before trial in the instant case.  United States District Judge Emmit Sullivan quickly dismissed the civil action *sua sponte*.  Then, only one week before his sentencing hearing that had been scheduled for May 6, 2015, Sitzmann filed a civil action in the

Superior Court for the District of Columbia against several of his prior attorneys.  See Sitzmann v. Abbenante, et al., Civil Case No. 15-003138.  Complaint attached as Attachment A. [10]

82.     Accordingly, because Gregory Joel Sitzmann is a callous career drug trafficker who must remain incarcerated to protect our communities, both domestic and international, the United States recommends that the Court impose the Guidelines compliant sentence of life imprisonment.

## II.     IMPOSITION OF STATUTORY FINE

83.     In addition to incarceration, the government requests that the Court impose a fine of $8,000,000 in accordance with 21 U.S.C. § 841(b)(1)(A).  This is the prescribed maximum fine applicable to the defendant as a result of his conviction.

84.     The burden lies with the defendant to demonstrate to the District Court that he cannot pay a fine imposed by a court following a criminal conviction.  United States v. Sobin, 56 F.3d 1423, 1430 (D.C. Cir. 1995); United States v. Monem, 120 F.3d 645, 647 (7th Cir. 1997); U.S.S.G. § 5E1.2.  The court is not required to identify the specific assets the defendant would use to pay the fine.  Monem, 120 F.3d at 647.  Evidence at trial demonstrating that the defendant has earned large profits and concealed those monies as part of a long-running conspiracy is grounds for the Court to disregard the PSR's description of the defendant's assets, which is merely the defendant's self-reporting of his assets.  United States v. Miller, 995 F.2d 865, 869 (8th Cir. 1993).

85.     The defendant has self-reported very few assets.  However, there is no doubt that the defendant was a large-scale drug trafficker and he has been convicted as such in several countries.  He made millions of dollars from his drug trafficking and had professionals like Jerry

---

[10] The government will refer to any exhibit that was not a trial exhibit as an "Attachment."   The Attachments will be filed with the Court and will be located after the trial exhibits.

Harvey laundering his money through banks and corporations in foreign countries, including Switzerland and Panama.  Harvey, 4/19/12, a.m., at 118-125 & p.m. at 28-49; Paulson, 4/24/12, p.m., 32-95.  Sitzmann has admitted that he had people laundering his money.  Armbruster, 5/10/12, p.m., at 28, 67.

86.     Sitzmann was a drug trafficker at the highest level, and he derived large profits from redistributing cocaine in the United States and Canada during the late 1990s.  Gary Paulson testified that Sitzmann together smuggled at least 330 kilograms of cocaine to Canada, delivering them to the Normand Theoret and the Hells Angels.  Jerry Harvey testified that in the late 1990s, a kilogram of cocaine cost about $7,000 to purchase in Colombia and could be sold for about $40,000 in Canada.  Harvey, 4/19/12 p.m. at 13-15.  Paulson testified that they sold the cocaine to the Hells Angels for $37,000 (Canadian) per kilogram, or roughly $27,000 (U.S.) per kilogram.  Paulson, 4/24/12 p.m. at 64-67.  Paulson further testified that Sitzmann was smuggling millions of dollars in drug proceeds from Canada to the United States in the secret compartments of leather bags and in the gas tanks of GMC Suburbans.  Paulson, 4/24/12, p.m., at 69-73.  This indicates that Sitzmann's proceeds from the sale of cocaine to the Canadian Hells Angels in the late 1990s alone were well in excess of the maximum statutory fine of $8,000,000 and that the profits were at least comparable to the maximum statutory fine.  This does not even include the cocaine smuggled to the Hell's Angels by Sitzmann before Paulson was released from Prison, the cocaine smuggled in the Piper Navajo Panther, or the multiple shipments of 10-20 kilograms of cocaine smuggled into New York by Sitzmann between 1996 and 1998.

87.     Moreover, the defendant was arrested in France with approximately eight kilograms of cocaine in his possession while traveling to Italy.  Serge Giraudo, a French law enforcement officer, testified that at the time of Sitzmann's arrest in 2004, the price of one

kilogram of cocaine in France was between 28,000 and 35,000 Euros.   During the same period,

the price of one kilogram of cocaine in Italy, the country into which Sitzmann was attempting to

enter when he was arrested by the French, was between 40,000 and 45,000 Euros.   Giraudo,

4/18/12, a.m., at 41-43.   Billy Long testified that on at least two occasions he successfully

transported for Sitzmann multiple kilograms of cocaine from Colombia to Spain.   James Fields

and Sitzmann also transported cocaine to Europe for Sitzmann's conspiracy.   Sitzmann clearly

enjoyed significant earnings and profits from his sale of cocaine in Europe during the early

2000s.

88.     The evidence at trial also established that Sitzmann earned and possessed

enormous amounts of cash.   Sitzmann earned $6 million for laundering at least $30 million for a

Colombian cartel in 2000.  Buss, 4/30/12, a.m., at 77-78, 91-96.  Brian Hill testified that

Sitzmann had Hill smuggle $1.5 million from Florida to Texas in 1997, which was destined for

Mexico.  Hill, 4/25/12, p.m., at 121-132; see also Harvey, 4/19/12, a.m., 118-125 & p.m. 28-49;

Paulson, 4/24/12, p.m., 32-95.  Furthermore, George Jones stated to Colligan during a tape

recorded conversation that Sitzmann had Jones deliver $3 million in cash and that on multiple

occasions Sitzmann had cardboard boxes full of hundred dollar bills.   Gov. Tr. Ex. 40, Tape B2,

Clip 12 (Transcript: Gov. Tr. Ex. 40b2 at 20).   In December of 2001, Sitzmann had $650,000 in

cash hidden in the doors of one of his Suburbans in Mexico and the government presented

photographs of the money during the trial.  Buss, 4/30/12, a.m., at 65, 91-95; Gov. Tr. Ex. 1007,

1008.

89.     The government's contention that Sitzmann has his profits hidden from the

federal government is not idle speculation.   Jerry Harvey testified that he laundered large sums of

money for Sitzmann in the mid and late 1990s.  On ten separate occasions during 1996 to 1998,

Sitzmann gave Harvey large amounts of cash to hold for safe keeping.  The amounts of cash

Sitzmann provided to Harvey during each occasion ranged from as little as $30,000 to as much

as $150,000.  Opinion and Order dated 11/18/14, ECF Document # 253, at 33; Harvey, 4/19/12,

p.m., at 40.  Harvey also testified, which was corroborated by documentary evidence admitted at

trial, that in a separate transaction in the late 1990s he laundered $500,000 in cash for Sitzmann.

Sitzmann had an account with a Panamanian bank named "BAC," and Harvey laundered the

$500,000 in cash using both a Swiss bank account and Sitzmann's BAC account.  At least a

portion of the $500,000 was used by Sitzmann to purchase a Piper Navajo Panther airplane.

Opinion and Order dated 11/18/14, ECF Document # 253, at 33; Harvey, 4/19/12, p.m. at 30-43;

Rine, 4/27/12, a.m., at 28-43; Gov. Tr. Exs. 44, 44A, Clip 2; Gov. Tr. Exs. 440-444, 446, 448,

759.  Additionally, Sitzmann was recorded by Gary Paulson admitting that Harvey laundered

Sitzmann's $500,000.  Paulson, 4/24/12, p.m., at 77-89; Gov. Tr. Exs., 44, 44A, Clip 2.

90.     Gary Paulson similarly testified that Sitzmann gave Harvey $500,000 dollars in

drug proceeds derived from the Canadian Hell's Angels deal to launder.  He further testified that

he personally smuggled back $300,000 in Canadian drug proceeds for Sitzmann to be given to

Harvey for purposes of laundering it in Panama.  The money was smuggled into the United

States in the Suburbans which carried anywhere from a half a million dollars to three million

dollars.  Paulson, 4/24/12, at 69-76.

91.     The evidence at trial also established that Sitzmann transferred large sums of

money totally $29,000 to Luxembourg during a several week period in the fall of 2000.  Rine,

5/10/12, a.m., at 45-53, Gov. Tr. Ex. 1029.

92.     Given the scope of his narcotics smuggling and money laundering enterprises at

issue in this case and in his previous criminal cases, Sitzmann has sizable assets hidden in

foreign bank accounts and other unknown places which can be put toward paying a fine now or when assets are discovered.  Sitzmann has not shown with any satisfaction that he is actually incapable of paying a fine, as required by the Sentencing Guidelines and case law.  To the contrary, Sitzmann advised his girlfriend Maritza Fontecha in a letter he wrote from a French prison to avoid discussion of assets when writing to him, for fear of being required to pay a fine.  See Letter attached as Attachment B.  Finally, Sitzmann not only admitted during his French debriefing that he used expert money launderers, he admitted in a letter to the government while he was incarcerated in France that he had the information on the money laundering aspects of his operations.  Gov. Tr. Ex. 890; Armbruster, 5/10/12, p.m., at 28, 67.  This is further evidence that defendant has gone to great lengths to hide his drug trafficking enterprise, the income derived from that enterprise and the assets he has accumulated as a result of that enterprise.  The evidence at trial established that Sitzmann has amassed significant assets that have been concealed from the United States.  Sitzmann conceded in the PSR that he had not filed any income tax returns since the 1990s.  PSR at ¶ 143.  Accordingly, a fine of $8,000,000 will provide the vehicle to disgorge Sitzmann of his illegal drug proceeds if or when those proceeds are found.  A fine of $8,000,000 is appropriate given the evidence of the extensive and lucrative nature of the drug conspiracy, the sophisticated nature of his money laundering activity and Sitzmann's role as leader of the conspiracy.

## <u>CONCLUSION</u>

93.    WHEREFORE, based upon the above and the information reflected in the Pre-Sentence Report, the United States respectfully requests that the defendant be sentenced to a period of incarceration for the remainder of his life and fined in the amount of $8,000,000.

Respectfully submitted,

VINCENT H. COHEN, JR.
Acting United States Attorney
D.C. Bar No. 471489

By:     _____/S/_____
GEORGE P. ELIOPOULOS
Assistant United States Attorney
D.C. Bar No. 390-601
555 Fourth Street NW, Room 4241
Washington, D.C. 20530
(O) (202) 252-6957
george.p.eliopoulos@usdoj.gov